```
 1                    UNITED STATES DISTRICT COURT
                      SOUTHERN DISTRICT OF FLORIDA
 2                      FORT LAUDERDALE DIVISION
                        CASE NO.  19-60505-CIV-RS
 3

 4     BPI SPORTS, LLC,

 5                    Plaintiff,
           vs.
 6                                          Fort Lauderdale, Florida
       THERMOLIFE INTERNATIONAL, LLC,       June 19, 2020
 7     MUSCLE BEACH NUTRITION, LLC,          Pages 1-96
       and RONALD L. KRAMER,
 8
                      Defendants.
 9     _____

10                   TRANSCRIPT OF DISCOVERY HEARING
11                 CONDUCTED VIA AT&T TELECONFERENCE
                 BEFORE THE HONORABLE ALICIA O. VALLE
12                 UNITED STATES MAGISTRATE JUDGE

13     APPEARANCES:

14     FOR THE PLAINTIFF:
                            Hillyer Legal, PLLC
15                          BY:  GREGORY L. HILLYER, ESQ.
                            5335 Wisconsin Avenue, N.W.
16                          Suite 440
                            Washington, D.C. 20015-2052
17
                            The Brickell IP Group, PLLC
18                          BY:  JAVIER SOBRADO, ESQ.
                            1101 Brickell Avenue
19                          South Tower,  Suite 800
                            Miami, Florida 33131
20     FOR THE DEFENDANTS:
                            Reed Smith, LLC
21                          BY:  EDWARD M. MULLINS, ESQ.
                            1001 Brickell Bay Drive
22                          Suite 900
                            Miami, Florida 33131
23
                            Kercsmar & Feltus, PLLC
24                          BY:  GREGORY B. COLLINS, ESQ.
                            7150 East Camelback Road
25                          Suite 285
                            Scottsdale, Arizona  85251
```

1   **TRANSCRIBED BY:**      **DAWN M. SAVINO, R.P.R., C.R.R.**
                             **Official Federal Court Stenographer**
2                            **400 N. Miami Avenue, 10S03**
                             **Miami, Florida  33128**
3                            **Telephone:  305-523-5598**

4

5                          P-R-O-C-E-E-D-I-N-G-S

6              THE COURT:  Good afternoon, everyone.  I mean, good

7   morning, everyone.  This is Alicia Valle.  We are here this

8   morning for three motions in the case BPI Sports, LLC versus

9   ThermoLife International, case number 19-civil-60505.

10             Please, starting with the Plaintiff, please state your

11  appearances for the record.

12             MR. HILLYER:  Good morning, Your Honor.  This is

13  Gregory Hillyer of the law firm Hillyer Legal on behalf of

14  Plaintiff BPI Sports, LLC.

15             MR. SOBRADO:  Good morning, Your Honor.  This is Javier

16  Sobrado of Brickell IP Group on behalf of Plaintiff BPI Sports,

17  LLC.

18             THE COURT:  Thank you.  And for the Defendants?

19             MR. MULLINS:  Good morning, Your Honor.  This is Ed

20  Mullins of Reed Smith on behalf of the Defendants.  I'm local

21  counsel.  Mr. Collins will be making the argument today.

22             MR. COLLINS:  Good morning, Your Honor.  This is Greg

23  Collins, Kercsmar and Feltus, on behalf of Defendant.

24             THE COURT:  All right.  Thank you everyone for calling

25  in this morning.  Obviously this is a hearing that we normally

1    would have had in person in the courtroom, but due to the global
2    situation with the pandemic this is certainly the better way to
3    go to keep everyone safe and distanced.  So thank you all for
4    calling in.

5        Before getting started, I just want to remind you all
6    of a few things.  First of all, when you speak, please state
7    your name for the record and speak clearly and slowly.  There a
8    lag in the telephone conferencing system, so speak a little
9    slower than you normally would, and that also will avoid us
10   speaking over one another.  The proceedings obviously are being
11   recorded by the audio system.  There is no court reporter taking
12   things down, so it's important that we follow these measures to
13   assure a more accurate and clean recording in case you need a
14   transcript of these proceedings.  So thank you.

15       In terms of technology, let me just tell you that I've
16   got a screen, a conference monitor before me.  I can tell who is
17   on the line and who's not.  If you drop off, I'll be able to see
18   that.  That's one of the reasons that I wanted to remain with
19   the numbers.  So if you get disconnected or you accidentally
20   hang up, just call back on the main number and you'll come right
21   back into the conference.  So no magic there.

22       Also, while you are not speaking, if someone else is
23   talking, I'm going to ask you that you please mute your phones.
24   That avoids a lot of the background noise and interference that
25   sometimes we get, everything from parrots to parakeets and dogs

1    and cats and generally background noise.  So please put it on

2    mute.  And that's pretty much it in terms of the background.

3         In terms of where we are, the first thing I'd like to

4    do is just put forth the relevant dates that I saw on the

5    docket.  It seems that all discovery is going to be closing on

6    July 8th, which is right around the corner, and that's at ECF

7    Number 38.  Dispositive motions are due in August, and you're

8    currently set for the trial period December 7th of this year.

9         Today we are here on two of Plaintiff's motions;

10   Plaintiff's motion to compel at ECF Number 62, and Plaintiff's

11   motion, second motion to compel at ECF Number 87.  Defendants

12   ThermoLife and Ronald Kramer also filed a motion at ECF Number

13   86 to compel Plaintiff to produce.

14        According to the JSR, the revised JSR, at ECF 110,

15   after the parties' June 11th meet and confer, Defendants

16   withdrew certain objections and many of the issues were

17   resolved.  So the following issues are discrete issues that

18   remain from the three motions as grouped by the parties.

19        As to ECF Number 62, which is Plaintiff's motion to

20   compel, the issues remaining are Request for Production Number

21   11 and Interrogatory 18 to ThermoLife, and 'rogs 2 and 3 to

22   Kramer.  With reference to ECF Number 87 'rogs, what's left to

23   discuss today are Requests for Production 1 through 3 and BPI's

24   second set of Requests for Production to Defendants, as well as

25   Interrogatory 1 to ThermoLife.  And then we've got Requests for

1   Production 4, 5, 7 and 11, 'rogs 2 and 3 to ThermoLife and 'rogs

2   1, 2 and 7 to Kramer.  It sounds complicated, but following the

3   JSR, we'll be able to get through this pretty quickly, I think.

4   Well, not quickly, but easily.  Defendants' motion to compel

5   comes at ECF Number 86, and that one requests production of

6   Request for Production 4.

7          UNIDENTIFIED SPEAKER:  If you need any water, just let

8   me know.  We can get you cups of water and stuff, okay?  No

9   problem.

10          THE COURT:  Stuart, can you mute your phone?

11          UNIDENTIFIED SPEAKER:  I apologize.

12          THE COURT:  Requests for Production Number 83, 11 and

13   'rogs 12 through 16.  So that's pretty much where we are.

14          What I'd like to do is start with the Plaintiff's two

15   motions, and then I'll have the Plaintiff argue the first

16   motion, Defense will respond, then we'll move on to the second

17   motion by the Plaintiff, Defendants will respond, then I'll hear

18   from the Defendants and Plaintiff will respond.  Each side will

19   have 20 minutes per motion.  Actually, 15 minutes.  It will end

20   up being 20 by the time I finish -- I start with questions and

21   you answer some of my questions.  Even if we limit it to 15

22   minutes, we're looking at an hour and a half hearing, so that's

23   a very long hearing.  I do have some questions for you, so

24   please answer them.  And that's pretty much where we are.

25          So with that as a background, I will set my timer at 15

 1   minutes and then for Plaintiff, who is going to be arguing?

 2   Mr. Hillyer or Mr. Sobrado?

 3            MR. HILLYER:  Mr. Hillyer.

 4            THE COURT:  Okay.  Great.  I'm going to set my timer.

 5   Give me a minute so I don't hang up on everybody.  Okay.  All

 6   set.  And then I will hear from you first with reference to your

 7   motion at ECF Number 62.  Let me just get my notes out.  Give me

 8   one moment.  I'm sorry.

 9            And by the way, thank you for re-doing the Joint Status

10   Report.  The first one was just way too detailed.  So I

11   appreciate you taking the time to do this.  It makes my life a

12   lot simpler.

13            Okay.  I'm ready.  Let's start with ECF Number 62.

14            MR. HILLYER:  Thank you, Your Honor.  This is Greg

15   Hillyer on behalf of BPI.  First, thanks to the Court for

16   allowing us to be heard, and also for the recommendation that we

17   group the discovery because I think that the organization of

18   this is going to help.  And what I'd like to do is try to follow

19   the grouping that we've laid out, maybe even grouping some more,

20   because I do think that there is -- there are some main

21   categories that we can work with that will expedite the process

22   and help us better explain why the discovery is relevant and

23   important.

24            So as it relates to our motion to compel, ECF 62, the

25   first RFP to ThermoLife concerns licenses.  And for purposes of

1    this initial discussion, I would also like to group that with

2    BPI's Interrogatory Number 1 because that concerns the revenue

3    under the licenses.  And I think that if we can discuss those

4    collectively, it will make some sense.  And I'm going to try as

5    hard as I can not to get too mired down in the facts of the

6    case.  I'm going to try to keep it at high level because I

7    actually think that these two requests are fairly

8    straightforward, and I'm hoping that we can resolve them quite

9    systemically.  There are at least two allegations in the Second

10   Amended Complaint that concern these licenses.  Just very

11   briefly, ThermoLife is in the business, in part, of providing

12   this ingredient, creatine nitrate, as a raw material.  I also

13   refer to it as a commercial product because it's sold in the

14   marketplace to finished product suppliers.  An allegation that

15   traces back to the First Amended Complaint and is still captured

16   in the Second Amended Complaint is that ThermoLife, on its own

17   website, lists creatine nitrate as a product that's available

18   for sale.  It makes representations that that product is

19   patented.  Its website hyperlinks to a patent marking website

20   that ThermoLife and Mr. Kramer control, and lists a number of

21   patents that are irrelevant to creatine nitrate.  So that was

22   the basis of a false marking claim in the First Amended

23   Complaint.

24        As the Court is probably now aware, very recently the

25   District Court Judge had allowed us to amend the complaint to

1    add additional allegations in the Second Amended Complaint which

2    was filed last week.  Those allegations are also relevant to the

3    requests that we're discussing because now there are allegations

4    of false marking against the finished products which are the

5    licensees and the customers to whom ThermoLife is providing

6    creatine nitrate.  So you have a false marking on the raw

7    material and you have a false marking on the finished product

8    supply companies who are receiving that raw material.  So the

9    licenses that we're requesting go directly to that relationship

10   and in fact, ThermoLife has already provided us with some

11   licenses which demonstrates the relevance of those documents.

12   The initial disputes came in connection with the scope, and

13   where we are now is that we want ThermoLife to produce the

14   licenses as it relates to creatine nitrate because we have

15   narrowed that request in that respect, but going back further in

16   time to 2013, in part because our allegations of false marking

17   we believe gave rise -- came about as it relates to creatine

18   nitrate in that time frame.

19          Number two, we already have a license agreement from

20   2011 produced by ThermoLife.  So we don't think that it's asking

21   much to get licenses going back further than -- I think what

22   they've given is four years.

23          THE COURT:  Mr. Hillyer, let me ask you -- that's

24   exactly what I was going to ask you.  Based on the JSR,

25   Defendants say that they have produced all licenses related to

1    creatine nitrate since February 2015; is that correct?

2             MR. HILLYER:  Your Honor, are you speaking to Greg

3    Hillyer?  I believe that's the representation.

4             THE COURT:  Right.  I'm asking if that's what you got.

5             MR. HILLYER:  I believe that's what we have.  However,

6    as I mentioned, we have some licenses that go back further than

7    that and we're asking for any additional licenses.  And by the

8    way, we don't even know if there are any, and there could simply

9    be a handful of them, in part because we believe the area of

10   damages goes back to 2013.  So I think we asked for seven years

11   instead of what they gave which was four, but also because those

12   documents illuminate those relationships that might exist prior

13   to the deadline in question which, as far as we're concerned,

14   for discovery purposes was arbitrary except to the extent that

15   they seemed to be predicating it on how far we can go back in

16   damages.  And our position is if they want to make the argument

17   that we're limited to damages at trial, they're certainly

18   welcome to do that but we're asking for the licenses that go

19   back further.

20             What's arguably more important in part because we got

21   licenses already is the revenue that's generated from them, and

22   we have no information in this respect.  And it's critically

23   important because the revenue that ThermoLife derived, both from

24   its own falsely marked product, creatine nitrate, and the

25   payments that were made from the recipients of that product go

1    to the heart of our damages case.  We've also asked one of the

2    main finished product suppliers, Cellucor, through a subpoena

3    for this information, and we had a hearing on that last week and

4    the Court essentially said, you know, maybe rightfully so, that

5    that's really an issue for the Florida court.  If you want those

6    documents, you should go there.  And we told the Court we were

7    simultaneously requesting them here.

8            The patent marking statute refers to a competitive

9    injury.  We provided a case, US Rubber, which speaks directly to

10   this issue.  That was a false marking case where a party

11   attempted to keep the profit numbers out of evidence.  They had

12   already been produced, and the court said that profits of a

13   defendant are relevant to competitive injury under the patent

14   marking statute.  The patent statute itself does not say

15   otherwise.  It stands to reason that a Plaintiff such as BPI

16   should be allowed to show damages, either by actual damages to

17   itself or the enrichment by ThermoLife as a result.  And so we

18   believe we're entitled to those numbers.  We've asked for them.

19   They go to the heart of our damages case.  We already have an

20   expert report based on the licenses that we do have.  Those are

21   confidential, so I don't want to disclose the specifics.  But

22   suffice it to say that there was enough financial information in

23   the license agreements themselves to predicate a damages report

24   on.  So we're really asking for greater specificity on

25   information we already have, and we believe it goes directly to

1    a critical aspect of our case which is the ability to prove the

2    competitive injury.

3            So Your Honor, the last aspects of the first motion to

4    compel, Docket Entry 62, concern interrogatories that asked for

5    Muscle Beach Nutrition, which is a company that has recently

6    been added to this case as a Defendant, and there's somewhat of

7    a long history here because --

8            THE COURT:  Mr. Hillyer, I'm sorry.  Mr. Hillyer,

9    before you get to Kramer 'rog 2 and 3, do you want to address

10   Interrogatory Number 18?

11           MR. HILLYER:  Yeah, Your Honor.  Interrogatory Number

12   18 is the interrogatory that asks for the revenue under the

13   licenses.

14           THE COURT:  Okay.  That's the one you were talking

15   about.

16           MR. HILLYER:  It's the large part of my last argument

17   concerning Interrogatory --

18           THE COURT:  I'm sorry.  I thought you had said

19   Interrogatory Number 1.  Okay.

20           MR. HILLYER:  I beg your pardon, Your Honor.  I

21   misspoke.

22           THE COURT:  No, I may have misheard.  So that's fine.

23   Great.

24           MR. HILLYER:  Yeah, Interrogatory Number 18.  My

25   apologies.  So that's why I grouped them together.  It's

```
 1    basically the licenses and the revenue generated under them, so
 2    I think that can be dealt with collectively.
 3           The last argument as it relates to the first motion to
 4    compel concerns interrogatories to Mr. Kramer in which we asked
 5    for suppliers and customers.  I'll keep this one brief.  The
 6    relevance of this information is because we believe that the
 7    information --
 8           THE COURT:  I'm sorry.  Mr. Hillyer, I'm sorry.  I want
 9    to stop you for a second.  I've got (unintelligible)
10    Interrogatory Number 18.  As I re-read it, you're asking for the
11    financial information but you're asking for it on a monthly
12    basis by customer.  Why do you need that?  Why can't you just
13    work with a year -- you know, a yearly figure?  Why do you need
14    a monthly basis and then even more narrower, by customer?  I
15    don't understand that.
16           MR. HILLYER:  Your Honor, I think that's a standard way
17    of requesting information so that -- and this was done in
18    consultation with our damages expert who proposed that format
19    not to be unduly burdensome, but because that's the kind of
20    category examination of information -- financial information
21    that's helpful.  It may be that the expert needs to drill down,
22    you know, to a closer level than just on an annual basis.  But
23    that was the rationale.
24           THE COURT:  Okay.
25           MR. HILLYER:  And Your Honor, may I just add that most
```

1    accounting software which would generate this kind of

2    information can produce that information using any metrics that

3    are input.  And having seen some of these financial documents

4    over the years, it would surprise me if ThermoLife didn't have

5    the ability to produce the information in any way that it

6    requested it.

7            THE COURT:  Now the Defendants argue that they claim

8    that Muscle Beach already produced its financial information to

9    you on the subpoena, and they produced financial information for

10   the last three years.  Why isn't that enough?

11           MR. HILLYER:  Well Your Honor, Muscle Beach Nutrition

12   only provided us revenue in connection with the product CRTN-3.

13   That's a finished dietary supplement product that has no

14   relationship to the sales that we're talking about.  The sales

15   we're talking about have to do with ThermoLife's sale of

16   creatine nitrate to other customers.

17           THE COURT:  Which is the --

18           MR. HILLYER:  Now that you've raised it, Your Honor, we

19   don't even have the -- well, let me take a step back.  We've

20   been told by ThermoLife, I think recently in this revised joint

21   statement, that the revenue generated from Muscle Beach

22   Nutrition to ThermoLife, since there's a license between them as

23   well, and we're going to come back to that, is zero.  So they

24   actually did report that revenue stream.  There's a whole bunch

25   of questions raised as to why that number is zero, but it goes

1    to show that those are two different streams of revenue.  So we

2    really only have a very small picture of the sales of CRTN-3,

3    but we're talking about different allegations now.  We're

4    talking about the mismarking of creatine nitrate as a raw

5    material as being patented, and now under the Second Amended

6    Complaint, the broader picture which is all of the products that

7    were falsely marked by ThermoLife's licensees.  And obviously

8    there's a number of them, and those are the very licensees that

9    are the subject of the licenses that we're discussing.

10           THE COURT:  Okay.  Now you can go on to the other ones.

11   Sorry about that.

12           MR. HILLYER:  No.  Quite all right, Your Honor.  Thank

13   you for asking the question.

14           So as it relates to Interrogatories Number 2 and 3, let

15   me say this is a threshold matter that until the recent

16   agreements, we don't have a single interrogatory that's been

17   answered by Mr. Kramer, for various reasons.  And I think we

18   served 23 of them.  It's somewhere along that number.  We're

19   near the limit and we don't have a single substantive response.

20   The reason we've asked for suppliers and customers is because we

21   want to evaluate the financial information and other

22   characteristics of the information that we got from Muscle Beach

23   Nutrition.

24           A moment ago you mentioned that we got financial data

25   from Muscle Beach Nutrition.  Well, we recently subpoenaed two

1    of the suppliers which were provided to us by Muscle Beach

2    Nutrition going to the fact that this information has already

3    been provided in part.  And by the way, it may be that those are

4    the only suppliers that they have.  But we've already served the

5    subpoena on both of them, and the investigation is still

6    ongoing.  But the information so far is showing that the

7    information that we got from Muscle Beach Nutrition, the revenue

8    that you just mentioned, is incorrect.  That there's different

9    payments being made by ThermoLife in connection with Muscle

10   Beach Nutrition's product not being accounted for correctly.

11   There's costs that are being attributable to Muscle Beach

12   Nutrition which, in turn, lower the profit number which

13   ThermoLife has been gratuitously putting into pretty much every

14   filing, including the answer that they filed last night, and we

15   think that number is wrong.  And so the only way that we can get

16   that information is to speak to the suppliers and figure out who

17   paid for it, whether it's a cost or not.  And again, that

18   dovetails right into our damages analysis which also includes

19   that stream of revenue.

20           So that would complete my argument in connection with

21   Interrogatories 2 and 3 to Mr. Kramer.

22           THE COURT:  I'm sorry.  So let's go back to the

23   supplier information.  So you're looking for supplier

24   information so that you can kind of back-in to their financials?

25           MR. HILLYER:  Well, that's part of the reason, Your

1    Honor.  We also are evaluating any roles that they may have

2    played as it relates to marking, what other agreements might be

3    in place and yes, to evaluate what entity paid for what

4    information.  In a minute I'm going to go into what I hope will

5    be a fairly brief discussion about BPI's need to evaluate

6    representations that had been made in this case already, and

7    they take multiple forms.  ThermoLife is attempting to preclude

8    us from doing that, but every time we serve discovery, every

9    time we ask another question, we get a different answer.  And so

10   if the information being provided to us by Muscle Beach

11   Nutrition is questionable, we believe we have the right to ask

12   other parties about the information, because so far when we've

13   done that we get different answers and it's troubling.

14          THE COURT:  All right.  Thank you.

15          I'll hear now from either Mr. Mullins who is going to

16   be arguing for the defense in response?

17          MR. MULLINS:  No, Your Honor.  Mr. Collins will be

18   making the argument.

19          THE COURT:  Okay.  Mr. Collins.  Thank you very much.

20   Are you ready?

21          MR. COLLINS:  I am, Your Honor.  Thank you.  I'll go

22   through the issues in the same order that Mr. Hillyer handled

23   them.

24          THE COURT:  Yes, that would be very helpful.

25          MR. COLLINS:  Yeah, which matches up with the Joint

1   Status Report, Your Honor.

2   THE COURT:  My goal is to follow the JSR.  That's why I

3   had you guys go through this exercise.  I think it just makes it

4   a lot more organized.

5   MR. COLLINS:  Okay.  I appreciate that.  And, you know,

6   I also appreciate the fact that there's a 60-page Joint Status

7   Report here which is a 160-page version.  You know, it really

8   was the grouping of the requests together that allowed us to

9   present to you something that's useable, I hope.

10   THE COURT:  I appreciate your efforts in having to go

11   back and do it, but it really did work and it just makes the

12   hearing so much more organized.  And it's long enough as it is,

13   but it would have been a lot longer if we went through 160

14   pages.

15   MR. COLLINS:  Yeah, well that's the same prep I would

16   have done for this hearing and, you know, now most of that prep

17   is done.  I don't want to repeat what's in the JSR here because

18   the Court certainly has read it, you're up to speed on all these

19   issues.  I'll try and, you know, provide additional information

20   and respond to what Mr. Hillyer has already offered here.

21   On Request for Production Number 11, BPI is seeking all

22   ThermoLife licenses.  It later limited that request to just

23   licenses related to an ingredient that ThermoLife has patented

24   and sells which is creatine nitrate.  Creatine nitrate is a very

25   well-selling ingredient that's used dietary supplement products.

1    ThermoLife both licenses the use of creatine nitrate to large

2    dietary supplement companies that sell to end consumers, and

3    sells the raw material creatine nitrate to large dietary

4    supplement companies that sell to end consumers which is what

5    BPI is.

6            THE COURT:  I'm sorry, Mr. Collins.  Let me ask you

7    this:  Based on the JSR, I think I understood that you have

8    produced seven redacted licenses for creatine nitrate that are

9    still active; is that correct?

10           MR. COLLINS:  That's correct, Your Honor.  And not only

11   seven that are still active, the seven that we produced include

12   ones that are no longer active but were active during the

13   damages period, during the four year statute of limitations,

14   which also reflects the damages period for a Lanham Act claim.

15           THE COURT:  What's the statute of limitations on Count

16   2, the Common Law-Unfair Competition?

17           MR. COLLINS:  I believe it's two years, Your Honor.  I

18   don't believe it would be longer than the four year statute of

19   limitations on --

20           MR. MULLINS:  Your Honor, it would be four years.

21           MR. COLLINS:  Four years.  I appreciate my local

22   counsel helping me out on that one.  In Arizona it certainly is

23   two years.  I apologize to the Court.

24           THE COURT:  That's good.  I didn't know the answer.

25   That's why I was asking you.

1          MR. COLLINS:  Okay.  So, you know, it's the same

2     statute of limitations period.  And, you know, we've given them

3     all the licenses that not only are currently active, but that

4     were active during that period.  The licenses, according to

5     BPI's complaint, are relevant because BPI alleges that

6     ThermoLife requires its licensees to mark its products in a

7     certain way.  It does, and that is right there in the licensing

8     agreements.  That's why these documents have been produced and

9     they are for a four year period.  I would say that BPI really

10    doesn't argue -- operate an argument as to why it's entitled to

11    more than that.  You know, anything other than those licenses is

12    not proportionate to the needs of this case.  You know, BPI

13    doesn't need these documents to put together its damages

14    analysis.  In fact, the patent licenses themselves are

15    irrelevant to a damages analysis.  So I think we leave it there.

16          You know, there's an allusion here to some agreements

17    with a ThermoLife licensee Cellucor, which BPI suggests that

18    ThermoLife is possibly missing a license or hasn't produced a

19    license for.  I've gone back and confirmed that with my client.

20    There is -- all of the licenses that were in effect during the

21    four year statute of limitations period have absolutely been

22    produced.  With regard to the Cellucor issue and the potential

23    gap there and the overlap there, that's an issue that my client

24    will address during deposition testimony.  We haven't been asked

25    in an interrogatory or in any other way to walk BPI through that

1    issue, but eventually we'll be happy to do so.  It's not some

2    nefarious game that ThermoLife is playing. The documents that

3    are responsive to this request have absolutely been produced.

4    There's no reason to require additional documents.

5           THE COURT:  Let me ask you this:  Why the redaction if

6    it's just supplier information and we've already got a

7    protective order in this case?

8           MR. COLLINS:  Absolutely.  All of the information

9    related to creatine nitrate in those licenses is there.  None of

10   it has been redacted.  The only information that has been

11   redacted from those licenses is related to the sale and

12   licensing of other ingredients that are not relevant to this

13   case.  You know, there is absolutely no argument why BPI is

14   entitled to know the patent restrictions, the agreements that

15   ThermoLife has with its licensees related to, for instance,

16   citrulline nitrate, which is not at issue in this case.  There

17   is absolutely nothing related to creatine nitrate in any way

18   that has been redacted from any of these documents, Your Honor.

19          THE COURT:  I'm sorry.  I'm going to stop you because

20   I'm looking at your response in the JSR.  Well, the actual

21   response to the Request for Production Number 11, the last

22   sentence says ThermoLife has only redacted cost and supplier

23   information.  That's nothing to do with licensing, it's just

24   cost and supplier.  They've already asked you for supplier

25   information with reference to Muscle Beach in Interrogatory

 1    Number 2, in the same Interrogatory Number 2.  It just seems not

 2    even to go -- it says cost and supplier.  I don't see anything

 3    about patent or other licensees.

 4            MR. COLLINS:  Well Your Honor, in the original response

 5    which we see in the Joint Status Report, it indicates all the

 6    redacted information relates to ingredients other than creatine

 7    nitrate.  And even here, ThermoLife has only redacted cost and

 8    supplier information.  So it has spelled out what the ingredient

 9    is, but it hasn't spelled out how much a company is paying for

10    that ingredient.

11            THE COURT:  Okay.

12            MR. COLLINS:  And again, that's not creatine nitrate

13    information, that is citrulline nitrate, which is not relevant

14    to this case.

15            THE COURT:  I think the Plaintiff has agreed under --

16    in the Joint Status Report and probably before that that it's

17    going to be limiting this request to creatine nitrate license

18    agreements only.

19            MR. COLLINS:  Yes.  The problem is some of the creatine

20    nitrate licensing agreements also include additional raw

21    materials and technology.  It's fairly limited part of those

22    licensing agreements but for instance, I know the agreement with

23    Cellucor with Woodbolt includes both a license for the creatine

24    nitrate agreed and for an agreed called citrulline nitrate.

25            THE COURT:  Okay.

1          MR. COLLINS:  With that Your Honor, I'll move on to the

2     response to Interrogatory Number 18.

3          THE COURT:  Yes.

4          MR. COLLINS:  Here, Interrogatory 18 seeks detailed

5     financial data from ThermoLife for a 10-year period related to

6     all of its revenues on all of its patent license.  On this one

7     Your Honor, BPI --

8          THE COURT:  Starting with that, it seems that Plaintiff

9     has agreed in its response to limit it to seven years, again

10    going back to 2013.

11         MR. COLLINS:  That's correct, Your Honor.  They have

12    agreed to limit it to seven years.  Again, our objection to the

13    seven year period is the same as the objection we just talked

14    about.  That's beyond the statute of limitations period.

15         THE COURT:  But *(unintelligible)* for four years for all

16    of these.

17         MR. MULLINS:  At a minimum there should be a four year

18    limitation on this interrogatory, but the interrogatory itself

19    goes far beyond BPI's claims here.  First, you know the court

20    has already said that the false advertising claim does not

21    relate to statements that have been made by ThermoLife's

22    licensees.  That is right there on Docket Entry 37, Page 12,

23    Footnote 3.  It appears that BPI in response is also arguing

24    contributory false advertising under the Lanham Act against

25    Defendants for statements made by licensees.  Court agrees with

1    Defendants.  The amended complaint fails to state a claim for

2    contributory false advertising, which is exactly what this is.

3    So since January 9, 2020, this has not been a part of this

4    lawsuit.

5         THE COURT:  I'm sorry, Mr. Collins.  Doesn't the Second

6    Amended Complaint change this now that -- and your answer?

7         MR. COLLINS:  Not in any way, Your Honor.  Not in any

8    way.  The Second Amended Complaint, as BPI acknowledged when it

9    moved for leave to file the Second Amended Complaint, was done

10   as a procedural mechanism to bring Muscle Beach Nutrition into

11   this case.  While BPI added additional allegations related to

12   other licensees, those allegations are completely -- those

13   allegations don't change this Court's order in Docket Entry 37.

14   There's absolutely nothing in those allegations, which are

15   fairly limited if we look at the difference between the First

16   Amended Complaint and the Second Amended Complaint, to suggest

17   that BPI has overcome the Court's order that was already out

18   there.

19        Second, if BPI was going to do that and it wanted to

20   challenge this Court's Docket Entry 37, it should have done so

21   when it had leave to amend the First Amended Complaint.

22   Instead, it specifically informed the Court that it was not

23   going to amend in response to the Court's order on the motion to

24   dismiss.  So BPI has acknowledged again and again and again

25   throughout this case that its false advertising case is limited

1   to CRTN-3 and the Muscle Beach Nutrition product, and it's done

2   so because the Court has limited BPI's claim ever since Docket

3   Entry 37 to just that issue.  In fact, in moving to compel on

4   this Your Honor, BPI specifically said we need only look at the

5   CRTN-3 advertising statements.  It didn't argue *(unintelligible)*

6   licensee statements.  That's not been part of this case.

7          Second Your Honor, you can look at BPI's expert

8   reports.  BPI's expert offered A through E, which are his

9   opinions in this case.  Each one of those opinions relates to

10  the CRTN-3 product.  Not a single one of those opinions states

11  that any statement anywhere from anyone else other than Muscle

12  Beach Nutrition is false.  Now, I don't know what better

13  evidence the Court could have, but BPI has both accepted the

14  Court's limitation and subsequently limited its own case other

15  than its expert disclosures.

16         BPI, when we presented this argument to them, came up

17  for the first time with this allusion to this interrogatory

18  response that argues that somehow ThermoLife is falsely

19  advertising creatine nitrate by including a link on its website

20  for a patent for creatine nitrate, which is currently pending

21  re-examination in the US Patent and Trademark Office.  That

22  link, Your Honor, first, could never be false advertising.

23  Second, Your Honor, even if that's the claim they wanted to

24  bring, BPI hasn't tried to back it up through expert testimony.

25  At most, that would be a claim that something is misleading

1    about what ThermoLife has done here.  And as the Eleventh

2    Circuit law is clear, if BPI was going to make that type of

3    claim, it should have had a survey expert and that survey expert

4    would have had to do a lot of work and it would have to

5    establish that look, consumers are actually misled in this way.

6    The real fact is look, one, it's an absolutely true statement

7    which we'll explain to the Court in a response to the motion for

8    summary judgment that will be filed later today but second, it's

9    certainly not a literally false statement.

10        And so the very fact that BPI didn't obtain a survey

11    expert, and the very fact that BPI's only liability expert

12    didn't offer an opinion on this tells us that BPI knows it

13    doesn't have this claim, and it shouldn't be allowed to take

14    discovery on it on a claim that doesn't exist in this case.

15        THE COURT:  So just so I understand what you're saying,

16    you're telling me that I should limit it only to the CRTN-3

17    product and not creatine nitrate in general?

18        MR. COLLINS:  Yes.  Yes, Your Honor.  Any revenues that

19    flowed from ThermoLife to Muscle Beach Nutrition in connection

20    with the CRTN-3 product or that flowed from Muscle Beach

21    Nutrition to ThermoLife in connection with the CRTN-3 product

22    are absolutely relevant to this case.  You know, there is no

23    dispute on that, everyone agrees on that point, Your Honor.  The

24    fact is that there are no revenues that have flowed that way, as

25    Mr. Hillyer indicated, and ThermoLife has provided that

1   information.  Further, Muscle Beach Nutrition already provided

2   that information in response to a subpoena that was served on

3   them earlier in this case.  So, you know, BPI already had the

4   information that's relevant to this claim, you know, and I can

5   -- the Court's already heard all my arguments on that.

6            I will move on to the false marking claim here.  On the

7   false marking claim, Your Honor, BPI again tries to argue that

8   all of these revenues are relevant to its false marking claim.

9   But again, if we go back to Docket Entry 37, the false marking

10  claim is specifically limited to the CRTN-3 product.  The Court

11  specifically says that ThermoLife is not responsible for the

12  downstream false marking potentially allegedly of its licensees.

13  That's on Page 16 of the Court's order.  And there is simply

14  nothing in the Second Amended Complaint that changes any of

15  that.

16           THE COURT:  Let me ask you this:  Doesn't your answer

17  change that?  You know, we haven't gotten to it yet, we'll be

18  talking a lot more about that when we get to some of the other

19  requests.  But in the answer, you've admitted that ThermoLife

20  and Muscle Beach are alter egos, and that if Muscle Beach is

21  your licensee, then by definition you're responsible for that as

22  well as ThermoLife.

23           MR. COLLINS:  That is a very good point, Your Honor,

24  and on the false marking claim, the Court is exactly correct.

25  That is the type of allegation that it takes to link

1   ThermoLife's conduct to the conduct of its licensees which is

2   that they are alter egos.  And so on this issue, Your Honor,

3   again, we would concede that on the false marking claim, Muscle

4   Beach Nutrition, LLC, revenue on CRTN-3, the product that it

5   sells, is relevant to the false marking claim.  But there is no

6   allegation in the Second Amended Complaint that ThermoLife is

7   the alter ego of anybody else.  And of course it's not.

8   Cellucor is a very large company that has been around for a very

9   long time which is one of ThermoLife's best clients.  BPI fully

10   knows that ThermoLife and Cellucor are fully separate entities.

11   So it is true, Your Honor, that for one licensee we have

12   acknowledged that look, because we've admitted alter ego

13   liability, you guys are entitled to all the financial

14   information regarding the flow of monies between the two, but

15   really that's it.  Doesn't go beyond that.  The issue really

16   should end there.

17        BPI though also makes this argument which is that

18   somehow on the patent marking statute, it should get

19   disgorgement of profits remedies.  I just heard Mr. Hillyer

20   argue that it's entitled to unjust enrichment essentially on

21   that claim.  35 Section 292 is the false marking statute, Your

22   Honor.  The false marking statute specifically says that at

23   most, BPI is entitled to, quote, damages adequate to compensate

24   for injury.  An unjust enrichment theory is not, quote, damages

25   adequate to compensate for injury.  Actual damages is what the

28

1    statute is referring to, and there is simply no reason that BPI

2    needs all of ThermoLife's financial data to do that type of

3    analysis.

4             Moreover, to the extent that it needs any financial

5    data, on the point, as you know as BPI has acknowledged again

6    and again and again to this Court, financial data is just

7    related to the CRTN-3 product.  And for BPI to be arguing

8    anything else here is disingenuous given the Court's order,

9    given its own disclosures, given its experts disclosures, given

10   what it told the Court when it moved to compel here that these

11   issues to limited to the Muscle Beach Nutrition CRTN-3 product.

12            THE COURT:  All right.  I'm going to ask you, Mr.

13   Collins, to turn to Interrogatories 2 and 3 for Mr. Kramer

14   because you already passed your time limit.

15            MR. COLLINS:  Thank you, Your Honor.  And on these I'll

16   be relatively brief.

17            Mr. Kramer, now that Muscle Beach Nutrition is in this

18   case, has agreed to provide the name of the supplier of the

19   CRTN-3 product to BPI and in fact, BPI already knows it, it

20   served a subpoena on that company already.  So to the extent

21   that Interrogatory Number 2 is limited just to the supplier of

22   the CRTN-3 product, ThermoLife really has no objection to that

23   portion of Interrogatory Number 2.  I read Interrogatory 2,

24   though, as seeking information as to the suppliers of individual

25   ingredients that are included in the CRTN-3 product and there,

1    that type of information is not relevant to any claim or defense

2    in this case.

3           ThermoLife provides the creatine nitrate to Muscle

4    Beach Nutrition.  BPI already knows that.  Where that creatine

5    nitrate comes from is not an issue that's relevant at all in

6    this case.  BPI doesn't claim that the creatine nitrate is

7    anything other than creatine nitrate.  It alleges that creatine

8    nitrate has certain properties that make it falsely advertised

9    when we advertise it the way that it does, but they don't say

10   that creatine nitrate is, you know, some fake product that, you

11   know, lacks something, and that's their false advertising claim.

12   You know, for that reason, you know, BPI is not entitled to know

13   where ThermoLife obtained its ingredients from.  That type of

14   information is highly confidential and given, you know, the

15   proportionality test, need not be produced here because it's

16   just not relevant to any claim or defense.

17          With respect to who Muscle Beach Nutrition has sold the

18   products to, that's not proportional either.  You know, at the

19   end of the day, BPI has served a subpoena on the supplier, the

20   person who makes the end product that then Muscle Beach

21   Nutrition puts its label on and then is sold to consumers

22   downstream.  BPI will be able to establish in that subpoena how

23   many units of CRTN-3 have been sold.  It doesn't need specific

24   customer data to then harass Muscle Beach customers by serving

25   them separately with subpoenas to see if they actually sold

1    their product, which is completely irrelevant.  Specific

2    customer information is just not proportional to the needs of

3    the case, and there's really no reason that BPI needs that to

4    back up any figures.

5           I will say, Your Honor, I haven't heard the allegations

6    that I heard from Mr. Hillyer before.  Mr. Hillyer has made a

7    lot of allegations in this case, and I have no idea what he's

8    talking about when he says that the numbers don't add up.  I

9    would have thought on an issue like that, that would have made

10    it into the joint report if Mr. Hillyer can really back it up.

11    But regardless, you know, BPI should be able to verify the

12    numbers.  It can verify the numbers by getting a response to the

13    subpoena for the supplier of Muscle Beach Nutrition, but they're

14    certainly not entitled to more than that.

15           THE COURT:  All right.  Thank you.

16           Mr. Hillyer, I have a question for you and then I want

17    to move on to the next motion.  Why, with reference to

18    Interrogatory Number 18 and even with reference to the

19    Interrogatory 2 with reference to suppliers, why do you need

20    nitrate information?  You know, like for example, let's go with

21    Number 18.  Why do you need nitrate product sales, creatine

22    nitrate product sales from folks other than -- or other to

23    Muscle Beach?

24           MR. HILLYER:  Your Honor, the argument made by Mr.

25    Collins, in my view, is an exercise in misdirection and quite

1    frankly, I think he's misrepresented what's in the Second

2    Amended Complaint.  And what he's done is he has pivoted back to

3    the original order by the Court in which it indicated that

4    CRTN-3 was the only product in the case.

5           THE COURT:  Right.  But let me stop you there.  Stop

6    for a second.  Even if your motion at ECF Number 62 -- he's

7    right.  On Page 1, your second line there says -- and I'm

8    looking at 62, ECF 62, Page 1.  You say for present purposes it

9    is sufficient to focus on the advertising and labeling of the

10   Muscle Beach Nutrition brand, including the product CRTN-3.

11          MR. HILLYER:  Well Your Honor, I may have stated that

12   too narrowly.  But at this point, it's really moot in view of

13   the Second Amended Complaint.

14          THE COURT:  Okay.  Walk me through the allegations in

15   the Second Amended Complaint which I have before me that support

16   --

17          MR. HILLYER:  Sure, Your Honor.  I'm happy to.  The

18   false marking allegations have always involved the product

19   creatine nitrate.  Now, maybe when the Court said CRTN-3 was the

20   only product at issue, it meant finished dietary supplement.

21   But throughout the First Amended Complaint creatine nitrate

22   featured so prominently, I think it was mentioned over 100

23   times.  And in that original complaint, the false marking of

24   creatine nitrate was documented again and again and again.  So

25   creatine nitrate is a product that was at issue in the First

1    Amended Complaint regardless of what the Court's order says.

2          In the Second Amended Complaint, now not only do you

3    have the false marking by ThermoLife of its raw material on its

4    own website and its own marking website, you now have false

5    marking of the licensee's products that incorporate it.  And the

6    reason that the licensees were not referenced in the First

7    Amended Complaint or rather weren't included, let's say, is

8    because the Court determined that even though BPI mentioned

9    ThermoLife's licensees, and even though BPI mentioned that

10   ThermoLife's licensee's products were mismarked, we didn't plead

11   it with sufficient particularity under Rule 9B, vis-a-vis we

12   mentioned the products in the specific --

13         THE COURT:  Let me stop you there.

14         MR. HILLYER:  Okay.  But we've done that now.  So Mr.

15   Collins is arguing to the Court, notwithstanding the fact that

16   specific paragraph numbers in the Second Amended Complaint which

17   include 41, 108 to 113 and 133, all of which lay out all of the

18   false marking by the licensees, and paragraph numbers 33 to 37,

19   91 to 96, 104 and 172 which lay out the false marking of the raw

20   material that they use, that the revenue exchanged by the two of

21   them is irrelevant.  I mean --

22         THE COURT:  I need to interrupt you for a minute.  I'm

23   looking at Paragraph 35, for example.  Paragraph 35 says

24   ThermoLife displays a list of specific products to create the

25   false impression that a license is needed to market or sell

1   them.  The product includes various amino acid nitrates

2   including creatine nitrate and arginine nitrate.

3          MR. HILLYER:  Correct.

4          THE COURT:  So that's one of the alleged

5   misrepresentations or false impressions?

6          MR. HILLYER:  Right.  And that's why I gave the range

7   of 33 to 37.  So what 33 to 37 are doing is laying out exactly

8   how ThermoLife promotes creatine nitrate as a patented product.

9   In fact, Mr. Collins just said in his argument that ThermoLife

10  has patented that ingredient.  That's false.  And so how could

11  the revenue derived from the sale of a product that we have

12  alleged is falsely marked be irrelevant?  Then on the

13  recipient's side, how could the false marking of the finished

14  cosmetic products that those companies pay to ThermoLife be

15  irrelevant?  So on both sides of that transaction of the license

16  and licensees you've got falsely marked product.  And what we're

17  asking for is the revenue derived by ThermoLife so that we can

18  predicate our damages report on it.

19          Mr. Collins has made this argument repeatedly that

20  we're not entitled to *(unintelligible)*.  Well, the case law

21  directly contradicts that.  The US Rubber case that we've cited

22  is directly on point, and it says, and I quote, plaintiff must

23  now prove a competitive injury due to the false marking in order

24  to succeed on its claim and evaluation of defendant's sales, and

25  profits is relevant to proving the measure of competitive injury

plaintiff suffered.  The statutory interpretation that
competitive injury is somehow limited to actual damages is quite
frankly something that's made up.  It's not based on anything.
It doesn't make logical sense because not only the US Rubber
case, but the Lanham Act as an example which also speaks -- it's
sort of the mother of all competitive injury statutes, allows a
plaintiff to show damages either by actual damages I lost to the
defendant or by the degree to which the defendant was enriched,
which is the lost profits.  So the notion that BPI is not
entitled to any revenue numbers based on licensees that are at
the heart of the old and new allegations is just nonsensical.
The idea that you could airlift the Court's earlier order to a
Second Amended Complaint that specifically lays out the falsely
marked products is just not -- just lacks merit, Your Honor.

MR. COLLINS:  Your Honor, this is Greg Collins.  If I
could just be heard very briefly in response.

THE COURT:  Sorry.  I was on mute.  I said yes please,
very briefly, because I want to move on to the next set of
motions.

MR. COLLINS:  Thank you, Your Honor.

You know, Mr. Hillyer just represented that somehow the
Second Amended Complaint pleads a contributory false advertising
claim where the First Amended Complaint did not.  First of all,
that's a claim that BPI wasn't given leave to amend to add to
its case.  Second of all, if you look at the First Amended

1    Complaint, the First Amended Complaint did allege that

2    ThermoLife and Kramer were responsible for its licensee's

3    conduct.  Paragraphs 158 through Paragraph 166 are exactly where

4    BPI made that argument.  BPI tried to back that up in response

5    to our motion to dismiss, the Court dismissed this from the

6    case, Your Honor.  And for BPI to file a Second Amended

7    Complaint that completely ignores the Court's Docket Entry 37

8    order is ridiculous.

9           Second, you know, for it now to argue that its Second

10   Amended Complaint somehow brings this back in the case when it

11   was moving to compel these issues all along, that's also

12   ridiculous, Your Honor.  That's just not true.  We'll test these

13   allegations on a summary judgment motion, but this part of BPI's

14   case has been long gone.  They can't sue ThermoLife for

15   statements made by its licensees other than Muscle Beach

16   Nutrition who we've admitted is an *(unintelligible)*.

17          With that, Your Honor, I'm not going to repeat all my

18   arguments.  I just did want to address what Mr. Hillyer is now

19   asserting.

20          THE COURT:  All right.  I'm going to -- we're going to

21   move on to the next set of motions which is ECF 87.  Just give

22   me a minute to take some notes and we'll start again with

23   Mr. Hillyer.  Okay.  I am ready.  Let me just start the timer

24   again.

25          All right.  Mr. Hillyer, I guess I'll hear from you on

1    ECF Number 87.

2         MR. HILLYER:  Thank you, Your Honor.  This is Greg

3    Hillyer.  The grouping that we've given could be expanded, I

4    believe, to include not only BPI's second set of Requests 1

5    through 3, as well as BPI's Second Interrogatory Number 1 to

6    ThermoLife, but also the second RFPs 4, 5 and 7.  And the reason

7    is because these all concern the alleged license agreement that

8    ThermoLife produced between ThermoLife and Muscle Beach

9    Nutrition.

10        Your Honor, we've had our suspicions from the beginning

11   of the case, and have expressly said so in many briefings so far

12   that Muscle Beach Nutrition is not and was never a licensee of

13   ThermoLife.  We suspected that it was a position that was

14   created to try to create the impression of artificial distance

15   between the two.  We know now that ThermoLife has reversed

16   course and says that it's an alter ego, and so we propounded

17   this discovery specifically so that we could investigate the

18   document that was supposed to be the centerpiece of the

19   relationship between these two parties.

20        Now, Request 3 -- strike that.  1 through 3 asks for

21   electronic discovery concerning the license agreements that

22   ThermoLife itself produced.  We want to know -- in native

23   format.  We want the metadata to understand when it was created

24   because if it was created after the lawsuit started instead of

25   when the effective date is reflected, then that document was

1    manufactured for purposes of litigation and has a lot of

2    implications that flow from that.

3         We asked in Interrogatory Number 1 for very simple

4    information.  I mean, where was it executed.  By whom was it

5    executed.  Were there any witnesses.  And instead of just simply

6    answering what could have been a very quick exercise in giving

7    information about a document that again, they produced, they

8    provided nothing.  And so that has done a lot to increase our

9    suspicion about the document itself.

10        Now let me go further into Requests for Production 4, 5

11   and 7.  During one of our meet and confers, Mr. Collins

12   indicated that he had to check that if those documents even

13   exist, and so not only has he not confirmed whether they do or

14   they don't, but if they don't --

15        THE COURT:  I'm sorry.  With reference to 4, 5 and 7,

16   you're talking Requests for Production 4 are for purchase

17   orders, 5 for invoices and 7 for proof of payment?

18        MR. HILLYER:  Correct, Your Honor.  Because these are

19   the documents that would naturally exist if this was an arm's

20   length transaction between two companies that were operating

21   under a license.  And guess what, we're being told that those

22   documents don't exist.  We've already mentioned that we've been

23   advised that no revenue was generated by ThermoLife under this

24   alleged license agreement, which means that Muscle Beach never

25   ordered any creatine nitrate, it never received any creatine

1    nitrate and it certainly didn't pay for any creatine nitrate.

2    Okay.  So if all of those things are true, Your Honor, first of

3    all, why didn't they just admit that the P.O.s and the invoices

4    and the proof of payment don't exist?  That's an easy enough

5    thing to do, and yet we're here pulling teeth over it.  And the

6    answer is because if Muscle Beach Nutrition is not purchasing

7    creatine nitrate from ThermoLife, that means that it's going out

8    and purchasing it on its own.  So now we get into -- we're sort

9    of backing in to this old issue about well, who is paying for

10   this stuff.  How is this a cost to Muscle Beach Nutrition if

11   ThermoLife is now paying for the materials.  So it gets into

12   this sort of web where we just want the truth to come out.

13            THE COURT:  Let me ask you -- I'm sorry, Mr. Hillyer.

14   Let me ask --

15            MR. HILLYER:  That's okay.  Sure.

16            THE COURT:  It goes to what the Defendants are saying

17   in the Joint Status Report.  They're saying, you know, we

18   admitted alter ego, this is a judicial admission.  So in any

19   event, in light of that admission, they're saying why do you

20   still need this?  They're saying it's moot, in effect.

21            MR. HILLYER:  First of all, Your Honor, this is the

22   same trick that they tried to pull earlier this week and last

23   week when they went to the Court and tried to get the discovery

24   deadline to stay in place notwithstanding the Second Amended

25   Complaint, because they were going to indemnify Muscle Beach

```
 1    Nutrition.  And they didn't tell the Court this, but the reason
 2    that they did that is because they're trying to moot our
 3    discovery.  They want to take the position that everything we've
 4    ever asked about Muscle Beach Nutrition -- which by the way
 5    they've always objected it's not a party, it's irrelevant, it's
 6    a separate entity, what they're trying to do is they're trying
 7    to sanitize the earlier representations that they made in the
 8    case, and there were many of them, about the relationship
 9    between this two companies.
10         So the question I would pose, rhetorically, is how
11    could it be -- first of all, the Court has already said in its
12    last order, and we put the language in the report, that
13    ThermoLife cannot affect our scope of discovery by unilaterally
14    redefining its relationship.  And I invite the Court to go back
15    and look at that language, because I'm actually, candidly quite
16    surprised that ThermoLife would do the exact same thing again so
17    that it could try to achieve the same result that the Court said
18    that it couldn't do.  Why do you think ThermoLife filed its
19    answer last night?  So it would be prepared for this call to
20    make the exact same objection to try to get over the Court's
21    language.  So number one, that's a problem.
22         Number two, how could it be, if ThermoLife actually
23    manufactured evidence, if ThermoLife provided affidavits under
24    oath that ThermoLife never sold CRTN-3 and never advertised it,
25    how could it be that discovery into representations that could
```

1   be false, that evidence that could be fabricated, are now

2   irrelevant?  I mean, we should have every right to investigate

3   information, in part because we asked for this information

4   months ago.  So what we're wondering is if there's no "there"

5   there, why don't they just answer?  And so I don't know how much

6   more strongly I could state the fact that not only have they

7   gone against what the Court has done, but it stands to reason

8   that simply because you've decided that you're an alter ego, and

9   not withstanding the fact that it's contrary to everything else

10  they've ever said in this case about that relationship, how

11  could that deprive us of our right to show that there's been

12  information provided that is not authentic, that's not accurate,

13  because now that's part of our case.

14          THE COURT:  All right.  Anything further on this?

15          MR. HILLYER:  No, Your Honor, except to say that

16  there's, you know, additional indicia about that license

17  agreement that we believe shows that it's not authentic.  So as

18  you can see, we propounded a number of discovery requests that

19  are still relevant, and we think that not only should we get the

20  answers, but the Court should get the answers as to what's been

21  going on so far.

22          THE COURT:  You talked about Requests for Production 4,

23  5, 7 and 11.  Then we've got Interrogatories 2 and 3 to

24  ThermoLife and Interrogatories 1, 2 and 7 to Kramer.  12 asks

25  for bank accounts -- I'm sorry, Interrogatory 2 to ThermoLife

1    asks for bank accounts and 3 asks for ThermoLife employees.

2    What are you trying to show with that?

3         MR. HILLYER:  Well Your Honor, if I may, I would like

4    to deal with all of these together because I think I can do it

5    very succinctly.

6         THE COURT:  Yeah.  Go ahead.

7         MR. HILLYER:  In connection with our first motion to

8    compel, and in an effort to preclude BPI from amending the

9    complaint, Mr. Collins submitted two declarations in which he

10   nominated himself as a fact witness.  Now, why Mr. Kramer didn't

11   file this affidavit I don't know, but it doesn't matter because

12   this is an agency and it was done under oath, and it made the

13   statement twice in the record that CRTN-3 is not sold or

14   marketed by ThermoLife.  And that's what these interrogatories

15   are designed to do, to discover the legitimacy of that statement

16   and here's why:

17        Number two, as you pointed out Your Honor, it gets into

18   who paid for the advertising.  Well, you know what, if

19   ThermoLife paid for the advertising, then that sworn statement

20   is absolutely false.

21        Number three, if ThermoLife's employees are being paid

22   by ThermoLife but are conducting the advertising for CRTN-3,

23   that statement is equally false.

24        Let me go to second set of interrogatories to Kramer

25   Number 1.  This gets into this issue about what's going on in

1     this retail store.  We already got ThermoLife to concede that it

2     shares the facility with Muscle Beach Nutrition, and there's

3     evidence in the record in an unguarded moment before the

4     litigation that Mr. Kramer said that he was going to use that

5     ThermoLife -- use that store to sell ThermoLife products.

6     There's documents from the county of Los Angeles in connection

7     with a public works program that call that the ThermoLife retail

8     store.  Well, if ThermoLife is selling CRTN-3 out of that, then

9     obviously the statement that CRTN-3 isn't sold by ThermoLife is

10    once again false.

11          Number 2 and Number 7 both get into advertising and

12    marketing and the argument is the same.  So the question is

13    whether or not the Court is going to allow them to sanitize

14    everything that they've said, whether it's through their

15    document production, sworn affidavits or representations to the

16    Court because they've now decided that they want to shield those

17    through this alter ego theory.  And make no mistake Your Honor,

18    that's exactly what they're doing, and I invite the Court to go

19    back and look at the last order that the Judge Smith issued

20    because it speaks directly to this issue which is why we put it

21    in the joint statement.

22          THE COURT:  I have a question with reference to Kramer

23    -- second set of interrogatories to Kramer, Interrogatory Number

24    1.  I'm sorry.  So that's the property you're referring to as

25    the ThermoLife property?

1          MR. HILLYER:  Exactly, Your Honor.  This is a property

2     that has Muscle Beach Nutrition and ThermoLife all over it.

3     This is the building in which what's been called both the Muscle

4     Beach Nutrition and the ThermoLife retail store resides.  In our

5     reply brief in support of our motion to amend the complaint,

6     we've put a picture not only of the facility, but of CRTN-3

7     being sold on the shelf.  So there should be an incredible

8     curiosity to know how ThermoLife, through its own lawyer, could

9     represent to the Court that ThermoLife is somehow completely

10    disconnected from the sale if profits from CRTN-3 are winding up

11    in a ThermoLife bank account.  If ThermoLife owns the retail

12    store, if ThermoLife is purchasing CRTN-3 which is something we

13    think we're on the precipice of already establishing.  I mean,

14    this is a problem, Your Honor.  If we've got representations

15    that are that black and white different, then we have a right to

16    know about it.  Because this case has been going on for some

17    time and we've spent enormous time, effort and resources.  And

18    as the Court is likely aware from the briefing we provided, Mr.

19    Collins also threatened me repeatedly with Rule 11 violations

20    including on the phone, through letters, through proposed motion

21    because I had the temerity to suggest that ThermoLife was

22    actually related to CRTN-3, look how far we've come.  So to me,

23    this discovery is about the search for the truth and ThermoLife

24    should not be allowed to rip the rug out from BPI because it

25    decided that it probably has something to hide.

1          THE COURT:  All right.  Thank you.  You had two minutes

2     to spare, but I don't think you need them.

3          MR. HILLYER:  Very well.  No.  I'm through, Your Honor.

4     Thank you.

5          THE COURT:  All right.  Let me get back to my notes

6     before I turn to Mr. Collins.

7          Okay, Mr. Collins.  Are you ready?

8          MR. COLLINS:  I am, Your Honor.

9          THE COURT:  You may proceed.

10          MR. COLLINS:  There's an awful lot to address here,

11     Your Honor.  I'm going to try to get to all of it, but let's

12     start with the Court's order earlier this week and what has

13     happened since that order.

14          As Your Honor saw, as soon as the Second Amended

15     Complaint was filed, ThermoLife worked with Muscle Beach

16     Nutrition, who is represented by Matthew Wolf which is a

17     separate attorney, to agree to indemnify and defend Muscle Beach

18     Nutrition in this case.  You know, it did that for many reasons

19     as is disclosed in the request for status conference and the

20     reply.  But the primary reason is Muscle Beach Nutrition has

21     $114,000 worth of revenue, not costs, revenue on CRTN-3.

22     Mr. Hillyer can throw bombs all he wants that are not supported

23     by anything in this record, but I didn't hear him question at

24     any point the revenue number for CRTN-3.  So this is a $114,000

25     issue.  And in fact, this is a $114,000 case, Your Honor.  And

1    you know, because this is a $114,000 case that BPI is throwing

2    resource after resource after it, with Mr. Hillyer seemingly

3    doing nothing else but working on this case over the last four

4    months, ThermoLife has to figure out a way to streamline this

5    case going forward.  It has already expended hundreds of

6    thousands of dollars to defend the case that BPI has brought,

7    and this is exactly what proportionality is about, Your Honor.

8    This is exactly why Rule 26 was amended to indicate that

9    discovery must be proportionate to the needs of the case.  And I

10   didn't hear Mr. Hillyer argue at any point that his discovery at

11   this point is proportional to the needs of the case, it

12   absolutely is not.

13          In connection with our motion to the Court for a status

14   conference, we informed the Court that there was this

15   indemnification agreement, we asked the Court to continue

16   forward because ThermoLife was going to stand behind Muscle

17   Beach Nutrition.  In response to that, the Court said look,

18   that's not in keeping with the Federal Rules of Civil Procedure.

19   Regardless -- quote, regardless of the indemnification agreement

20   between ThermoLife and MBN, Defendants must comply with the

21   rules and laws governing this action.  We took the Court's

22   statement and we took the Court's direction and what we did

23   immediately is we did something that absolutely complies with

24   the Rules of Federal Procedure which is that we filed an answer

25   where we admitted liability on the alter ego allegations.

1    Paragraph 66 of the Second Amended Complaint.  That accomplishes

2    the goal, Your Honor, that we wanted to accomplish with the

3    filing of the status conference.  We didn't want to do it in

4    this way because we wanted the Court to keep BPI to the

5    deadlines in this case.  The Court decided it couldn't do it,

6    and we understand that, but we've now given up that argument,

7    the deadlines are going to get moved.  And but nonetheless,

8    we're still streamlining this case by making this admission, and

9    the admission is absolutely dispositive on the alter ego issue.

10           And Mr. Hillyer argued that all of this discovery -- he

11   didn't give you any argument that any of this discovery on the

12   second motion to compel is related to anything other than the

13   alter ego allegation.  That's exactly what they're trying to

14   investigate here.  They want to continue to go down this rabbit

15   hole.  Why they want to do that, I have my suspicions, but

16   they're not allowed to anymore.  And we all know that if they're

17   allowed to go down this rabbit hole, we are talking about

18   hundreds of thousands of dollars in discovery.  Anybody who has

19   ever been involved in a case that involved the production of

20   metadata knows that look, there will be experts on all sides

21   that can say just about anything about what that metadata means.

22   You know, I personally have been involved in cases where the

23   other side, in my view, manipulated metadata, and that was a

24   $100,000 issue minimum to even get an expert to opine on.  So

25   where we're at with the discovery deadlines quickly approaching

1     and this case ready to come to a close and BPI, in our view,

2     dead in the water on its actual claims for false advertising and

3     false marketing, or at the very minimum BPI's claim is limited

4     to a revenue number of $114,000 is ThermoLife doesn't want to go

5     through that.  It doesn't want to pay hundreds of thousands of

6     dollars to defend alter ego allegations that it can make not

7     relevant anymore in this case and not proportional to the needs

8     of the case as far as discovery goes.

9          What you heard Mr. Hillyer argue is that somehow he's

10     entitled to take discovery into representations that I've made

11     on behalf of my clients in this case.  First, he's not.  That's

12     not what proportionality means.  But second, there is not a

13     false representation that has been made, and for Mr. Hillyer to

14     continue, continue to argue otherwise --

15          THE COURT:  Mr. Collins, I have a question.  I mean, I

16     hear you talking about proportionality, but as I looked at these

17     requests, in particular Requests for Production Number 1, Number

18     2 and Number 3, they seem to me to be pretty specific and

19     targeted and not -- you know, very limited and specific.  How is

20     that not proportional?  Why is that so difficult to get?

21          MR. COLLINS:  Well first, we know that those documents

22     are produced.  There is going to be time and expense analyzing

23     that metadata, Your Honor.  First, let's start there.  It is not

24     simply the cost of producing the metadata; it is the litigation

25     activities that will be done surrounding the metadata.  Second

1    you know, it is not relevant to this case anymore.  As my Joint

2    Status Report points out, you know, every case, every case that

3    we could find that looked at the issue said look, once an issue

4    is conceded, there is no point in allowing further discovery on

5    that.

6            THE COURT:  Right.  I think the issue that Mr. Hillyer

7    is referring to, and obviously it's not proven, it's an

8    allegation, but there is a suspicion on his part that, you know,

9    there really isn't a licensing relationship and that these

10   documents may have been created for this litigation.  Don't you

11   think he's entitled to dive into that and see if that's true or

12   not?  Because if it is, then it's a misrepresentation upon the

13   Court.

14           MR. COLLINS:  No.  No, Your Honor.  Quite frankly --

15   and no, even if that were true Your Honor, it would not be a

16   misrepresentation upon the Court.  All ThermoLife has ever

17   represented to the Court is that Muscle Beach Nutrition, LLC is

18   a separate entity.  All ThermoLife has ever represented to the

19   Court is that Muscle Beach Nutrition is the one that sells

20   CRTN-3.  Now that ThermoLife is standing behind Muscle Beach

21   Nutrition admitting alter ego liability, those issues are one

22   and the same.  The profit that CRTN-3 has earned, that is profit

23   that if BPI can prove up its case, ThermoLife will be liable

24   for, simple as that.  There is no case anywhere saying that

25   counsel can take discovery on alleged misrepresentations, but

1    also there is not any misrepresentation.

2         If you look at the Rule 11 motion that I served on

3    Mr. Hillyer, the Rule 11 motion was very clear on this issue.

4    It wasn't done out of malice, Your Honor.  It was done because

5    BPI continued to seek discovery from ThermoLife, and

6    specifically from Mr. Kramer who is the majority owner of both

7    of these companies, ThermoLife and Muscle Beach Nutrition,

8    continued to seek discovery from Mr. Kramer regarding Muscle

9    Beach Nutrition's product and conduct.  And we served a Rule 11

10   motion that said look, if you think that ThermoLife is liable

11   for Muscle Beach Nutrition, LLC's conduct, you need to sue them

12   as an alter ego.  You need Muscle Beach Nutrition in this case.

13   So what did Mr. Hillyer do?  He amended his claims to add Muscle

14   Beach Nutrition to the case.  The Rule 11 motion had the exact

15   effect that Rule 11 is supposed to have, is it brought the issue

16   to a head.  I wish I had been able to bring it to a head through

17   the writing of a letter, which I tried to do before that; I wish

18   I had been able to bring it to a head through the writing of an

19   e-mail, which I also did before that.  But when neither of those

20   things worked, we had to get clarification as to why BPI was

21   seeking to hold ThermoLife liable for a party that it didn't

22   mention in the First Amended Complaint for its conduct.  And now

23   the Second Amended Complaint has been filed, the Second Amended

24   Complaint got filed and ThermoLife immediately said okay, we'll

25   admit alter ego liability, we'll drop a footnote and indicate

1   that this shouldn't be binding on us going forward because it's

2   a judicial admission and we did not research, but nonetheless

3   we'll defend this $114,000 case as though we're Muscle Beach

4   Nutrition.

5           So why is any conduct or why is anything between Muscle

6   Beach Nutrition and ThermoLife still relevant to the needs of

7   this case?  The Rule 26 amendment that adds proportionality says

8   look, one part of proportionality is it's got to be important to

9   the issues at stake in the case.  This is no longer important to

10  any issue at stake in the case.  There is simply no reason to

11  allow this type of discovery which absolutely will result in

12  further rabbit-holing and the issue has got to get stopped here.

13  That's where proportionality comes in.

14          You know, is it an undue burden to produce this type of

15  stuff.  Generally metadata is a burden to produce, but why

16  require the production of it when it's not relevant to any issue

17  in the case that ThermoLife and Muscle Beach Nutrition will be

18  jointly and severally liable.  Mr. Hillyer hasn't argued why

19  it's relevant to any issue that's actually at issue in this

20  case, Your Honor.

21          THE COURT:  Would it be easier for the Defendant to

22  respond -- instead of producing what is requested in Requests

23  for Production 1, 2 and 3, would it be less burdensome, quote

24  unquote, for the Defendant to answer Interrogatory Number 1?

25          MR. COLLINS:  Give me a second, Your Honor.

1        THE COURT:  Sure.  That's the one that basically asks

2   for the same information, but it's in interrogatory form.  It

3   asks you to describe the circumstances surrounding the creation

4   of the ThermoLife Muscle Beach license agreement by identifying

5   the author, the date that it was created and finalized, et

6   cetera.

7        MR. COLLINS:  Would it be less burdensome?  It

8   absolutely would be less burdensome, Your Honor.  But

9   nonetheless, Interrogatory 1 is still irrelevant to any issue

10   that's in dispute.  There is no reason to require the production

11   of this information.  You know, we're essentially -- you know,

12   the alter ego admission was made to streamline this case, to get

13   us through the discovery, to take these expert disclosures that

14   have already been provided based on Muscle Beach Nutrition's

15   advertising and it really -- you know, it is odd that BPI served

16   expert reports that directly address Muscle Beach Nutrition's

17   advertising despite the fact that Muscle Beach Nutrition wasn't

18   in this case, but they did.  So this case is ready.  And sure,

19   we'll extend discovery deadlines, but there is no reason to

20   allow BPI to go on a fishing expedition, and that's what this is

21   here, an absolute fishing expedition when ThermoLife and Muscle

22   Beach Nutrition are going to stand up and jointly be responsible

23   for the advertising and the marketing that BPI alleges is false.

24        THE COURT:  All right.  I think you have some time

25   left.  Can you go and discuss the remaining generally -- I guess

1    it's all the same general arguments regarding the request for

2    the purchase orders and invoices, proof of payment, financial

3    statements, bank accounts, the same argument, correct?

4         MR. COLLINS:  Yes, Your Honor.  You know, it's the same

5    argument.  Invoices between ThermoLife and Muscle Beach

6    Nutrition, you know, we've already disclosed.  And Muscle Beach

7    Nutrition has disclosed to BPI that there are no payments going

8    from ThermoLife to Muscle Beach Nutrition.  You know, they have

9    the information that they're entitled to on that.  That's the

10   information they want, that's the information that arguably is

11   relevant to their claims.  Why they need any of this information

12   is, you know, beyond understanding given the admission that's

13   been made.

14        I will focus, though, specifically on the bank account

15   one, Interrogatory Number 2.  You know, this is unquestionably

16   overly broad and an undue burden to produce.  This type of

17   information would require the client to produce all of its bank

18   account information, and then allow BPI to go through that bank

19   account information and identify what it thinks may have been

20   payments back and forth between Muscle Beach Nutrition, you

21   know, where it's going to know all of the funds that ThermoLife

22   uses for everything related to its business.  You know, that's

23   not relevant to any claim or dispute in this case and that's

24   certainly not proportional to the needs of the case.

25        On the employee one, which is Interrogatory Number 3,

1    with ThermoLife acknowledging or standing behind Muscle Beach

2    Nutrition and admitting alter ego liability, we shouldn't have

3    to give a list of our employees and how much they make, where

4    they work, what they do, those types of things.  That is -- you

5    know, that is a privacy concern, both on the employee's side and

6    on the ThermoLife side to what the nature of its daily business

7    is, and BPI doesn't *(inaudible)* that type of information given

8    the admission that's been made.

9          The property on Ocean Front, again, look, this issue is

10   solely related to alter ego.  Muscle Beach Nutrition and

11   ThermoLife, they share the same corporate office in this

12   building.  BPI wants to know who pays what related to that

13   building.  We're not taking -- sorry.  If you look at Muscle

14   Beach Nutrition's disclosures, Muscle Beach Nutrition is not

15   taking an overhead expense in its costs.  So it's not reducing

16   the CRTN-3 profit that it's disclosed by something related to

17   overhead.  That's the only thing that this issue would be

18   related to outside of alter ego, and Mr. Hillyer can't even

19   argue that Muscle Beach Nutrition is taking an overhead expense.

20   It's absolutely not, and it would be improper for it to anyway.

21   On a false advertising claim, you don't get to deduct overhead,

22   you get to deduct specific costs related to the product at

23   issue.

24         Then we go on to more information regarding employees

25   in Interrogatory Number 2 and Interrogatory Number 7; who pays

1    the expenses and these types of things.  Again, again, those

2    types of things have not been deducted from the CRTN-3's profit

3    number that's been disclosed.  That's not what's in there.  And

4    so why does BPI care?  It's actually got a profit number that is

5    higher as a result of the disclosures that it already has.  You

6    know, plus, with the alter ego thing being admitted, now we're

7    jointly and severally liable.  So who cares?  Who cares about

8    any of these issues.

9             And if the Court doesn't have any further questions,

10   I'd be happy to address any of my representations that have been

11   made to this Court at any time.

12             You know, I feel like BPI is absolutely misstated

13   ThermoLife's defense here, and has misstated it for reasons that

14   allow it to make these types of arguments now.  There has not

15   been a representation made by me at any point that ThermoLife

16   and Muscle Beach Nutrition were not alter egos.  That

17   representation was not made.  That's a legal conclusion which

18   can be drawn.  Now, ThermoLife and Muscle Beach Nutrition have

19   come forward and admitted alter ego liability to streamline this

20   case.  The Court shouldn't punish us for that admission by still

21   having us to undergo the discovery and going down the rabbit

22   hole and the fishing expedition that will cost the hundreds of

23   thousands of dollars that we're specifically trying to avoid

24   here.

25             THE COURT:  All right.  Thank you.

 1          Mr. Hillyer, I have a quick question for you.  Looking

 2     at the -- what is it?  Let me go back.  The ThermoLife

 3     Interrogatory Number 3, which it very broadly asks for employee

 4     information, and comparing that with Kramer Interrogatory Number

 5     2 which more specifically asks for identification of joint --

 6     what I'm going to call joint employees of ThermoLife and Muscle

 7     Beach, isn't what you're looking for really what's contained in

 8     the Kramer Interrogatory Number 2?  And ThermoLife Interrogatory

 9     Number 3 should be denied as incredibly overbroad and perhaps

10     over-stepping personal information of these employees?  I think

11     you might be on mute, Mr. Hillyer.  Can anyone hear me?

12          MR. HILLYER:  My apologies.  I internalized your

13     instruction a little too much and I was on mute.

14          THE COURT:  I gave you a hint.

15          MR. HILLYER:  The question I asked, Your Honor, is

16     could you reorient me to the interrogatory that you indicate

17     might be overbroad?  I just need to get it in front of me.

18          THE COURT:  I'm comparing the ThermoLife Interrogatory

19     Number 3 which asks a lot of information including W-2

20     information for -- hold on.  It's on page -- no, I'm sorry.

21          MR. HILLYER:  Yeah, that would be helpful if I can grab

22     the page.

23          THE COURT:  Yeah, just give me a second.

24          MR. HILLYER:  Sure.

25          THE COURT:  It's reduced, but it's still a lot of

1    pages.

2              UNIDENTIFIED SPEAKER:  Are you referring to the bottom

3    of Page 35, Judge?

4              THE COURT:  Correct.  So I'm comparing that

5    Interrogatory Number 3 at the bottom of Page 35 in the JSR which

6    asks for -- this one asks you to identify all employees of

7    ThermoLife, you know, work location, et cetera, entity reflected

8    on the paychecks reflected in the W-2.  You're not asking really

9    for -- you're asking for all employees of ThermoLife, but then

10   when you turn to Interrogatory Number 2 at Page Number 36, this

11   is the Kramer Interrogatory Number 2, you're asking them to

12   identify ThermoLife employees who also worked for Muscle Beach.

13   Isn't that what you really want?

14             MR. HILLYER:  Fair point, Your Honor.  I mean, the

15   reason the one to Mr. Kramer is not broader is because we

16   believe that that's more fairly propounded to the corporate

17   entity.  But what we really want to know is -- first of all, I

18   don't even know that ThermoLife has that many employees, and Mr.

19   Collins asked BPI the exact same question in deposition.  So

20   this notion that identifying employees is somehow invasive or

21   out of bounds is ridiculous.  But to your point, what we want to

22   know is how many employees are shared with Muscle Beach

23   Nutrition, if any, and of those employees that are shared, what

24   entity is reflected on their check.  You know, this gets back

25   into the notion that ThermoLife has nothing to do with anything

1    except that it's paying the employees that are doing the

2    advertising, which is not reconcilable to what they've

3    represented.

4         So Your Honor, with that clarification, you know, we

5    don't need some of the more granular information if the Court

6    believes that it's overly sensitive or, you know, doesn't go to

7    the heart of what we're pursuing.

8         THE COURT:  Okay.  You're not asking for their salary

9    information, you just want to know who is paying them.

10        MR. HILLYER:  That's exactly right.  In fact, I don't

11   even know that we ask for their salary.

12        THE COURT:  But you refer to W-2, you don't want the

13   W-2.

14        MR. HILLYER:  Fair enough, Your Honor.  And Your Honor

15   --  correct, Your Honor.

16        THE COURT:  Okay.

17        MR. HILLYER:  Your Honor, may I just have about 15 to

18   30 seconds to drive a couple points as it relates to these

19   issues?

20        THE COURT:  All right.  Make it quick.

21        MR. HILLYER:  I mean, you cited the proportionality

22   issue which is sort of at the heart of what's going on.  I mean,

23   here we spent all this money on this motion to compel and rather

24   than answering --

25        THE COURT:  I'm sorry.  I'm going to need some of your

1    15 seconds.  I do have a question before I forget.  I'm sorry to

2    interrupt you.

3              MR. HILLYER:  No, sure.  Go ahead.

4              THE COURT:  I asked Mr. Collins the following question

5    with reference to Requests for Production 1, 2 and 3 versus

6    Interrogatory Number 1 for ThermoLife, all of which you're

7    looking at the same information, the creation of the license

8    agreement between ThermoLife and Muscle Beach.  Why do you need

9    the metadata for 1, 2 and 3 versus just the response to

10   Interrogatory Number 1?

11             MR. HILLYER:  Your Honor, we need both and here's why.

12   First of all, we're talking about one document.  You know, so

13   this notion there's going to be hundreds of thousands of dollars

14   is ridiculous.  In fact, if they had just produced it, we would

15   be done by now.  But the metadata is going to be in the native

16   file and it's going to tell us when it was created, which is

17   what we want to know.  You know, was this made, is this

18   authentic, vis-a-vis it reflects the date on the front of the

19   document.  Because by the way, there's no date on the signature

20   line at all.  So, I mean, what are we really arguing about here?

21   So first of all, the document and the metadata is not subject to

22   human interpretation, that's why people ask for electronic

23   information.  So we need it as a double-check, Your Honor,

24   because we're concerned that an answer that comes in an

25   interrogatory may be, you know, how shall I say, tailored to

1    reach the right result.  But to sit here and argue and take up

2    the Court's time that it's burdensome to answer that, that

3    interrogatory, while talking about proportionality, I mean, is

4    sort of the height of hypocrisy.

5         And not for nothing, Your Honor, this is not a $110,000

6    case.  It's a multi-million dollar case, which is why they don't

7    want to give you the revenue under the licenses.  And we have

8    zero confidence in the revenue numbers for the reason that I've

9    already given you, because we think that this nefarious

10   relationship, multiple entities paying for multiple things or

11   maybe one not paying for anything at all means that those

12   revenue numbers and the costs associated with them are subject

13   to question.

14        And I'll just end on this, Your Honor:  The idea that

15   one party misrepresenting facts to either BPI, the Court or

16   fabricating evidence could ever be irrelevant or too burdensome,

17   I think speaks for itself.

18        THE COURT:  I'm going to move on to the next and last

19   motion, and this is the Defendant's motion to compel that is at

20   ECF Number 86.  I'll set my timer.  Hold on.  And Mr. Collins,

21   are you prepared to proceed?

22        MR. COLLINS:  Yes, Your Honor.  Thank you.

23        THE COURT:  You're welcome.  I'll start the time.

24        MR. COLLINS:  First, if I'm talking too loud at any

25   point, somebody please let me know.

```
 1            THE COURT:  No, no.  I love it.  Thank you.
 2            MR. COLLINS:  Okay.  It's hard on these calls to know
 3    where the volume needs to be.
 4            THE COURT:  If anybody gets too loud, they can lower
 5    their own volume.  But for me, you're doing great.
 6            MR. COLLINS:  Okay.  Thank you.  On ThermoLife's motion
 7    to compel, BPI, in a case that it claims is worth millions upon
 8    millions of dollars, has produced 110 documents, Your Honor.
 9    110.  And they're the Plaintiff in this case.  So, you know, all
10    of these -- all of this bomb throwing about Defendants'
11    discovery responses is just incredulous, Your Honor.
12            And so we begin with Request for Production Number 4.
13    BPI tested creatine nitrate, it put that testing both into the
14    First Amended Complaint and the Second Amended Complaint.  It
15    did this at the laboratory which is abbreviated ABC, Advanced
16    Botanical Consulting and Testing.  We have lots of complaints
17    about how BPI uses that testing, but that's for summary
18    judgment.  BPI has refused to produce to ThermoLife any other
19    testing that it did on creatine nitrate or that it did on any
20    other ThermoLife product.  That testing is unquestionably
21    relevant to this case.  And I don't know how BPI could possibly
22    argue otherwise.  If there is testing out there, let's see what
23    that testing showed.  You know, just as Mr. Hillyer wants to
24    throw bombs attacking my credibility, let's assume that testing
25    shows that BPI's allegations in the First Amended Complaint have
```

1   absolutely no merit.  You know, and as Mr. Hillyer wants to

2   argue, you know, if the testing is consistent with what BPI

3   already did, why isn't BPI producing the testing.  You know, I

4   won't make those types of arguments because I don't want to

5   impugn Mr. Hillyer's integrity, but I will say creatine nitrate

6   is at the heart of this case.  If BPI tested creatine nitrate or

7   any other ThermoLife ingredient, it's unquestionably relevant

8   and, you know, for BPI to hold it back is -- there's no basis

9   for that objection.

10          To move on to the next Request for Production, and here

11   we've got 10, 11 --

12          THE COURT:  I'm sorry.  I'm going to take you back to

13   Request for Production Number 4.  So just to be clear, you're

14   asking for the testing of other creatine nitrate products.

15   Whose?  Not yours, but --

16          MR. COLLINS:  Right.  Well, yeah.  If BPI tested our

17   licensee's products, you know, we should see what those tests

18   showed.  Why aren't those produced in this case?  You know, so

19   -- you know, any tests that involved creatine nitrate we want to

20   see because really BPI's complaint -- sorry.  Go ahead.

21          THE COURT:  What time frame are you talking about?

22          MR. COLLINS:  In the four years preceding this lawsuit.

23   Any time in the statute of limitations period.

24          THE COURT:  Why is this other testing data relevant?

25          MR. COLLINS:  Because BPI is alleging that CRTN-3 that

1    it's -- testing that it did on CRTN-3 shows that the product

2    doesn't meet its advertising claims.

3              THE COURT:  CRTN-3 is the Muscle Beach product,

4    correct?

5              MR. COLLINS:  Exactly.  Exactly, Your Honor.

6              THE COURT:  And they claim, at least by looking at

7    their position in the JSR, that they've turned over all

8    responsive documents including e-mails relating to its testing

9    of the CRTN products.  So isn't that what you need?

10              MR. COLLINS:  We need to know if they tested creatine

11    nitrate, the raw ingredient at any point, and we need to know

12    what that testing showed and whether or not -- because that's

13    what really their allegations relate to as far as CRTN-3, is

14    that the creatine nitrate ingredient in it is somehow falsely

15    advertised.

16              THE COURT:  Well, what you told me before is that raw

17    ingredients were not the issue, that the only issue was CRTN-3.

18              MR. COLLINS:  Well, that's correct, Your Honor.  And

19    frankly, if Your Honor wants to limit them to CRTN-3 throughout

20    the rest of its order, we are absolutely fine with that, Your

21    Honor.  But to the extent that BPI wants to make arguments that

22    this case goes beyond CRTN-3, we absolutely should be entitled

23    to more testing.

24              Furthermore, I will say that the aspect of CRTN-3 that

25    BPI claims is falsely advertised is the ingredient in the

1    product and therefore, testing on the ingredient is relevant to

2    BPI's claims.

3            Moving on to Request for Production Number 10, Request

4    for Production Number 11, Request for Production Number 12 --

5    well actually, Request for Production Number 11 is where we

6    stopped.  This set of requests for production seeks all

7    communications that BPI has had related to ThermoLife, Muscle

8    Beach Nutrition and the ingredient at issue, creatine nitrate.

9    These are typical requests that you see in any piece of

10   litigation where one party asks for all communications you've

11   had about us, right?  And, you know, you don't know what those

12   communications show, that's why you ask for them.  Perhaps those

13   communications show that there is some sort of vendetta here,

14   that's why this lawsuit is filed.  Perhaps the communications

15   show that really the CRTN-3 product isn't harming BPI's sales at

16   all.  For instance, if there is no communication regarding any

17   BPI sales manager regarding CRTN-3, that's certainly relevant to

18   whether or not CRTN-3 is harming BPI in any way in the

19   marketplace.

20           We learned during the 30(b)(6) deposition of BPI's

21   chairman Derek Ettinger that BPI hasn't done anything to search

22   for relevant e-mails.  While Mr. Hillyer wants to indicate --

23   look, a few e-mails have been produced.  Those e-mails are all

24   related to ABC, the company that tested the CRTN-3 product.  So,

25   you know, BPI hasn't done a search for ThermoLife related

1    e-mails, a search for Muscle Beach Nutrition related e-mails, a

2    search for CRTN-3 related e-mails.  BPI really has no argument

3    that these types of communications aren't relevant.  Instead, it

4    turns around and attacks Defendants' production of documents

5    here.

6            I was very clear in my objections to the BPI's requests

7    that look, we are producing all advertising related to the

8    products at issue in this case, and all advertising related to

9    the products at issue in this case was produced.  I specifically

10   cited to BPI why communications related to that advertising are

11   not relevant to any issue at stake here because those

12   communications are not disseminated to the public such that they

13   give rise to a false advertising claim under the Lanham Act.

14   BPI elected not to move to compel on that issue.  It has the

15   advertising that it wants to assert as false, it has asked -- it

16   will ask questions and it has asked interrogatories about the

17   basis of that advertising.  It needs to comply with its own

18   discovery obligation.  If BPI wants to bring ThermoLife into

19   this case and assert that -- you know, assert these types of

20   claims against it, it needs to do its work.  It needs to produce

21   the documents that are relevant to its claims, and that includes

22   these types of e-mail communications that are always asked for

23   in any piece of litigation.  And for BPI to argue --

24           THE COURT:  Now, how do you respond to Plaintiff's

25   complaint that these e-mails are -- and I do think they are

1    overbroad and can capture a lot of privileged information, and

2    that the two of you should actually sit down and come up with

3    appropriate search terms so that you can both produce ESI

4    information.  That's making a lot of sense to me.

5          MR. COLLINS:  Well Your Honor, I've handled plenty of

6    cases where there's an ESI order in place and both parties go

7    and image the hard drives and then exchange word searches and

8    produce thousands upon thousands upon thousands of documents

9    working with vendors.  That is very expensive and, you know, it

10   is -- in this case, you know, BPI can simply go and search its

11   documents through an Outlook search for ThermoLife and produce

12   those documents to us.  Sure, any of those communications that

13   happened after this lawsuit was filed, you know, those are

14   generally going to be privileged, right?  But if they're with an

15   attorney, of course, and communications prior to the lawsuit are

16   going to be privileged.  But it's real easy to do a word search

17   and look for Mr. Hillyer's name or any other attorney that BPI

18   has.  I pull out those documents and put them on a privilege

19   log.  There doesn't have to be this comprehensive ESI order in

20   every case, and there shouldn't be an ESI order in this case at

21   this stage of the case.  We are one month --

22          THE COURT:  It's pretty late in the case.  We're either

23   going to get through this ESI stuff or your deadline is going to

24   blow on July 8th.

25          MR. COLLINS:  Right.  And I'm not asking to get through

1    the ESI stuff.  You know, we don't want an ESI order.  At the

2    end of the day, we want BPI to produce documents related to

3    Muscle Beach Nutrition, CRTN-3 product or any of ThermoLife's --

4    anything related to ThermoLife.  You know, it's not a hard

5    search for them to do.  They need to have their sales

6    individuals do that search, they need to have their officers and

7    directors do that search.  I suspect there's not going to be

8    many communications at all.  You know, this is not a product

9    that really competes with BPI's products.  Contrary, that

10   competes with BPI's creatine nitrate products.  You know, this

11   is not an issue where I suspect there's going to be many

12   communications at all, Your Honor.  And in fact, that's why we

13   asked these questions because, you know, we want there to be

14   very few communications which we strongly suspect there are.

15           THE COURT:  Now, let me stop you there for a second

16   because, I mean, at least looking at Request for Production

17   Number 8, I think that's very over-inclusive.  I mean, BPI also

18   sells creatine nitrate, so that first interrogatory seems to me

19   to be incredibly broad.

20           MR. COLLINS:  It doesn't actually, Your Honor.  BPI

21   doesn't sell creatine nitrate.  In fact, part of their alleged

22   damages argument in this case is that they have been unable to

23   obtain creatine nitrate to include it in their products.  And,

24   you know, whether or not that's damages that should be allowed

25   in a Lanham Act false advertising case, you know, that's what

1      they're asserting here.  And so look, let's get all

2      communications that BPI has had about trying to obtain creatine

3      nitrate.  Let's see what they've done there and that's why

4      that's relevant.  It's not going to hit on a whole bunch of BPI

5      products.  BPI doesn't use this ingredient.

6              THE COURT:  10 calls for communications regarding

7      ThermoLife.  11 is Muscle Beach.

8              MR. COLLINS:  And again, Muscle Beach Nutrition is a

9      very small player in this market.  $114,000 in revenue.  Again,

10     this is not going to hit on a lot of documents.

11              THE COURT:  And 11 is e-mails regarding Muscle Beach.

12     Okay.  Anything else?

13              (Cross-talk between the Court and Counsel)

14              MR. COLLINS:  ...that there's plenty of case law

15     talking about the fact that you don't need an ESI order to

16     obtain electronic discovery in that, but you can count on the

17     good faith of each side to do their due diligence and do their

18     searching.  You know, we're willing to do that here.  You know,

19     I have a lot of experience with ESI orders.  I think this case

20     is not appropriate for one because of how expensive that process

21     is.  Even the meet and confer process over the search terms is

22     incredibly expensive, and vendors holding the imaged documents

23     to then do the searches themselves, sometimes one search, one

24     round of searching on ESI can cost upwards of $10,000.  It

25     should not cost that much, Your Honor, but it does.  And it is a

1    problem in a case like this where, you know, the damages are so

2    limited.  It's just not worth doing.  So, you know, BPI needs to

3    produce these documents, it needs to be ordered to produce the

4    documents, but we don't need an ESI order, in my view.

5           Now, we move on to Interrogatory 12, 13, 14, 15, 16.

6    These are all related to the exact same issue.  BPI sells

7    creatine products.  You know, these are the set of products that

8    it claims compete with CRTN-3 which is a creatine product.  And

9    BPI has made many advertising claims, of course, relating to its

10   own creatine products, including its Best Creatine product.  And

11   so we want to know the basis of some of BPI's advertising claims

12   on its Best Creatine product, and we haven't just picked random

13   advertising statements that BPI has made here.  Instead, we've

14   specifically called out ingredients that are included in Best

15   Creatine, which are creatine salts.  And, you know, everybody

16   agrees that creatine nitrate is a creatine salt, and so the

17   advertising of creatine salts is very important in this case.

18          So BPI has this Magna Power Creatine AKG, you know, and

19   it makes other various claims related to its Best Creatine

20   product based on the performance of its creatine salts.  And so

21   BPI is suing Muscle Beach Nutrition and ThermoLife now based on

22   the fact that ThermoLife's advertising -- Muscle Beach is

23   advertising it claims misleads people into believing that the

24   creatine salt does not -- it stays bonded when consumed and

25   somehow that bond results in additional benefit.  Well, BPI is

1    specifically asserting in its own advertising that its creatine

2    salt ingredients have additional benefits on top of creatine and

3    the bonded ingredients separately.  That's exactly what this

4    advertising is targeted towards.  So we want to know look,

5    what's the factual basis for your claim that your creatine

6    salts, when they're included in a product in a bonded form and

7    then disassociate when put in water, what's the basis for your

8    statements.

9              THE COURT:  Let me ask you -- let me stop you, Mr.

10   Collins.  The Plaintiff is saying that its products are not at

11   issue in this case, your products are.  How is this relevant?

12             MR. COLLINS:  It's relevant for two reasons, Your

13   Honor.  First, include BPI's own advertising statements are

14   relevant to determine what BPI believes is truthful advertising.

15   Right?  BPI -- you know, BPI is suing CRTN-3 for making

16   representations that you're getting a benefit from a bonded

17   ingredient, right?  That's essentially what BPI's entire case

18   comes down to, is that CRTN-3 is falsely advertised because

19   Muscle Beach Nutrition advertised that you're getting a benefit

20   from a bonded nature of this ingredient.  Well, let's see how

21   BPI advertises its bonded ingredients so we can determine what

22   BPI believes is true and what BPI believes is false in this

23   arena, in the bonded creatine salt arena.

24             And so look, you know, exactly why, BPI, do you believe

25   that your statements are truthful, and at the same time assert

1    that our same type of statements are false.  That is not related

2    to unclean hands at all, that is simply a look, you're making

3    the same type of advertising we are making, what's your basis

4    and then how do you assert our claim is false given your basis

5    for your advertising.  It makes their claim more or less true,

6    right?

7           The second basis is unclean hands.  This is precisely,

8    directly on point here is that BPI is falsely advertising its

9    bonded creatine salt products.  And if they're falsely

10   advertising their products, they have unclean hands and they

11   can't sue either Muscle Beach Nutrition or ThermoLife for its

12   statements regarding bonded creatine salt products.  We have

13   that affirmative defense, BPI has moved to dismiss it.  It's

14   dismissal is, in my view, overly technical arguing that look,

15   you need to plead more in your affirmative defense than you even

16   need to allege in a complaint but, you know, we're certainly, we

17   believe, going to survive that motion to dismiss.  But

18   regardless, this type of information is relevant for two

19   reasons.  You know, why are you asserting our statements are

20   false if you're making the very same type of statements we are

21   making.  What's the basis for your statement and how do we

22   differentiate that between why you believe we're lying, right?

23           THE COURT:  All right.  Let me turn to Mr. -- whoops,

24   who do I have here?  So somebody dropped off and called back in?

25           MR. HILLYER:  Your Honor, yeah.  This is Mr. Hillyer, I

 1   didn't want to interrupt Mr. Collins' flow, but I did drop off
 2   but it was briefly.  So my number is in a different order.  It's
 3   the same phone, though.
 4          THE COURT:  Add you here again.  I heard you drop.
 5          MR. HILLYER:  Sorry, technical difficulty.
 6          THE COURT:  No, I know this happens.  That's why I warn
 7   everyone to just simply call back and join the conference in
 8   progress.
 9          All right.  Mr. Hillyer, are you ready to proceed and
10   respond?
11          MR. HILLYER:  Yeah, Your Honor.  I'm going to try to do
12   so as briefly as I can.  That's a promise that every lawyer
13   makes and never keeps, but let me try in good faith to do it.
14          THE COURT:  I want you to start if you would backwards.
15   Start with the ad, because I think Mr. Collins made some good
16   points which is, you know, your ads say one thing and if it's
17   pretty similar to what they're saying, I can see his argument
18   that your allegations hold less weight and are going to unclean
19   hands.  The idea is that they're complaining about the same
20   thing you're doing.
21          MR. HILLYER:  So a couple problems with that position.
22    Number one, they're not asking for our ads.  That's not what
23   this discovery is designed to do.
24          THE COURT:  But it's the basis for the advertisement
25   statements that you make with reference to your various creatine

1    nitrate products.

2        MR. HILLYER:   Yeah.   But, Your Honor, the distinction

3    is profound between asking for the ads and asking for scientific

4    conclusions based on what compounds do in solution.   First of

5    all, I mean, the breadth of it, for a person who has been

6    arguing the entire day about proportionality for a $110,000

7    case, now they want to conduct a trial within a trial pursuant

8    to claims that don't exist in this case.   But more specifically,

9    in order to support our position about what these compounds do

10   in solution, we gave them third party testing and we gave them

11   expert testimony.   Now they want to propound discovery on BPI

12   which is supposed to either argue them without the basis of --

13   strike that.   Answer them without the basis of knowledge for

14   doing so, because clearly this requires testing and expert

15   testimony, or they want us to go out and hire both in order to

16   create a new set of issues in a case that isn't about these

17   products, as the Court aptly pointed out.

18       Now they already have our advertising and in fact,

19   before Mr. Collins sings hallelujah to his own production and

20   criticizes ours, a spreadsheet of what they produced is largely

21   publicly available information, and a lot of it is BPI's ads.

22   So let's not try to draw false comparative about who has been

23   the better document producer.

24       So the bigger issue, Your Honor, is the notion that

25   these are not easily answerable.   In fact, they can't be

1    answered without -- especially under the kind of oath that we're

2    expecting to provide under an interrogatory response without

3    endeavoring to do that information.  First of all, I don't think

4    we could do it without paying for those resources; but second of

5    all, if we're talking about proportionality, they can make all

6    those arguments they want based on the advertisements but the

7    advertisements to what they've pled in their affirmative defense

8    is also a false comparative because the only thing that they've

9    included in their unclean hands defense is this notion about how

10   something is listed on the bottle versus what exists in

11   solution.  Well, that's not the sum total of BPI's claims.  Our

12   expert report talks about how the testing works in conjunction

13   with specific advertising representations that they've made that

14   we don't make.  So, I mean, they could have amended their

15   affirmative defense yesterday to be more specific about why

16   these are on our direct comparison, but they didn't.  So there's

17   no counterclaim, there's no affirmative defense that's broad

18   enough to cover the kind of specificity they're talking about,

19   and this has the absolute possibility to hijack the real issues

20   in the case which is BPI's claims against their product.

21          So my position is they're free to argue that if they

22   want to.  Heaven knows that they spent at least half of the

23   deposition, I'm estimating, with BPI's representatives about its

24   own ads rather than trying to address the allegations against

25   them.  That's how they want to spend their time, fine.  Our

1    position is by the time it's all said and done, these issues are

2    not going to be in the case anymore because they're just

3    irrelevant and don't justify their inclusion because they're a

4    waste of time.

5         THE COURT:  I'm sorry.  You're saying to me this is not

6    asking for the ad as I initially summarized, but really the

7    scientific data that supports your claims in the ads?

8         MR. HILLYER:  Well, right.  So Your Honor, if I may

9    just use an exemplary, look at Interrogatory Number 12.  This is

10   a question.  This isn't a document request.  If they asked for

11   ads, one, we would probably say you have them already, but they

12   don't.  What they're saying is does the creatine and magnesium

13   in this compound disassociate prior to the ingestion by the

14   consumer.  That's not something that a layperson can easily

15   answer.  We're not in a position to answer that interrogatory,

16   and if we view the rest of them, 13 through 16, they're all of

17   the same kind of quality.  So, I mean, you know, talk about a

18   collateral issue that can only be dealt with through additional

19   resources, if at all; that's the -- you know, the hallmark of

20   our objection here.  Let them do their own testing.

21        So, you know, that's basically the sum of my argument

22   on those particular interrogatories.

23        THE COURT:  Look at 15 and 16.  15 and 16 don't ask for

24   that conclusion, but rather provide any and all basis for your

25   statements *(unintelligible)*.

 1           MR. HILLYER:  Well, I mean, the basis that bonded

 2   creatine forms one thing or another; again, you're talking about

 3   culling over of scientific literature, review by an expert, any

 4   and all basis for the statement.  To me, it's -- you know, it

 5   may be cast differently, but it gets into the exact same issue.

 6           THE COURT:  All right.  Move on to the e-mails request.

 7           MR. HILLYER:  Sure, Your Honor.  You know, on this,

 8   again, I started off with Mr. Collins at our meet and confer

 9   with a very simple principle which was that neither party, no

10   matter how much finger-pointing, hadn't produced e-mails.  They

11   just hadn't.  And I proposed two things, and none of them had to

12   do with an elaborate ESI.  I don't even know why he's talking

13   about that, because I certainly wasn't the one to raise it, nor

14   do I raise it in our Joint Status Report and I can be corrected

15   if anybody wants to.  We were talking about a very simple

16   identification of terms and identification of custodians.  We

17   wanted to make it reciprocal because I said look, let's be

18   honest, nobody really wants to do this, nobody ever wants to do

19   it.  Okay.  Fair enough.  We don't fault you for that, don't

20   fault us for it.  Neither one of us produced e-mails, okay, from

21   our parties.  So I made two proposals.  I said look, let's just

22   decide that this isn't worth it.  Because at the end of the day,

23   you're talking about a lot of e-mails that concern attorneys.  I

24   don't even know that BPI was even talking about Muscle Beach

25   Nutrition before the lawsuit started or creatine nitrate for

1    that matter.  I know that the chairman of BPI has known

2    Mr. Kramer for 20 years.  So, you know, Mr. Collins even

3    admitted there's probably not even that many e-mails.  So we're

4    talking about even the process of going ahead and identifying

5    these search terms and the custodians, then running the

6    searches.  Could it be done?  Sure.  Do we think that it's worth

7    it on balance?  I personally don't, but at the end of the day,

8    in our objections we said look, talk to us about search terms

9    and custodians.  In our meet and confer, I said let's talk about

10   search terms and custodians.  He had a witness in front of him,

11   he could have said well, how many people do you think have

12   e-mails that might be touching on this subject matter?  He

13   didn't ask that question.  He wasn't interested in it.

14        So aside from the breadth, there's the

15   disproportionality.  And, you know, there's still the

16   opportunity to meet and confer.  We just think that it should be

17   reciprocal.  But I would still welcome a stipulation that this

18   case, which Mr. Collins seems to think is not worth the time,

19   effort and resources, that doesn't require endeavoring into

20   either company's e-mails, and I can't imagine it being any more

21   reasonable than that, but that's kind of where we land.

22        THE COURT:  And lastly with reference to Request for

23   Production Number 4?

24        MR. HILLYER:  Right.  So Your Honor, look, Mr. Collins

25   said repeatedly that this is incredibly relevant, testing of

1    other products that we're not relying on, we're not using and

2    quite frankly is probably, at the end of the day, one of the

3    most unremarkable series of tasks.  But at the end of the day,

4    he never told us why it was relevant.  I mean, he said creatine

5    nitrate is at the heart of the case.  Well, I agree with that,

6    which is why I gave a full-throated argument that that

7    ingredient, whether a commercial product or otherwise, is

8    important in the case.  But I can't say it any better than the

9    Court posed it:  Why does it matter what finished dietary

10   supplement products led to in testing when at the end of the day

11   we're not relying on it?  You know, we're not trying to play

12   both sides of this.  We're not relying on something and then

13   refusing to provide it.  But at the end of the day, I can

14   honestly say I don't know what they would do with it.  Creatine

15   nitrate landing in a finished cosmetic product is tested.  Well,

16   I mean, who cares?  How would you even use that?

17            THE COURT:  Did you, for example, perform any tests on,

18   let's say, creatine nitrate products from Cellucor?

19            MR. HILLYER:  We tested completed finished product by

20   Cellucor.  We never tested the raw material creatine nitrate

21   that ThermoLife provides.  But I kind of think that that's a

22   distinction without a difference because we're not advancing any

23   arguments on any additional testing so I don't -- I mean, if the

24   Court in its discretion wants us to produce it, we will.  I

25   mean, we're not playing hide the ball.  I think it's a

1   legitimate objection to say well, why does it matter.

2          THE COURT:  So your answer is basically that you

3   produced all responsive documents relating to the testing of the

4   finished product Creatine 3 as done by ABC on BPI -- oh, boy.

5   On Muscle Beach.

6          MR. HILLYER:  Yeah.  In fact, Your Honor, that

7   production was -- I mean, I don't want to overstate it, but it

8   was thorough.  They got e-mails associated with the ordering of

9   the tests.  They got raw data, they got chain of custody

10   documents.  They got finished reports.  I mean, pretty much

11   every single piece of paper.  And in fact, they independently

12   subpoenaed ABC.  Ultimately, I don't know what ended up

13   happening to that, but they never came back and said you gave us

14   half the documents.  I mean, we played absolutely fair.  They're

15   entitled to that data.  That's a fair request.  We're relying on

16   it.  So that's how I would answer.

17          THE COURT:  All right.  Anything else?

18          MR. HILLYER:  No, Your Honor.  In the interest of time,

19   I'll stop talking.

20          THE COURT:  Okay.  Good.  I don't mean good that you

21   stopped talking.

22          MR. HILLYER:  You're right.  It probably --

23          THE COURT:  That did not come out right.  I didn't mean

24   it that way.  I just meant good, you've got three minutes and 44

25   seconds which I will ask Mr. Hillyer -- I'm sorry, Mr. Collins,

1   if he has anything he wishes to add in those three minutes.

2   MR. COLLINS:  Yes.  And I'll be as brief as I can, Your

3   Honor.

4   On Interrogatory 12, Interrogatory Number 13, it's

5   amazing that dietary supplement companies can represent that

6   they don't know whether or not the ingredients they put in their

7   products disassociate in water when they're put in water.  I

8   mean, that's troubling on so many levels for consumers and

9   that's what Mr. Hillyer is telling you.  That BPI can't answer

10  this simple question in Interrogatory Number 12 and

11  Interrogatory Number 13 which simply asks whether or not the

12  creatine salt included in Interrogatory 12 and Interrogatory 13

13  in their products disassociates in water.  That somehow this is

14  an undue burden to require a company that sells products to

15  consumers to answer this question.  That's very troubling.

16  On 14 and 15, here we're asking for their basis for

17  specific statements as to why they're asserting that their

18  bonded creatines, quote, enhance bioavailability and, quote,

19  enhance creatine absorption.  There's a specific statement that

20  they're making touting the effects of their bonded creatines.

21  Look, BPI wants to stipulate that there's absolutely no basis

22  for those statements, it can do so.  But whatever basis BPI has

23  for its advertising in these regards, which is very similar to

24  advertising they're asserting is false by Muscle Beach

25  Nutrition, it's got to give us, it's got to give us an answer

1    here.  You know, the rest of the issues, Your Honor, you know,

2    on the production of testing documents --

3         THE COURT:  I want to talk about the e-mails for a

4    minute.  How do you respond to Plaintiff's suggestion that he's

5    not necessarily talking about a full-blown search protocol with

6    experts, but rather that the two of you meet, make the

7    obligation mutual and discuss -- he calls them custodians, I'm

8    going to call them key players, whose e-mails, whose Outlook are

9    you going to search.  Come up with some key players that you're

10   going to search and some terms for which you're going to search

11   and some time frames.  What's the problem with doing that?  That

12   sounds rather reasonable to me.

13        MR. COLLINS:  Well first, BPI has already gone past its

14   deadline to compel that type of information from ThermoLife.  It

15   elected not to.  So let's start there.

16        Second, that's pretty much an ESI order.  Doesn't

17   differ that much from an ESI order.  There's still the meet and

18   confer, there's still these searching of documents, there's the

19   exchange of look, who are the possible custodians out there.

20   You know, who BPI even has -- you know, who are your sales

21   managers, who are these types of people.  That is the exact same

22   as an ESI order.  You know, and then to just take it out because

23   we're not going to use a vendor in the interim of it, now, now

24   it's a problem with credibility, right?  And look, if we're each

25   going to trust each other that we're producing documents, then

1   why are we going through that process?  Why, instead, don't we

2   just have BPI say look, we searched in good faith, here's what

3   we got.  And you heard Mr. Hillyer tell you, one, he doesn't

4   believe there's really communications about CRTN-3.  That's the

5   whole point of this request for production is look, if CRTN-3 is

6   really causing you competitive harm in the marketplace, there

7   should be some e-mail communications about it, right?  And

8   that's something that BPI needs to prove in order to prove its

9   case.  If ThermoLife's creatine nitrate is really causing you

10  competitive harm in the marketplace, there should be some

11  communications about it.  And that's something that BPI has to

12  prove.  You know, that's -- I mean, his acknowledgement that

13  there are likely very few documents here and potentially none is

14  very important for this case, and that's exactly why we need

15  then to confirm in good faith that there actually aren't those

16  documents which we'll take so --

17              THE COURT:  All right.

18              MR. HILLYER:  Your Honor, this is Greg Hillyer.  That

19  was Mr. Collins' representation.  I was quoting him.  He's the

20  one who said that there aren't going -- that there probably

21  aren't any e-mails.  And moreover, we don't have a request for

22  CRTN-3.

23              THE COURT:  Let me ask you, Mr. Hillyer.  I think Mr.

24  Collins made one point which is you're asking for reciprocal

25  ESI, but didn't you blow your time to file your motion to compel

1   on that?

2        MR. HILLYER:  Well Your Honor, we didn't move to compel

3   on those, but we think that the entry of the Second Amended

4   Complaint would give us good cause to do so.  We would have to

5   think about that.  But I'm not going to try to argue that we

6   moved to compel when we didn't.

7        THE COURT:  Okay.  I appreciate that.  All right.

8        Well, let's take 20 minutes.  I would suggest just put

9   me on hold and mute your phones.  It is now 12:19.  Actually,

10  let's make it a half hour.  I need to talk to my law clerk, so

11  I'll be back on at 12:45.  I'm going to do the same thing, I'm

12  going to mute you and then we'll regroup at 12:45.  Is that

13  good?

14       MR. HILLYER:  Yes, Your Honor.  Thank you.

15       THE COURT:  You can have a personal comfort break, grab

16  yourself a sandwich, a glass of water and then rejoin us at

17  12:45.  Stuart and Michelle, I'm going to move us into a

18  separate room so that we can have a private discussion.  And I'm

19  also going to stop the recording so that you guys can, if you

20  choose to talk amongst yourselves, you're not going to be

21  recorded.  I'll do that before I leave the room.  I'll do that

22  first.

23       All right.  Thank you, everyone.  We took a short break

24  and I'm prepared to rule on the matter.  It's almost 1:00, so

25  good afternoon I should be saying.

1          As I said in the beginning, I don't expect that I'm

2     going to be writing a formal order.  I'm going to rule from the

3     bench and I will enter a paperless order merely confirming my

4     rulings and addressing -- and just saying for the reasons stated

5     on the record.  So if you need a copy of the rulings, make sure

6     that you get a transcript, and you can contact my CRD, my

7     Courtroom Deputy Tamisha Shotwell, and she'll let you know how

8     that can be done.

9          So we're back on the record and I'm ready to rule.

10    First of all, I want to say thank you to both Plaintiff and

11    Defense attorneys for their really solid work on this case.

12    These are, you know, very interesting issues.  You guys did a

13    great job in the Joint Status Report in helping to streamline

14    the issues which made for a much more organized hearing.  It

15    still took a long time, but there was just a lot of issues to be

16    covered.  But thank you for that.

17         So as I said, I'm ready to rule, and the first thing I

18    would like to do before ruling is to set forth the standard that

19    governs the rulings that I make with reference to the different

20    motions to compel.  Starting, of course, with the general

21    standard for discovery that is controlled by Rule 26, pursuant

22    to Federal Rule of Civil Procedure 26(b) the parties may obtain

23    discovery regarding any nonprivileged matter that is relevant to

24    any parties' claim or defense and proportional to the needs of

25    the case.  Considering the importance of the issues at stake in

1  the action, the amount in controversy, the parties' relevant

2  access to relevant information, the parties' resources and the

3  importance of discovery in resolving the issues, as well as

4  whether the burden or expense of the proposed discovery

5  outweighs its likely benefit.  Importantly, information within

6  this scope of discovery need not be admissible in evidence to be

7  discoverable.  Courts interpret relevancy broadly to encompass

8  any matter that bears on or reasonably could lead to other

9  matters that could bear on any issue that is or may be in the

10  case, and I'm citing to Coach versus Visitor's Flea Market which

11  is a 2013 US District Lexis case, Middle District of Florida,

12  2013.

13       Discovery should ordinarily be allowed under the

14  concept of relevancy unless it is clear that the information

15  sought has no possible bearing on the subject matter of the

16  action.  Under the rules, a party may pose interrogatories

17  related to any matter and to which Rule 26(b) allows inquiry,

18  and the courts rule controlling interrogatories is Federal Rule

19  of Civil Procedure 33(a)(2), and a party may also request the

20  production of documents that fall within the scope of Rule 26(b)

21  pursuant to Rule 34(a).  Rule 26(b) allows discovery through its

22  increased reliance on the common sense concept of

23  proportionality, and I'm referencing In Re:  Takata Air Bag

24  Product Litigation, Southern District of Florida, March 1, 2016.

25  If the opposing party objects to interrogatories or requests,

1   the requesting party may file a motion to compel production

2   pursuant to Rule 37, but only after conferring in good faith to

3   resolve discovery disputes without court intervention.

4          As I mentioned before, the Federal Rules afford the

5   Court broad authority to control the scope of discovery,

6   Josendis versus Wall to Wall Residence Repairs, Eleventh Circuit

7   2011, but strongly favor full discovery whenever possible;

8   Farnsworth versus Proctor and Gamble, Eleventh Circuit, 1985.

9   For that reason, courts employ a liberal and broad scope of

10  discovery in keeping with the spirit and purposes of the rules;

11  Rosenbaum versus Becker and Poliakoff, Southern District of

12  Florida, 2010.

13         The overall purpose of discovery under the rule is to

14  require the disclosure of all relevant information so that the

15  ultimate resolution of disputed issues in any civil action may

16  be based on a full and accurate understanding of the true facts

17  and therefore, embody a fair and just result.  I'm citing

18  Shapiro versus Dynamic Recovery Solutions, Southern District of

19  Florida, 2018.

20         Accordingly, when a party objects to discovery, the

21  onus is on the objecting party to demonstrate with specificity

22  how the objected-to request is unreasonable or otherwise unduly

23  burdensome; Alvar versus No Pressure Roof Cleaning, Southern

24  District of Florida, March 7, 2018.

25         Against this background, I'm now going to be ruling on

1   the discrete issues before me starting with Plaintiff's motion

2   to compel at ECF number *(unintelligible)*.  In that motion, there

3   are four matters still at issue; Request for Production Number

4   11, Interrogatory Number 18 and Interrogatories 2 and 3 to

5   Kramer.

6         Starting with Request for Production Number 11, I'm

7   going to be following the JSR much as we did during this

8   hearing.  As to the Request for Production Number 11, Defendant

9   has already produced seven redacted licenses that are still

10  active dealing with the creatine nitrate product.  The

11  Plaintiff, however, is seeking all licenses including -- all

12  licenses to the ThermoLife patent and any third party.  I am

13  going to grant and deny in part as follows:

14        As I said, the Defendants have already produced all

15  creatine nitrate licenses in effect until, I think, 2015 and

16  they were using a four-year statute of limitations period that

17  applies in the Lanham Act claim.  So I am going to grant in

18  part, but extend it to February 2014 giving the Plaintiff a full

19  five years as opposed to four.  Obviously my goal here is to

20  develop a practical approach to resolving these discovery

21  disputes.  I think Plaintiff's requested seven years was

22  excessive.  I think Defendant's offer of four was reasonable,

23  but a little tight, so we're going to split the baby and we will

24  go back to February of 2014 as to creatine nitrate licenses

25  only.

1              In addition, I'm going to ask for the unredacted

2      version of these documents to be turned over. As I read the JSR,

3      the redacted information includes cost and supplier information,

4      and I do not think that this information is a trade secret or

5      has any other kind of privilege and I think should be provided.

6      In any event, to the extent that it is confidential, there is a

7      protective order already in place that will address that

8      confidentiality if necessary.

9              As to Interrogatory Number 18 which asks for financial

10     information regarding creatine nitrate, I am going to again

11     grant and deny in part.  I will -- ThermoLife is required to

12     produce the financial documents relevant to creatine nitrate

13     product sales to Muscle Beach Nutrition and any other company.

14     And again, that will be limited to five years.

15             Turning next to Kramer Interrogatory Number 2 which

16     calls for -- I believe it is the suppliers of the raw

17     ingredients to MBN, I am going to deny that motion.  I think

18     that is overly broad in terms of the suppliers of raw

19     ingredients, it's just not an issue in this case.

20             With reference to the customers that Muscle Beach

21     Nutrition has sold the products, CRTN-3, not including end

22     customers, I am going to grant that.  And I note that Defendant

23     Kramer has already agreed to produce the name of the

24     manufacturer of the creatine as part of this as well.

25             Okay.  Turning next to ECF Number 87 which is BPI's

1    motion to compel, the requests at issue there are Requests for

2    Production 1 through 5, Request Number 7, Request Number 11 and

3    ThermoLife Interrogatories 1 and 3. As to Mr. Kramer, it's

4    Interrogatories 1, 2 and 7. Starting first then with Request

5    for Production Number 12 and 3, these three requests ask -- most

6    of these interrogatories deal with the licensing agreement

7    between ThermoLife and Muscle Beach Nutrition. 1, 2 and 3

8    requests -- the first one is requesting first native Microsoft

9    Word of the agreement. Number 2 requests the file for the final

10   version that was used to prepare with signatures and Number 3

11   requests a PDF of the final version that was actually executed

12   by the parties. These three requests also include a request for

13   the native metadata that support the underlying documents. I

14   find that production of these documents is not overly burdensome

15   and it is in fact proportional to the needs of the case.

16        The licensing agreements, despite the Defendant's

17   judicial admission of alter ego remains relevant to the issues

18   in this case, and should be produced.

19        With reference to interrogatory to ThermoLife Number 1,

20   that interrogatory will also be granted. It goes hand in hand

21   for Requests for Production 1, 2 and 3, and seeks a narrative

22   response that should be provided by those documents.

23        Request for Production Number 4. Grouped together we

24   have Request for Production Number 4, 5, 7 and 11. Request for

25   Production Number 4 asks for purchase orders generated by Muscle

1    Beach pursuant to the ThermoLife Muscle Beach license agreement.

2    Request Number 5 requests invoices again generated by the same

3    agreement.  Number 7, proof of payment by Muscle Beach Nutrition

4    under the license agreement and lastly -- well, I'll do those

5    first.  4, 5 and 7 are granted.  Again, I think the licensing

6    agreement is a very important part of this litigation and this

7    is relevant to that, and I've already said before the

8    Defendants' decision to judicially admit alter ego liability

9    does not change the scope of the discovery as to the underlying

10   licensing agreement.

11        Request for Production Number 11 asks for the financial

12   statements that have been prepared during the past five years.

13   I think that is also relevant and that too will be granted.

14        Request for Production Number 11, Interrogatory Number

15   2 go hand in hand with interrogatory -- with request for

16   production Number 11, and it asks for the identification of all

17   bank accounts of ThermoLife, so that also will be granted.

18        Interrogatory Number 3 to ThermoLife which requests

19   employee identification will be granted.

20        Interrogatory Number 1 to Mr. Kramer asking for the

21   information regarding the California property is also granted as

22   is Interrogatory Number 2 and Number 7, so these are all

23   granted.

24        Again, Defendants' decision to indemnify Muscle Beach

25   and to admit alter ego doesn't alter the parties' discovery

1    obligations going forward.

2         I turn next to the Defendants' motion at ECF Number 86,

3    and we start with Request for Production Number 4.  Request for

4    Production Number 4 asks for all documents related to the

5    testing by BPI on any product that includes creatine nitrate,

6    which are the raw material.  I find that I'm going to deny that

7    request.  Plaintiff has already provided responsive documents

8    regarding its testing of the Creatine 3 product which was

9    conducted by ABC on the product -- on the Muscle Beach product.

10   The other testing on any other product that uses creatine

11   nitrate is overbroad.

12        Then we turn to Request for Production Numbers 8, 9, 10

13   and 11.  And I got to be honest with you, on these I gave it a

14   lot of thought because I do see that there is -- within these

15   broad undefined categories, there probably are some relevant

16   documents.  But as written, I'm going to deny these four

17   requests.  They're just incredibly overbroad and undefined.  So

18   I'm going to deny them as written.  I don't think it's my job to

19   rewrite these for you.  Obviously the two of you know the

20   parameters of your case much more than I can pretend.  So what

21   I'm going to encourage the two of you to do -- I know that you

22   don't want me to impose an ESI protocol on you because of the

23   time and expense, but I think the Plaintiff is right, you don't

24   necessarily need a formal ESI protocol.  I think the two of you

25   should get together and come up with parameters that will

 1    further define these broad -- these broad categories in Requests

 2    for Production 8 through 11.  I mean, honestly, Request for

 3    Production Number 8 calls for all communications you've ever had

 4    with anyone regarding creatine nitrate.  Number 10 is the same

 5    thing, communications you have ever had with anyone regarding

 6    ThermoLife.  Number 11, anyone regarding Muscle Beach.  These

 7    are just so broad and so undefined that they are inappropriate.

 8    So I am going to deny them as written, and I leave it to the

 9    parties as to whether or not they wish to work together to

10    modify these terms and come up with -- I don't know if you want

11    to call it custodians or key players or search terms, I don't

12    want to use, you know, high-falutin terms, but you need to come

13    back basically in effect to the Defendant, these requests really

14    need to be more narrowly tailored.

15          With reference to Interrogatory Number 12, 13, 14, 15

16    and 16, I am going to deny those.  I think Plaintiff is correct

17    when it points out that there are no counterclaims at issue here

18    regarding Plaintiff's creatine salts.  I think that's important

19    -- and I also agree that these call for scientific answers which

20    may not be readily available.  And more important I think is the

21    fact that Defendant already has the ad in its possession as to

22    what Plaintiff claims or doesn't claim with reference to its own

23    creatine salts.  So I am going to deny 12 through 16 as well.

24    So I guess I denied all of these.  So this motion 86 is denied.

25          As to any of my rulings, to the extent that any of the

1   documents call for the production of privileged documents, I'll
2   remind everyone that the proper response is to identify the
3   documents in a privilege log and the privilege log should
4   identify each document as well as the individuals who were a
5   party to the communications and authors, and do so with
6   sufficient detail to permit a compelling party or the Court to
7   determine if the privilege is properly claimed.  A privilege log
8   should contain at a minimum the following information:  The
9   first is the name and job title or capacity of the author of the
10  document.  Second, the name and job title or capacity of each
11  recipient of the document.  Third, the date the document was
12  prepared and if different, the date on which it was sent or
13  shared with other people other than the author.  Fourth, the
14  title and description of the document.  Fifth, the subject
15  matter addressed in the document.  Sixth, the purpose for which
16  it was prepared or communicated.  And seventh, the specific
17  basis for the claim that it was privileged.
18         In regards to production, with reference to any of the
19  requests that I have granted, Defendant is to produce the
20  documents by April -- I'm sorry.  By July 1st.  It's a little
21  less than two weeks, but the discovery deadline is July 8th.
22         All right.  I think that takes care of everything.
23         One last thing, and that is the issue of fees.  I know
24  that both parties have requested fees.  The Plaintiff requested
25  it in ECF 87 and then again there was a request for fees, I

1     think, in some of the responses.  I'm going to deny each

2     parties' request for fees.  I think the issues -- the fact that

3     we ended up having a two-hour hearing show that the issues in

4     this case are nuanced and complicated, and that the parties'

5     respective positions were substantially justified under Rule

6     37(a)(5), so I am going to not shift any costs and everyone will

7     bear their own costs and fees in connection with the motions and

8     response to the motion.

9               Anything further?

10              MR. HILLYER:  Not from us, Your Honor.  Thank you.

11              THE COURT:  Okay.  If you want a copy of my order, make

12    sure that you get a transcript from my courtroom deputy and I

13    can give you her number if you need it.

14              MR. MULLINS:  Your Honor, this is defense counsel.  I

15    do have one question.  Just trying to understand your ruling.

16    On our request for production you found to be overbroad, you did

17    suggest that we could do some narrowing and --

18              THE COURT:  I think you should, but I wasn't about --

19    you know.

20              MR. MULLINS:  No, I appreciate it.  I just wonder, what

21    it sounds like though that you do think there's probably

22    requests that we could narrow down and that would be

23    permissible, and I'm just trying to understand, I don't want to

24    start another 30 day time period so --

25              THE COURT:  Honestly what I would prefer to do, and I

1    just saw that you guys were, you know, not amenable, maybe you

2    are, I can certainly modify my order, and I think I will as a

3    matter of fact.  Because what I really want to do in that one is

4    deny it because I think as written, these things failed.

5    They're just too overbroad.  So I'm going to deny them as

6    written and I'm going to order you to -- I know you all love to

7    meet and confer.  I'm going to order you to meet and confer and

8    I'm going to say meet and confer by June 26th at the latest.

9    Actually, I would say even less than that so that you could

10   produce the documents by July 1st.

11           MR. HILLYER:  Your Honor, this is Greg Hillyer.  I

12   don't know if this changes the aspect on the timing.  I just

13   wanted to let the Court know that Judge Smith has asked us to

14   provide a proposed schedule, and the proposed schedule is

15   actually after the close of discovery.  So on the off chance

16   you're trying to fit everything in before that date, all signs

17   point to the fact that discovery is going to be extended.  In

18   fact, I think that was the import of the Court's order.  So I

19   just didn't want you to think you had to have everything in --

20           *(Cross-talk between the Court and counsel)*

21           THE COURT:  That's exactly what I'm trying to do

22   because as you may know, as a magistrate judge I cannot touch

23   the district judge's scheduling order.  So I live and die by

24   those deadlines that are set by the district judge and I do not

25   have the power to extend them.

1          MR. HILLYER:  Understood.  I just wanted to share that

2     with the Court.  If it doesn't affect anything, then so be it.

3          THE COURT:  I don't think it will.  Based on my

4     understanding of everything you all said, I don't think it's

5     going to be that voluminous and if it is, I'm sure you'll let me

6     know.

7          MR. HILLYER:  Okay.  Thank you, Your Honor.

8          THE COURT:  But let me just double-check on the dates.

9     I think I told you June 26th.  Today is the 19th.  Yes.  June

10    26th is a week from today.  So you should meet and confer, which

11    is a lot of time to meet and confer, but it's not just to meet

12    and confer, it's to develop -- I should make it clear.  You're

13    to meet and confer and have those search terms ready to go by no

14    later than June 26th, and then apply them so that you can turn

15    the documents around by the following week, let's say July 4th

16    weekend, so I would say July 3rd.

17         So let's clear those dates up.  Search terms by -- I'm

18    going to take away time from you.  Search terms by Wednesday

19    June 24th.  Call it what you want, search terms, key players,

20    narrower interrogatories, okay?  Search terms by 6-24 and then

21    document production by July 2nd.  And if you need more time for

22    the production, you know, confer, agree, or else file a motion.

23         All right?

24         MR. HILLYER:  Yes.  Thank you, Your Honor.

25         THE COURT:  All right.  Thank you very much, gentlemen.

1    I appreciate your input.

2              MR. HILLYER:  Thanks for your time.

3              THE COURT:  You're welcome.  Have a great day, and

4    everyone stay safe.

5              MR. HILLYER:  You too.

6              THE COURT:  All right.  Bye-bye.

7              (PROCEEDINGS CONCLUDED)

8                          *  *  *  *  *

9                    C E R T I F I C A T E

10   I certify that the foregoing is a correct transcript from the
     digital audio recording of proceedings in the above-entitled
11   matter.

12
     6-24-2020                /s/ Dawn M. Savino, R.P.R., C.R.R.
13   Date                     DAWN M. SAVINO, R.P.R., C.R.R.

14

15

16

17

18

19

20

21

22

23

24

25

**PROCEEDINGS RECORDED BY COURTROOM DIGITAL AUDIO RECORDING
TRANSCRIPT PRODUCED BY MANUAL STENOGRAPHY
AND COMPUTER-AIDED TRANSCRIPTION**