IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

BPI SPORTS, LLC,

       Plaintiff,

vs.

THERMOLIFE INTERNATIONAL, LLC,
MUSCLE BEACH NUTRITION LLC, and
RONALD L. KRAMER,

       Defendants.

CASE NO.: 0:19-cv-60505-RS

**FILED UNDER SEAL**

## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

BPI has provided no evidence that any consumer ever was deceived, nor evidence to prove the "materiality" element of its Lanham Act false advertising claim. BPI failed to retain an expert to testify to support this element of its claim and it did not provide any market research on consumer behavior. (This, despite Defendants informing BPI that it lacked exactly this evidence and after the Court gave BPI the opportunity to update its expert disclosures).[1] As a result, no reasonable fact-finder could conclude that consumers bought Defendants' CRTN-3 product because Defendants advertised: (1) it a "first time fusion of [three creatines]"; (2) its contains two sub-sets of ingredients that Defendants labeled "matrix" (a categorization BPI uses on more than ten BPI products); or (3) that CRTN-3 contains "three of the most effective forms of creatine." The only evidence on this point is ***Defendants'*** marketing expert (the only marketing expert disclosed by either party) who testified that there is no evidence that the advertising at issue affected consumer behavior.

Likewise, BPI has established no evidence to demonstrate a causal link between Defendants' alleged false advertising and any loss. In fact, BPI withdrew its damages expert. ████████████████████████████████████████████████ ████████████████████████████████████████████ This is not harm attributable to Defendants' advertising. Again, BPI's lack of evidence on a necessary element of its Lanham Act claim requires summary judgment for Defendants.

BPI also has provided no evidence that any of the advertising statements at issue are "literally false," another necessary element of BPI's false advertising claim. As BPI's own expert witness, a pharmaceutical chemist, testified, that CRTN-3's product label "relieves" any confusion that the alleged false advertising statements may create. Thus, everyone agrees there is no literal falsity when the advertising is put in the context that the consumer views. Tellingly, in order to opine that any advertising statement at issue was "false or misleading", BPI's expert had to ignore this context and then: (1) create his own definitions of the words used in Defendants' advertising (employing definitions not found in any dictionary); (2) determine how a "scientifically literate" consumer might understand the advertising; and (3) "imply meaning" from Defendants' advertising content, outside the actual written words. These artifices fabricate alleged falsity where none exists under proper Lanham Act standards. In addition to admitting during his deposition that the labels of CRTN-3 prove there is no literal false advertising here,

---

[1] DE 101 at 12; DSOF ¶ 33; DE 131.

1

BPI's expert has admitted that Defendants' advertising is capable of multiple meanings to different types of consumers. That is insufficient to raise a triable issue of fact of misleading advertising. For this reason, as well, summary judgment is appropriate.[2]

Summary judgment also is required on BPI's false patent marking claim. Here, again, BPI lacks any evidence from which to prove the elements of its claim. First, ThermoLife's patent marking related to its U.S. Patent No. 7,777,074 ("the '074 Patent") is entirely appropriate. While the '074 Patent is undergoing Reexamination in the United States Patent Office, the '074 Patent is presumed valid, as issued, unless and until a Reexamination Certificate issues. Second, regardless, BPI has no evidence that any of Defendants' products were falsely marked "for purposes of deceiving the public," an element of a false patent marking claim. In fact, BPI lacks a scintilla of evidence that Defendants' alleged false patent marking was done intentionally in bad faith (it was not). Third, and finally, even if BPI could show a factual dispute related to actual patent marking (and it cannot), BPI has no evidence from which a reasonable juror could find that any alleged false patent marking caused it harm.[3]

The truth is BPI's lawyers filed this meritless lawsuit in retaliation for ThermoLife's false advertising suit against BPI filed in Arizona, which alleged, based on independent third-party testing, that BPI's BCAA Products do not include ingredients that BPI sold tens of millions of dollars' worth of for years based only on falsities that ThermoLife exposed. In fact, BPI's instant suit was filed with such haste that nearly all of the alleged false advertising statements that BPI's lawyers sued Defendants for are statements made by *BPI* to promote its *own* products.

At deposition, BPI's lone 30(b)(6) witness, its CEO Derek Ettinger, could not explain how or why Defendants' advertising was false (answering "I don't know" to questions over 150 times on 10 different topics and differing factual questions to BPI's lawyers 19 times).[4] This lawsuit never should have been filed and the Court should end it now, on summary judgment. This motion is supported by the following Memorandum of Points and Authorities, Defendants' Statement of Facts ("DSOF"), and the separately filed Daubert Motion.[5]

---

[2] BPI's common law unfair competition claim fails for the same reasons as its Lanham Act false advertising claim.
[3] Summary judgment is also required on BPI's claim that Ron Kramer is the alter ego of ThermoLife and/or Muscle Beach Nutrition; he isn't, and BPI lacks any evidence to the contrary. (DSOF ¶ 97.)
[4] DSOF ¶ 36.
[5] This motion is not dependent on exclusion of Dr. S. Bannister, BPI's only expert witness; BPI's claims fail even with Dr. S. Bannister's testimony. The motion refers to BPI's expert as "Dr. S. Bannister," because Defendants' scientific expert is Dr. Thomas Bannister. The Bannisters are not related.

## <u>MEMORANDUM OF LAW</u>

### I.   **BRIEF FACTUAL BACKGROUND**

On July 7, 2020, Defendants conceded BPI's alter ego claims for the purposes of streamlining this litigation. (DE 135.) This Motion is the reason. Regardless of whether Defendants are alter egos or not, BPI has no evidence from which to prove any of the Defendants committed any false advertising or false patent marking claim.

In this section, Defendants set out their conduct, which BPI claims gives rise to its claims. Where pictures are shown of the alleged offending advertising, <u>yellow arrows highlight the specific conduct BPI claims is tortious</u>. While the factual background below attempts to inform the Court succinctly regarding the conduct that BPI alleges is tortious, the argument section of this motion includes detailed information gleamed from discovery, generally from BPI's expert, addressing the lack of factual support for any of BPI's claims.

### A.   **The Only Product At Issue: CRTN-3.**

BPI alleges that Defendant's CRTN-3 product is falsely advertised. (DSOF ¶ 1.) A picture of the product, the alleged false advertising statements as used in ThermoLife's advertising, and the product's Supplement Facts Panel appear below:

 

Muscle Beach Nutrition promotes its product with the following advertising statement:

CRTN-3™ is the first-time fusion of Creatine Nitrate, Creatine Hydrochloride, and Creatine Monohydrate, along with our Hydro-GO™ electrolyte matrix, will help you push harder, get stronger, recover quicker, and reach your goals faster than ever before.* Experience the progress with every rep.

(DSOF Ex. 1.)

B.      **ThermoLife's Advertisement of Its Patent Rights.**

BPI also asserts that ThermoLife falsely advertises its patent rights on the website ThermoLife.com. (DSOF ¶ 2.) A screenshot of the relevant website appears below:



(DSOF Ex. 3.) BPI asserts that ThermoLife's website creates the "false impression" that a license from ThermoLife is necessary to sell products that include certain amino acid nitrate compounds. BPI, though, does not dispute that, as the website states, ThermoLife holds "19 nitrate related patents" with "more 450 valid claims." And, BPI has not identified any other company that holds a patent for "amino acid nitrates" or any company that sells (or is a legitimate source for) "patented and licensed amino acid nitrates." (DSOF ¶ 14.)

C.      **The Patent Marking At Issue.**

In discovery, BPI has alleged that ThermoLife is liable for false patent marking of other companies' products, that are licensees of ThermoLife, based on the following conduct: If a company desires to use ThermoLife's patented raw materials or technology in their dietary supplement products, as part of its patent licensing agreement (which companies only must use

<u>if they want</u> to use ThermoLife's patented raw materials or patented technology), ThermoLife requires that the company use the NO3-T stylized logo on their products that include ingredients or technology practiced by at least one of ThermoLife's patents. (DSOF ¶¶ 4-6.)  A copy of the label from one of ThermoLife's licensee's products is below:



(DSOF ¶ 7 Ex. 7.)  A blow-up of the NO3T logo on the above label is below:



As the blowup indicates, ThermoLife's NO3-T logo is displayed on products along with a statement, like the one above, that "NO3-T is a trademark of ThermoLife International, LLC. NO3-T.com/patents."  (DSOF ¶¶ 4-6.)  Between March 15, 2015 and May 4, 2019, the NO3-T.com/Patents website displayed essentially the following content:



(DSOF Ex. 4.) In or around May 2019, after BPI filed suit here, ThermoLife modified the content on the NO3-T.com website to call-out exactly which ThermoLife patents were practiced by its licensees' products (as represented below). (DSOF ¶ 7.)

**NO3-T**
**NITRATE TECHNOLOGY**
**NO3-T.COM/PATENTS**

Legal Notice / Virtual Patent Marking:

In accordance with 35 U.S.C. § 287(a), the reader is hereby placed on notice of ThermoLife International, LLC's rights in the United States Patents and Patent Applications listed on this site and associated with the products listed. The listed products may not be all inclusive, and one or more patents may protect other products not listed here. Information included in this listing does not preclude us from pursuing any and all legal rights we may have for the purpose of protecting those rights on our intellectual property.

7,777,074 - 8,034,835 - 8,048,921 - 8,178,572 - 8,183,288 - 8,455,531
8,466,187 - 8,569,368 - 8,569,369 - 8,952,046 - 8,952,047
8,957,100 - 8,957,101

| Cellucor: | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| C4 Original | 7,777,074 | 8,178,572 | 8,183,288 | 8,455,531 | 8,466,187 | 8,952,046 | 8,957,100 | 8,957,101 |
| C4 Ultimate | 7,777,074 | 8,178,572 | 8,183,288 | 8,455,531 | 8,466,187 | 8,952,046 | 8,957,100 | 8,952,047 |
| C4 Extreme Energy | 7,777,074 | 8,178,572 | 8,183,288 | 8,455,531 | 8,466,187 | 8,952,046 | 8,957,101 | |
| NO3 Chrome | 8,178,572 | 8,183,288 | 8,455,531 | 8,466,187 | 8,952,046 | 8,957,100 | 8,957,101 | |
| NO3 Ultimate | 8,178,572 | 8,183,288 | 8,455,531 | 8,466,187 | 8,952,046 | 8,957,100 | 8,957,101 | |
| M5 Ultimate | 7,777,074 | 8,178,572 | 8,183,288 | 8,455,531 | 8,466,187 | 8,952,046 | 8,957,101 | |
| CN3 | 7,777,074 | 8,178,572 | 8,183,288 | 8,455,531 | 8,466,187 | 8,952,046 | 8,957,101 | |
| | | | | | | | | |
| Dedicated USA: | | | | | | | | |
| Unstoppable | 8,455,531 | 8,466,187 | 8,952,046 | 8,957,101 | 8,952,047 | 8,569,368 | 8,569,369 | |
| VasoGrow | 7,777,074 | 8,178,572 | 8,183,288 | 8,455,531 | 8,466,187 | 8,952,046 | 8,957,101 | |
| | | | | | | | | |
| Purus labs: | | | | | | | | |
| NOXygen | 8,952,047 | 8,569,368 | 8,569,369 | 8,952,369 | | 8,957,101 | | |

On all versions of the NO3-T.com website, the hyperlinks at the top of page listing ThermoLife's patents link to the United States Patent Office's website page displaying the specific patent at issue. (DSOF ¶ 8.)

## II.    THE SUMMARY JUDGMENT STANDARD

Summary judgment "shall" be granted if "the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. Pro. 56(a). "[T]he mere existence of some alleged factual dispute…will not defeat an otherwise properly supported motion[.] [T]he requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247- 48 (1986) (emphasis added). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Id*. at 248. An issue is "genuine" when the evidence is such that a reasonable jury could return a verdict for the nonmovant. *Id*. at 249–50. The moving party bears the initial burden of showing, by reference to materials in the record, that there is no genuine dispute as to any material fact. *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1260 (11th Cir. 2004). The moving party may discharge its burden by showing that the record lacks evidence to support the nonmoving

6

party's position. *Moton v. Cowart*, 631 F.3d 1337, 1341 (11th Cir. 2011) (citing *Celotex v. Catrett*, 477 U.S. 317, 322–23 (1986)). Summary judgment is the "put up or shut up" moment, when a party must show what evidence it has that would convince a trier of fact to accept its version of events. *Steifel Labs., Inc. v. Brookstone Pharmaceuticals, LLC*, 2012 WL 12888436, at *11 (N.D. Ga. July 24, 2012) (citing *Arnett v. Webster*, 658 F.3d 742, 760 (7th Cir. 2011).

## III.    ARGUMENT

### A.    BPI's False Advertising Claims Related to CRTN-3 Fail for Three Separate Reasons.

To succeed on a false advertising claim, the plaintiff must establish that (1) the advertisements of the opposing party were false or misleading; (2) the advertisements deceived, or had the capacity to deceive, consumers; (3) the deception had a material effect on purchasing decisions; (4) the misrepresented product or service affects interstate commerce; and (5) the movant has been—or is likely to be—injured as a result of the false advertising. *Johnson & Johnson Vision Care, Inc. v. 1–800 Contacts, Inc.,* 299 F.3d 1242, 1247 (11th Cir. 2002).

As a matter of law, BPI cannot meet its burden of proof on four of the five required elements. (All BPI can show is that the advertising at issue was distributed in commerce).

### B.    BPI Has No Evidence That The Alleged False Advertising Was Material.

Make no mistake, Defendants' advertising is truthful (in Lanham Act terms, it is not "literally false," as explained in Section C below), but the Court need not even reach this issue. BPI has provided no evidence regarding customers' reaction to the alleged false advertising. The materiality element requires a plaintiff to "establish that 'the defendant's deception is likely to influence the purchasing decision.'" *Johnson & Johnson Vision Care, Inc. v. 1-800 Contacts, Inc.*, 299 F.3d 1242, 1250 (11th Cir. 2002) (quoting *Cashmere & Camel Hair Mfrs. Inst. v. Saks Fifth Ave.,* 284 F.3d 302, 311 (1st Cir. 2002)). "The materiality requirement is based on the premise that not all deceptions affect consumer decisions." *Id*. In this Circuit, a plaintiff still must "establish materiality even when a . . . court finds that the defendant's advertisement is literally false." *Johnson & Johnson Vision Care, Inc.,* 299 F.3d at 1250.

BPI has provided no evidence that the alleged false statements "affect[ed] consumer decisions." It has not produced any evidence from any consumers demonstrating that any of the alleged false statements were a factor in a single purchase. In *1-800 Contacts*, the Eleventh Circuit granted summary judgment based on a similar lack of proffered evidence, holding that the plaintiff "did not prove that 1-800 Contacts' use of the term 'eye doctor' was material to

7

consumer decisions." 299 F.3d 1242, 1250 (11th Cir. 2002).

In *Johnson & Johnson*, the Eleventh Circuit cited an example from the Second Circuit, *Nat'l Basketball Ass'n v. Motorola, Inc.,* 105 F.3d 841 (2d Cir. 1997). There, "Motorola's advertisement that its SportsTrax device provided sports information 'direct from each arena' was literally false, but irrelevant to consumer decisions. . . . Consumers were interested in the fact that statistics were updated quickly, and did not make purchasing decisions based on whether data was collected firsthand or though broadcasts." *Johnson & Johnson*, 299 F.3d at 1250 (citing *NBA,* 105 F.3d at 855); *see also Intertape Polymer Corp. v. Inspired Techs., Inc.*, 725 F. Supp. 2d 1319, 1335 (M.D. Fla. 2010) ("Sales of Bloc-it—without more—are not evidence from which a factfinder could find that Intertape's false advertising had a material effect on retailers' or end-consumers' purchasing decisions"); *Stiefel Labs., Inc. v. Brookstone Pharm., L.L.C.*, 535 F. App'x 774, 778 (11th Cir. 2013).

During this litigation, BPI has not disclosed any evidence demonstrating any customers' understanding of the alleged false statements, nor has BPI disclosed any evidence that the alleged false statements impacted consumers buying decisions in any way; much less any evidence that any consumer was deceived. Instead, BPI relies on Dr. Steve Bannister's expert testimony that the alleged false statements are, in his opinion, in fact false. Dr. S. Bannister, a pharmaceutical chemist (who has no training in lexigraphy, marketing, or consumer behavior), admits that, to deem Defendants' advertising false, he made up his own definitions of the advertising terms in question. (DSOF ¶¶ 57-60.) He did not conduct any consumer survey. (DSOF ¶ 55.) He testified, "I do not know any specific consumer so I do not know any specific reactions." (DSOF ¶ 46.) He explained, "I am a physical chemist, and I based all the opinions contained in my reports on chemistry and descriptions of the physical systems which make up CRTN-3." (DSOF ¶ 47.)

He admitted, "No, I am not an expert in consumer behavior." (DSOF ¶ 50.) When asked whether he "tr[ied] to determine how consumers understand [a] phrase," Dr. S. Bannister testified, "I am interpreting the phrase and its implications and I find it to be false in relation to CRTN-3." (DSOF ¶ 51.) Dr. S. Bannister could not say whether **consumers** actually found advertising statements false or misleading, he could say only that he himself, interpreting the statements as a pharmaceutical chemist (with no training in lexigraphy, marketing, or consumer behavior) thinks the statements are false and misleading. (DSOF ¶ 52.)

Simply put, Dr. S. Bannister never attempted to discern consumers' opinions regarding

Defendants' advertising; he was not qualified to do that. The best Dr. S. Bannister could come up with is imagining that the consumer is someone more like him (or aspires to be like him): "As I said before, the promotion is product, including -- and I can't remember the specific terms, but it includes references to science and that is very clearly an effort to appeal to someone who is or aspires to be scientifically literate[6] so the general uneducated consumer may not be the appropriate reference." (DSOF ¶ 53.) And, when asked what percentage of the market accounts for this "scientifically literate" segment, Dr. S. Bannister conceded, "Again, I can't -- I can't put specific numbers[.] . . . I think a significant portion of them aspire to be scientifically literate. I can't judge whether they -- they -- whether they all are." (DSOF ¶ 54.)

Unsubstantiated opinion testimony from a chemist is not evidence of likely consumer behavior. As Defendants' Mark Keegan, an actual expert in determining consumer behavior, explained, BPI could have sought to determine whether consumers were, or were likely to be, deceived, by Defendants' advertising. (DSOF ¶ 33.) This is learned through use of a consumer survey; even, Dr. S. Bannister agreed. (DSOF ¶ 55.) BPI has failed to produce a market survey despite being told again-and-again (*infra* n. 1) that BPI needs this evidence. With BPI offering no expert testimony or market research, marketing expert Mark Keegan's testimony is unrefuted:

> A consumer perception survey would be necessary to determine which meaning consumers subscribe to the marketing statements at issue. It is my understanding that BPI has not conducted this survey. Without a consumer survey or market research, it is impossible to know whether consumers changed their buying behavior as a result of the [advertising statements at issue].

(DSOF ¶ 34.)

BPI left its only expert Dr. S. Bannister to guess what customers believe. (DSOF ¶ 56.) In short, there is no evidence that any consumer was persuaded by Defendants' advertising that CRTN-3 included: (1) a fusion of three creatines; (2) a hyper-infused creatine matrix and a hydro-go electrolyte matrix; or (3) three of the most effective forms of creatine. The only admissible evidence on this point is the testimony of Defendants' marketing expert Mark

---

[6] Dr. S. Bannister acknowledged during deposition that he formed his opinion that Defendants' advertising is directed at "scientifically literate" consumers because one of Defendants' advertisements said that CRTN-3 is "scientifically formulated." To highlight the absurdity of this opinion, we point to Bayer Pharmaceutical Company's' tagline which is "Science for a better life." In Dr. S. Bannisters' opinion, because Bayer uses the word "science" in relation to its products, "a significant portion" of consumers who buy Bayer aspirin would be people who "aspire to be scientifically literate." Furthermore, as Defendants' President stated during deposition, Defendants target the entire dietary supplement market, not just "scientifically literate" consumers. This testimony is undisputed.

Keegan. BPI has the burden of proof on materiality and BPI has no evidence from which to prove this necessary element of its claim or to refute Mr. Keegan's opinion here. Accordingly, summary judgment is appropriate on this basis alone; the Court need not even consider the truthfulness of the advertising at issue (which is true nonetheless).

        **C.**      **BPI Cannot Prove Any Of The Alleged False Statements Caused Harm.**

        Summary judgment is also appropriate because BPI cannot, as a matter of law, prove that any of the alleged false statements caused any damages. "[F]alse advertising under the Lanham Act requires, among other things, a showing of both an injury and a causal link between the injury and the allegedly false advertising." *Air Turbine Tech., Inc. v. Atlas Copco AB*, 410 F.3d 701, 709 (Fed. Cir. 2005) (citing *Johnson & Johnson,* 299 F.3d at 1247); *see Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 133–34, 134 S. Ct. 1377, 1391, 188 L. Ed. 2d 392 (2014) ("a plaintiff suing under § 1125(a) ordinarily must show economic or reputational injury flowing directly from the deception wrought by the defendant's advertising; and that that occurs when deception of consumers causes them to withhold trade from the plaintiff"); *see also Orange Lake Country Club, Inc. v. Reed Hein & Assocs., LLC,* No. 617CV1542ORL78DCI, 2019 WL 7423517, at *14 (M.D. Fla. Oct. 4, 2019) (holding plaintiff failed "to satisfy the Lanham Act's proximate causation requirement").

        "This 'causation' element can be established when the movant provides evidence linking the false advertisement to consumers' decisions not to purchase the movant's product." *Snac Lite, LLC v. Nuts 'N More, LLC*, No. 2:14-CV-01695-RDP, 2016 WL 6778268, at *10 (N.D. Ala. Nov. 16, 2016). "[E]ven where a defendant's statements are literally false and the court presumes consumer deception, a plaintiff must still prove that the alleged false advertising caused the asserted damages (here, that consumers chose Defendant's products rather than those of Plaintiff)." *Id*. at *11 (citing *PBM Prod., LLC v. Mead Johnson & Co.*, 639 F.3d 111, 122 (4th Cir. 2011)). BPI cannot dispense with this element by seeking disgorgement of Defendants' profits as a remedy here: "A plaintiff is only entitled to apportionment of a defendant's profits after providing evidence to establish that the alleged false advertising caused some injury to the plaintiff." *Snac Lite, LLC,* 2016 WL 6778268, at *14.

        BPI has produced no evidence from customers at all, let alone "evidence linking the false advertisement to consumers' decisions not to purchase the movant's product." ███████

████████████████████████████████████████████████████████████████

███████████████████████████████████
███████████████████████████████████
███████████████████████████████████
███████████████████████████████████
███████████████

**D.      The Alleged Advertising Is Not Literally False And BPI Lacks Sufficient Evidence To Establish A Claim That The Advertising Is Misleading.**

Because BPI has zero evidence to prove either materiality or damages, this Court need not even reach the falsity element of the false advertising claim.  But if it does so, the Court will see that summary judgment independently is warranted because BPI cannot establish this element either.

"If the court deems an ad to be true but misleading, the movant . . . must present evidence of deception. While 'full-blown consumer surveys or market research are not an absolute prerequisite,' the moving party must provide 'expert testimony or other evidence.'" *Johnson & Johnson Vision Care, Inc. v. 1-800 Contacts, Inc.*, 299 F.3d 1242, 1247 (11th Cir. 2002) (quoting *United Indus. Corp.,* 140 F.3d at 1183).   Put another way, "[t]he classification of an advertisement as literally false or true but misleading affects the [plaintiff's] burden with respect to the element of consumer deception. If the court deems an advertisement to be literally false, then the [plaintiff] is not required to present evidence of consumer deception. . . . If, on the other hand, the court deems the advertisement to be true but misleading, ***then the movant is required to present evidence of deception***." *Osmose, Inc. v. Viance, LLC*, 612 F.3d 1298, 1318–19 (11th Cir. 2010) (emphasis added).

Here, as explained above, just as BPI lacks any evidence to show that Defendants' advertising was material, BPI has no consumer survey or market research to establish that Defendants' advertising is misleading (it isn't). Accordingly, BPI's Lanham Act claim can survive only if BPI establishes that Defendants' advertising is literally false.

In determining whether a statement is capable of being proven literally false, "[t]he ambiguity of the statement at issue, or the lack thereof, is significant. ***Statements that have an unambiguous meaning, either facially or considered in context, may be classified as literally false***." *Osmose, Inc. v. Viance, LLC*, 612 F.3d 1298, 1308–09 (11th Cir. 2010) (citing *United Indus. Corp. v. Clorox Co.,* 140 F.3d 1175, 1180 (8th Cir. 1998)) (emphasis

added). The Eleventh Circuit holds, "As the meaning of a statement becomes less clear, however, and it becomes susceptible to multiple meanings, the statement is more likely to be merely misleading." *Osmose, Inc. v. Viance, LLC*, 612 F.3d 1298, 1308–09 (11th Cir. 2010). In *Osmose*, the Eleventh Circuit quoted with approval *Time Warner Cable, Inc. v. DIRECTV, Inc.,* where the Second Circuit succinctly stated: "[I]f the language or graphic is susceptible to more than one reasonable interpretation, the advertisement ***cannot be literally false***." 497 F.3d 144, 158 (2d Cir.2007) (emphasis added). As the Second Circuit held, "'only an ***unambiguous*** message can be literally false.'" *Id*. (quoting *Novartis Consumer Health, Inc. v. Johnson & Johnson–Merck Pharm. Co.,* 290 F.3d 578, 587 (3d Cir.2002)) (emphasis in original).

And, "[w]hen determining whether an advertisement is literally false or misleading, courts 'must analyze the message conveyed in full context,' and 'must view the face of the statement in its entirety.'" *Osmose*, 612 F.3d at 1308 (quoting *Johnson & Johnson*, 299 F.3d at 1248). "While the court should consider context, it may not ***assume*** context." *Johnson & Johnson*, 299 F.3d at 1248 (emphasis in original). This means that in false advertising claims premised on an advertising label, "the Court must consider the qualifiers in packaging, usually on the back of a label or in ingredient lists, [which] 'can ameliorate any tendency of the label to mislead.'" *Moore v. Mars Petcare US, Inc.*, 966 F.3d 1007, 1017 (9th Cir. 2020).

Here, in the context of the CRTN-3's label, as BPI's own expert has admitted, Defendants' advertising statements are not false (the label itself explains the truthfulness of the advertising at issue). (DSOF ¶ 62.) Moreover, even ignoring the full-context of the CRTN-3 label, each of the advertising statements at issue is capable of multiple interpretations; thus, these statements cannot be deemed literally false.  Indeed, as explained below, the advertising claims under any reasonable interpretation are proven true (even by BPI's own expert).

> ### a.  All Of The Advertising Statements At Issue Are Capable of Multiple Interpretations And, Therefore, They Cannot Be Literally False.

> *i.  First-Time Fusion Is Capable of Multiple Meanings And It Is Not Literally False When Used to Describe CRTN-3.*

Ignoring the full-context of Defendants' product label, BPI claims that the statement that

CRTN-3 is a "first-time[7] fusion of Creatine Nitrate, Creatine HCL, and Creatine Monohydrate" constitutes false advertising. To support this claim, BPI's expert invented his own definition for the word "fusion." At deposition, BPI's expert was asked whether, "Q: Any dictionary anywhere use the definition that you used [for fusion] word for word? A. Word for word, no." (DSOF ¶ 59.) BPI's expert further testified that the definition he applied to "fusion" was appropriate due to "implication[s]" arising from the word fusion in Muscle Beach Nutrition's advertising. (DSOF ¶ 51.) As he stated, "There may be a variety of definitions [for fusion] but the labeling -- the representation on the product *implies* more than a -- than a blend. It implies some new species." (DSOF ¶ 61.)

The fact that BPI's own expert had to "imply" something from Defendants' advertising to conclude that "first-time fusion of [three creatines]", as used in CRTN-3's advertising, meant that a new "species" of creatine was included in CRTN-3 demonstrates that BPI lacks any evidence that this statement is literally false. BPI's own expert had to make up a definition to opine the statement was false; as a matter of law, this renders this statement ambiguous and not capable of literal falsity. In *FieldTurf USA Inc. v. TenCate Thiolon Middle E.*, 945 F. Supp. 2d 1379, 1386 (N.D. Ga. 2013), the court found that "the phrase 'industry's strongest fiber' is not susceptible to only one interpretation. Because the statement is ambiguous and could cover several different meanings of 'strength' aside from 'tensile strength,' [plaintiff] has not shown that the statement was literally false." As BPI's own expert testified, "fusion" has many meaning in different contexts, just like "strength." As a result, a claim that a product includes a "fusion" of ingredients cannot be literally false.

Indeed, the claim that CRTN-3 includes a "first-time fusion of Creatine Nitrate, Creatine HCL, and Creatine Monohydrate" is a true statement. As even Dr. S. Bannister admitted at deposition, he can tell by looking at the label that CRTN-3 includes "a powder blend" of three creatines (DSOF ¶ 62.) He also admitted he can tell by looking at the label that it is a "mixture of powders." (DSOF ¶ 63.) The dictionary definitions that Dr. S. Bannister consulted to come-

---

[7] At deposition, BPI's expert conceded that CRTN-3 is the first time that BPI is aware of where Creatine Nitrate, Creatine HCL and Creatine Monohydrate have been included in one product. (S. Bannister Depo. at 118:20-120:6.) As he testified:

Q: If the phrasing of the CRTN-3 advertising was this is a first-time inclusion of creatine nitrate, creatine HCl, and creatine monohydrate in a product, would you contend that was false?
A. Stated that narrowly, no.
(DSOF ¶ 96.)

up with his own custom definition for "fusion" include "blend" as a definition for fusion. (DSOF ¶ 64.) The second definition for fusion listed at https://www.yourdictionary.com/fusion, which BPI's own expert used as a reference, states that "fusion" is "the union of different things by or as if by melting; **blending**; coalition … ." (DSOF ¶ 65.)  Moreover, as Dr. S. Bannister admitted during deposition, the very sources that he used, list "mixture" as a synonym for "fusion." (DSOF ¶ 66.)  Accordingly, the very sources that BPI's own expert relied on demonstrate that CRTN-3 is a fusion of three creatines: it is "a powder blend" and also "a mixture." (DSOF ¶¶ 64-65.) As a matter of law, these competing definitions demonstrate that the phrase "first-time fusion of [three creatines]" is capable of multiple meanings, at least one of which is unquestionably true.[8] Thus, this evidence establishes as matter of law that "fusion" is "not susceptible to only one interpretation" and it is, therefore, ambiguous and not "literally false." *See FieldTurf USA Inc. v. TenCate Thiolon Middle E.*, 945 F. Supp. 2d 1379, 1386 (N.D. Ga. 2013).

> ii. *Describing CRTN-3 As Including A HYPER INFUSED CREATINE MATRIX And A HYDRO-GO ELECTROYTE MATIX Is Not Literally False.*

Again, ignoring the entire context of CRTN-3's label, BPI's expert testified that the label's listing of a "HYPER INFUSED CREATINE MATRIX" constitutes false advertising because "It is an expression that very apparently **_suggests_** unique properties of this -- this product, CRTN-3, and promotion, advertising, is always for a purpose to persuade and I believe this is an inappropriate expression of the characteristics of the product that **_would lead to a misunderstanding_** of the results of using the product." (DSOF ¶ 68.) Thus, to explain why CRTN-3's advertising that uses the phrase HYPER INFUSED CREATINE MATRIX is literally false, BPI's expert again uses more than the dictionary to define the meaning of the advertising phrase.

BPI's expert also testified similarly that, "The promotion of CRTN-3 as containing a proprietary 'Hydro-GO Electrolyte Matrix' is literally false because these electrolytes are not present "in a matrix." (DSOF ¶ 68.) The representation would mislead consumers to believe that

---

[8] Defendants' President Ron Kramer testified that indeed the word "fusion" in CRTN-3's advertising means "blend." (DSOF ¶ 94.) And, thus, Defendants advertising is indisputably true. Defendants' own expert, Dr. Thomas Bannister, also stated in his expert report that CRTN-3 did include a "first-time fusion" of three creatines. (DSOF Ex. 16.) This testimony undisputedly establishes that there is a reasonable reading of Defendants' advertising statement that makes the claim true.  Because Plaintiffs can only generate a triable issue of fact if they show that there is no such reasonable reading and the statement is unambiguously and literally false, this evidence establishes Defendants' right to summary judgment in their favor on this issue.

these electrolytes are present in a form uniquely capable of enhancing performance." And "the term matrix has a specific, well-defined, meaning: a defined structure in which each element has a fixed position. The electrolytes of CRTN-3 are not in any structured form; they are simply components of an unstructured powder blend."

Thus, the reason that BPI asserts that these two sets of ingredients constitute false advertising is the same, the phrases, which are not found in any dictionary anywhere, would "lead to a misunderstanding" with consumers. Again, this is not literal false advertising. To prevail on its claim of literal falsity, BPI needs to establish that the phrases at issue, HYPER INFUSED CREATINE MATRIX and HYDRO-GO Electrolyte Matrix, are not susceptible to alternative interpretation. *See FieldTurf USA Inc. v. TenCate Thiolon Middle E.*, 945 F. Supp. 2d 1379, 1386 (N.D. Ga. 2013).

Indeed, BPI's own 30(b)(6) witness admitted that these phrases are susceptible to multiple interpretations. At deposition, BPI's President Derek Ettinger was asked, "What does 'matrix mean in the supplement industry?" He answered, "That's an easy one. We use that [matrix] a lot. My interpretation, as I've always known it to be, is just a subsection of a greater part of the ingredient panel." (DSOF ¶ 70.) This testimony is absolutely consistent with how Muscle Beach Nutrition uses the term on its CRTN-3 product. The label lists both a "HYPER INFUSED CREATINE MATRIX " and a "HYDRO-GO ELECTROLYTE MATRIX":

| | | |
|---|---|---|
| Potassium | 100 mg | 3% |
| **HYPER INFUSED CREATINE MATRIX™** | **5000 MG** | |
| Creatine Monohydrate | 3,000 g | ** |
| Creatine Nitrate (NO3-T®) | 1,000 g | ** |
| Creatine HCL | 1,000 g | ** |
| **HYDRO-GO™ ELECTROLYTE MATRIX** | **1250 MG** | |
| Coconut Water | 250 mg | ** |
| Tripotassium Citrate | 250 mg | * |
| Tricalcium Phosphate | 250 mg | * |
| Magnesium Chloride | 250 mg | * |
| Sodium Citrate | 250 mg | * |

If follows, then, (even according to BPI's own 30(b)(6) and  President) that the advertising phrases for "MATRIX" that Muscle Beach Nutrition employed in connection with CRTN-3 are susceptible to multiple meanings. As Defendants' President and Defendants' Expert explained, under a reasonable interpretation of these phrases, Defendants' advertising statements are true. (DSOF ¶ 72.) In fact, BPI itself uses the term "MATRIX" to describe blends or subsections in the Supplement Facts Panels on more than 11 separate BPI products. (DSOF ¶ 71.) As a result, BPI cannot prove that these advertising statements are literally false.

iii.  *CRTN-3 Includes "Three Of The Most Effective Forms Of Creatine In One Cutting-Edge Formula"; This Statement Is Not Literally False.*

Again viewing CRTN-3's advertising in isolation, outside the context of CRTN-3's label, BPI's expert also contends that Defendants' statement that CRTN-3 includes "Three of The Most Effective Forms of Creatine In One Cutting-Edge Formula" constitutes false advertising. In rendering this opinion, BPI's expert indicates that because CRTN-3 is meant to be mixed in water CRTN-3 is falsely advertised. For Dr. S. Bannister, once a form of creatine is added to water it breaks down to its ionic forms and becomes two ionic creatine forms: the creatinium ion, and the creatine zwitterion. (DSOF ¶ 73.) For this reason, Dr. S. Bannister does not believe that any product can be advertised as providing three forms of creatine (no matter how many forms are actually in the bottle) and he even accuses BPI, who retained him here, of falsely advertising its own creatine product.[9]

Like the rest of Dr. S. Bannister's opinions this is again an obvious reach to create falsity in CRTN-3's advertising where none exists. As he acknowledged during his deposition, he has no reason to doubt that there are three forms of creatine in the CRTN-3 bottle. (DSOF ¶ 75.) And, as Dr. S. Bannister testified, he does not know which forms of creatine are "the three most effective forms of creatine." (DSOF ¶ 76.) For him, this wasn't relevant because, according to him, only two forms of creatine are delivered after the product is dissolved in water.

But CRTN-3 does not claim that it delivers three of the most effective forms of creatine after being dissolved in water. CRTN-3 is merely advertised (in compliance with FDA regulations) as including "Three Of The Most Effective Forms of Creatine In One Cutting Edge Formula."



(DSOF Ex. 2.) Neither BPI nor its expert can dispute this statement; it is not literally false.

---

[9] When Dr. S. Bannister was presented with BPI's own advertising that touts BPI's Best Creatine product as including "six advanced forms of creatine", he acknowledged that if his reasoning applied to BPI's product, there were only two forms of creatine delivered to a consumer of BPI's product. (DSOF ¶ 74.)

And, incredibly, despite suing Defendants for advertising that CRTN-3 contains three of the most effective forms of creatine is false, BPI's own advertising touts two of the same three forms of creatine that are in CRTN-3 (Creatine Monohydrate and Creatine HCL) as: "The two best forms of creatine." (DSOF ¶ 77.) Given that, BPI's own expert testified that creatine nitrate (the third of the three effective forms of creatine in CRTN-3) is a superior form of creatine (DSOF ¶ 78.), the statement that "CRTN-3 includes three of the most effective forms of creatine" is true even under BPI's own analysis. Moreover, despite that BPI's own expert claims that when used as directed powered creatine products only deliver two forms of creatine in their ionic forms after being dissolved in water (creatinium ion and creatine zwitterion), BPI itself advertises its own powered creatine products as "includ[ing] not one, but six advanced forms of creatine to enhance the effects." (DSOF ¶ 74.) So while BPI proudly advertises that it sells six of the best forms of creatine in one formula (the product is actually named "BEST CREATINE"), BPI at the same time accuses Defendants of making false statements because Defendants advertise that they sell three of the best forms of Creatine in one formula (even when two of the forms used in CRTN-3 are exactly the same as in BPI's product, and the third form (creatine nitrate), BPI's own expert admits provides useful benefits no other creatine species can provide). (DSOF ¶ 86.) In sum, Defendants' advertising claim that CRTN-3 includes three of the most effective forms of creatine is true; at a minimum, the statement is not literally false.

At bottom, none of the BPI's arguments related to the falsity of Defendants' alleged advertising statements are based on "an unambiguous meaning." *See FieldTurf USA Inc. v. TenCate Thiolon Middle E.*, 945 F. Supp. 2d 1379, 1386 (N.D. Ga. 2013). That being so, BPI cannot establish literal falsity, and therefore must show consumer deception through evidence. But, BPI has no evidence of deception, and, therefore, summary judgment is warranted. *See FieldTurf USA Inc. v. TenCate Thiolon Middle E.*, 945 F. Supp. 2d 1379 (N.D. Ga. 2013).[10]

---

[10] In addition to alleged false statement discussed herein, in the Rebuttal Report of Dr. S. Bannister, BPI disclosed for the first time, that it intended to assert here that CRTN-3 did not include an effective dose of nitrates to cause a physiological effect. (DSOF ¶¶ 25-31.) As fully explained in the separately filed Daubert Motion, BPI's late disclosed claim should be struck. In an abundance of caution though, Defendants write briefly here to address the fact that BPI's late disclosed claim is also entirely without legal of factual support. CRTN-3 includes an effective dosage of nitrates. (DSOF ¶¶ 91-93.) And, as BPI's own expert concedes, there may be studies that conclude that a lower dosage of nitrate (than what he claims) is necessary to cause a physiological effect. (*Id.*) Indeed, there are studies showing that 1/5 of the dosage of nitrates included in CRTN-3 has a physiological effect. For this reason, as well, as a matter of law, BPI's late disclosed claim fails. See *In re GNC Corp.*, 789 F.3d 505, 516 (4th Cir. 2015) (holding that when a Lanham Act claim is premised on whether an ingredient is effective, the plaintiff cannot prevail if "some reasonable and duly qualified experts agree with the scientific proposition [espoused by the defendant].")

**E.      Regardless, Dr. S. Bannister Acknowledged The CRTN-3 Label Would Resolve Any Confusion Arising From Defendants' Alleged False Advertising; As A Result There is Not Dispute Regard Literal Falsity.**

Summary judgment is also appropriate here because BPI's expert has admitted that, when put in context of the CRTN-3 label (where all of the advertising at issue appears), the advertising does not confuse consumers. "Qualifiers in packaging, usually on the back of a label or in ingredient lists, "can ameliorate any tendency of the label to mislead." *Moore*, 966 F.3d at 1017; *accord Pernod Ricard USA, LLC v. Bacardi U.S.A., Inc.,* 653 F.3d 241 (3d Cir. 2011). Even though Dr. S. Bannister opines that CRTN-3's label includes false statements, he testified at deposition that he is not at all familiar with "DSHEA" (The Dietary Supplement Health and Education Act of 1994), or the laws governing the labeling of dietary supplements. (DSOF ¶ 80.)When asked to apply basic labeling regulations to the label of CRTN-3, Dr. Bannister acknowledged that those laws, and CRTN-3's supplement facts panel, would "relieve" any confusion allegedly created by Defendants' advertising statements. (DSOF ¶ 81.)

At deposition Dr. Bannister simply was asked to apply the basic FDA labeling regulations that require dietary supplements to list their ingredients on a supplement facts panel. Under 21 CFR 101.36(b)(3)(i), "Other Dietary Ingredients", like Creatine nitrate, Creatine HCL, and Creatine monohydrate (the 3 creatines in CRTN-3), must "be declared by their common or usual name when they are present in a dietary supplement" just like they are in the Supplement Facts Panel of Muscle Beach Nutrition's CRTN-3 product, as displayed below (DSOF Ex. 1):



When asked to apply these basic labeling regulations to the labeling of CRTN-3 (which CRTN-3 is in full compliance of), Dr. Bannister acknowledged that "If that was a requirement

[listing the actual ingredients that are in the product] and if it was on the facts panel, the consumer would know." Questioned further, whether the "supplement facts panel would remedy any confusion that might be created by the advertising on the product?" Dr. S. Bannister answered, "It would -- it would relieve that element … of confusion." (DSOF ¶ 81.)

Dr. S. Bannister's honest answer here cannot be ignored, it is consistent with horn-book law and it eviscerates any genuine issue of material fact from BPI's false advertising claim. As admitted by Dr. S. Bannister, when the statements are viewed in the proper context, as they must be, the statements are true. After all, how can a reasonable jury find that a consumer would be deceived by CRTN-3's Hyper Infused Matrix or Hydro-Go Electrolyte Matrix, when the product's label lists the ingredients included in these two "matrix" right on the label? And how could a reasonable jury find that a consumer could be tricked by Muscle Beach Nutrition's advertising into believing, as BPI alleges, that CRTN-3 includes a "first-time fusion [of three creatines]" means that CRTN-3 includes an entirely new species of creatine when the label specifically indicates that product includes three separate species of creatine: Creatine Monohydrate, Creatine HCL, and Creatine Nitrate. And finally, how could a reasonable jury find that a consumer be misled by the statement that the product includes "three of the most effective forms of creatine" when the CRTN-3 label specifically lists the three effective forms of creatine that are included in the product. As Dr. S. Bannister testified, the label, in compliance with FDA regulations, "relieves" any element of "confusion" from Defendants' alleged false advertising.

As a result, for this reason, as well, summary judgment is appropriate and must be granted on this alleged false advertising statements in favor of Defendants.[11]

### F.   BPI's False Advertising Claims Related to the NO3-T Website Fail.

In addition to alleging that CRTN-3 is falsely advertised, BPI asserts that ThermoLife creates "a false impression that a license is needed to use, manufacture, supply, market, sell or import them, including amino acid nitrates such as creatine nitrate." But, BPI does not allege that ThermoLife made any literally false statement here (a false impression is not "literally false"). As with all of BPI's alleged false advertising claims, BPI has no evidence from customers demonstrating that any customer formed such a "false impression" and that the "impression" impacted any buying decision. Indeed, BPI's Rule 30(b)(6) witness could not even identify a

---

[11] BPI also uses the word "fusion" in connection with its products. As BPI's President explained, when BPI uses the word "fusion" "it's just cool words." (DSOF ¶ 67.)

falsehood related to ThermoLife's advertising of its patented raw materials and BPI's expert did not opine on this issue. As stated above, BPI's claim that "consumers have been misled" requires evidence of deception, materiality, and causation. BPI has none.

The reason that BPI's false advertising theory is supported only by inadmissible lawyer argument in disclosure statements is obvious. ThermoLife has not made any false claim related to its patented raw materials. As ThermoLife's President has declared under oath, and BPI has no evidence to dispute, "ThermoLife is the only legitimate source for patented and licensed amino acid nitrates." (DSOF ¶ 14.) The statements on the website displayed below are true and this is undisputed.



Summary judgment is warranted on any claim BPI may assert related to ThermoLife's advertising of its patent rights and/or the patent rights that its licensees identify on their products.[12]

---

[12] The Court also need not reach this issue because advertising statements regarding the scope of a patent are not grounds for a Lanham Act false advertising claim. *In Robert Bosch, LLC v. Pylon Mfg. Corp.,* 632 F.Supp.2d 362, (D. Del. 2009), the defendant (represented by BPI's current counsel Gregory Hillyer, who takes the exact opposite position in this case) won a motion to dismiss on this very point: "[F]alse attribution of the authorship" of an invention or innovation is not an actionable false advertisement under § 43(a) of the Lanham Act. *Baden Sports, Inc. v. Molten USA, Inc.,* 556 F.3d 1300 (Fed.Cir.2009); *see Monsanto Company v. Syngenta Seeds, Inc.,* 443 F.Supp.2d 648, 653 (D.Del.2006). Therefore, plaintiff has not stated a claim under the Lanham Act for false advertising related to Pylon's statement that it developed a frameless windshield wiper blade." *Robert Bosch*, LLC, 632 F.Supp.2d at 366.

### G.     BPI's Common Law Unfair Competition Claim Fails.

"[T]he legal analysis is the same for … violations of the Lanham Act, FDUPTA, and Florida's state law common law infringement and unfair competition [claims]." *Suntree Tech., Inc. v. Ecosense Intern, Inc.,* 693 F.3d 1338, 1343 (11th Cir. 2012). The failure to establish a Lanham Act claim here requires that summary judgment also be entered on BPI's common law unfair competition claim. *Id.* Accordingly, because BPI's Lanham Act false advertising claim fails, its common law unfair competition claim suffers the same fate.

### H.     BPI's False Marking Claim Fails.

In ruling on ThermoLife's Motion to Dismiss, the Court limited BPI's false patent marking claim to just the CRTN-3 product. The Court's Order states:

> The only ThermoLife product specifically identified as being a marked unpatentable article (the "what") is the Muscle Beach CRTN-3 dietary supplement. BPI generally alleges that ThermoLife's licensees "products are falsely marked, but the allegation lacks the specificity required by Rule 9(b). Moreover, BPI has cited no case law extending liability to a patent holder for markings by a licensee, when the marking statute on its face attaches liability to the person who marks the unpatented product.

(DE 37 at 16.) Accordingly, as the Court already held, ThermoLife cannot be held liable for the conduct of its licensees, other than Muscle Beach Nutrition, LLC which ThermoLife has admitted for purposes of this case is ThermoLife's alter ego.

Throughout discovery though BPI consistently and repeatedly has disclosed that it intends to hold ThermoLife liable for all of its licensees' patent marking.  As the Court already has held, ThermoLife does not "mark" its licensees' products; accordingly, it is not liable for their alleged false patent marking. As the Declaration of Ron Kramer explains, if a company wants to purchase and use ThermoLife's patented raw materials, ThermoLife generally requires that the party enter into a license agreement (which could be implied, oral, or written). Most of ThermoLife's licensing agreements require that the licensee include the ThermoLife NO3-T logo on the product. (DSOF ¶ 6.) But, ThermoLife does not affix its logo to the product. Of course, dietary supplement companies are free not enter into licensing agreements with ThermoLife if they don't want to include the NO3-T logo on their product. Accordingly, as the Court already has held, ThermoLife is not the company that marks any of its licensees' products; BPI's claims asserting that ThermoLife can held liable for its licensees' conduct here violates this Court's prior Order and are also completely without legal and factual support.

21

As explained below however, even if the Court were to consider the markings on ThermoLife's licensees' products, there is no false patent marking here.  "To be liable for false marking, a party must mark 'an unpatentable article'" and it must do so "for purposes of deceiving the public." *Pequignot v. Solo Cup. Co.*, 608 F.3d 1356 (Fed. Cir. 2010) (En Banc). Here, BPI asserts that the inclusion of the NO3-T trademark on CRTN-3 (and other of ThermoLife's licensees' products) constitutes marking "an unpatentable article." BPI also contends that ThermoLife has falsely marked its creatine nitrate dietary supplement ingredient through the same inclusion of the NO3-T trademark.  As explained below, BPI's claim fails as a matter of law.

a.   **BPI's False Patent Marking Claim Related To The '074 Patent Is Legally Flawed And Must Be Dismissed.**

BPI previously moved for partial summary judgment, seeking an order "that Defendants have no patent rights in the composition of matter creatine nitrate under the '074 Patent." (DE 81 at 17.) The parties' briefing on that motion is incorporated herein by reference. In brief, ThermoLife's briefing explained that the '074 patent is currently in reexam, if the patent reexamination had concluded, pursuant to 35 U.S.C. § 307 and 37 C.F.R. § 1.570(a), a Reexamination Certificate would have issued. 37 CRF 1.530(k) provides that in any ex parte reexamination:

> Although the Office actions will treat proposed amendments as though they have been entered, **the proposed amendments will not be effective until the reexamination certificate is issued and published**. (Emphasis added.)

As a result, unless and until the Reexamination Certificate issues, the '074 Patent, as originally granted by the USPTO, is entitled to a presumption of validity. And, it cannot be disputed that the '074 Patent is currently valid and protects the composition of matter creatine nitrate. (DSOF ¶¶ 11-13.)

At deposition, Defendants brought the relevant patent re-examination statutes to the attention of BPI's expert Dr. S. Bannister. After reviewing the 37 C.F.R. 1.530(k), Dr. S. Bannister admitted that this federal regulation altered his opinions and that, with regard to the '074 Patent, if no re-examination certificate has issued, the Defendants are not false patent marking. (DSOF ¶ 83.) The fact that the '074 Patent is still involved in a reexamination

proceeding[13], and no Reexamination Certificate has issued, are the only facts needed for entry of summary judgment on BPI's false patent marking claim related to the '074 Patent (whether that marking attaches to CRTN-3 or other of ThermoLife licensees' products).

> **b. Regardless, There Is No Evidence That ThermoLife Acted With The Intent To Deceive; For This Reason, As Well, Summary Judgment Is Appropriate on BPI's False Patent Marking Claim.**

BPI must show that any wrongful patent marking that occurred was done "for the purposes of deceiving the public." *See Pequignot*, 608 F.3d at 1363. As the Federal Circuit has held, because the false patent marking statute was originally criminal in nature, this is a high-standard. The defendant must act with "purpose of deceit, rather than simply knowledge that a statement is false." *See Pequignot*, 608 F.3d at 1363. A good-faith legal argument that the conduct does not constitute false marking is sufficient to support entry of summary judgment on a plaintiff's claim for false marking. *See id.*

BPI has no evidence that ThermoLife acted "with purpose of deceit." It didn't. Listing its patents on a website that stated that the NO3-T logo "protects these patents", with links to the United States Patent Office's live page displaying the patent at issue, wasn't done to deceive anyone. As ThermoLife's President Ron Kramer testified:

> I never intended to deceive anybody, nor would I think, as I pretty much alluded to in my testimony yesterday, I don't even see how this could be deceptive. What it says here is the NO3 logo -- NO3-T logo protects these patents and it lists a bunch of patents that are protected by the logo. And when the logo is on a product, the logo doesn't say, "This product practices every patent listed at NO3-T.com." If you see this logo and you are so inclined to go to this website and you're so interested in what these patents are and you look at these patents, like the 836 patent that Mr. Hillyer showed me yesterday several times or the 921 patent that lists, I think taurine and carnitine and doesn't list any form of creatine or creatine nitrate. There is nobody that, you know, has a high school education, that could read English that would even be interested in these patents that would be deceived by a patent that doesn't say creatine nitrate thinking it covers creatine nitrate. And not only did I never meant to deceive anybody with this website, I can't imagine how it would deceive anybody under those circumstances.

(DSOF ¶ 95.) This is not purposeful deceit and BPI has no evidence to dispute this material fact;

---

[13] The validity of certain claims in the '074 Patent (including its protection of the composition of matter creatine nitrate) is before the United States Supreme Court. (DSOF ¶ 11.)

which is a necessary element of BPI's false marking claim. Again, summary judgment is warranted.

### c. BPI Has No Evidence To Support Its Claim That It Suffered Damages From ThermoLife's Alleged False Marking.

Finally, summary judgment should also be entered on BPI's false marking claim because BPI has not suffered any damage from Defendants' alleged false marking. 35 U.S.C. § 292 provides that, "A person who has suffered a competitive injury as a result of a violation of this section may file a civil action in a district court of the United States for recovery of damages adequate to compensate for the injury." For a party to prevail on false patent marking claims, it must demonstrate that the defendant's patent marking is the but-for cause of its alleged harm. *See Sukumar v. Nautilus, Inc.,* 785 F.3d 1296 (Fed. Cir. 2015). This means that the actual patent marked on the product must have caused the harm; as the Federal Circuit held in *Sukumar*, the defendant's alleged conduct unrelated to the patent marking is not relevant here and, in fact, damages flowing from conduct other than the actual patent marking itself suggest that the patent marking is not, in-fact, the "but-for" cause of the harm. *Id.*



Simply put, the NO3-T logo on products, and the virtual patent marking on the NO3-T website, has not caused an iota of harm to anyone ever. BPI's alleged damages are not tied to the alleged false patent marking. BPI has no competitive injury. (DSOF ¶¶ 37-44.) For this reason, as well, summary judgment should be entered.

### I. BPI's Claim That Ron Kramer Is The Companies' Alter Ego Fails.

In addition to alleging claims against Defendants for false advertising and false patent marking, BPI also asserts a claim alleging that Ron Kramer is the alter ego of ThermoLife. BPI has no evidence to support this claim. Ron Kramer is not the alter ego of ThermoLife or Muscle Beach Nutrition; these companies have a corporate existence separate and distinct from Ron Kramer personally. (DSOF ¶ 97.) Accordingly, summary judgment should be entered here as

well.

## IV.    CONCLUSION

BPI has not adduced, and cannot adduce, any evidence that the statements it challenges were literally false, material to any customer's purchasing decision, deceived any customer, or caused any damages.  Each of those evidentiary voids is an independent reason why its Lanham Act claims fail as a matter of law.  And its false patent marking claims fall even further short of any triable issue.  The Court should grant summary judgment in favor of Defendants on all claims.


Dated this 13th day of November, 2020                    Respectfully submitted,

                                                         /s/Edward M. Mullins
                                                         Edward M. Mullins (FBN 863920)
                                                         Ana M. Barton (FBN 85721)
                                                         **Reed Smith LLP**
                                                         1001 Brickell Bay Drive
                                                         9th Floor
                                                         Miami, FL 33131
                                                         Telephone: 786-747-0200
                                                         Facsimile: 786-747-0299
                                                         Email: emullins@reedsmith.com
                                                         Email: abarton@reedsmith.com

                                                         and

                                                         **KERCSMAR & FELTUS PLLC**
                                                         Gregory B. Collins
                                                         E-mail: gbc@kflawaz.com
                                                         7150 E. Camelback Road
                                                         Suite 285
                                                         Scottsdale, AZ 85251
                                                         Telephone: (480) 421-1001

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on November 13, 2020, the foregoing document was electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to counsel or parties of record.

/s/ <i>Edward M. Mullins</i>
Edward M. Mullins
