IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| BPI SPORTS, LLC,<br><br>  Plaintiff,<br>vs.<br><br>THERMOLIFE INTERNATIONAL, LLC, MUSCLE BEACH NUTRITION LLC, and RONALD L. KRAMER,<br><br>  Defendants. | CASE NO.: 0:19-cv-60505-RS |

**DEFENDANTS' STATEMENT OF MATERIAL FACTS
IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

Defendants submit their statement of material facts in support of Defendants' contemporaneously filed Motion for Summary Judgment and *Daubert* Motion.

1. Advertising for CRTN-3 is attached as Ex. 1, with the product label attached as Ex. 2.

2. A print-out of ThermoLife's website is attached as Exhibit 3.

3. Copies of the NO3-T.com website as it has appeared over time are attached as Exhibit 4.

4. If a company desires to use ThermoLife's patented raw materials or technology in their dietary supplement products as part of its patent licensing agreement (which companies must use if they want to use ThermoLife's patented raw materials or patented technology), ThermoLife requires that the company use the NO3-T stylized logo on their products that include ingredients or technology practiced by at least one of ThermoLife's patents. (Depo. of R. Kramer (10/29/20), attached as Ex. 5, at 110:5-111:10; Declaration of R. Kramer, attached as Ex. 6, at ¶ 8.)

5. A copy of a webpage advertising a product that is sold by one of ThermoLife's licensees, which includes a product label, is attached as Ex. 7.

6. On licensees' products, ThermoLife's NO3-T logo is displayed along with a statement that "NO3-T is a trademark of ThermoLife International, LLC. NO3-T.com/patents." (Ex. 6 ¶ 9.)

7. In or around May 2019, ThermoLife modified the NO3-T.com website to call-out exactly which ThermoLife patents were practiced by its licensees' products. (Depo. R. Kramer (10/28/20), attached as Exhibit 10, at 148:8-149:24; NOT3-T.com website printouts, attached as Ex. 8.)

8. The NO3-T.com website includes hyperlinks, which link to the United States Patent Office's website displaying the clicked-on patent. (Ex. 5 at 149:3-20; Ex. 6 ¶ 10.)

9. The NO3-T.com website was never meant to deceive anyone. (Ex. 5 at 147:6-152:1; Ex. 6 ¶ 11.)

10. The NO3-T.com website at times has listed the U.S. Patent 7,777,074 ("the '074 Patent"). (Ex. 4; Ex. 8.)

11. The '074 Patent is currently undergoing reexamination, with ThermoLife recently having appealed certain decisions in that reexamination proceeding to the United States Supreme Court. (Ex. 6 ¶¶ 4-6.) ThermoLife's Petition for Writ of Certiorari is attached as Ex. 9.

12. No matter the outcome of ThermoLife's Supreme Court appeal, the '074 Patent will emerge from reexamination with claims practiced by some of ThermoLife's licensees; only ThermoLife's protection for composition of matter that is creatine nitrate is at issue. (Ex. 6 ¶ 12.)

13. Furthermore, ThermoLife holds multiple patents related to the use of creatine nitrate or the

1

compound creatine nitrate. These patents are not at issue in the pending reexamination. (Ex. 6 ¶ 13.)

14. ThermoLife is the only legitimate source for patented and licensed amino acid nitrates. The statements on the website ThermoLife.com are true. (Ex. 6 ¶ 14.)

15. BPI Sports, LLC ("BPI") disclosed expert reports for two experts: Dr. Steve Bannister and Dr. John Plumpe. (BPI's First Supp. Discl., attached as Ex. 11.)

16. BPI withdrew Dr. Plumpe. (Email from G. Hillyer to G. Collins, attached as Ex. 12.)

17. Dr. S. Bannister prepared two expert reports: Expert Report of D. Steve Bannister (attached as Ex. 13) and Rebuttal Report of Dr. Steve Bannister (attached as Ex. 14).

18. Dr. S. Bannister received a Ph.D. in Pharmaceutical Chemistry in 1983. (Ex. 13 at 4.)

19. Dr. S. Bannister has no experience related to marketing or consumer behavior. (Ex. 13 at 4-6; Depo. of Dr. S. Bannister, attached as Ex. 15, at 66:7-24.)

20. Dr. S. Bannister's only experience reviewing advertising was to substantiate the accuracy of scientific claims. (Ex. 15 at 66:24-67:14.)

21. Dr. S. Bannister summarized the opinions that he offers in his expert report as follows:

> V. SUMMARY OF OPINIONS ................................................................. 8
>
> A. The Representation That CRTN-3 Is A "first-time fusion of Creatine Nitrate, Creatine HCl, and Creatine Monohydrate" Is Literally false, Misleading, and Unsubstantiated ................................................................. 8
>
> B. The Representation That CRTN-3 Includes A "HYPER INFUSED CREATINE MATRIX" Is False, Misleading, And Unsubstantiated ................................................................. 9
>
> C. The Representation That CRTN-3 Includes A "Hydro-GO Electrolyte Matrix" Is False, Misleading, and Unsubstantiated ................................................................. 9
>
> D. When Used As Directed, CRTN-3 Does Not Administer "Three Of The Most Effective Forms Of Creatine In One Cutting-Edge Formula" ................................................................. 9
>
> E. CRTN-3 Does Not Increase Vasodilation Increase Vasodilation To Achieve Any Effects Faster Than Ever Before ................................................................. 10
>
> F. Defendants Are Engaged In False Patent Marking ................................................................. 10

(Ex. 13 at 2.)

22. Defendants served the response expert report of Dr. Thomas Bannister. (Expert Report of Dr. Thomas Bannister, attached as Ex. 16.)

23. Dr. Thomas Bannister is the Senior Scientific Director in the Department of Molecular Medicine at the Scripps Research Institute in Jupiter, Florida, with a joint appointment in the

Department of Chemistry. He earned a bachelor's degree in 1984, conferred Summa Cum Laude, from Wabash College in Indiana, where he majored in chemistry with minors in biology and mathematics. He then received his M.S. and M.Phil. degrees in organic chemistry from Yale University in 1986. In 1991, he received his Ph.D. from Indiana University in the synthesis of complex biologically active natural products. (Ex. 16 at 3.)

24. Dr. Thomas Bannister's opinions are summed up in his report as follows:

> A. The meaning of the word "fusion" ascribed by Dr. S. J. Bannister is inappropriate ................. 9
> B. Dr. S. J. Bannister incorrectly implies the equivalence of two products that are distinctly different.................................................................................................................................... 12
> C. Other labeling terms are also misconstrued by Dr. S. J. Bannister ........................................... 13
> D. Contrary to Dr. S. J. Bannister's opinion, there is evidence supporting the claim that creatine nitrate has specific properties that make it superior to creatine monohydrate as a supplement. 15
> E. Contrary to Dr. S. J. Bannister's opinion, there is evidence supporting CRTN-3's claim that CRTN-3 includes "three of the most effective forms of creatine in one-cutting edge formula" 17
> F. Contrary to Dr. S. J. Bannister's opinion, there is evidence supporting CRTN-3's claim that CRTN-3 includes will "increase vasodilation" ......................................................................... 18
> G. BPI labels its products in the same way as CRTN-3 ............................................................... 18
> H. BPI falsely marks its products as patented............................................................................... 20
> I. Contrary to Dr. S. J. Bannister's opinion, ThermoLife has valid patent claims that cover their products, patents that are clearly listed on the NOT-3.com website......................................... 22

(Ex. 16 at 1.)

25. On May 29, 2020, BPI disclosed Dr. S. Bannister's Rebuttal Expert Report. (Ex. 14.)

26. Dr. S. Bannister's Rebuttal Expert Report opines that "The Nitrate Counterion in CRTN-3 Provides No Physiological Effects." (Ex. 14 at 6.)

27. To reach this opinion, Dr. S. Bannister relied on a paper, referenced as "the Galvan Paper." (*Id*. at 9; Galvan Paper, attached as Ex. 20.)

28. As Dr. S. Bannister's report notes, the minimum dose of creatine nitrate administered in the Galvan study was 500 mg. The Galvan Paper does not include any analysis regarding whether a lower nitrate dosage would have a physiological effect. (*Id*.)

29. Dr. S. Bannister also relied on a declaration from Dr. Jon Lundberg, M.D. Ph.D., submitted on behalf of ThermoLife in an Ex Parte Reexamination proceeding. (*Id*. at 10.)

30. The Lundberg Declaration opines on the art of nitrate supplementation in 2006 - 2007, the relevant date in the patent reexamination. (Decl. of Dr. Jon Lundberg, attached as Ex. 17.)

31. Based only on these two references, Dr. S. Bannister states: "The nitrites contained in one serving of CRTN-3 (319.4 mg) is substantially below the minimum nitrate does (500 mg) reported by both Galvan and Lundberg (on behalf of ThermoLife) to be effective." (Ex. 14 at 11-12.)

3

32. Defendants disclosed the expert report of Mark Keegan. Mr. Keegan has personally conducted hundreds of consumer surveys. (Expert Report of M. Keegan, attached as Ex. 18.)

33. Among the opinions offered in Mr. Keegan's report are: (1) "without any type of consumer survey, or some other form of scientifically verified market research, BPI does not provide any relevant evidence related to consumer purchasing decisions" (Ex. 18 at 9); (2) "testing the potential impact of one or more of [Defendants' advertising claims" is a task well-suited to survey research" (*Id*. at 15); "neither of plaintiff's experts offer opinions regarding consumer perception or materiality of the contested claims." (*Id*. at 23).

34. Mr. Keegan also concluded:

> A consumer perception survey would be necessary to determine which meaning consumers subscribe to the marketing statements at issue. It is my understanding that BPI has not conducted this survey. Without a consumer survey or market research, it is impossible to know whether consumers changed their buying behavior as a result of the [advertising statements at issue].

(*Id*.)



46.    Dr. S. Bannister testified, "I do not know any specific consumer so I do not know any specific reactions." (Ex. 15 at 69:3-17.)

47.    Dr. S. Bannister stated, "I am a physical chemist, and I based all the opinions contained in my reports on chemistry and descriptions of the physical systems which make up CRTN-3." (*Id*.)

48.    When reviewing the alleged false statements, Dr. S. Bannister testified: "I read them as a chemist. I interpreted them based on apparent intent of the statement." (*Id*. at 70:6-7.)

49.    Dr. S. Bannister testified: "The average consumer—consumers may include chemists. I don't know what the average consumer is." (*Id*. at 69:24-70:5.)

50.    Dr. S. Bannister is not an expert in consumer behavior or marketing. (*Id*. at 66:6-20.)

51.    When asked whether he "tr[ied] to determine how consumers understand [a] phrase," Dr. S. Bannister testified, "I am interpreting the phrase and its implications and I find it to be false in relation to CRTN-3." (*Id*. at 191:13-15.)

52.    Dr. S. Bannister cannot not say whether consumers actually found advertising statements false or misleading, he could only say that he himself, interpreting the statements as a pharmaceutical chemist (with no training in lexigraphy, marketing, or consumer behavior), thinks the statements are false and misleading. (*Id*. at 184:12-24.)

53.    Dr. S. Bannister stated, "As I said before, the promotion … includes references to science and that is very clearly an effort to appeal to someone who is or aspires to be scientifically literate

so the general uneducated consumer may not be the appropriate reference." (*Id*. at 216:15-20.)

54. Dr. S. Bannister testified, "I think a significant portion of them aspire to be scientifically literate. I can't judge whether they -- they -- whether they all are." (*Id*. at 216:23-217:15.)

55. Dr. S. Bannister acknowledged that a consumer survey could have determined how consumers understood the advertising and whether that advertising deceived. (*Id*. at 218:622.)

56. Dr. S. Bannister had to guess what consumers believe. (*Id*. at 218:20-219:4.)

57. In his report, Dr. S. Bannister provided dictionary definitions of fusion, including: "[f]usion is the process of combining two or more things together into one;" "fusion is the act of melting or blending two or more separate things into one;" and fusion is "[t]he process or result of joining two or more things together to form a single entity'." (Ex. 13 ¶ 57.)

58. Despite citing multiple dictionary definitions, Dr. S. Bannister rejects these definitions and declares: "The common phenomenon in these contexts is the joining of two or more substances – by nuclear, chemical or biochemical reactions – to create new, bonded, homogeneous substance. This is distinct from simple mixing. In each case, fusion can be proven by physical, biological, or chemical measurements." (*Id*. at ¶ 66.)

59. BPI's expert was asked, and he answered as follows: "Q: Any dictionary anywhere use the definition that you used [for fusion] word for word? A. Word for word, no." (Ex. 15 at 126:18-20.)

60. Dr. S. Bannister is not "an expert in all aspects of lexicography." (*Id*. at 121:17-122:4.)

61. BPI's expert further testified that the definition he applied to "fusion" was appropriate due to "implication[s]" arising from the word fusion in Muscle Beach Nutrition's advertising. As he stated, "There may be a variety of definitions [for fusion] but the labeling -- the representation on the product implies more than a -- than a blend. It implies some new species." (Ex. 15 at 128:8:21.)

62. Dr. S. Bannister admitted at his deposition that he can tell by looking at the label that CRTN-3 includes "a powder blend" of three creatines. (*Id*. at 199:17-18.)

63. He admitted he can tell by looking at the label that it is a "mixture of powders." (*Id*. at 212:7-10.)

64. The dictionary definitions that Dr. S. Bannister consulted include "blend" as a definition for fusion. (Ex. 13 at 23 n. 24; Ex. 15 at 132:3-134:5.)

65. The second definition for fusion listed at https://www.yourdictionary.com/fusion states that "fusion" is "the union of different things by or as if by melting; blending; coalition … ."

6

(Yourdictionary.com printout, attached as Ex. 21.)

66. The sources that Dr. S. Bannister relied on to define "fusion" list "mixture" as a synonym. (Ex. 21; Ex. 15 at 134:11-17.)

67. BPI also uses the word "fusion" in connection with its products. As BPI's CEO explained, when BPI uses the word "fusion," "it's just cool words." (Ex. 19 at 175:15-25.)

68. Dr. S. Bannister testified that the label's listing of a "HYPER INFUSED CREATINE MATRIX" constitutes false advertising because "[i]t is an expression that very apparently suggests unique properties of this -- this product, CRTN-3, and promotion, advertising, is always for a purpose to persuade and I believe this is an inappropriate expression of the characteristics of the product that would lead to a misunderstanding of the results of using the product." (Ex. 15 at 176:11-19.)

69. BPI's expert also testified similarly that, "[t]he promotion of CRTN-3 as containing a proprietary 'Hydro-GO electrolyte matrix' is literally false because these electrolytes are not present "in a matrix." (*Id.* at 185:11-15.) He stated, "the term matrix has a specific, well-defined, meaning: a defined structure in which each element has a fixed position. The electrolytes of CRTN-3 are not in any structured form; they are simply components of an unstructured powder blend." (Ex. 13 ¶ 78.)

70. BPI's President Derek Ettinger testified: **Q:** "What does 'matrix mean in the supplement industry?" **A:** "That's an easy one. We use that [matrix] a lot. My interpretation, as I've always known it to be, is just a subsection of a greater part of the ingredient panel." (Ex. 19 at 256:4-15.)

71. In fact, BPI itself uses the term "MATRIX" to describe blends or subsections in the Supplement Facts Panels on more than 11 separate BPI products. (Ex. 19 at 260:24-266:6; Website printouts for BPI products that include matrix, attached as Ex. 22.)

72. As Defendants' President and Defendants' Expert explained at deposition, under a reasonable interpretation of these phrases, Defendants' advertising statements are true. (Ex. 5 at 140:15-145:7; Ex. 6 ¶ 15; Ex. 16; Rough Trans. Depo. of Dr. T. Bannister, attached as Exhibit 23 at 53:22-62:12; *id.* at 102:1-105:25; *id.* 120:23-125:7; *id.* at 187:23-197:5.)

73. For Dr. S. Bannister, once a form of creatine is dissolved in water, it breaks down to become two ionic creatine forms: the creatinium ion, and the creatine zwitterion. (Ex. 13 ¶ 79.)

74. When Dr. S. Bannister was presented with BPI's own advertising that touts BPI's Best Creatine product as including "six advanced forms of creatine," he acknowledged that if his

reasoning applied to BPI's product, there were only two forms of creatine delivered to a consumer of BPI's product. (Ex. 15 at 197:820; 205:7-17.)

75. Dr. S. Bannister acknowledged during his deposition that he has no reason to doubt that there are three forms of creatine in the CRTN-3 bottle. (*Id*. at 26:2-27:24.)

76. Dr. S. Bannister was asked at deposition: "What are the most effective forms [of creatine]?" He responded, "I don't have a way to distinguish creatine forms." (*Id*.)

77. BPI's own advertising touts two of the same three forms of creatine that are in CRTN-3 (Creatine Monohydrate and Creatine HCL) as: "The two best forms of creatine." (Ex. 5 at 155:13-157:16; BPI Video (produced as TLI000927), submitted as a physical exhibit here as Exhibit 24.)

78. Dr. S. Bannister testified that "creatine nitrate has activity that other creatines species without nitrate ion don't have. … A creatine nitrate product will do things that a creatine product will not do." (Ex. 15 at 208:20-209:7.)

79. Dr. S. Bannister admitted that Defendants' advertising statements are not false, when the entirety of the CRTN-3 product label is considered. (Ex. 15 at 153:5-15.)

80. Dr. S. Bannister is not at all familiar with DSHEA. (*Id*. at 47:20-48:4.)

81. He acknowledged that "If that was a requirement [listing the actual ingredients that are in the product] and if it was on the facts panel, the consumer would know." Questioned further, whether the "supplement facts panel would remedy any confusion that might be created by the advertising on the product?" Dr. S. Bannister answered, "It would -- it would relieve that element … of confusion." (*Id*. at 153:13-18.)

82. Dr. S. Bannister's opinion related to false patent marking is limited the CRTN-3 product:

> **Q:** The false marking opinion that you offer, are you offering an opinion that any product is falsely marked other than CRTN-3?
> **A:** In this report, no.
> **Q:** Are you prepared to offer an opinion today that any other product is falsely marked.
> **A:** I would have to look at the product and look at the patents associated with that product, look at the claims, look at the specific compounds included in those claims.

(Ex. 15 at 162:21-163:5.)

83. He acknowledged that unless and until a Reexamination Certificate issued related to the '074 Patent, Defendants were not falsely marking with the '074 Patent. (Ex. 15 at 173:12-175:4.)

84. Dr. S. Bannister also opined in his report that CRTN-3 does not increase vasodilation. (Ex. 13 ¶ 82.) He "did not specifically research this question." (*Id*. at 162:7-9.) Confronted with a

scientific paper that refuted his opinions, Dr. S. Bannister did not provide any basis to dispute the findings of the only research any party has presented on this topic. (*Id*. at 161:14-162:9.)

85. Dr. S. Bannister is not an expert on nitrate supplementation: "I am not specifically a nitrate pharmacologist." (*Id*. at 87:16.)

86. Dr. S. Bannister testified: "I don't know exactly the benefit realized. I know if you dissolve creatine nitrate in water, you will have creatine ionic species and nitrate species." (*Id*. at 28:22-29:7.) Pressed further on this issue, he was asked: "So you don't know how the benefit of creatine nitrate is provided to consumers, right?" He answered, "I know – if we are talking about CRTN-3. I know what the administration instructions are." (*Id*.)

87. As he testified, in order to render his opinion regarding an effective dosage of nitrates, he has to rely on scientific studies, which he read carefully. (*Id*. at 87:23-88:7.)

88. When Dr. S. Bannister was asked what studies he read closely, he testified that he relied on just "the Galvan paper and Lundberg declaration." (*Id*. at 89:11-15.)

89. As he acknowledged at deposition, there may be other studies that conclude that a lower dosage of nitrates was necessary to cause a physiological effect. (*Id*. at 102:107:1.)

90. Dr. S. Bannister did nothing "to determine whether or not a reasonable scientist held a different view [regarding the required dosage of nitrates]." As he testified, he "used the sources [the Galvan paper and Lundberg declaration] without looking further." (*Id*. at 107:8-23.)

91. At deposition, Dr. S. Bannister was confronted with scientific literature supporting the fact that a dosage of just 68mg of nitrate is necessary to cause a physiological effect. (*Id*. at 101:16-102:19; D. Hobbs et. al., *Acute Ingestion of Beeetroot Bread Increases Endothelium-Independent Vasodilation*, Jor. Of Nut. Disease (July 24, 2012), attached as Exhibit 26.)

92. Hobbs et. al., *Acute Ingestion of Beeetroot Bread Increases Endothelium-Independent Vasodilation*, Jor. Of Nut. Disease (July 24, 2012), supports the fact that lower dosages of nitrates cause a physiological effect; indeed, dosages of nitrates 1/5 the amount included in CRTN-3 have been proven effective. (Ex. 26; Ex. 23 at 191:22-197:3.)

93. CRTN-3 includes an effective dosage of nitrates to cause vasodilation. (Ex. 5 at 142:7-143:8; Ex. 6 ¶ 15; Ex. 23 at 191:22-197:3.)

94. Defendants' President testified that "fusion," consistent with dictionary definitions, meant "blend" in Muscle Beach Nutrition's advertising. (Ex. 5 at 143:20-144:8.)

95. The NO3-T.com website was never meant to deceive anyone. The website says at the top

that the NO3-T logo protects these patents and it lists a bunch of patents that are protected by the logo. And when the logo is on a product, the logo doesn't say, "This product practices every patent listed at NO3-T.com." There is nobody that has a high school education that could read English that would even be interested in these patents that would be deceived by a patent that doesn't say creatine nitrate thinking it covers creatine nitrate. And not only did I never mean to deceive anybody with this website, Defendants' can't imagine how it would deceive anybody under those circumstances. (Ex. 5 at 147:1-148:20; Ex. 6 ¶ 11.)

96.     At deposition, BPI's expert conceded that CRTN-3 is the first time that BPI is aware of where Creatine Nitrate, Creatine HCL and Creatine Monohydrate have been included in one product. (Ex. 15 at 118:20-120:6.)

97.     Ron Kramer is not the alter ego of ThermoLife or Muscle Beach Nutrition; these companies have a corporate existence separate and distinct from Ron Kramer personally. (Ex. 6 ¶ 16.)

Dated this 13th day of November, 2020

Respectfully submitted,

*/s/Edward M. Mullins*
Edward M. Mullins (FBN 863920)
Ana M. Barton (FBN 85721)
**Reed Smith LLP**
1001 Brickell Bay Drive
9th Floor
Miami, FL 33131
Telephone: 786-747-0200
Facsimile: 786-747-0299
Email: emullins@reedsmith.com
Email: abarton@reedsmith.com

and

**KERCSMAR & FELTUS PLLC**
Gregory B. Collins
E-mail: gbc@kflawaz.com
7150 E. Camelback Road
Suite 285
Scottsdale, AZ 85251
Telephone: (480) 421-1001

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on November 13, 2020, the foregoing document was electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to counsel or parties of record.

                                              /s/ *Edward M. Mullins*
                                              Edward M. Mullins