**IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA**

BPI SPORTS, LLC,

  Plaintiff,

vs.

THERMOLIFE INTERNATIONAL, LLC, MUSCLE BEACH NUTRITION LLC and RONALD L. KRAMER,

  Defendants.

**CASE NO.: 0:19-cv-60505-SMITH
FILED UNDER SEAL**

**PLAINTIFF BPI SPORTS, LLC'S STATEMENT OF MATERIAL FACTS**

Plaintiff BPI Sports, LLC ("BPI"), pursuant to L.R. 56.1, hereby submits its Statement of Material Facts in Opposition to Defendants' Motion for Summary Judgment.

1. Undisputed, but the advertising websites listed in D.E. 178, Ex. 1 are undated.

2. Undisputed, but the ThermoLife website in D.E. 178, Ex. 3 is undated.

3. Undisputed, but the last website shown D.E. 178, Ex. 4 is undated.

4. Disputed. Some ThermoLife licensees are required to mark with a version of the NO3-T logo. Plaintiff disputes that raw materials are patented. *See generally,* D.E. 81.

5. Undisputed.

6. Disputed. Defendants present no evidence of an actual licensee product having statement that "NO3-T is a trademark of ThermoLife International, LLC. NO3-T.com/patents."

7. Undisputed. D.E. 178, Ex. 8 shows that on May 4, 2019 the Way Back Machine hosted on archive.org cached a copy of the NO3-T.com website showing a table of products which was later further revised.

8. Undisputed.

9. Disputed. Defendants' intent to deceive with respect to the patents listed on the NO3-T.com marking website is supported by record evidence. *See, e.g.,* ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮; ThermoLife August 12, 2019 press release entitled "New Patent Claims On Creatine Nitrate …Effectively Monopolizing The Use Of Creatine Nitrate In Dietary Supplements" overstating ThermoLife's patent rights to creatine nitrate, attached hereto as Exhibit 4; www.thermoLife.com website where Defendants' tout broad patent rights to creatine nitrate and attempt to convince competitors that they need a license to all patents, D.E. 178, Ex. 3; the original NO3-T website listing all of their patents as covering any product having the NO3-T logo, *Id.*, Ex. 4 at TLI000396; subsequent versions of the NO3-T website that continue to falsely mark products until present (*e.g.*, C4 Ultimate is not covered by the U.S. Patent No. 8,952,047), as admitted by Defendants' expert, Dr. T. Bannister, *Id.*, through balance of exhibit, and at Ex. 14, ¶ 101, Ex. 23, 180:24-181:9; ThermoLife continues to maintain that it has patent rights to creatine nitrate composition based on U.S. Patent No. 7,777,074 notwithstanding that all issued claims of the '074 have been rejected and cancelled in reexamination, reexam claim 6 has been rejected by the USPTO in view of 150 year old art showing the use of creatine nitrate, and the rejection has been affirmed by the

PTAB and Court of Appeals for the Federal Circuit, and notwithstanding the prior art BPI has disclosed teaching creatine nitrate, *see* D.E. 81 BPI's Motion for Summary Judgment, in its entirety, D.E. 82 BPI's Statement of Material Facts, at ¶¶ 27-90 and Exs. 5-15, D.E. 83, Exhibits 17-27; Defendants' list all nitrate patents in cease and desist letters despite inapplicability to product, D.E. 82, Exhibit 30; ThermoLife claims to have "invented" creatine nitrate, D.E. 82, Exhibit 29; ThermoLife's Press Releases refer to controlling a "global patent portfolio with 450 claims to the use of nitrates in dietary supplements," D.E. 82, Exhibit 28; and Defendants' litigiousness support that they are over-enforcing their IP rights. D.E. 143, Ex. 2-5.

10. Undisputed.

11. Disputed. The '074 Patent has completed the reexamination procedure as to certain claims, newly introduced claim 6 relating to creatine nitrate has been rejected. D.E. 81, at 4-7; D.E. 82, at ¶¶ 27-40 & Exs. 5-15. That rejection has been affirmed by the Federal Court of Appeals for the Federal Circuit, and ThermoLife has filed a Petition for Writ of Certiorari to the U.S. Supreme Court seeking, in bad faith, to prolong the time period in which it can falsely represent to the world that it has patent rights on creatine nitrate. D.E. 82, at ¶¶ 41-44; D.E. 83, at Ex. 16-19; D.E. 178, Ex. 9.

12. Disputed. Defendants have provided no evidence that their other irrelevant claims of the '074 Patent are practiced by its licensees.

13. Disputed. Defendants hold no other patents to creatine nitrate itself as a composition of matter. Creatine nitrate has been known for over 150 years and is in the public domain. D.E. 81, at 4-7; D.E. 82, at ¶¶ 37, Ex. 14, Atch. 2 & 3. Defendants do not dispute that ThermoLife holds patents claiming limited uses of creatine nitrate, and compositions of creatine nitrate combined with other elements or chemicals, as identified in D.E. 178, Ex. 6 ¶ 13, however, BPI does not concede that these patents are valid.

14. Disputed. Creatine nitrate was first synthesized over 150 years ago and is in the public domain. D.E. 81, at 7-8; D.E. 82, at ¶¶ 37, 45-49, Ex. 14, Atch. 2 & 3, & Exs. 20-49. ThermoLife's claim that creatine nitrate itself remains patented, and that therefore "ThermoLife is the only legitimate source for patented and licensed amino acid nitrates" such as creatine nitrate is false. *Id.*

15. Undisputed.

16. Undisputed.

██████████████████████████████████████████████
██████████████████████████████████████████████

17. Undisputed.

18. Undisputed.

19. Disputed. Dr. Bannister's full experience is set forth in his C.V. and includes work with consumer products, business practice consulting, technical support for marketing, including direct customer interactions, demonstrations and trouble shooting. D.E. 178, Ex. 13 Ex. A. Furthermore, BPI is not proffering Dr. S. Bannister as an expert on marketing or consumer behavior.

20. Disputed. Dr. S. Bannister's has experience in reviewing advertising for the purpose of substantiating the accuracy of scientific claims, but also has worked with consumer products, business practice consulting, technical support for marketing, including direct customer interactions, demonstrations and trouble shooting. *Id.*

21. Undisputed.

22. Undisputed.

23. Undisputed.

24. Undisputed.

25. Undisputed.

26. Undisputed.

27. Disputed to the extent that the Defendants claim the Galvan Paper was the only material relied upon by Dr. S. Bannister. To reach this opinion, Dr. S. Bannister relied on the Galvan Paper, which was initially cited by Dr. T. Bannister in his expert Report. D.E. 178, Ex. 20 (Galvan Paper); Ex. 16, at ¶ 48.

28. Disputed. Dr. S. Bannister's report concludes that the Galvan study administered a minimum dose of 500 mg of nitrate, not creatine nitrate. Ex. 178 Ex. 14, ¶¶ 20, 21.

29. Undisputed. Dr. S. Bannister also relied on a declaration from Dr. Jon Lundberg, M.D. Ph.D., submitted by ThermoLife in an *Ex Parte* Reexamination proceeding of U.S. Patent No. 8,455,531, which was also relied on by Dr. T. Bannister. *Id.* at ¶ 10.

30. Disputed. The opinions presented in the Lundberg Declaration on the minimum amount of nitrate dosage necessary to produce a physiological effect are not limited to any time period. D.E. 178, Ex. 17, ¶6.

3

31. Disputed. Dr. Bannister's opinions were not based only on the Lundberg Declaration and Galvan, but he also relied on additional materials. D.E. 178, Ex. 17 at ¶25, 26, & Ex B, Reference 60.

32. Disputed. BPI dispute that the purported expert report of Mark Keegan is a proper disclosure of expert opinions for the reasons set forth in BPI's *Daubert* Motion. D.E. 175

33. Disputed. Mr. Keegan offers no proper opinions in his purported expert report. Mr. Keegan states the undisputed facts that BPI is not relying on survey evidence and or its experts to show consumer perception or materiality. D.E. 178, at Ex. 18 at 9, 15. The remainder of Mr. Keegan's report offers irrelevant statements describing evidence that is not being presented, and thus BPI is moving to strike same. D.E. 175.

34. Disputed. BPI disputes the incorrect legal conclusions presented in Mr. Keegan's report and has moved to strike same and preclude his testimony at trial. D.E. 175

35. Disputed. Although BPI's owner and Chairman, Derek Ettinger, was the sole 30(b)(6) corporate representative designated to testify on behalf of BPI, he is not BPI's Chief Executive Officer. Ex. 11, 2, D.E. 178, Ex. 19 at 28:23-29:3, 45:15-24. BPI's Chief Executive Officer, Chris Mackenzie, did not testify as a 30(b)(6) witness. *Id.*

36. Disputed. Derek Ettinger was asked a host of irrelevant, compound, ambiguous and unanswerable questions, with the intention of taking discovery on an unrelated, irrelevant pending Arizona lawsuit that was later filed in Florida and transferred back to Arizona. D.E. 178, Ex. 19; *see also* ThermoLife International LLC, et al. v. BPI Sports, LLC, Case No. 0:20-cv-61373-RS.

37. Disputed. Derek Ettinger is not BPI's CEO. D.E. 178, Ex. 19 45:15-24. In addition to the harm identified in the Ettinger testimony, BPI has provided the declarations of its CEO, Chris Mackenzie and its V.P. of National Sales, Jason Marazzito, who offer evidence that Defendants' false advertising and false marking harmed BPI. *See* Ex. 1 & 2 and ¶¶ 100-118.

38. Disputed. ███████████████████████████████████████████
███████████████████████████████████████ D.E. 158, Ex. 28 at 6-7.

39. Disputed. BPI was harmed because it was wrongfully kept out of the creatine nitrate market by Defendants' false claims of ownership of this compound. Additionally, BPI was harmed because Defendants' false advertising and false marking created an unfair market advantage for Defendants and their licensees which led to BPI's loss of sales, market share and

4

shelf space. *See* Ex. 1 & 2 and ¶¶ 100-118.

40. Disputed. Derek Ettinger is not BPI's CEO. D.E. 178, Ex. 19 45:15-24. Mr. Ettinger's response about consumer behavior concerned the question being asked, which had nothing to do with general consumer behavior. *Id*. at 346:4-11.

41. Disputed. Derek Ettinger is not BPI's CEO. *Id.*, at 45:15-24. Mr. Ettinger's testimony relates only to the NO3-T patent marking website, and his testimony is that he does not know because he is not a patent law expert. *Id.*, at 105:7-106:22.

42. Disputed. Derek Ettinger is not BPI's CEO. *Id.*, at 45:15-24. Mr. Ettinger was presented with a version of the NO3-T patent marking website, a ThermoLife flyer, and his testimony was that he did not know because he was not a patent law expert, and noted that ThermoLife's claim to creatine nitrate was false. *Id.* at 107:16-108: 15; 127:21--131:10. In addition to this false claim Mr. Ettinger testified that Defendants utilize litigation strategies to create a "climate of fear" to unlawfully keep others, like BPI, out of markets, (like the creatine nitrate market). *Id.*, and ¶ 90:14-92:10, 420:20-421:5. The final citation is invalid; the transcript ends at 430.

43. Disputed. Derek Ettinger is not BPI's CEO. D.E. 178, Ex. 19 45:15-24. BPI's CEO provides a declaration discussing the harm arising out of Defendants' tortious acts. Ex. 1.

44. Disputed. Derek Ettinger is not BPI's CEO. *Id.*, at 45:15-24. BPI's CEO provides a declaration discussing the harm arising out of Defendants' tortious acts. Ex. 1. Mr. Ettinger also testified that Defendants' vasodilation claims were a major contributing factor to BPI's loss of sales. *Id.* at ¶ 90:14-92:10; 388:14-389:22.

45. Disputed. Derek Ettinger is not BPI's CEO. *Id*., at 45:15-24. BPI's CEO provides a declaration discussing the harm arising out of Defendants' tortious acts. Ex. 1. Mr. Ettinger also testified that Defendants' vasodilation claims were a major contributing factor to BPI's loss of sales and that BPI was unlawfully kept out of the creatine nitrate market. D. E. 178, Ex. 19 at 388: 14-389:22.

46. Undisputed.

47. Undisputed.

48. Undisputed.

49. Undisputed.

50. Disputed to the extent that Defendants suggest Dr. S. Bannister is somehow

5

unqualified to opine on the falsity of their advertising. Dr. S. Bannister's qualifications are set forth in his report. *Id.*, at Ex. 13, Ex. A.

51. Undisputed.

52. Disputed. This allegation is literally false and misleading because cited testimony does not support the alleged fact. *Id.*, Ex. 15, at 184:12-24. This testimony is limited to the "Hyper-Infused Matrix" statement, which Dr. Bannister testifies is "entirely false." *Id.* at 184:12-185:19.

53. Undisputed.

54. Undisputed.

55. Disputed, the cited deposition testimony refers only to Defendants' hyper-infused matrix false statement and that many things are possible. *Id.* at 218:6-22.

56. Disputed. Dr. S. Bannister testified that "bounded by knowledge of - of physiology and - this is - product is - is not intended obviously to appeal to all consumers. Promotion makes it clear that it is intended to appeal to informed consumers." *Id.* at 218:20-219:4.

57. Disputed to the extent that it is alleged that these are the only definitions Dr. S. Bannister considered and relied upon. D.E. 179, Ex. 13, ¶¶ 56-66. Dr. S. Bannister's report provides various definitions of fusion that include both technical and common definitions. *Id.*

58. Disputed. Dr. S. Bannister's report did not reject the multiple dictionary definitions, but rather he adopted an interpretation that was consistent with all of the competing definitions based on his expertise in the chemical arts and the technical context provided by the CRTN-3 label. D.E. 178, Ex. 13 at ¶¶ 56-66.

59. Undisputed.

60. Undisputed.

61. Undisputed.

62. Disputed. Dr. S. Bannister did not testify that it was a powder blend of three creatines. *Id.* at 199:17-18.

63. Disputed. At most, Dr. S. Bannister testified that the product appeared to be a mixture of powders. *Id.* at 212:7-10.

64. Disputed. Dr. S. Bannister testified that the definitions required that a union be formed, such as blending two or more separate things into one. *Id.*, at 125:14-23; 132:3-134:5.

65. Undisputed.

66. Disputed. Not all sources that Dr. S. Bannister relied upon list mixture as a

6

synonym. D.E. 178, Ex. 13 at ¶¶ 56-66.

67. Disputed. Derek Ettinger is not BPI's CEO. *Id.*, Ex. 19 45:15-24. Also disputed to the extent that it equates BPI's marketing and product name use of "fusion" to the technical manner in which Defendants use the term in a statement of fact on the CRTN-3 label. BPI does not dispute that it also uses the word "fusion" in connection with its products. *Id.*, Ex. 19 at 175:15-25.

68. Undisputed.

69. Undisputed.

70. Undisputed.

71. Disputed to the extent that it equates BPI's use of the word "matrix" with Defendants' use of the term and completely out of context. D.E. 178, Ex. 22.

72. Disputed. Defendants' and its expert's biased, self-serving explanation is not a reasonable interpretation of the phrases in question, in part, because those statements of fact that have been determined to be literally false by BPI's expert, S. Bannister. D.E. 178 Ex. 13, ¶¶ 17-92, Ex. 14, ¶¶ 12-33.

73. Disputed. Dr. S. Bannister does not opine that all forms of creatine break down in water, but rather, that the dissolution of creatine in water results in separately solvated creatinium ions, creatine zwitterions, and nitrate ions. Ex. 13 ¶ 79.

74. Disputed, the cited testimony does not support the alleged facts. Ex. 15 at 197:8-20; 205:7-17.

75. Undisputed.

76. Undisputed.

77. Undisputed.

78. Undisputed.

79. Disputed. Dr. Steven Bannister's testimony that allegedly concedes that there is no confusion pertains only to the false statement that CRTN-3 is a "first-time fusion of Creatine Nitrate, Creatine HCL, and Creatine Monohydrate, and is based on a false premise set forth in a hypothetical having assumptions that Defendants have not and cannot establish. D.E. 178, Ex. 15 151:14-153:15. Dr. Bannister's full testimony, in context, was in response to a hypothetical based on the assumption that the FDA would require the separate, independent listing of "new species" of creatine nitrate fused during manufacturing from three ingredients that are separately listed on the ingredients label, and that consumers would be aware of such a requirement. D.E. 178, Ex.

15, 151:14-153:15. Defendants cannot and have not established these assumptions in this case. Dr. Bannister's testimony is consistent with his expert report that under real-world facts the statement that CRTN-3 is a "first-time fusion of Creatine Nitrate, Creatine HCL, and Creatine Monohydrate" is literally false. D.E. 178, Ex. 13 at ¶¶ 52-66, Ex. 19 at 111:2-22.

80.     Disputed. Dr. S. Bannister testified, "I understand that there are laws which are described as DSHEA. I am not an expert in the legal aspects of DSHEA." *Id*. at 47:20-48:4.

81.     Disputed.  As discussed *supra* in ¶79, Dr. Steven Bannister's testimony that allegedly concedes that there is no confusion is based on a false premise set forth in a hypothetical that Defendants have not and cannot establish. Dr. Bannister's full testimony is set forth above in ¶79. Defendants cannot and have not established these assumptions in this case. Instead, Dr. Bannister's testimony is consistent with his expert report that under real-world facts the statement that CRTN-3 is a "first-time fusion of Creatine Nitrate, Creatine HCL, and Creatine Monohydrate" is literally false. D.E. 178, Ex. 13 at ¶¶ 52-66, Ex. 19 at 111:2-22.

82.     Disputed.  Dr. S. Bannister's report opines that any products marked with U.S. Patent Nos. 8,034,836, 8,048,921, 8,569,368, 8,569,369, 8,952,045, 8,952,047 or 8,957,100 on the basis that such products contain creatine nitrate are falsely marked. *Id.*, Ex. 13, ¶101.

83.     Disputed.  Dr. S. Bannister is not a patent law expert, and is not qualified to testify as to the effects of a final rejection of a claim by the USPTO, the denial of an appeal by the Federal Circuit for patent claims anticipated by 150 year old prior art, or the legal status of such a rejected patent claim during the pendency of a Petition for Writ of Certiorari.

84.     Disputed.  Dr. S. Bannister opined in his report that CRTN-3 does not increase vasodilation. *Id.* Ex. 13 ¶ 82. However, his testimony that "he did not specifically research this question" was not about whether CRTN-3 caused vasodilation, but rather whether creatine alone caused vasodilation. *Id*. at 162:7-9. In his initial report, Dr. S. Bannister stated that creatine will not increase vasodilation at all. D.E. 178, Ex. 13, ¶ 90. There was no need to research this issue because ThermoLife admits this fact in all of its nitrate patents. D.E. 82-4, p. 3, second-to-last sentence. Dr. S. Bannister was presented with a paper that he had never read and indicated that he "would have to read the study and the measurements that they made" and that he could not "draw conclusions from the abstract of a printed page." *Id.*, Ex. 15, at 161:20-162:6. Dr. S. Bannister was never asked to study the document and opine on it. Similarly, Defendants' expert, Dr. T. Bannister, never read any scientific papers that refuted the opinions of Dr. S. Bannister, and never

8

provided a report addressing such issues. *Id.*, Ex. 23 at 197:10-198:18, 199:13-201:1 202:7-24. Instead, Defendants introduced scientific papers that neither Dr. S. Bannister nor Dr. T. Bannister had read or opined on, and asked Dr. T. Bannister to provide testimony on same without the opportunity to read and analyze same. *Id.*, at 202:7-24. As it stands, there is no evidence that this paper refuted anything, and if it did, it would refute ThermoLife's own patents as well.

85. Disputed. Dr. S. Bannister is qualified to provide expert opinions on the creatine nitrate chemistry issues presented in this case, regardless of whether he is "not specifically a nitrate pharmacologist." *Id*. at 87:16, Ex. 13 Ex. A (C.V. of Dr. S. Bannister).

86. Disputed. When Dr. Steve Bannister was asked what the effects of nitrates are in the body, he responded "I know that one of the effects of nitrate is vasodilation." *Id.*, Ex. 15 at 29:9-17. Dr. Steve Bannister later testified that the amount of nitrate to achieve vasodilation is "6.2 milligrams per kilo is the dose necessary to cause an effect and lesser doses than would not." *Id.* at 90:11-20.

87. Undisputed. In order to render an opinion regarding an effective dosage of nitrates, any expert should rely on scientific studies that they have read carefully. *Id*. at 87:23-88:7.

88. Disputed to the extent that it suggests that the Galvan Paper and the Lundberg declaration were the only materials Dr. S. Bannister relied upon. *Id*., Ex. 13 & 14 at Ex. B.

89. Disputed. Dr. S. Bannister testified that he was not aware of any scientists that hold a reasonable opinion that a lower dosage of nitrates would be necessary to cause an effect. *Id.*, Ex. 15 at 103:2-104:5.

90. Disputed. Dr. Bannister testified that he was not aware of any scientists that hold a reasonable opinion that a lower dosage of nitrates would be necessary to cause an effect. *Id.* As he testified, he "used the sources [the Galvan paper and Lundberg declaration] without looking further." *Id*., at 104:6-12.

91. Disputed. No expert in this matter has read and analyzed D. Hobbs et. al., *Acute Ingestion of Beetroot Bread Increases Endothelium-Independent Vasodilation*, Jor. Of Nut. Disease (July 24, 2012) ("Hobbs Reference") and provided admissible opinions supporting the claim that it establishes that lower dosages of nitrates can cause any physiological effects, including vasodilation. *See supra*, at ¶ 84. Dr. S. Bannister was presented with the Hobbs Reference at his deposition with no opportunity to review and analyze it and testified that he did not know the nature or the quality of the research. *Id.*, at 101:22-102:6. Similarly, Defendants'

9

expert, Dr. T. Bannister, admitted that he never read it or considered it. 202:7-24.

92. Disputed. The Hobbs is hearsay when offered to "establish that lower dosages of nitrates can cause vasodilation." Hobbs does not establish the broad, general proposition that low dosages of nitrates can cause vasodilation. D.E. 178, Ex. 26. Its findings are necessarily limited to the parameters of the experiment. *Id.* Furthermore, no expert in this matter can interpret the materials, methods, or results of Hobbs because no expert has read and analyzed the Hobbs references or provided admissible opinions supporting the claim alleged. *See supra*, at ¶¶ 84 & 91.

93. Disputed. Defendants have provided no admissible expert testimony establishing that CRTN-3 includes an effective dosage of nitrates to cause vasodilation. *See supra*, at ¶¶ 84, 91, 92. Mr. Kramer has not been proffered as an expert and is incompetent to testify to this allegation on behalf of Defendants. Dr. T. Bannister provided no expert opinions in his report as to the dosage of nitrates necessary to cause vasodilation, he did not read the untimely references relied upon by Defendants to support this allegation, and the only paper he relies on is the Galvan Paper, which supports BPI's position. *Id.*, Ex. 16 at ¶ 48. BPI's expert has provided unrebutted expert opinions and testimony that CRTN-3 does not include an effective dosage of nitrates to cause vasodilation. *Id.*, Ex. 14 at ¶¶ 17-33, Ex. 15, at 90:3-20, 102:7-13.

94. Disputed. BPI disputes that "Fusion" is used by Muscle Beach Nutrition to mean that the ingredients are merely blended. The use of the technical term "fusion" in conjunction with chemical names of ingredients uses the technical term of the word "fusion", and not Defendants' cherry picked, definition of the term. *Id.*, Ex. 13 at ¶¶ 52-68. The biased, self-serving testimony of an interested witness does not establish an undisputed fact.

95. As set forth above in ¶9, BPI has proffered extensive circumstantial evidence that Defendants published the NO3-T website with an intent to deceive the public. *See supra,* at ¶9. The biased, self-serving testimony of an interested witness does not establish an undisputed fact.

96. Disputed. The witness does not concede the allege facts in the cited testimony. *Id.*, Ex. 15 at 118:20-120:6.

97. Disputed. Kramer is the alter-ego of both ThermoLife and Muscle Beach Nutrition because he exercises complete control over both, uses the resources of one to pay the debts or do the work of the other, and represents himself to the world as one and the same as the corporate entity. See, e.g. , and *infra* at ¶¶ 127-136.

## ADDITIONAL FACTS

98. Dr. Steve Bannister testified that the Defendants' advertisement of CRTN-3, as set forth in his report, was literally false. D.E. 178, Ex. 15, at 57:10-58:2, 111:2-22, 175:20-176:18, 205:7-16

99. BPI uses the word "fusion" in its advertisements as "cool words" in a very different context from how Defendants use it, such as denoting a product name, "Green Fusion," where the term "fusion" is used as a flavor and not in any statement of fact. D.E. 178, Ex. 19 at 175:13-25.

100. In 2016, BPI's creatine products included BEST CREATINE, which was one of BPI's premiere products and best sellers. Ex. 1, Declaration of Chris Mackenzie, at ¶ 5.

101. BEST CREATINE had been so successful that BPI launched a second product, BEST CREATINE DEFINED in 2017. *Id.*, at ¶ 6.

102. [REDACTED]

103. [REDACTED]

104. The reasons for the decline in BPI's sales of creatine products were related primarily to the introduction and expansion of creatine nitrate products into the marketplace. *Id.*, at ¶8. Companies like Cellucor and its creatine nitrate product line were gaining an advantage over BPI's products, supplanting BPI's products online and greatly reducing BPI's shelf space in various retail stores. *Id.* at ¶8.

105. BPI directly competed with Cellucor to maintain a product base at stores such as GNC (one of BPI's largest accounts), but throughout 2017, creatine nitrate products gradually gained market share and eventually pushed BPI's creatine products out of the marketplace. *Id.*, at ¶ 9

106. Jason Marazzito, BPI's Vice President of National Sales, was a Regional Manager for Nutrabolt, Inc., later renamed Woodbolt Distribution, LLC ("Cellucor"), in 2016-17, and oversaw the sales force that marketed and sold creatine products, including the creatine nitrate

containing products CN3, C4 Original, C4 Ultimate, C4 Extreme Energy and M5 Ultimate ("Cellucor Products"). Ex. 2, Declaration of Jason Marazzito, at ¶¶ 2-5.

107. Mr. Marazzito participated in sales meetings with customers and potential customers, including GNC, which was one of Cellucor's largest accounts where several Cellucor Products are advertised and sold online and in stores. *Id.*, at ¶5. The purpose of these meetings was to promote the Cellucor Product line in direct competition with other creatine products. *Id.* In retail stores the focus was achieving a greater share of a store's limited shelf space. *Id.*

108. Cellucor's biggest competitor in the creatine market is BPI. *Id.* at ¶6. Cellucor considered BPI's BEST CREATINE product its strongest competition for major accounts, such as the GNC account, and competed with BPI for "shelf space" for Cellucor's products. *Id.*, at ¶7.

109. At sales meetings, Cellucor would tout the benefits of creatine nitrate products over BPI's creatine products, including ingredient form (*i.e.*, creatine in the form of the nitrate salt), chemical properties (*i.e.*, creatine nitrate being more soluble in water); physical benefits (*i.e.*, creatine nitrate increasing vasodilation), and patent status (*i.e.*, creatine nitrate being subject to patented protection). *Id.*, at ¶ 8.

110. The factual information regarding the Cellucor Product ingredients was sourced from ThermoLife, the provider of creatine nitrate and owner of the patents Cellucor promoted to the accounts. *Id.*, at ¶9.

111. As a result of these sales points regarding creatine nitrate, Cellucor successfully grew its market share in creatine products and all other creatine-containing product categories (including pre-workout and mass builders products) at GNC and other retailers, to the detriment of BPI, in part, because Cellucor represented to customers and potential customers that the creatine nitrate products would impart enhanced benefits to consumers and were subject to patent protection. *Id.*, at ¶10.

112. ThermoLife and Ronald Kramer are the source of and otherwise responsible for creatine nitrate, which in turn, is incorporated into Cellucor's creatine nitrate products. Ex. 1, Declaration of Chris Mackenzie, at ¶ 10.

113. ThermoLife and Mr. Kramer promote patent protection on creatine nitrate and the products containing it in an effort to achieve and maintain a competitive advantage over other creatine products, including those of BPI. *Id.*, at ¶11.

114. BPI did not believe it could sell creatine nitrate or develop products containing it

12

because BPI did not wish to compensate ThermoLife or Kramer, both of which claimed to have a monopoly on creatine nitrate and any products incorporating it. *Id.*, at ¶12

115. It was not until 2019 that BPI discovered that ThermoLife and Ronald Kramer had misrepresented the scope of their patent coverage and that all of the patents listed on the NO3-T website did not cover the products that were marked with the NO3-T logo. *Id.*, at ¶ 13.

116. Defendants are the self-proclaimed inventors, innovators and providers of creatine nitrate, and the CRTN-3 product is Defendants' exemplary embodiment of the alleged superior benefits and their proprietary rights. *Id.*, at 14.

117. BPI was harmed by Defendants' false advertising and unfair competition regarding creatine nitrate and the products incorporating it (including Muscle Beach Nutrition's CRTN-3) because Defendants falsely promoted the benefits of creatine nitrate to BPI's customers, such as GNC, which created the misimpression that Defendants had created the next, best creatine product. *Id.* Defendants' false advertising (of their CRTN-3 product and otherwise) compromised BPI's ability fairly compete and market its traditional creatine-based products, harmed BPI directly as well as indirectly, and misrepresented the benefits of all creatine nitrate products. *Id.*

118. Defendants, through their false marking or CRTN-3 and the representations on their websites and elsewhere, created the misimpression that they had broad patent rights in creatine nitrate and products incorporating same. *Id.*, at ¶15. Under these circumstances, Defendants presented BPI with the false choice of having to license creatine nitrate in order to sell the raw ingredient or incorporate it into a dietary supplement, or risk getting sued for doing so after entering the market. *Id.*

119. BPI's Second Supplemental Initial Disclosures identifies Chris Mackenzie and Jason Marazzito as having knowledge relevant to BPI's harm as a result of Defendants' false advertising and Cellucor's activities. Ex. 3, at 2.

120. Defendants obstructed BPI's discovery efforts, only producing their financial information after an order to compel, months after BPI had produced its sales figures. D.E. 62-4, p. 26; D.E. 158, Ex. 28, at 6-7.

121. Defendants fabricated evidence in this case, including the Muscle Beach Nutrition – ThermoLife License Agreement. D.E. 143, at 4, 12-13 & Ex. 4, Ex. 15 at 1-3.

122. ███████████████████████████████

███████. D.E. 178, Ex. 10, 243:16-246:15.

123. ████████████████████████████████████████████████████████████

███████████ D.E. 143, Ex. 27, at p. 32-33 (███████, *Bates* labeled 000016-17).

124. ████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████

██████ D.E. 178, Ex. 10, at 92:5-21, 106:6-10.

125. To this day, Defendants continue to falsely mark products on their website, such as the Cellucor C4 Ultimate product, which is falsely marked with U.S. Patent No. 8, 952,047. *Id.*, Ex. 4, last version of NO3-T website, and at Ex. 14, ¶ 101, Ex. 23, 180:24-181:9

126. ThermoLife's August 12, 2019 press release announced that "ThermoLife To Be Awarded Additional Patent Claims On Creatine Nitrate By The USPTO, Effectively Monopolizing The Use Of Creatine Nitrate In Dietary Supplements." Exhibit 4 (Bates-labeled TLI000066-67).

127. Kramer (i) is the founder, owner, CEO and Managing Member of ThermoLife; (ii) is a named inventor on the ThermoLife Patents; (iii) participated in, directed and controlled the representations to the USPTO, FDA and the CAFC; (iv) authored the content on the ThermoLife websites; (v) authored the false public statements regarding creatine nitrate; (vi) refers to himself as the personal beneficiary of corporate activity; (vii) applied for his personal name as a trademark on behalf of ThermoLife; (viii) uses the corporate form of ThermoLife as a mere instrumentality; and (ix) has caused harm to BPI in Florida. D.E. 12, ¶¶45-57.

128. ThermoLife filed trademark applications for the mark RON KRAMER. Exhibit 5.

129. Ron Kramer founded ThermoLife in 1998. D.E. 74-1, Complaint in ThermoLife v. https://ronkramermusclebeach.wordpress.com/, et al., Case No.: 3:15-CV-01616 (N.D. Cal.), ¶19.

130. Ron Kramer is ThermoLife's President and Chief Executive Officer. D.E. 74-1, Complaint in ThermoLife v. https://ronkramermusclebeach.wordpress.com/, et al., Case No.: 3:15-CV-01616 (N.D. Cal.), ¶14; D.E. 178, Ex. 10, at 28:14-29:11.

131. Mr. Kramer is the named inventor on 17 patents related to the dietary supplement industry. D.E. 74-1, Complaint in *ThermoLife v. https://ronkramermusclebeach.wordpress.com/*, et al., Case No.: 3:15-CV-01616 (N.D. Cal.), ¶20.

132. Ron Kramer is widely known in the dietary supplement industry and those in the

industry recognize that Mr. Kramer is affiliated with ThermoLife and the names that ThermoLife does business under.  D.E. 74-1, Complaint in *ThermoLife v. https://ronkramermusclebeach.wordpress.com/, et al.*, Case No.: 3:15-CV-01616 (N.D. Cal.), ¶21; D.E. 22-2, Complaint in *ThermoLife International LLC v. Shartouni*, Case No.: 2:18-cv-01546-JJT (D. Arizona).

133.   Ron Kramer has common law trademark rights in his name, RON KRAMER, which has been used in connection with the sale and advertising of dietary supplements for over sixteen years (during which he was associated with ThermoLife).   D.E. 74-1, Complaint in *ThermoLife v. https://ronkramermusclebeach.wordpress.com/, et al.*, Case No.: 3:15-CV-01616 (N.D. Cal.), ¶22.

134.   Ron Kramer took over the buildings across from Muscle Beach and stated that "I'm opening a retail store that will feature my products" to "make ThermoLife a top selling company while still making real products that are 100% compliant and not hiring guys on steroids to say they got big from taking my products."  D.E. 74-2.

135.   Ron Kramer uses his name interchangeably with ThermoLife, particularly when threatening companies with infringement under ThermoLife's patents.  Exhibit 6, Declaration of Jack Owoc, Ex. A (email from Ron Kramer threatening infringement action by ThermoLife) and Ex. B ("the Jack Owoc compound is now the Ron Kramer compound").

136.   Ron Kramer personally executed the alleged ThermoLife - Muscle Beach Nutrition Purchase and License Agreement on behalf of both entities.  D.E. 143, Exhibit 4.

| | |
|---|---|
| Respectfully submitted, | Dated this 7th day of December, 2020. |//

Respectfully submitted,                Dated this 7th day of December, 2020.

KRINZMAN, HUSS & LUBETSKY
FELDMAN & HOTTE
Cary A. Lubetsky
Florida Bar No. 961360
Salvatore H. Fasulo
Florida Bar No. 143952
800 Brickell Avenue, Suite 1501
Miami, Florida 33131
Telephone: (305) 854-9700
Facsimile: (305) 854-0508
Primary email:  cal@khllaw.com
                shf@khllaw.com
Secondary email: eservicemia@khllaw.com

HILLYER LEGAL, PLLC
Gregory L. Hillyer
Fla. Bar No. 682489
Email: ghillyer@hillyerlegal.com
5335 Wisconsin Avenue, N.W.
Suite 440
Washington, D.C. 20015-2052
Telephone: 202-686-2884
Facsimile: 202-686-2877

*s/ Javier Sobrado*
Javier Sobrado
Fla. Bar. No. 44992
Email: JSobrado@BrickellIP.com
1101 Brickell Ave
South Tower, Suite 800
Miami, FL 33131
Telephone (305)728-8331

*Attorneys for Plaintiff BPI Sports, LLC*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a true and correct copy of this Statement of Facts was filed via CM/ECF on December 7, 2020 and served on counsel of record.

*s/ Javier Sobrado*

16