# Exhibit 12

LAW OFFICES
BROWN & CHARBONNEAU, LLP
420 EXCHANGE, SUITE 270
IRVINE, CALIFORNIA 92602
TELEPHONE (714) 505-3000

GREGORY G. BROWN, SBN 132004
MARK M. HIGUCHI, SBN 247262
TIFFANY Y. LIU, SBN 354961

Attorneys for Defendants/Cross-Complainant Alexandros Nikolaidis
and Defendant Niki IP Services

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF LOS ANGELES

UNLIMITED CIVIL JURISDICTION

| | |
|---|---|
| THERMOLIFE INTERNATIONAL, LLC, an Arizona Limited Liability Company, <br><br> Plaintiff, <br><br> v. <br><br> ALEXANDROS NIKOLAIDIS, an individual; Niki Ip Services, an unregistered entity; and DOES 1-10, <br><br> Defendants. <br> _____ <br> ALEXANDROS NIKOLAIDIS, an individual, <br><br> Cross-Complainant, <br><br> v. <br><br> THERMOLIFE INTERNATIONAL, LLC, an Arizona Limited Liability Company; RONALD KRAMER, an individual; and ROES 1 through 20, inclusive, <br><br> Cross-Defendants. <br> _____ | **Case No. 25STCV23506** <br><br> **CROSS-COMPLAINT** |

BROWN & CHARBONNEAU LLP

**CROSS-COMPLAINT**

1

Cross-Complainant Alexandros Nikolaidis hereby complains and alleges as follows:

1.      Cross-Complainant ALEXANDROS NIKOLAIDIS ("Cross-Complainant" or "Nikolaidis") is an individual residing in Long Beach, California, dba as Niki Ip Services. Cross-Complainant is a member of ThermoLife International, LLC ("ThermoLife, LLC"), owning a fifty percent (50%) member interest in ThermoLife LLC.

2.      Cross-Defendant RONALD KRAMER ("Cross-Defendant" or "Kramer") is an individual, and on information and belief, residing in Huntington Beach, California. Cross-Defendant is a member of ThermoLife, LLC, owning a fifty percent (50%) member interest in ThermoLife LLC.

3.      Cross-Defendant THERMOLIFE INTERNATIONAL, LLC, ("Cross-Defendant" or "ThermoLife") is an Arizona limited liability company with its principal place of business in Signal Hill, California.

4.      The true names or capacities of Cross-Defendants ROES 1 through 20, whether individual, corporate, associate or otherwise are unknown to Cross-Complainant at the time of filing this Cross-Complaint. Cross-Complainant, therefore, sues said Cross-Defendants by such fictitious names and will ask for leave to amend the Cross-Complaint to reflect their true names and capacities when Cross-Complainant ascertains them. Cross-Complainant is informed and believes, and thereon alleges, that each of the ROE Cross-Defendants is, in some manner, responsible for the events and happenings set forth herein.

5.      Cross-Complainant is informed and believes and based thereon allege that all times mentioned herein, each of the Cross-Defendants, including the fictitiously named Cross-Defendants, were the agents and/or employees of each of the remaining Cross-Defendants, and were at all times acting within the scope and course of their employment and/or agency. Additionally, Cross-Complainant is informed and believes and based thereon alleges that each of the Cross-Defendants authorized, consented to and/or ratified each act and/or omission of each of the remaining Cross-Defendants as hereinafter alleged.

6.      Jurisdiction and venue are appropriate in Orange County because the contract at

BROWN & CHARBONNEAU LLP

issue in this action was entered in and breached in Orange County, the wrongful conduct complained of herein occurred in Orange County, Cross-Defendant ThermoLife International, LLC, has its principal place of business in Orange County, California, and on information and belief Cross-Defendant Robert Kramer resides in Orange County, California. The amount of damages exceeds $25,000.

## GENERAL ALLEGATIONS

7.      In or around February 2005, Kramer introduced himself to Nikolaidis via an online body building forum and offered Nikolaidis a position with ThermoLife. At the time, Nikolaidis lived in Greece, working with another supplement company and was planning to start his own pharmaceutical business, so he declined the offer. The two reacquainted later that year and Kramer, on behalf of ThermoLife, extended a second offer to Nikolaidis for him to develop ThermoLife's patent portfolio.

8.      On or around December 28, 2005, ThermoLife and Nikolaidis entered into a valid and enforceable oral contract wherein ThermoLife agreed to pay Nikolaidis fifty percent (50%) of the net profits derived from any patents invented by Nikolaidis during his time with ThermoLife ("Patents") in consideration for Nikolaidis assigning and allowing ThermoLife to be the sole assignee of the Patents.

9.      Beginning in 2012, Kramer and Nikolaidis had several discussions wherein Kramer requested Nikolaidis move to the U.S. to continue his work as a full-time ThermoLife employee. On or around October 5, 2012, Kramer and Nikolaidis entered into a valid and enforceable oral contract, under the terms of which Kramer, sold, assigned, and transferred a fifty percent (50%) member interest in ThermoLife to Nikolaidis, in consideration for Nikolaidis moving to the U.S. and for services rendered by Nikolaidis to Kramer, and/or for the benefit of Kramer. Kramer further promised to pay Nikolaidis an additional living stipend to cover his housing and utility costs.  In November 2013, Nikolaidis immigrated to the U.S., leaving behind his friends, family, and his own profitable pharmaceutical business.

BROWN &
CHARBONNEAU LLP

**CROSS-COMPLAINT**
3

10.     Throughout their professional relationship, Nikolaidis and Kramer regularly and openly discussed business matters, their expected profits, and strategized about ThermoLife's patent portfolio. Kramer often referred to Nikolaidis as his "partner", "business partner", or "brother", even in several third-party communications.

11.     Beginning 2007, ThermoLife was the sole assignee on each of the Patents of which Nikolaidis was a named inventor. From approximately 2009 to 2013, ThermoLife paid Nikolaidis the promised patent profits. ThermoLife stopped these payments in 2014, after Nikolaidis immigrated to the U.S. When Nikolaidis inquired about the patent profits, Kramer represented to him that ThermoLife was no longer making any money.

12.     In 2020, ThermoLife also stopped paying for Nikolaidis's housing and utilities, also, under the pretense of ThermoLife's lack of profits. On information and belief, ThermoLife did actually report profits from 2014 to 2024.

13.     On or around January 13, 2021, Nikolaidis requested ThermoLife provide him any documentation which reflected his 50 percent member interest in ThermoLife at the request of Nikolaidis's bank in Bulgaria. Kramer provided Nikolaidis an Operating Agreement ("Original OA") which showed a date of January 1, 2020. The Original OA stated that Nikolaidis was a member and 1% equity holder in ThermoLife. Nikolaidis disputed the one percent (1%) ownership with Kramer. However, Kramer represented that the document was purely for administrative purposes and had no effect on their previous agreement and Nikolaidis' 50 percent member interest or profit sharing in ThermoLife. A true and correct copy of the Original OA is attached hereto as Exhibit 1.

14.     During Nikolaidis's time at ThermoLife, ThermoLife failed to provide Nikolaidis proper safety equipment and protocols while researching and developing its products. ThermoLife never provided Nikolaidis a properly ventilated lab and caused Nikolaidis to suffer unnecessary exposure to harmful chemicals. ThermoLife further required Nikolaidis to work in harmful and unsafe conditions.

BROWN &
CHARBONNEAU LLP

**CROSS-COMPLAINT**
4

15. On July 2, 2025, Nikolaidis sent Kramer a message, requesting to take a week of unpaid leave. Neither Kramer nor ThermoLife responded to his request until July 7, 2025, when Kramer sent an email to Nikolaidis unilaterally stating that his return to ThermoLife was conditioned on his completion of a two-week alcohol rehabilitation program. Kramer further stated that Nikolaidis was banned from company premises and revoked his access to all ThermoLife systems and accounts during his leave.

16. Later that day, Kramer emailed Nikolaidis an "Amended Operating Agreement" ("Amended OA"). This amendment purportedly made Kramer the sole Manager of ThermoLife and gave him sole discretion to deny shareholders' requests for financial information, control distributions, and other management powers. A true and correct copy of the Amended OA is attached hereto as Exhibit 2.

17. Nikolaidis was not notified of these proposed amendments, nor was he involved in any formal or informal vote to approve or ratify the Amended OA. Upon Nikolaidis's dispute of this amendment, Kramer cited ThermoLife's Original OA, which states in relevant part, "6.1 Procedure. Each Member agrees that a simple majority vote of Member interests may ratify an amended Operating Agreement, whether by addendum or restatement, at a later time." There was no vote of any kind held with respect to the Amended OA.

18. On July 9, 2025, Nikolaidis communicated his resignation to Kramer and later submitted a written resignation via email.

19. On July 23, 2025, Nikolaidis received an email from ThermoLife's accountant, Shannon Sugar, with a document titled "Assignment and Assumption Gift Agreement" ("Gift Agreement"), purportedly signed December 31, 2024, wherein Nikolaidis allegedly gifted the assignment of a $763,278.33 promissory note ("Note") to Kramer. On information and belief, no such Note has ever existed, and Kramer fabricated the Gift Agreement. A true and correct copy of the Gift Agreement is attached hereto at Exhibit 3.

20. Kramer has a documented history of falsifying evidence. In *BPI Sports, LLC v. ThermoLife International, LLC*, the court found that Kramer created a back-dated license

agreement, withheld metadata, and was sanctioned for this bad faith conduct. The Court ultimately found that "Mr. Kramer acted in bad faith by knowingly fabricating the License Agreement and repeatedly obstructing discovery to conceal this fraud," and ordered an adverse instruction regarding his credibility.

## FIRST CAUSE OF ACTION

**(Breach of Oral Contract–Against Cross-Defendant Kramer, and ROES 1-20, inclusive)**

21.     Cross-Complainant repeats, re-alleges and incorporates by reference the allegations contained in paragraphs 1 through 20 of this Cross-Complaint as fully set forth herein.

22.     On or around October 5, 2012, the Kramer and Nikolaidis entered into a valid and enforceable oral contract, under the terms of which Kramer sold, assigned, and transferred a fifty percent (50%) member interest in ThermoLife to Nikolaidis, in consideration for Nikolaidis moving to the U.S. and for services rendered by Nikolaidis to Kramer, and/or for the benefit of Kramer.

23.     Cross-Complainant has performed all promises, conditions and covenants required on his part to be performed under the terms of the contract, except those which have been waived, excused or prevented by Kramer.

24.     On or about July 9, 2025, Kramer materially breached the contract by repudiating and denying Cross-Complainant his ownership interest in ThermoLife.

25.     As a direct and proximate result of Kramer's breach of contract, Cross-Complainant has suffered damages in a total amount to be proven at trial.

## SECOND CAUSE OF ACTION

**(Breach of Oral Contract–Against Cross-Defendant ThermoLife, and ROES 1-20, inclusive)**

26.     Cross-Complainant repeats, re-alleges and incorporates by reference the allegations contained in paragraphs 1 through 20 of this Cross-Complaint as fully set forth herein.

27.     On or about December 28, 2005, Cross-Complainant Nikolaidis and Cross-Defendant ThermoLife, entered into a valid and enforceable oral contract, wherein ThermoLife agreed to pay Nikolaidis fifty percent (50%) of the net profits derived from any patents invented

**CROSS-COMPLAINT**

6

by Nikolaidis during his time with ThermoLife, in consideration for Nikolaidis assigning and allowing ThermoLife to be the sole assignee of the Patents.

28. Cross-Complainant has performed all promises, conditions and covenants required on his part to be performed under the terms of the contract, except those which have been waived, excused or prevented by ThermoLife.

29. On or about June 20, 2025, Cross-Complainant discovered that Cross-Defendant ThermoLife had materially breached the contract by failing to pay Cross-Complainant fifty percent (50%) of the net profits derived from the Patents. As a direct and proximate result of Cross-Defendants' breach of contract, Cross-Complainant has suffered damages in a total amount to be proven at trial.

## THIRD CAUSE OF ACTION

### (False Promise–Against Cross-Defendant Kramer, and ROES 1-20, inclusive)

30. Cross-Complainant repeats, re-alleges and incorporates by reference the allegations contained in paragraphs 1 through 20 of this Cross-Complaint as fully set forth herein.

31. On or around October 5, 2012, the Kramer promised Nikolaidis he would sell, assign, and transfer a fifty percent (50%) member interest in ThermoLife to Nikolaidis, in consideration for Nikolaidis moving to the U.S. and for services rendered by Nikolaidis to Kramer, and/or for the benefit of Kramer.

32. At the time the foregoing promise was made to Nikolaidis, Kramer had no intention of performing the promise. Rather, Kramer made the foregoing false promise to Nikolaidis with the intent to deceive Nikolaidis, and induce him to move to the U.S. and not seek compensation for services rendered and continue to render services to Kramer, and/or for the benefit of Kramer.

33. Nikolaidis was induced to, and did, rely on the foregoing false promise made by Kramer, and Nikolaidis moved to the U.S. and did not seek compensation for services rendered and continued to render services to Kramer, and/or for the benefit of Kramer. But for Kramer's false promise, Nikolaidis would not have done so. At all relevant times, Nikolaidis was ignorant of the falsity of Kramer's promise and secret intention not to perform.

BROWN &
CHARBONNEAU LLP

**CROSS-COMPLAINT**

34. Nikolaidis' reliance on Kramer's false promise was reasonable and justified, and Nikolaidis placed the utmost trust and confidence in Kramer, and had no reason to question the truthfulness of Kramer's promise.

35. As a direct and proximate result of Kramer's false promise, Nikolaidis has suffered damages in a total amount to be proven at trial.

36. Kramer's acts as herein alleged were intentional, willful, malicious and oppressive and were undertaken with wanton disregard for the rights of Nikolaidis, thereby justifying an award of exemplary and punitive damages.

### FOURTH CAUSE OF ACTION

### (False Promise Against Cross-Defendant ThermoLife, and ROES 1-20, inclusive)

37. Cross-Complainant repeats, re-alleges and incorporates by reference the allegations contained in paragraphs 1 through 20 of this Cross-Complaint as fully set forth herein.

38. On or around October 5, 2012, the Kramer promised Nikolaidis he would sell, assign, and transfer a fifty percent (50%) member interest in ThermoLife to Nikolaidis, in consideration for Nikolaidis moving to the U.S. and for services rendered by Nikolaidis to Kramer, and/or for the benefit of Kramer.

39. On or about December 28, 2005, Cross-Defendant ThermoLife, through Kramer, promised Nikolaidis that ThermoLife would pay Nikolaidis fifty percent (50%) of the net profits derived from any patents invented by Nikolaidis during his time with ThermoLife, in consideration for Nikolaidis assigning and allowing ThermoLife to be the sole assignee of the Patents.

40. At the time the foregoing promise was made to Nikolaidis, ThermoLife had no intention of performing the promise. Rather, ThermoLife made the foregoing false promise to Nikolaidis with the intent to deceive Nikolaidis, and induce him to assign and allow ThermoLife to be the sole assignee of the Patents.

41. Nikolaidis was induced to, and did, rely on the foregoing false promise made by Kramer, and Nikolaidis assigned and allow ThermoLife to be the sole assignee of the Patents. But

BROWN &
CHARBONNEAU LLP

---

**CROSS-COMPLAINT**

8

for ThermoLife's false promise, Nikolaidis would not have done so. At all relevant times, Nikolaidis was ignorant of the falsity of ThermoLife's promise and secret intention not to perform.

42.     Nikolaidis' reliance on ThermoLife's false promise was reasonable and justified, and Nikolaidis placed the utmost trust and confidence in Kramer, and had no reason to question the truthfulness of ThermoLife's promise.

43.     As a direct and proximate result of ThermoLife's false promise, Nikolaidis has suffered damages in a total amount to be proven at trial.

44.     ThermoLife's acts as herein alleged were intentional, willful, malicious and oppressive and were undertaken with wanton disregard for the rights of Nikolaidis, thereby justifying an award of exemplary and punitive damages.

## FIFTH CAUSE OF ACTION

### (Breach of Fiduciary Duty – Against Cross-Defendant Kramer, and ROES 1-20, inclusive)

45.     Cross-Complainant repeats, re-alleges and incorporates by reference the allegations contained in paragraphs 1 through 20 of this Cross-Complaint as fully set forth herein.

46.     As a managing-member of ThermoLife, Cross-Defendant Kramer owed Cross-Complainant, fiduciary duties of care and loyalty.

47.     Kramer materially breached these fiduciary duties by, among other breaches, engaging in self-dealing including using ThermoLife funds for personal purposes, and diverting ThermoLife funds and/or receivables to himself for his personal benefit.

48.     Kramer further materially breached his fiduciary duties by, among other breaches:

a)     Unilaterally executing an amendment of the Original OA to remove Cross-Complainant as a member, and further restrict his rights to inspect financial records and participate in management decisions;

b)     Misrepresenting to Cross-Complainant that ThermoLife had no profits from 2014 to approximately 2023.

c)     Falsifying a gift assignment purportedly showing Cross-Complainant's gift to Cross-Defendant Kramer of $763,278.33

BROWN & CHARBONNEAU LLP

---

**CROSS-COMPLAINT**

9

49.     As a direct and proximate result of Kramer's breach of fiduciary duty, Cross-Complainant has suffered damages in an amount to be proven at trial.

50.     Kramer's acts alleged herein were intentional, willful, malicious and oppressive and were undertaken with wanton disregard for the rights of Cross-Complainant, thereby justifying an award of exemplary and punitive damages.

## SIXTH CAUSE OF ACTION

### (Violation of Business and Professions Code §17200 – Against All Cross-Defendants, and ROES 1-20, inclusive)

51.     Cross-Complainant repeats, re-alleges and incorporates by reference the allegations contained in paragraphs 1 through 20 of this Cross-Complaint as fully set forth herein.

52.     Cross-Defendants violated California's Unfair Competition Law, Business and Professions Code section 17200 *et. seq.* when, among other things:

a)  Cross-Defendant ThermoLife fraudulently induced Cross-Complainant to assign his patent rights to ThermoLife under the pretense of receiving fifty percent (50%) of the net profits derived from the Patents.

b)  Cross-Defendant Kramer, attempted to unilaterally amend the Original Operating Agreement to make Kramer the sole Manager of ThermoLife and give him sole discretion to deny shareholders' requests for financial information, control distributions, and other management powers.

c)  Cross-Defendant Kramer, in bad faith, forged and backdated a Gift Agreement falsely purporting to show that Cross-Complainant gifted Cross-Defendant Kramer $763,278.33.

53.     As a direct and proximate result of Cross-Defendants' unlawful, unfair, and fraudulent conduct, Cross-Complainant has suffered economic and noneconomic harm in an amount to be proved at trial.

## SEVENTH CAUSE OF ACTION

### (Declaratory Relief – Against All Cross-Defendants and ROES 1-20, inclusive)

BROWN & CHARBONNEAU LLP

**CROSS-COMPLAINT**
10

54.     Cross-Complainant repeats, re-alleges and incorporates by reference the allegations contained in paragraphs 1 through 20 of this Cross-Complaint as fully set forth herein.

55.     An actual controversy has now arisen and exists between Cross-Complainant Nikolaidis, on the one hand, and Cross-Defendants, on the other hand, as to Cross-Complainant's ownership of a fifty percent (50%) member interest in ThermoLife LLC.

56.     Cross-Complainant requests a judicial determination of the parties' rights and a determination that Cross-Complainant is a member of ThermoLife owning a fifty percent (50%) member interest.

57.     An actual controversy has now arisen and exists between Cross-Complainant Nikolaidis, on the one hand, and Cross-Defendants, on the other hand, as to the enforceability of the Amended OA, dated July 7, 2025.

58.     Cross-Complainant requests a judicial determination of the parties' rights and a determination that the Amended OA, dated July 7, 2025, is void, cancelled and unenforceable.

59.     An actual controversy has now arisen and exists between Cross-Complainant Nikolaidis, on the one hand, and Cross0Defendants, on the other hand, as to Cross-Complainant's ownership of the disputed patents currently assigned to ThermoLife.

60.     Cross-Complainant requests a judicial determination of the parties' rights and a determination that Cross-Complainant is the owner of the disputed patents currently assigned to ThermoLife.

61.     An actual controversy has now arisen and exists between Cross-Complainant Nikolaidis, on the one hand, and Cross-Defendants, on the other hand, as to the enforceability of the Gift Assignment, dated December 31, 2024.

62.     Cross-Complainant requests a judicial determination of the parties' rights and a determination that the Gift Assignment, dated December 31, 2024, is void, cancelled and unenforceable.

63.     A judicial declaration is necessary and appropriate at this time under the circumstances so that Cross-Complainant may rightfully assert its interests.

**PRAYER FOR RELIEF**

WHEREFORE, Cross-Complainant pray for a judgment against Cross-Defendants, and ROES 1 through 20, inclusive, as follows:

1.    For general and special damages in a sum according to proof at the time of trial;

2.    For punitive damages in a sum according to proof at the time of trial;

3.    For a judicial declaration, decree, order, and judgment that Nikolaidis is the owner of a fifty percent (50%) member interest in ThermoLife LLC;

4.    For a judicial declaration, decree, order, and judgment that Nikolaidis is the owner of a fifty percent (50%) member interest in the disputed Patents;

5.    For a judicial declaration, decree, order, and judgment that the Amended OA, dated July 7, 2025, is void, cancelled and unenforceable;

6.    For a judicial declaration, decree, order, and judgment that the Gift Assignment, dated December 31, 2025, is void, cancelled and unenforceable;

7.    For costs of suit herein;

8.    For attorney's fees if recoverable pursuant to contract or statute.

9.    For prejudgment interest;

10.    For such other and further relief as the Court deems just and proper.

DATE: September 29, 2025            BROWN & CHARBONNEAU, LLP

BY: _____

GREGORY G. BROWN
MARK M. HIGUCHI
TIFFANY Y. LIU

---

**CROSS-COMPLAINT**

12

**PROOF OF SERVICE**
CCP §§ 1013A, 2015.5

STATE OF CALIFORNIA, COUNTY OF ORANGE

I, the undersigned, am employed in the County of Orange, State of California.  I am over the age of eighteen (18) years and not a party to the within action.  My business address is 420 Exchange, Suite 270, Irvine, CA 92602.

On September 29, 2025, I served true copies of the foregoing document described as:

**CROSS-COMPLAINT**

on the interested parties in this action, addressed as follows:

| | |
|---|---|
| Evangeline A.Z. Burbidge<br>Sable Bahleda<br>Lewis & Llewellyn LLP<br>601 Montgomery Street, Suite 2000<br>San Francisco, CA 94111<br>Eburbidge@lewisllewellyn.com<br>sbahleda@lewisllewellyn.com<br>Telephone: (415) 800-0590 | *Attorneys for Plaintiff: Thermolife International, LLC* |

( )     **BY U.S. MAIL:**  The documents were placed in sealed, addressed envelopes on the above date and placed for collection and mailing at my place of business.  I am "readily familiar" with the firm's practice of collecting and processing correspondence for mailing.  Under that practice, it would be deposited with the U.S. Postal Service on that same day with postage thereon fully prepaid at Irvine, California in the ordinary course of business.  I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

( )     **BY OVERNIGHT DELIVERY:** I enclosed the documents in an envelope or package provided by an overnight delivery carrier and addressed them on the above date.  I placed the envelope or package for collection and overnight delivery at an office or a regularly utilized drop box of the overnight delivery carrier.

(X)     **BY ELECTRONIC SERVICE:** Based on a court order or an agreement of the parties to accept service by electronic transmission, I caused the documents to be sent to the persons at the electronic notification address listed above. **Send Electronic Service for Brown & Charbonneau, LLP to mail@bc-llp.com**.

(X)     **(State)** I certify (or declare) under penalty of perjury under the laws of the State of California that the foregoing is true and correct, and that this declaration was executed on September 29, 2025, at Irvine, California.

*Guadalupe Flores*
**Guadalupe Flores**

PROOF OF SERVICE

# EXHIBIT 1

# Operating Agreement
for
*ThermoLife International, LLC*

## Article I - Organization

**1.1 Formation.** The Company has been organized as a *member-managed* limited liability company under applicable state law.

**1.2 Purpose.** The Company has been formed to carry out any lawful business activity under applicable law limited only by state filings. Any activity necessary or convenient for the Company shall be deemed proper in furthering the financial strength of the Company.

**1.3 Duration.** The Company shall exist perpetually subject only to operation of law or Member dissolution as provided by statute.

**1.4 Registered Agent and Registered Office.** The Registered Agent and Registered Office of the Company shall be

*Ron Kramer*
*1334 E Chandler Blvd #5-D76*
*Phoenix, AZ 85048*

**1.5 No Liability of Members or Managers.** Unless otherwise required by law or subsequent Member action, no Member or Manager of the Company shall be personally liable for the debts, obligations or acts of the Company.

## Article II-Membership

**2.1 Membership Interests.** The Members of the Company are as follows:

| Name: | Number of Shares: |
|---|---|
| *Ron Kramer* | *99.00%* |
| *Alexandros Nikolaidis* | *1.00%* |

## Article III - Member Voting

**3.1. Member Voting Rights.** For the purposes of Member voting each share shall count as one vote. Member voting rights shall follow default operation of law and subsequent Member resolution changing these procedures subject to applicable statutory requirements.

## Article IV - Managers

**4.1 Designation of Managers.** The Company is initially formed as a *member-managed* LLC. Non-Member Managers, if appointed later, shall hold office and management powers upon Member approval in accordance with applicable law or any subsequent voting procedures later ratified by the Members of the Company.

## Article V - Transfer of Membership Interest Prohibited

**5.1 Transferability of Interest.** No Member of the Company shall transfer their shares or interest in the Company without unanimous Member approval in writing, subject only to applicable statutory requirements. Each Member agrees that they will not sell, gift, transfer, encumber, assign, or otherwise transfer their shares whether voluntarily or involuntarily without unanimous Member approval.

## Article VI - Amendment of this Agreement

**6.1 Procedure.** Each Member agrees that a simple majority vote of Member interests may ratify an amended Operating Agreement, whether by addendum or restatement, at a later time.

6.2 **Whole Agreement.** This Operating Agreement represents the entire agreement of each Member listed here. Any modification is subject to the voting procedures above or default operation of law in this jurisdiction.

Signed,

*Thermolife International,* Limited Liability Company, by

_____         _____

*Ron Kramer* Member                                                          Date

_____         _____

*Alexandros Nikolaidis* Member                                       Date

# EXHIBIT 2

**AMENDED & RESTATED**

**LIMITED LIABILITY COMPANY AGREEMENT**
**OF**
**THERMOLIFE INTERNATIONAL, LLC**

Effective Date: July 7, 2025

This Amended & Restated Limited Liability Company Agreement (this "<u>Agreement</u>"), dated as of July 7, 2025, is made and entered into by Thermolife International, LLC, a Arizona limited liability company (the "<u>Company</u>") and Ron Kramer (the "<u>Majority Member</u>") and amends that certain Limited Liability Company Agreement of the Company, dated January 1, 2020, (the "<u>Original Agreement</u>").

**RECITALS**

**WHEREAS,** pursuant to <u>Section 6.1</u> of the Original Agreement, a simple majority vote of member interests is necessary to ratify an amended operating agreement.

**WHEREAS**, the Majority Member owns 99% of the percentage interests in the Company, which constitutes a majority of the interests of the Company.

**WHEREAS**, the Majority Member deems it in the best interests of the Company to amend the Original Agreement, which shall be of no further force or effect and replaced entirely by this Agreement;

**WHEREAS**, The ownership of the Members are set forth in <u>Schedule A</u> as attached hereto.

**NOW, THEREFORE**, in exchange for the mutual covenants and promises contained herein, the parties agree as follows:

**AGREEMENT**

Section 1 <u>Purpose; Powers.</u>

The principal business activity and purpose of the Company shall be to engage in any lawful act or activity for which limited liability companies may be formed pursuant to the Arizona Limited Liability Company Act, A.R.S. §§ 29-3101 et seq (the "<u>Act</u>"). The Company shall possess and may exercise all the powers and privileges granted by the Act, any other law orthis Agreement, together with any powers incidental thereto, and may take any other action not prohibited under the Act or other applicable law, so far as such powers and actions are necessary or convenient to the conduct, promotion or attainment of the business, purposes or activities of the Company.

Section 2 <u>Capital Contributions.</u>

The Members own one hundred percent (100%) of the interest in the Company and may contribute capital to the Company in amounts and at times as the Members may deem appropriate.

Section 3 <u>Distributions.</u>

Distributions (including distributions in liquidation) shall be made to the Members at such

times as the Manager (as defined below) may deem appropriate in their sole discretion.

Section 4    Management.

(a)    The Company shall be managed by a manager (the "Manager"). The Manager shall be Ron Kramer. The Members shall have the right to appoint, remove and replace any Manager at any time.

(b)    The business, policies, property and affairs of the Company shall be managed exclusively by the Manager. The Manager shall have full, complete and exclusive authority and discretion to control the business, policies, property and affairs of the Company, to make all decisions regarding those matters and to perform any and all other acts or activities customary or incident to the management of the Company's business, property and affairs, including the naming of officers of the Company pursuant to Section 4(c) below and the delegation of responsibility for the preceding to such officers. There is no requirement that the Manager hold a meeting in order to take action on any matter. Unless otherwise provided in this Agreement, any action taken by the Manager and the signature of the Manager on any agreement, contract, instrument or other document on behalf of the Company, shall be sufficient to bind the Company and shall conclusively evidence the authority of the Manager and the Company with respect thereto.

(c)    The Manager may appoint officers at any time. The officers of the Company, if deemed necessary by the Manager, may include a president, a chief executive officer, one or more vice presidents, secretary, treasurer, chief financial officer, chief operating officer, one or more assistant secretaries or assistant treasurers and such other officers as a Manager determines to be appropriate. The officers shall serve at the pleasure of the Manager, subject to all rights, if any, of an officer under any contract of employment. An officer need not be a Member of the Company, and the officers shall exercise such powers and perform such duties as shall be determined from time to time by the Manager.

(d)    Subject to the rights, if any, of an officer under a contract of employment, any officer may be removed, either with or without cause, by the Manager at any time. A vacancy in any office because of death, resignation, removal, disqualification or any other cause shall be filled in the manner prescribed in this Agreement for regular appointments to that office.

Section 5    Fiscal Year.

The fiscal year end of the Company shall be December 31.

Section 6    Term.

The term of the Company commenced on the date the Certificate of Formation was filed in the Office of the Secretary of State of the State of Arizona and shall continue until the first to occur of the following:

(a)    the election to dissolve the Company made in writing by the Manager;

(b)    the entry of a decree of judicial dissolution under Section A.R.S. § 29-3701(A)(4) of the Act; or

2

(c)      dissolution required by operation of law.

Section 7      Indemnification

(a)      The Company shall indemnify each Indemnitee (as defined in Section 7(e), from and against any and all losses, claims, damages, liabilities (joint or several), expenses (including, without limitation, attorneys fees and other legal fees and expenses), judgments,fines, settlements, and other amounts arising from any and all claims, demands, actions, suits or proceedings (whether the same be civil, criminal, administrative or investigative) that relate to the operations of the Company as set forth in this Agreement in which such Indemnitee may be involved, or is threatened to be involved, as a party or otherwise, to the fullest  extent permitted by state law.

(b)      The indemnification provided by this Section 7 shall be in addition to any other rights to which an Indemnitee or any other Person (as defined in Section 7(f) may be entitled under any agreement, executed by the Members, as a matter of law or otherwise, and shall continue as to an Indemnitee who has ceased to serve in such capacity unless otherwise provided in a written agreement pursuant to which such Indemnitee is indemnified. The Members expressly intends that the provisions of this Section 7 shall be interpreted to reflect an ordering ofliability for potentially overlapping or duplicative indemnification payments, with any applicablethird-party indemnifier having primary liability and the Company having only secondary liability.

(c)      In no event may an Indemnitee subject the Members to personal liability by reason of the indemnification provisions set forth in this Agreement.

(d)      The provisions of this Section 7 are for the benefit of the  Indemnitees, their heirs, successors and assigns and shall not be deemed to create any rights for the benefit of any other Persons. Any amendment, modification or repeal of this Section 7 or any provision hereof shall be prospective only and shall not in any way affect the limitations on the Company's liability to any Indemnitee under this Section 7 as in effect immediately prior to  such amendment, modification, or repeal with respect to claims arising from or relating to matters occurring, in whole or in part, prior to such amendment, modification or repeal, regardless of when such claims may arise or be asserted.

(e)      As used in this Section 7, the term "Indemnitee" or "Indemnitees" shall mean (i) any Person made a party to a proceeding by reason of his, her or its status as (A) the Members, or (B) a member, partner or shareholder of the Members, or (C) a director, officer or employee of the Company, the Members or any direct or indirect member, partner or shareholder of the Members and (ii) such other Persons as the Members may designate from time to time (whether before or after the event giving rise to potential liability), in its sole and absolute discretion.

Section 8      Liability of Members.

The Members shall not have any liability for the debts, obligations or liabilities of the Company, except to the extent required under the Act. The Members shall not have any liability to restore any negative balance in their capital accounts.

Section 9      Interests Not Governed by Article 8.

Limited liability company interests in the Company shall not be securities governed by Article 8 of the Arizona Uniform Commercial Code unless the Company opts into Article 8 in accordance with A.R.S. § 47-8103.

Section 10  Books, Records.

The Company shall maintain, or cause to be maintained, in a manner customary and consistent with good accounting principles, practices and procedures, a comprehensive system of office records, books and accounts (which records, books and accounts shall be and remain the property of the Company) in which shall be entered fully and accurately each and every financial transaction with respect to the ownership and operation of the property of the Company. Such books and records of account shall be prepared and maintained at the principal place of business of the Company or such other place or places as may from time to time be determined by Manager.

Section 11 Confidentiality.

(a)  The Manager shall have the right to keep confidential from Members for such period of time as the Manager deems reasonable, any information which the Manager reasonably believes to be in the nature of trade secrets or other information the disclosure of which the Manager in good faith believes is not in the best interest of the Company or could damage the Company or which the Company is required to keep confidential by law or by agreement with a third party to keep confidential with respect to Company tax items.

(b)  All information relating to the Manager, the Company, or the business or operations of such Persons (including processes, plans, data, reports, drawings, documents, business secrets, financial information or information of any other kind) received by the Members ("Confidential Information") shall be received and maintained in confidence by the Members.

(c)   The obligations of limited use and nondisclosure contained in this Section shall not: (i) restrict the disclosure of Confidential Information to the Members attorneys, tax advisors, accountants or other professional advisors or consultants who have a reason to have access to such Confidential Information in connection with their duties and responsibilities to the Members relating to the Permitted Purpose (so long as such Persons are under an obligation of confidentiality consistent with the terms of this Section 11); (ii) restrict the disclosure of Confidential Information by the Members to the extent such disclosure is required by any governmental or regulatory authority or court entitled by law to such disclosure, or that is required by law to be disclosed, provided that the Members promptly notifies the Manager when such requirement to disclose arises (but only to the extent such notification by the Members is permitted by law) to enable the Manager to seek an appropriate protective order and to make known to such governmental or regulatory authority or court the proprietary nature of the Confidential Information and to make any applicable claim of confidentiality in respect thereof, and provided, further, that such party shall only make such disclosure to the extent it is required to do so by law; (iii) restrict the disclosure of Confidential Information by the Members to the extent permitted with the written consent of the Manager; or (iv) apply to information that (x) was publicly known or otherwise known to the Members prior to the time it was disclosed pursuant to this Agreement and was not otherwise subject to any restriction on disclosure by the Members, (y) subsequently becomes publicly known through no act or omission by the Members or any Person acting on the Members behalf, or (z) otherwise becomes known to the Members without breach of this Agreement (other than through disclosure by the Company or the Manager) or any other contractual,

4

legal, or fiduciary obligation and is not otherwise subject to any restriction on disclosure by such Members.  The Members agree: (A) to cooperate in any appropriate action that the Manager may decide to take to prevent or minimize the disclosure of such Confidential Information; (B) that all Confidential Information is and shall be the exclusive property of the Manager and its Affiliates, and upon the request of the Manager, the Members shall immediately return, delete or destroy all Confidential Information, including all copies or derivations thereof, held by the Members (other than Confidential Information that constitutes tax information or other financial information necessary for the Members internal and external audit activities); and (C) that the misappropriation or unauthorized disclosure of Confidential Information by the Members is likely to cause substantial and irreparable damage to the Company and/or one or more Affiliates such that damages may not be an adequate remedy for breach of this Section 11; accordingly, the Company and the Manager and its Affiliates shall be entitled to seek injunctive and other equitable relief, in addition to all other remedies available to them at law or at equity, and, to the fullest extent permitted by law, no proof of special damages shall be necessary for the enforcement of this Section 11.

Section 12     Amendment.

This Agreement may be amended only pursuant to an instrument signed by the Majority Member.

Section 13     Governing Law.

This Agreement shall be governed by the laws of the State of Arizona, without regard to conflicts of laws provisions.

Section 14     Entire Agreement.

This Agreement embodies the entire agreement and understanding between the parties hereto with respect to the subject matter hereof and supersedes all prior and contemporaneous agreements and understandings relating to such matter.

[THE REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK.]

IN WITNESS WHEREOF, the undersigned has executed this Amended & Restated Limited Liability Company Agreement as of the date first set forth above.

MANAGER:

**RON KRAMER**

_____

MEMBER:

**RON KRAMER**

_____

[Signature Page to Amended & Restated Limited Liability Company Agreement]

## SCHEDULE A

*(as of July 7, 2025)*

| Member | Interest |
| --- | --- |
| Ron Kramer | 99.00% |
| Alexandros Nikolaidis | 1.00% |
| **TOTAL:** | **100.00%** |

# EXHIBIT 3

## ASSIGNMENT AND ASSUMPTION GIFT AGREEMENT

This ASSIGNMENT AND ASSUMPTION GIFT AGREEMENT (this "Agreement"), effective as of December 31, 2024, is entered into by and among Alexander Nikolaidis ("Assignor"), Ron Kramer ("Assignee") and ThermoLife International LLC, a [Arizona] limited liability company ("Company").

WHEREAS, pursuant to the terms of that certain oral Promissory Note ("Promissory Note"), effective on or about June 1, 2017, Assignor purchased such Promissory Note from Company with a principal amount of about $1,000,000 and a simple annual interest rate of 1.18%.

WHEREAS, pursuant to the terms of the Promissory Note, Company have made certain repayments, and a principal amount of $700,585.70 and an accumulated interest of $62,692.63[1] remain outstanding as of the date hereof.

WHEREAS, the parties thereto have agreed, among other things, that (a) Assignor will assign, transfer and convey to Assignee the Promissory Note as a gift and (b) Assignee will accept such Promissory Note as a gift and assume all rights and obligations thereunder.

NOW, THEREFORE, in consideration of the mutual covenants contained herein and other valuable consideration, the receipt and adequacy of which are expressly acknowledged, the parties agree as follows:

1.      Assignor does hereby grant, convey, transfer and assign to Assignee, and its successors and assigns, effective as of the date hereof, all of Assignor's right, title and interest in and to the Promissory Note, as a gift for no consideration, and Assignee does hereby accept all right, title and interest in and to the Promissory Note as a gift and agrees to assume all rights and obligations thereunder.

2.      Nothing herein expressed or implied is intended to confer upon any person, other than Assignee and Assignor and their respective successors and assigns, any rights, remedies, obligations or liabilities.

3.      This Agreement may not be amended or modified in any respect, except by a written instrument signed by all the parties hereto making specific reference to this Agreement. This Agreement shall inure to the benefit of and be binding upon the parties and their respective successors and assigns.

4.      This Agreement may be executed in one or more counterparts, each of which will be deemed to be an original but all of which together will constitute one and the same document. Any signature to this Agreement delivered via facsimile, PDF format or other electronic means shall be deemed an original for all purposes.

---------------

1

5. This Agreement is governed by and construed in accordance with the internal laws of the State of [Arizona], without regard to conflict of laws principles.

6. If any term, provision or clause hereof, or of any other agreement or document which is required by this Agreement, is held to be invalid, such invalidity shall not affect or render invalid any other provision or clause hereof or thereof, all of which shall remain in full force and effect. If any provision of this Agreement is so broad as to be unenforceable, such provision shall be interpreted to be only as broad as is enforceable under applicable Law.

7. Notwithstanding anything herein to the contrary, the provisions of this Agreement shall be subject to the terms of the Promissory Note. Nothing contained herein shall be deemed to alter, modify, expand or diminish the terms of the Promissory Note.

*[Signature Page Follows]*

2

IN WITNESS WHEREOF, the parties hereto have executed this Assignment and Assumption Agreement as of the date first set forth above.

ASSIGNOR:

ALEXANDER NIKOLAIDIS

_____

ASSIGNEE:

RON KRAMER

_____

Acknowledged and agreed by:

THERMOLIFE INTERNATIONAL LLC

By_____
Name: Ron Kramer
Title:

[*Signature Page to Assignment and Assumption Gift Agreement*]