# Exhibit 13

LAW OFFICES
BROWN & CHARBONNEAU, LLP
420 EXCHANGE, SUITE 270
IRVINE, CALIFORNIA 92602
TELEPHONE (714) 505-3000

GREGORY G. BROWN, SBN 132004
MARK M. HIGUCHI, SBN 247262
MONICA K. SANDHU, SBN 297535

Attorneys for Defendants/Cross-Complainant Alexandros Nikolaidis
and Defendant Niki IP Services

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF LOS ANGELES

UNLIMITED CIVIL JURISDICTION

| | |
|---|---|
| THERMOLIFE INTERNATIONAL, LLC, an Arizona Limited Liability Company, <br><br> Plaintiff, <br><br> v. <br><br> ALEXANDROS NIKOLAIDIS, an individual; Niki Ip Services, an unregistered entity; and DOES 1-10, <br><br> Defendants. <br> _____ <br> ALEXANDROS NIKOLAIDIS, an individual, <br><br> Cross-Complainant, <br><br> v. <br><br> THERMOLIFE INTERNATIONAL, LLC, an Arizona Limited Liability Company; RONALD KRAMER, an individual; and ROES 1 through 20, inclusive, <br><br> Cross-Defendants. <br> _____ | **Case No. 25STCV23506** <br> Assigned to: Hon. Judge Curtis A. Kin <br> Department: 86 <br><br><br><br><br> **FIRST AMENDED CROSS-COMPLAINT** <br><br><br><br><br><br> Complaint Filed: August 12, 2025 <br> Trial Date: TBD |

**FIRST AMENDED CROSS-COMPLAINT**

1

Cross-Complainant Alexandros Nikolaidis hereby complains and alleges as follows:

1. Cross-Complainant ALEXANDROS NIKOLAIDIS ("Cross-Complainant" or "Nikolaidis") is an individual residing in Long Beach, California, dba as Niki Ip Services.-Cross-Complainant is a member of ThermoLife International, LLC ("ThermoLife"). Cross-Complainant is informed and believes, and thereon alleges, that he was promised a fifty percent (50%) ownership interest and corresponding share of profits, and is equitably entitled to such interest based on the parties' agreements and course of conduct.

2. Cross-Defendant RONALD KRAMER ("Kramer") is an individual and, on information and belief, a member and manager of ThermoLife LLC.

3. Cross-Defendant THERMOLIFE INTERNATIONAL, LLC, ("Cross-Defendant" or "ThermoLife") is an Arizona limited liability company with its principal place of business in Signal Hill, California.

4. The true names or capacities of Cross-Defendants ROES 1 through 20, whether individual, corporate, associate or otherwise are unknown to Cross-Complainant at the time of filing this Cross-Complaint. Cross-Complainant, therefore, sues said Cross-Defendants by such fictitious names and will ask for leave to amend the Cross-Complaint to reflect their true names and capacities when Cross-Complainant ascertains them. Cross-Complainant is informed and believes, and thereon alleges, that each of the ROE Cross-Defendants is, in some manner, responsible for the events and happenings set forth herein.

5. Cross-Complainant is informed and believes and based thereon alleges that all times mentioned herein, each of the Cross-Defendants, including the fictitiously named Cross Defendants, were the agents and/or employees of each of the remaining Cross-Defendants, and were at all times acting within the scope and course of their employment and/or agency. Additionally, Cross-Complainant is informed and believes and based thereon alleges that each of the Cross-Defendants authorized, consented to and/or ratified each act and/or omission of each of the remaining Cross-Defendants as hereinafter alleged.

BROWN & CHARBONNEAU LLP

---

**FIRST AMENDED CROSS-COMPLAINT**

2

6. Jurisdiction is proper in this Court because the amount in controversy exceeds the jurisdictional minimum of this Court. Venue is proper in the County of Los Angeles pursuant to California Code of Civil Procedure section 395(a) because Cross-Defendants reside in this County and the acts and omissions giving rise to the claims alleged herein occurred, in substantial part, in this County. The amount of damages exceeds $25,000.

**GENERAL ALLEGATIONS**

7. In or around February 2005, Kramer introduced himself to Nikolaidis via an online body building forum and offered Nikolaidis a position with ThermoLife. At the time, Nikolaidis lived in Greece, working with another supplement company and was planning to start his own pharmaceutical business, so he declined the offer. The two reacquainted later that year and Kramer, on behalf of ThermoLife, extended a second offer to Nikolaidis for him to develop ThermoLife's patent portfolio.

8. On or around December 28, 2005, ThermoLife and Nikolaidis entered into a valid and enforceable oral contract wherein ThermoLife agreed to pay Nikolaidis fifty percent (50%) of the net profits derived from any patents invented or developed by Nikolaidis and assigned to ThermoLife ("Patents") in consideration for Nikolaidis assigning and allowing ThermoLife to be the sole assignee of the Patents.

9. Beginning in 2012, Kramer and Nikolaidis had several discussions wherein Kramer requested Nikolaidis move to the U.S. to continue his work as a full-time ThermoLife employee. On or around October 5, 2012, Kramer promised Nikolaidis a fifty percent (50%) member interest in ThermoLife in exchange for Nikolaidis moving to the U.S. and for services rendered by Nikolaidis to Kramer, and/or for the benefit of Kramer. Kramer further promised to pay Nikolaidis an additional living stipend to cover his housing and utility costs. In November 2013, Nikolaidis immigrated to the U.S., leaving behind his friends, family, and his own profitable pharmaceutical business.

10. Throughout their professional relationship, Nikolaidis and Kramer regularly and openly discussed business matters, their expected profits, and strategized about ThermoLife's patent

**FIRST AMENDED CROSS-COMPLAINT**

3

portfolio. Kramer often referred to Nikolaidis as his "partner", "business partner", or "brother", even in several third-party communications.

11. Beginning in 2007, ThermoLife was the sole assignee on each of the Patents of which Nikolaidis was a named inventor. From approximately 2009 to 2014, ThermoLife paid Nikolaidis payments that were characterized as the promised royalites and patent profits. ThermoLife stopped these payments in 2015. When Nikolaidis inquired about the patent profits, Kramer represented to him that ThermoLife was no longer making any money and that therefore there was no patent profits owed to Nikolaidis at and after that time.

12. In 2020, ThermoLife also stopped paying for Nikolaidis's housing and utilities, under the pretense of ThermoLife's lack of profits. On information and belief, and based on financial records available to Nikolaidis for certain years, including 2015, 2022, 2023, and 2024, ThermoLife reported profits during those periods.

13. On or around January 13, 2021, Nikolaidis requested ThermoLife provide him any documentation which reflected his 50 percent member interest in ThermoLife at the request of Nikolaidis's bank in Bulgaria. Kramer provided Nikolaidis an Operating Agreement ("Original OA") which showed a date of January 1, 2020. The Original OA stated that Nikolaidis was a member and 1% equity holder in ThermoLife. Nikolaidis disputed the one percent (1%) ownership with Kramer. However, Kramer represented that the document was purely for administrative purposes and had no effect on their previous agreement and Nikolaidis' 50 percent member interest or profit sharing in ThermoLife. A true and correct copy of the Original OA provided by Kramer to Nikolaidis is attached hereto as Exhibit 1.

14. During Nikolaidis's time at ThermoLife, ThermoLife failed to provide Nikolaidis proper safety equipment and protocols while researching and developing its products. ThermoLife never provided Nikolaidis a properly ventilated lab and caused Nikolaidis to suffer unnecessary exposure to harmful chemicals. ThermoLife further required Nikolaidis to work in harmful and unsafe conditions.

15. On July 2, 2025, Nikolaidis sent Kramer a message, requesting to take a week of unpaid leave. Neither Kramer nor ThermoLife responded to his request until July 7, 2025, when Kramer sent an email to Nikolaidis unilaterally stating that his return to ThermoLife was conditioned on his completion of a two-week alcohol rehabilitation program. Kramer further stated that Nikolaidis was banned from company premises and revoked his access to all ThermoLife systems and accounts during his leave.

16. Later that day, Kramer emailed Nikolaidis an "Amended Operating Agreement" ("Amended OA"), which purported to make Kramer the sole Manager of ThermoLife and grant him sole discretion over company operations, including control over financial information and distributions.

17. Nikolaidis was not notified of these proposed amendments, nor was he involved in any formal or informal vote to approve or ratify the Amended OA. Upon Nikolaidis's dispute of this amendment, Kramer cited ThermoLife's Original OA, which states in relevant part, "6.1 Procedure. Each Member agrees that a simple majority vote of Member interests may ratify an amended Operating Agreement, whether by addendum or restatement, at a later time." There was no vote of any kind held with respect to the Amended OA.

18. On July 9, 2025, Nikolaidis communicated his resignation to Kramer and later submitted a written resignation via email.

19. On July 23, 2025, Nikolaidis received an email from ThermoLife's accountant, Shannon Sugar, with a document titled "Assignment and Assumption Gift Agreement" ("Gift Agreement"), purportedly signed December 31, 2024, wherein Nikolaidis allegedly gifted the assignment of a $763,278.33 promissory note ("Note") to Kramer. On information and belief, no such Note has ever existed, and Kramer fabricated the Gift Agreement. A true and correct copy of the Gift Agreement is attached hereto at Exhibit 3.

20. Kramer has a documented history of falsifying evidence. In BPI Sports, LLC v. ThermoLife International, LLC, the court found that Kramer created a back-dated license agreement, withheld metadata, and was sanctioned for this bad faith conduct. The Court ultimately

BROWN & CHARBONNEAU LLP

**FIRST AMENDED CROSS-COMPLAINT**

5

found that "Mr. Kramer acted in bad faith by knowingly fabricating the License Agreement and repeatedly obstructing discovery to conceal this fraud," and ordered an adverse instruction regarding his credibility. Cross-Complainant is informed and believes that Kramer has engaged in similar conduct in this action, including the production of disputed or altered documents and sworn statements that are inconsistent with objective facts.

21. At all relevant times, Kramer represented to Nikolaidis that compensation for Nikolaidis's work was not limited to salary but included substantial royalty and profit participation tied to ThermoLife's patents, licensing, and related intellectual property, as well as significant non-salary benefits including company-provided housing, utilities, and vehicle benefits.

22. These representations were not merely prospective. Kramer and ThermoLife, in fact, paid Nikolaidis substantial sums characterized as royalties or patent-related compensation during the course of their relationship, thereby reinforcing the existence of an ongoing royalty arrangement.

23. In contemporaneous communications, including but not limited to electronic messages and correspondence, Kramer expressly described funds paid to Nikolaidis as "patent royalties" and discussed the structure and timing of such payments in relation to ThermoLife's financial position and tax considerations.

24. Beginning in or around 2017 and continuing into approximately 2018, Nikolaidis advanced substantial funds to Kramer totaling approximately $1,000,000, in multiple payments at Kramer's request.

25. These advances were made in the context of the parties' ongoing business relationship and based on Kramer's representations regarding ThermoLife's financial needs and Nikolaidis's expected participation in the company's profits and royalty streams.

26. The precise dates, amounts, and documentation of each transfer are not fully known to Nikolaidis at this time because Kramer and ThermoLife maintained possession and control over the relevant financial records, including bank account information and company books.

BROWN & CHARBONNEAU LLP

**FIRST AMENDED CROSS-COMPLAINT**
6

27. On information and belief, the parties did not agree to a fixed repayment date and instead understood that the funds would be repaid when ThermoLife had sufficient profitability or cash flow.

28. At no time prior to 2025 did Kramer deny or repudiate the obligation to repay these funds. To the contrary, Kramer acknowledged the existence of the advances and characterized them as loans in contemporaneous communications.

29. Nikolaidis reasonably believed that the funds would be repaid when ThermoLife achieved sufficient profitability or otherwise had adequate cash flow to repay the loan without impairing company operations.

30. Nikolaidis first learned that Kramer would not honor the obligation to repay the funds in or about July 2025, when Kramer, through ThermoLife's accountant, asserted for the first time that the funds constituted a "gift" rather than a loan.

31. This assertion directly contradicted Kramer's prior representations and the parties' course of dealing and was made only after years of acknowledging the existence of royalty obligations and financial arrangements between the parties.

32. On information and belief, the purported "Gift Agreement" was created or backdated in order to mischaracterize the parties' financial relationship and avoid repayment obligations to Nikolaidis.

33. At all relevant times, Kramer exercised control over ThermoLife's financial records, accounting, and banking information, and Nikolaidis reasonably relied on Kramer and ThermoLife's accountant for accurate information regarding compensation, profits, and financial transactions.

34. Nikolaidis did not have independent access to complete financial records, including company financial statements, tax returns, or detailed accounting of royalty payments and distributions, despite repeated requests.

35. Kramer and ThermoLife provided explanations for payments and financial discrepancies, including characterizing certain payments as "bonuses," "member draws," or otherwise. When

**FIRST AMENDED CROSS-COMPLAINT**

Nikolaidis requested financial information, Kramer directed him to K-1s and tax-related documents and represented that those documents accurately reflected ThermoLife's profitability and financial condition, which Nikolaidis reasonably relied upon.

36. The structure of the parties' financial dealings, including multiple transactions over time, varying characterizations of payments, and reliance on Kramer's representations, made it not reasonably possible for Nikolaidis to ascertain the true nature of the transactions without access to underlying records.

37. Nikolaidis did not discover, and could not have reasonably discovered, the full scope of Cross-Defendants' misconduct until in or about 2025.

38. The discovery of Cross-Defendants' wrongful conduct occurred in stages and was not triggered by any single event, but rather by a series of developments that collectively revealed the nature of the misconduct.

39. These developments included, among other things: (a) Kramer's unilateral changes to Nikolaidis's compensation; (b) the restriction of Nikolaidis's access to company financial information; (c) the production of documents purporting to alter Nikolaidis's rights; and (d) the assertion that substantial funds loaned by Nikolaidis constituted a "gift."

40. Prior to these events, Nikolaidis reasonably relied on Kramer's repeated representations, the parties' longstanding relationship of trust, and the explanations provided by ThermoLife and its accountant regarding compensation and financial matters.

41. Even where certain documents appeared inconsistent with Kramer's prior representations, Nikolaidis reasonably relied on Kramer's explanations that such documents were administrative, temporary, tax-related, or did not reflect the true nature of the parties' agreement. This understanding was reinforced by Kramer's own course of conduct, including instances in which Kramer did not adhere to the formal terms or procedures of documents he created and instead acted inconsistently with their stated provisions.

42. In or around 2017, Kramer, on behalf of ThermoLife, presented Cross-Complainant with a patent assignment agreement in connection with tax and accounting issues arising from an IRS

**FIRST AMENDED CROSS-COMPLAINT**

audit involving ThermoLife. Kramer represented that the document was administrative in nature and would not alter the parties' existing agreement regarding Cross-Complainant's entitlement to royalties. Cross-Complainant did not understand the agreement to modify his rights and did not receive any consideration in exchange for executing it.

43. At all relevant times, Kramer's conduct, representations, and control over financial information concealed the true facts and prevented Nikolaidis from discovering the wrongful conduct earlier despite reasonable diligence.

44. Accordingly, the statute of limitations for each of the claims alleged herein is tolled under the doctrines of delayed discovery, equitable estoppel, and fraudulent concealment.

45. The conduct alleged herein is part of a broader pattern in which Kramer utilized informal agreements, inconsistent documentation, and control over financial information to misrepresent the parties' rights and obligations.

46. This pattern includes, but is not limited to, the recharacterization of financial transactions, the use of documents that do not reflect the parties' actual agreements, and the withholding of information necessary for Nikolaidis to evaluate his rights.

47. At all relevant times, Cross-Complainant's actual role at ThermoLife extended beyond scientific and research duties and included substantial patent-related, legal, and paralegal-type work performed for the benefit of Cross-Defendants.

48. Cross-Complainant is informed and believes that, in connection with immigration and employment-related filings, Cross-Defendants at one point described Cross-Complainant's role in broader terms reflecting these combined responsibilities.

49. Cross-Complainant is further informed and believes that Cross-Defendants later amended such filings to remove reference to legal and patent-related duties and to present Cross-Complainant's role more narrowly as limited to scientific and research functions.

50. Despite these changes in formal documentation, Cross-Complainant continued to perform the broader range of duties, including patent-related and legal-type work, at Cross-Defendants' direction and for their benefit.

**FIRST AMENDED CROSS-COMPLAINT**

BROWN & CHARBONNEAU LLP

51. Cross-Complainant was compensated in a manner consistent with the narrower description of his role, and not for the full scope of the work he actually performed.

52. Cross-Complainant did not treat these discrepancies as a basis for asserting legal claims at the time because he reasonably relied on Kramer's repeated representations that Cross-Complainant's true compensation would come through royalties, ownership interests, and long-term participation in ThermoLife's success.

53. This discrepancy between formal documentation and actual practice further reflects Cross-Defendants' pattern of presenting one set of facts in official documents while operating under a different understanding in practice.

## FIRST CAUSE OF ACTION

### (Money Lent Common Count–Against Cross-Defendants Thermolife and Kramer, and ROES 1-20, inclusive)

54. Cross-Complainant repeats, re-alleges and incorporates by reference the allegations contained in paragraphs 1 through 53 of this Cross-Complaint as fully set forth herein.

55. Within the last two years, Cross-Defendants' obligation to repay the loan became due and payable, and Cross-Defendants remain indebted to Cross-Complainant in a sum of approximately $1,000,000 for money lent by Cross-Complainant to Cross-Defendants at their special instance and request.

56. As alleged herein, the funds were advanced in multiple tranches in or around 2017–2018 at Cross-Defendants request, in the context of the parties' ongoing business and fiduciary relationship.

57. Cross-Complainant did not agree that any royalties, distributions, bonuses, wages, compensation, or other amounts owed to him would replace, waive, or satisfy Cross-Defendants' independent obligation to repay the loan. Any such amounts were separate from, and in addition to, repayment of the loan.

---

**FIRST AMENDED CROSS-COMPLAINT**

10

58. At no time prior to 2025 did Cross-Defendants clearly deny or repudiate the obligation to repay the loan. To the contrary, Cross-Defendants acknowledged the existence of the loan and represented that it would be repaid through ongoing profitability or company cash flow.

59. Cross-Complainant reasonably relied on Cross-Defendants' representations and did not make earlier demand for repayment because he believed, based on those representations, that repayment would occur in the ordinary course of the parties' financial relationship.

60. Cross-Complainant first learned that Cross-Defendants would not honor the repayment obligation in or about 2025, when Cross-Defendants asserted for the first time that the funds constituted a "gift" rather than a loan.

61. As a result, the indebtedness became due and payable at that time, and Cross-Defendants have failed and refused, and continue to fail and refuse, to repay the amounts owed.

62. The sum of approximately $1,000,000, or according to proof, remains due and unpaid despite demand. Cross-Complainant did not knowingly or voluntarily forgive, gift, waive, or release the loan.

63. Cross-Complainant is entitled to prejudgment interest according to proof.

64. Cross-Complainant also alleges a common count for money had and received, as set forth in the Judicial Council form attached hereto and incorporated herein by reference.

## SECOND CAUSE OF ACTION

### (Breach of Oral Contract–Against Cross-Defendant ThermoLife, and ROES 1-20, inclusive)

65. Cross-Complainant repeats, re-alleges and incorporates by reference the allegations contained in paragraphs 1 through 64 of this Cross-Complaint as fully set forth herein.

66. On or around December 28, 2005, ThermoLife and Nikolaidis entered into a valid and enforceable oral contract wherein ThermoLife agreed to pay Nikolaidis fifty percent (50%) of the net profits derived from any patents invented or developed by Nikolaidis and assigned to ThermoLife ("Patents") in consideration for Nikolaidis assigning and allowing ThermoLife to be the sole assignee of the Patents.

BROWN & CHARBONNEAU LLP

**FIRST AMENDED CROSS-COMPLAINT**

11

67. Cross-Complainant has performed all promises, conditions and covenants required on his part to be performed under the terms of the contract, except those which have been waived, excused or prevented by ThermoLife.

68. On or about June 20, 2025, ThermoLife materially breached the contract by failing to pay Cross-Complainant fifty percent (50%) of the net profits derived from the Patents. As a direct and proximate result of ThermoLife's breach of contract, Cross-Complainant has suffered damages in a total amount to be proven at trial.

## THIRD CAUSE OF ACTION

## (Promissory Estoppel–Against Cross-Defendants ThermoLife and Kramer, and ROES 1-20, inclusive)

69. Cross-Complainant repeats, re-alleges and incorporates by reference the allegations contained in paragraphs 1 through 68 of this Cross-Complaint as fully set forth herein.

70. Beginning in or around 2005 and continuing thereafter, Cross-Defendants, through Kramer, made clear and unambiguous promises to Cross-Complainant that he would receive a substantial share of royalties, profits, and other financial benefits derived from patents invented or developed by Cross-Complainant for ThermoLife. These promises were specific and repeated over time, and were not merely aspirational statements, but were presented as concrete terms of Cross-Complainant's compensation.

71. These promises included, among other things, that Cross-Complainant would receive approximately fifty percent (50%) of the net profits and/or royalties derived from such patents, and that Cross-Complainant would share in the long-term financial success of ThermoLife's patent portfolio.

72. Cross-Defendants reasonably expected that Cross-Complainant would rely on these promises, including by continuing to develop patents for ThermoLife, assigning intellectual property rights to ThermoLife, relocating to the United States, and foregoing other business opportunities.

**FIRST AMENDED CROSS-COMPLAINT**

12

73. Cross-Complainant did, in fact, reasonably and foreseeably rely on these promises by, among other things:

    (a) relocating from Greece to the United States;

    (b) devoting substantial time and effort to developing ThermoLife's patent portfolio;

    (c) assigning valuable patent rights to ThermoLife;

    (d) continuing to work for ThermoLife despite reductions or irregularities in compensation; and

    (e) advancing substantial funds to Cross-Defendants in reliance on the parties' ongoing financial relationship.

74. Cross-Complainant's reliance was reasonable in light of the parties' longstanding relationship, Kramer's repeated representations, and the fact that Cross-Defendants previously made payments to Cross-Complainant characterized as royalties or patent-related compensation.

75. Even where certain documents appeared inconsistent with Cross-Defendants' promises, Cross-Complainant reasonably relied on Kramer's explanations that such documents were administrative in nature and did not alter the parties' true agreement.

76. Cross-Defendants failed to honor their promises, including by failing to pay Cross-Complainant the agreed-upon share of royalties and profits derived from the patents and by mischaracterizing or withholding payments owed to Cross-Complainant.

77. As a direct and proximate result of Cross-Complainant's reasonable reliance on Cross-Defendants' promises, and but for those promises, Cross-Complainant would not have taken the actions described above and has suffered damages in an amount to be proven at trial, including but not limited to unpaid royalties, lost profits, and other economic losses.

78. Injustice can be avoided only by enforcement of Cross-Defendants' promises and by awarding damages to Cross-Complainant in an amount according to proof.

79. Cross-Complainant did not discover, and could not have reasonably discovered, that Cross-Defendants would not honor their promises until in or about 2025, when Cross-Defendants'

**FIRST AMENDED CROSS-COMPLAINT**

13

conduct, including the denial of financial rights, restriction of access to information, and repudiation of obligations, made clear that the promises would not be fulfilled.

### FOURTH CAUSE OF ACTION

**(Breach of Fiduciary Duty–Against Cross-Defendant Kramer, and ROES 1-20, inclusive)**

80. Cross-Complainant repeats, re-alleges and incorporates by reference the allegations contained in paragraphs 1 through 79 of this Cross-Complaint as fully set forth herein.

81. At all relevant times, a fiduciary relationship existed between Cross-Complainant and Kramer.

82. This fiduciary relationship arose from, among other things: (a) the parties' relationship as business partners and/or co-venturers; (b) Cross-Complainant's status as a member or equitable owner of ThermoLife; and (c) Kramer's role as managing member and person in control of ThermoLife's operations, finances, and records.

83. Kramer breached his fiduciary duties to Cross-Complainant by engaging in conduct including, but not limited to: (a) misrepresenting Cross-Complainant's ownership interest and financial rights; (b) failing to pay Cross-Complainant his share of royalties and profits, including those derived from patent licensing and commercial partnerships; (c) mischaracterizing or withholding payments owed to Cross-Complainant; (d) soliciting and obtaining funds from Cross-Complainant under the representation that such funds would be repaid, and later attempting to recharacterize those funds as a "gift"; (e) concealing or withholding material financial information, including company financial records and revenue data; (f) exercising unilateral control over ThermoLife to deprive Cross-Complainant of financial rights; (g) restricting Cross-Complainant's access to company records; and (h) engaging in a pattern of conduct designed to mislead Cross-Complainant regarding the parties' financial relationship.

84. Cross-Complainant was harmed.

85. Kramer's breaches of fiduciary duty were a substantial factor in causing harm to Cross-Complainant.

86. As a direct and proximate result of Kramer's conduct, Cross-Complainant has suffered damages, including but not limited to: (a) unpaid royalties and profit distributions; (b) unrepaid loan amounts; (c) lost income and economic opportunities; and (d) other financial losses according to proof.

87. Cross-Complainant did not discover, and could not have reasonably discovered, Kramer's breaches of fiduciary duty until in or about 2025.

88. Because of the fiduciary relationship, Cross-Complainant was entitled to rely on Kramer's representations and was not required to investigate absent clear repudiation.

89. Kramer's concealment, misrepresentations, and control over financial information prevented earlier discovery despite reasonable diligence.

90. Kramer acted with malice, oppression, and fraud within the meaning of Civil Code section 3294.

91. Cross-Complainant is entitled to punitive damages in an amount according to proof.

## FIFTH CAUSE OF ACTION

### (Fraud – Intentional Misrepresentation/Concealment - Against Cross-Defendants ThermoLife and Kramer, and ROES 1-20, inclusive)

92. Cross-Complainant repeats, re-alleges and incorporates by reference the allegations contained in paragraphs 1 through 91 of this Cross-Complaint as fully set forth herein.

93. Cross-Defendant Kramer made representations to Cross-Complainant regarding material facts, including but not limited to: (a) the proper inventorship of patents developed by Cross-Complainant; (b) Kramer's entitlement to be named as an inventor on those patents; (c) Cross-Complainant's entitlement to royalties, profits, and financial benefits derived from such patents; and (d) the nature and effect of documents presented to Cross-Complainant for signature relating to patent filings, inventorship, and financial arrangements.

94. Cross-Defendant Kramer also concealed material facts from Cross-Complainant, including: (a) the true basis for inventorship determinations; (b) the financial impact of inventorship designations on royalty and profit allocation; (c) the true nature of financial

---

**FIRST AMENDED CROSS-COMPLAINT**

15

transactions between the parties, including funds advanced by Cross-Complainant; and (d) the extent to which Cross-Complainant's financial rights were being reduced or mischaracterized.

95. The representations made by Kramer were false.

96. At the time the representations were made, Kramer knew they were false or made them recklessly and without regard for their truth.

97. Kramer intended that Cross-Complainant rely on these representations and omissions, including to: (a) permit Kramer to be named as an inventor; (b) execute documents relating to patent filings and financial arrangements; (c) continue working for ThermoLife; and (d) refrain from asserting rights to full ownership, royalties, profits, and repayment of funds.

98. Cross-Complainant reasonably and justifiably relied on Kramer's representations and omissions.

99. In reliance, Cross-Complainant: (a) allowed Kramer to be named as an inventor on patents; (b) executed documents relating to patent filings and financial arrangements; (c) continued to perform work and assign intellectual property rights; and (d) advanced substantial funds to Cross-Defendants.

100. As a direct and proximate result of Cross-Defendants' fraud, Cross-Complainant has suffered damages, including but not limited to: (a) reduction in royalty payments and profit distributions; (b) diversion or misallocation of revenues derived from patents and commercial agreements; (c) loss of economic benefits associated with patent ownership and licensing; (d) unrepaid loan amounts; and (e) other financial losses according to proof.

101. Cross-Complainant did not discover, and could not have reasonably discovered, the facts constituting the fraud until in or about 2025.

102. Cross-Complainant's failure to discover the fraud earlier was the result of Cross-Defendants' concealment, ongoing misrepresentations, and the parties' fiduciary relationship.

103. Cross-Defendants acted with malice, oppression, and fraud within the meaning of Civil Code section 3294.

**FIRST AMENDED CROSS-COMPLAINT**

16

104. Cross-Complainant is entitled to punitive damages in an amount according to proof.

## SIXTH CAUSE OF ACTION

### (Invasion of Privacy – Public Disclosure of Private Facts Against Cross-Defendants ThermoLife and Kramer, and ROES 1-20, inclusive)

105. Cross-Complainant repeats, re-alleges and incorporates by reference the allegations contained in paragraphs 1 through 104 of this Cross-Complaint as fully set forth herein.

106. Cross-Defendants publicly disclosed information concerning Cross-Complainant that was private, personal, and not generally known to the public.

107. Cross-Defendants disclosed and disseminated this information to third parties, including attorneys, witnesses, employees, administrative participants, mediation participants, and participants in court-related proceedings, and also disclosed the information in court filings and related proceedings accessible to the public.

108. The information disclosed included highly sensitive personal information concerning Cross-Complainant, including allegations regarding Cross-Complainant's personal health and related matters.

109. Cross-Complainant is informed and believes that such information was derived, in whole or in part, from proceedings and materials that are subject to statutory protections limiting their use in other actions.

110. The disclosure of this information was not necessary to the claims or defenses asserted in this action and was made in a manner that exceeded any legitimate litigation purpose.

111. The disclosure of such private information would be highly offensive to a reasonable person.

112. The disclosed information was not a matter of legitimate public concern.

113. As a direct and proximate result of Cross-Defendants' conduct, Cross-Complainant has suffered harm, including but not limited to emotional distress, reputational damage, and other damages according to proof.

**FIRST AMENDED CROSS-COMPLAINT**

17

114.    Cross-Defendants acted intentionally, and with conscious disregard for Cross-Complainant's privacy rights.

115.    Cross-Complainant is entitled to recover damages in an amount according to proof.

## **PRAYER FOR RELIEF**

WHEREFORE, Cross-Complainant prays for a judgment against Cross-Defendants, and ROES 1 through 20, inclusive, as follows:

1. For general and special damages in a sum according to proof at the time of trial;

2. For punitive damages in a sum according to proof at the time of trial;

3. For restitution and/or disgorgement, to the extent permitted by law, of all amounts wrongfully obtained by Cross-Defendants, including but not limited to unpaid royalties, profits, and other financial benefits;

4. For recovery of all sums loaned by Cross-Complainant to Cross-Defendants, in an amount according to proof, together with interest thereon;

5. For an accounting of all revenues, royalties, profits, and distributions derived from the patents and business activities at issue;

6. For prejudgment interest as permitted by law;

7. For costs of suit herein;

8. For attorney's fees if recoverable pursuant to contract, statute, or otherwise applicable law;

9. For such other and further relief as the Court deems just and proper.

DATE: May 4, 2026                    BROWN & CHARBONNEAU, LLP

BY: _Monica K. Sandhu_

GREGORY G. BROWN
MARK M. HIGUCHI
MONICA K. SANDHU

BROWN & CHARBONNEAU LLP

---

**FIRST AMENDED CROSS-COMPLAINT**
18

## PROOF OF SERVICE
CCP §§ 1013A, 2015.5

STATE OF CALIFORNIA, COUNTY OF ORANGE

I, the undersigned, am employed in the County of Orange, State of California.  I am over the age of eighteen (18) years and not a party to the within action.  My business address is 420 Exchange, Suite 270, Irvine, CA 92602.

On May 4, 2026, I served true copies of the foregoing document described as:

### FIRST AMENDED CROSS-COMPLAINT

on the interested parties in this action, addressed as follows:

| | |
|---|---|
| Evangeline A.Z. Burbidge<br>Sable Bahleda<br>Lewis & Llewellyn LLP<br>601 Montgomery Street, Suite 2000<br>San Francisco, CA 94111<br>Eburbidge@lewisllewellyn.com;<br>sbahleda@lewisllewellyn.com<br>cc:dharris@lewisllewellyn.com;<br>sbonnel@lewisllewellyn.com;<br>service@lewisllewellyn.com<br>Telephone: (415) 800-0590 | *Attorneys for Plaintiff: Thermolife International, LLC* |

( )  **BY U.S. MAIL:**  The documents were placed in sealed, addressed envelopes on the above date and placed for collection and mailing at my place of business.  I am "readily familiar" with the firm's practice of collecting and processing correspondence for mailing.  Under that practice, it would be deposited with the U.S. Postal Service on that same day with postage thereon fully prepaid at Irvine, California in the ordinary course of business.  I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

( )  **BY OVERNIGHT DELIVERY:** I enclosed the documents in an envelope or package provided by an overnight delivery carrier and addressed them on the above date.  I placed the envelope or package for collection and overnight delivery at an office or a regularly utilized drop box of the overnight delivery carrier.

**(X)**  **BY ELECTRONIC SERVICE:** Based on a court order or an agreement of the parties to accept service by electronic transmission, I caused the documents to be sent to the persons at the electronic notification address listed above. **Send Electronic Service for Brown & Charbonneau, LLP to mail@bc-llp.com**.

(X)  **(State)** I certify (or declare) under penalty of perjury under the laws of the State of California that the foregoing is true and correct, and that this declaration was executed on <u>May 4, 2026</u>, at Irvine, California.

*Guadalupe Flores*
Guadalupe Flores

BROWN & CHARBONNEAU LLP

PROOF OF SERVICE