# EXHIBIT 2

**2023-1068, -1112 & -1625**

# United States Court of Appeals
# for the Federal Circuit

BPI SPORTS, LLC,

*Plaintiff-Cross-Appellant,*

– v. –

THERMOLIFE INTERNATIONAL LLC, RONALD L. KRAMER,
MUSCLE BEACH NUTRITION LLC,

*Defendants-Appellants.*

*On Appeal from the United States District Court for the Southern District of Florida in No. 0:19-cv-60505-RS Honorable Rodney Smith*

## BRIEF FOR PLAINTIFF-CROSS-APPELLANT

GREGORY HILLYER
NICHOLAS J. SULLIVAN
HILLYER LEGAL LLC
5335 Wisconsin Avenue, NW,
Suite 440
Washington, DC 20015
(202) 686-2884
ghillyer@hillyerlegal.com
nsullivan@hillyerlegal.com

*Counsel for Plaintiff-Cross-Appellant*

ORIGINALLY FILED: AUGUST 23, 2023
CORRECTED: SEPTEMBER 6, 2023

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

**Case Number** 23-1068, 23-1112 and 23-1625

**Short Case Caption** BPI Sports, LLC v. ThermoLife International LLC

**Filing Party/Entity** BPI Sports, LLC

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.
2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.
3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.
4. Please do not duplicate entries within Section 5.
5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes. Fed. Cir. R. 47.4(c).

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 09/06/2023

Signature: /s/ Gregory L. Hillyer

Name: Gregory L. Hillyer

**FORM 9. Certificate of Interest** **Form 9 (p. 2)**
**March 2023**

| **1. Represented Entities.** Fed. Cir. R. 47.4(a)(1). | **2. Real Party in Interest.** Fed. Cir. R. 47.4(a)(2). | **3. Parent Corporations and Stockholders.** Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.<br><br>☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br><br>☑ None/Not Applicable |
| BPI Sports, LLC | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐ Additional pages attached

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☐ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| Hillyer Legal, PLLC - Gregory Hillyer | Krinzman Huss Lubetsky Feldman & Hotte - Salvatore Hazard Fasulo | Mintz, Levin, Cohn, Ferris, Glovsky and Popeo PC - Philip C. Ducker & Stephen J. Akerley |
| The Brickell IP Group - Javier Sobrado | Krinzman Huss Lubetsky - Cary Alan Lubetsky | |
| Hinshaw & Culbertson, LLP - Clinton Sawyer Payne | | |

**5. Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☐ Yes (file separate notice; see below) ☑ No ☐ N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b). **Please do not duplicate information.** This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal. Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases.** Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ... iii

STATEMENT OF RELATED CASES ... 1

STATEMENT OF JURISDICTION ... 2

STATEMENT OF THE ISSUES ON APPEAL ... 2

STATEMENT OF THE CASE ... 3

SUMMARY OF THE ARGUMENT ... 5

ARGUMENT ... 7

I. CROSS-APPEAL ... 7

A. Standards of Review and Legal Principles ... 7

1. Motion for New Trial ... 7

2. The Prohibition Against Compromise Verdicts ... 7

B. The Jury's Compromise Verdict Mandates a New Trial ... 9

C. The Jury's Zero Damage Awards Were Grossly Inadequate ... 12

D. Liability Was "Hotly Contested" ... 15

E. The Jury Was Deadlocked Without Any Means of Reaching Unanimity Then Reached A Verdict Shortly After The *Allen* Charge ... 16

F. The Jury's Questions During Deliberations Establish That It Was Considering A Trade-Off Between Liability And Damages ... 17

G. The District Court Abused Its Discretion By Denying A New Trial ... 19

II. RESPONSE TO APPELLANT'S OPENING BRIEF ... 22

A. The District Court's Sanction Was Not An Abuse of Discretion ... 22

1. The Court's Inherent Powers To Sanction Parties ... 23

2. Defendants Fabricated Evidence To Favor Their Case ... 25

i. Defendants ThermoLife and Kramer Originally Alleged That Muscle Beach Nutrition Is A Licensee Of ThermoLife ....25

ii. Kramer Fabricates A License To Support The False Allegation That Muscle Beach Nutrition Is Merely A Licensee Of ThermoLife ....26

iii. Defendants Obstructed Discovery Into The Fabricated License Agreement ....28

iv. Defendants Attempt To Use The Judicial Proceedings To Cover Up Their Fraud ....28

3. The Standard For An Award Of Sanctions Has Been Met ....31

B. The District Court Correctly Denied Defendants' Renewed JMOL ....38

1. Standard Of Review ....39

2. BPI Does Not Have To Prove Specific Monetary Damage Or Losses Coextensive With CRTN-3 Sales To Support The Damages Verdict ....41

3. BPI Presented Sufficient Evidence That BPI Was Harmed ....42

4. BPI Proved That Advertising CRTN-3 As "Increasing Vasodilation" Was Literally False And Misleading ....46

5. BPI Presented Sufficient Evidence That The False Advertising OF CRTN-3 Was Material to Consumers' Purchasing Decisions ....50

6. The District Court Correctly Denied The JMOL As It Relates To Unfair Competition ....57

C. The District Court Did Not Err In Denying Relief Under Rule 60 ....58

CONCLUSION AND PRAYER FOR RELIEF ....59

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Allapattah Servs., Inc. v. Exxon Corp.*,
372 F. Supp. 2d 1344 (S.D. Fla. 2005) ....................24

*Allied Chem Corp. v. Daiflon, Inc.*,
449 U.S. 33 (1980) ....................7

*Apotex Inc. v. Accorda Therapeutics, Inc.*,
823 F.3d 51 (2d Cir. 2016) ....................55

*Arthur Pew Constr. Co. v. Lipscomb*,
965 F.2d 1559 (11th Cir.1992) .................... 39, 41

*Balsamo/Olson Grp., Inc. v. Bradley Place Ltd. P'ship*,
966 F. Supp. 757 (C.D. Ill. 1996) ....................35

*Barash v. Kates*,
585 F. Supp. 2d 1347 (S.D. Fla. 2006) .................... 24, 32

*Barnes v. Dalton*,
158 F.3d 1212 (11th Cir. 1998) ....................24

*Barton v. Griffith*,
253 F. Supp. 774 (D.S.C. 1966) ....................12

*Beckwith v. City of Daytona Beach Shores*,
58 F.3d 1554 (11th Cir. 1995) ....................40

*Booker v. Dugger*,
825 F.2d 281 (11th Cir. 1987) ....................24

*Borges v. Jacobs*,
483 So. 2d 773 (Fla. 3d DCA 1986) ....................12

*Broward Cnty. Sch. Bd. v. Dombrosky*,
579 So. 2d 748 (Fla. 4th DCA 1991) ....................11

*Burger King Corp. v. Mason*,
710 F.2d 1480 (11th Cir. 2014) ....................9

*Calloway v. Dania Alai Palace, Inc.*,
560 So. 2d 808 (Fla. 4th DCA 1990) .......... 11, 15

*Carter v. City of Miami*,
870 F.2d 578 (11th Cir. 1989).......... 39

*Chambers v. NASCO, Inc.*,
501 U.S. 32 (1991) .......... 23, 24, 32

*Chaney v. City of Orlando*,
483 F.3d 1221 (11th Cir. 2007).......... 39, 40

*Cleveland v. Home Shopping Network, Inc.*,
369 F.3d 1189 (11th Cir. 2004).......... 39, 41-42

*Collins v. Marriott Int'l, Inc.*,
749 F.3d 951 (11th Cir. 2014).......... *passim*

*Continuum Condo., Ass'n, Inc. v. Continuum VI, Inc.*,
549 So. 2d 1125 (Fla. 3d DCA 1989) .......... 11

*Cortez v. Falley*,
1994 WL 409576 (D. Kan. Aug. 2, 1994) .......... 18

*Een v. Rice*,
637 So. 2d 331 (Fla. 2d DCA 1994) .......... 11

*Food Lion v. Jackson*,
712 So. 2d 800 (Fla. 5th DCA 1998) .......... 11

*Frasher v. Whitehurst Family, Inc.*,
948 So. 2d 36 (Fla. 3d DCA 2006) .......... 11

*Hammarskjold v. Fountain Powerboats*,
782 F. Supp. 1032 (E.D. Pa. 1992) .......... 12

*Hatfield v. Seaboard Air Line R.R. Co.*,
396 F.2d 721 (5th Cir. 1968).......... 8, 11, 13

*Hewitt v. B.F. Goodrich Co.*,
732 F.2d 1554 (11th Cir. 1984).......... 7

*In re E.I. DuPont De Nemours & Company-Benlate Litigation*,
99 F.3d 363 (11th Cir. 1996).......... 23

*In re GNC Corp.*,
789 F.3d 505 (4th Cir. 2015)....................................................................50

*J-B Weld Company, LLC v. the Gorilla Glue Company*,
978 F.3d 778 (11th Cir. 2020)................................................................ 53, 54

*Johnson & Johnson Vision Care, Inc. v. 1-800 Contacts, Inc.*,
299 F.3d 1242 (11th Cir. 2002)............................................................ 53, 57

*Johnson v. FFE Transp. Servs., Inc.*,
227 Fed. Appx. 780 (11th Cir. 2007)......................................................13

*JTR Enterprises, LLC v. Columbian Emeralds*,
697 F. App’x 976 (11th Cir. 2017) .........................................................24

*Link v. Wabash R. Co.*,
370 U.S. 626 (1962)..................................................................................23

*Lipphardt v. Durango Steakhouse of Brandon, Inc.*,
267 F.3d 1183 (11th Cir. 2001)...................................................... 39, 40, 41

*Lucas v. Am. Mfg. Co.*,
630 F.2d 291 (5th Cir. 1980)....................................................................11

*Martin v. Automobile Lamborghini Exclusive, Inc.*,
307 F.3d 1332 (11th Cir. 2002)............................................................ 23, 24

*McDowell v. Seaboard Farms of Athens, Inc.*,
1996 WL 684140 (M.D. Fla. Nov. 4, 1996) ...............................................25

*McGinnis v. American Home Mortgage Servicing, Inc.*,
817 F.3d 1241 (11th Cir. 2016)............................................................ 39, 40

*Mekdeci ex rel. Mekdeci v. Merrell Nat’l Labs.*,
711 F.2d 1510 (11th Cir.1983)........................................................... *passim*

*Montgomery v. Noga*,
168 F.3d 1282 (11th Cir. 1999)................................................................40

*Newalk v. Fla. Supermarkets, Inc.*,
610 So. 2d 528 (Fla. 3d DCA 1992) ..................................................... 11, 21

*Ochlockonee Banks Rest., Inc. v. Colvin*,
700 So. 2d 1229 (Fla. 1st DCA 1997) .......................................................11

*Osmose Inc. v. Viance, LLC*,
612 F.3d 1298 (11th Cir. 2010)........................................................................ 53, 57

*Pryer v. C.O. 3 SLAVIC*,
251 F.3d 448 (3d. Cir. 2001)................................................................ 8, 12, 15, 18

*Purchasing Power, LLC v. Bluestem Brands, Inc.*,
851 F.3d 1218 (11th Cir. 2017)........................................................................ 33, 34

*Qantum Communs. Corp. v. Star Broad., Inc.*,
473 F. Supp. 2d 1249 (S.D. Fla. 2007) ..................................................................24

*Rease v. AT&T Corp.*,
358 F. App'x 73 (11th Cir. 2009) .........................................................................59

*Rivera v. Aldrich*,
538 So. 2d 1390 (Fla. 3d DCA 1989) ............................................................ 11-12

*Roadway Express, Inc. v. Piper*,
447 U.S. 752 (1980) ...............................................................................................32

*Schuerholz v. Roach*,
58 F.2d 32 (4th Cir. 1932)......................................................................................12

*Shannon v. Bellsouth Telecomms., Inc.*,
292 F.3d 712 (11th Cir. 2002)................................................................................40

*Skinner v. Total Petroleum, Inc.*,
859 F.2d 1439 (10th Cir. 1988)..................................................................... 9, 12, 16

*Stansell v. Revolutionary Armed Forces of Colombia*,
771 F. 3d 713 (11th Cir. 2014)................................................................................59

*TeleVideo Systems, Inc. v. Heidenthal*,
826 F.2d 915 (9th Cir. 1987)...................................................................................34

*Timmy Woods Beverly Hills, Ltd. v. Greenwald*,
475 So. 2d 256 (Fla. 3d DCA 1985) ..................................................... 9, 12, 13, 18

*United States v. Hudson*,
11 U.S. 32 (1812) ....................................................................................................23

*Vargas v. Peltz*,
901 F. Supp. 1572 (S.D. Fla. 1995) ............................................................... 23, 25

*Vidrine v. Kansas City Southern Ry. Co.*,
466 F.2d 1217 (5th Cir. 1972) .......... 11

*Walker v. NationsBank of Fla., N.A.*,
53 F.3d 1548 (11th Cir. 1995) .......... 40

*Walls v. Button Gwinnett Bancorp, Inc.*,
1 F.3d 1198 (11th Cir. 1993) .......... 40

*Watson v. Builders Square, Inc.*,
563 So. 2d 721 (Fla. 4th DCA 1990) .......... 11, 13

*Westminster Comty. Care Servs., Inc. v. Mikesell*,
12 So. 3d 838 (Fla. 5th DCA 2009) .......... *passim*

*Williams v. Ragsdale*,
500 So. 2d 314 (Fla. 2d DCA 1986) .......... 12

*Yarbrough v. Strum, Ruger & Co.*,
964 F.2d 376 (5th Cir. 1992) .......... 8, 13, 16

**Statutes and Other Authorities:**

15 U.S.C. § 1121 .......... 2

15 U.S.C. § 1125(a) .......... 14, 57

28 U.S.C. § 1295(a)(l) .......... 2

28 U.S.C. § 1331 .......... 2

28 U.S.C. § 1332 .......... 2

28 U.S.C. § 1338 .......... 2

28 U.S.C. § 1367 .......... 2

28 U.S.C. § 2107 .......... 2

28 U.S.C. § 2201 .......... 2

28 U.S.C. § 2203 .......... 2

35 U.S.C. § 292 .......... 14

Fed. Cir. R. 4 .......... 2

Fed. R. App. P. 4(a) ..........2
Fed. R. App. P. 4(a)(4)(B)(i) ..........2
Fed. R. Civ. P. 50 .......... *passim*
Fed. R. Civ. P. 50(a) ..........40
Fed. R. Civ. P. 50(a)(1) ..........39
Fed. R. Civ. P. 50(b) .......... 39, 40, 60
Fed. R. Civ. P. 59 ..........7
Fed. R. Civ. P. 59(a)(1)(A) ..........7
Fed. R. Civ. P. 60 .......... 5, 58, 59, 60
Fed. R. Civ. P. 60(b) .......... 3, 6, 58, 59
Fed. R. Civ. P. 60(b)(1) ..........58
Fed. R. Civ. P. 60(b)(3) ..........58
Fed. R. Civ. P. 60(c) ..........58
Fed. R. Civ. P. 60(c)(1) ..........58
37 C.F.R. § 1.132 ..........46
Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure (2d ed. 1995) ..........40
U.C.C. § 2-305 ..........36

Case: 23-1068 Document: 35 Page: 13 Filed: 09/26/2023

## STATEMENT OF RELATED CASES

No other appeal from the same case was previously before this Court or any other appellate court with the exception of the above related appeal numbers 23-1068, -1112 and -1625.

## STATEMENT OF JURISDICTION

BPI brings this appeal from the district court, in accordance with 28 U.S.C. § 1295(a)(l). *See* Fed.R.App.P. 4(a)(4)(B)(i). The district court had jurisdiction under 15 U.S.C § 1121; 28 U.S.C §§ 1331, 1332, 1338; 1367; 2201 and 2203.

BPI appeals from the district court's erroneous order entered in the case below denying BPI's Motion for New Trial ("Order"). Appx0005-0008. BPI timely filed Notice of Appeal within thirty (30) days of entry of final judgment in accordance with 28 U.S.C. §2107, Fed.R.App.P. 4(a), and Fed.Cir.R. 4.

## STATEMENT OF THE ISSUES ON APPEAL

1. Whether the district court abused its discretion in denying BPI's Motion for New Trial.

2. Whether the district court's sanctions imposed on Appellants was warranted based on Appellants' bad faith and fraudulent fabrication of evidence, osbtructionism and related conduct.

3. Whether the district court correctly denied Appellants' motion for judgment as a matter of law under Federal Rule of Civil Procedure 50 on the false advertising and unfair competition causes of action because there was more than adequate evidence to support the jury verdict on liability in BPI's favor.

4. Whether the jury instruction on the materiality element of the false advertising cause of action was correct or amounted to harmless error.

5. Whether the district court correctly denied Appellants' motion under Federal Rule of Civil Procedure 60(b) motion as being time barred when the motion was filed a year or more after the relevant judgments.

## STATEMENT OF THE CASE

On February 26, 2019, Appellee/Cross-Appellant BPI Sports, LLC ("BPI") sued Appellant/Cross-Appellee ThermoLife International, LLC ("ThermoLife") and Ronald Kramer ("Kramer") (collectively, "Defendants" or Appellants") for, *inter alia*, false advertising, unfair competition and false patent marking in connection with the product CRNT-3. Appx0200-0218. On June 5, 2020, the Second Amended Complaint became the operative pleading when Appellant Muscle Beach Nutrition ("MBN")—admitted to be the alter ego of ThermoLife—was added as a Defendant. Appx0360; Appx0427.

On July 14, 2021, the district court affirmed a report and recommendation issued by the magistrate judge ("R&R") and sanctioned all three Defendants on the basis that they committed a fraud on the court when Kramer knowingly, in bad faith and on behalf of all Defendants, fabricated a License Agreement to advance their case and attempted to obstruct discovery of the fraud ("Sanctions Order"). Appx0011. As a result, the district court ordered that (1) Defendants were precluded from introducing into evidence or otherwise using the License Agreement in their case-in-chief; (2) the jury would be advised of Kramer's attempt to manufacture

favorable evidence and its effect on his overall credibility; and (3) BPI was entitled to reasonable attorneys' fees and costs incurred in connection with the sanctions motion and two motions to compel discovery regarding the License Agreement. *Id.*

BPI's claims of false advertising, unfair competition and false patent marking were tried to a jury in October 2021. Appx0500-1482. One of the key issues at trial was whether the Muscle Beach Nutrition product CRTN-3 was falsely advertised as providing "increased vasodilation." This also formed part of the basis of BPI's unfair competition claim. The jury returned a verdict in favor of BPI on the false advertising and unfair competition claims. Appx5263. On October 25, 2021, the district court rendered a final judgment in favor of BPI on the false advertising and unfair competition claims. Appx0001.

On November 21, 2022, BPI filed a Motion for New Trial under Rule 59 arguing that a new trial is required because the verdict itself and the surrounding circumstances establish that the jury impermissibly compromised on the issues of liability and damages. Appx3945-3953. On September 30, 2022, the district court denied BPI's Motion for New Trial. Appx0005-0008. As a result of this ruling, the district court failed to provide BPI a new trial as necessitated by a compromise verdict.

On November 22, 2021, ThermoLife renewed its Rule 50 motion for judgment as a matter of law that BPI failed to meet its burden of proving false advertising and

unfair competition ("JMOL"). Appx3954. On September 30, 2022, the district court denied Defendants' Rule 50 Motion. Appx0003. Over a year after the district court's ruling on the sanctions motion, ThermoLife filed a motion under Federal Rule of Civil Procedure 60 seeking relief from the district court's sanctions decision and the judgment itself. Appx3998. On February 14, 2023, the district court denied the Rule 60 motion as untimely with respect to both rulings. Appx0009. Defendants have appealed the Sanctions Order, the ruling on the JMOL and the ruling on the Rule 60 Motion. Appx0085-0086.

## SUMMARY OF THE ARGUMENT

1. The district court's ruling denying BPI's Motion for New Trial under Rule 59 is erroneous and should be reversed. All of the critical indicia of a compromise verdict are present and the district court abused its discretion in failing to consider those indicia.

2. The district court did not abuse its discretion in sanctioning Defendants on the basis that they committed a fraud when Kramer knowingly, in bad faith and on behalf of all Defendants fabricated a License Agreement to advance their case and repeatedly attempted to obstruct discovery of the fraud ("Sanctions Order"). Appx0011. The district court had the authority to order that Defendants were precluded from introducing into evidence or otherwise using the License Agreement in their case-in-chief; advising the jury that Kramer attempted to manufacture

favorable evidence which could have an effect on his overall credibility; and BPI was entitled to reasonable attorneys' fees and costs incurred in connection with the motion for sanctions and two prior motions to compel discovery regarding the License Agreement. *Id*.

3. The district court correctly denied Appellants' renewed JMOL on the Lanham Act false advertising and unfair competition claims because BPI established all of the elements of false advertising and unfair competition to support the verdict.

4. The district court correctly denied Defendants' Rule 60(b) motion as untimely because the portion of the motion that sought relief from the Sanction's Order was brought over a year after entry and the portion that sought relief from the final judgment was not made within a reasonable time after the entry of judgment.

## ARGUMENT

## I. CROSS-APPEAL

### A. Standards of Review and Legal Principles

#### 1. Motion for New Trial

Federal Rule of Civil Procedure 59 provides that a court may grant a motion for a new trial "for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a)(1)(A). The decision on a motion for a new trial is in the sound discretion of the district court. *Hewitt v. B.F. Goodrich Co.*, 732 F.2d 1554, 1556 (11th Cir. 1984); see *Allied Chem Corp. v. Daiflon, Inc.*, 449 U.S. 33, 36 (1980) ("The authority to grant a new trial, moreover, is confided almost entirely to the exercise of discretion on the part of the trial court.").

#### 2. The Prohibition Against Compromise Verdicts

A district court's denial of a motion for a new trial based on the verdict being an improper compromise is reviewed for abuse of discretion. *Mekdeci ex rel. Mekdeci v. Merrell Nat'l Labs.,* 711 F.2d 1510, 1513 (11th Cir.1983). "A motion for a new trial under Federal Rule of Civil Procedure 59 must be granted 'when the issues of liability and damages were tried together and there are indications that the jury may have rendered a compromised verdict.'" *Collins v. Marriott Int'l, Inc.*, 749

F.3d 951, 960 (11th Cir. 2014) (quoting *Mekdeci v. Merrell Nat'l Labs., Div. of Richardson-Merrell, Inc.*, 711 F.2d 1510, 1513 (11th Cir. 1983)).

The law governing compromise verdicts is well settled. "A compromise verdict results when jurors resolve their inability to make a determination with any certainty or unanimity on the issue of liability by finding inadequate damages." *Collins*, 749 F.3d at 960; *Mekdeci*, 711 F.2d at 1513. "The first, and most important, evidence of a compromise is in the verdict form itself." *Yarbrough v. Strum, Ruger & Co.*, 964 F.2d 376, 379 (5th Cir. 1992). If a jury finds the defendant liable but, "in the teeth of an uncontroverted showing of substantial damages," fails to award any or adequate damages, the liability finding coupled with the grossly inadequate award strongly indicates compromise. *Hatfield v. Seaboard Air Line R.R. Co.*, 396 F.2d 721, 722-24 (5th Cir. 1968). Courts also look to additional indicia. A key factor suggesting a jury compromise is that "the parties 'strongly contested' the issue of liability." *Mekdeci*, 711 F.2d at 1515; *Pryer v. C.O. 3 SLAVIC*, 251 F.3d 448, 455 (3d. Cir. 2001) ("[b]oth sides vigorously contested liability"); *Westminster Comty. Care Servs., Inc. v. Mikesell*, 12 So. 3d 838, 842 (Fla. 5th DCA 2009) ("the issue of liability was hotly contested throughout the trial proceedings").

The jury's deliberation process may also strongly suggest jury compromise. An indication the jury was deadlocked is particularly significant in this regard. *Mekdeci*, 711 F.2d at 1515 ("the jury sent word that it was 'hopelessly

deadlocked'"); *Skinner v. Total Petroleum, Inc.*, 859 F.2d 1439, 1446 (10th Cir. 1988) ("the jury indicated that it could not reach a verdict"); *Westminster*, 12 So. 3d at 842 ("after deliberating for several hours, the jury informed the court that it was deadlocked"). Courts also look at other communications or questions by the jury during deliberations, and the timing of the verdict, which would indicate the jury interwove the liability and damage issues and rendered a compromise verdict. *Mekdeci*, 711 F.2d at 1515 & nn.4-5 (jury communication during deliberations indicated uncertainty on damage causation); *Westminster*, 12 So. 3d at 842 (jury reached verdict less than one hour after being deadlocked); *Timmy Woods Beverly Hills, Ltd. v. Greenwald*, 475 So. 2d 256, 258 n.5 (Fla. 3d DCA 1985) (jury asked during deliberations whether there was minimum amount that may be awarded). Here, *all the above indicia are present*, and the totality of circumstances establish that the jury rendered a compromise verdict requiring a new trial.[1]

**B. The Jury's Compromise Verdict Mandates a New Trial**

Under prevailing Eleventh Circuit law, this case presents a classic "compromise verdict" on liability and damages requiring a new trial on all issues.

[1] "[A] jury verdict influenced by an improper compromise cannot stand and a complete new trial is required because liability and damages are inseparable. Hence, if there is a compromised finding on liability, a separate trial on damages alone will not suffice—both liability and damages must be relitigated in a new trial." *Burger King Corp. v. Mason*, 710 F.2d 1480, 1486 (11th Cir. 2014).

Case: 23-10068 Document: 35 Page: 22 Filed: 08/28/2023

*Collins*, 749 F.3d at 960 (ruling that Florida district court abused its discretion in not granting a new trial under extremely similar circumstances); *Mekdeci*, 711 F.2d at 1513 (where the district court properly ordered new trial on all issues based on "abundant indicia that the jury compromised the issues of liability and damages"); *Westminster*, 12 So. 3d at 842 (holding that there was an impermissible compromise where the damages award was inadequate, liability was "hotly contested" at trial, the jury was deadlocked, the court charged the jury to continue deliberating to reach a decision and less than one hour later the jury returned a verdict).

Here, all of the critical indicia of a compromise verdict are present though several are ignored by the Order: (1) the jury found that Defendants (i) were liable for both false advertising and unfair competition; and (ii) committed two substantive elements associated with false patent marking, but in the face of uncontroverted damage evidence – including direct harm suffered by BPI – gave grossly inadequate $0 damage awards; (2) Defendants' liability was hotly contested as evidenced by the jury's deliberations[2]; (3) the jury indicated it was deadlocked and could not reach unanimity; (4) the jury's questions to the district court before reaching a verdict,

[2] A compromise verdict does not require that the contest over liability be "exceptional" to support a finding that the jury reached an impermissible compromise. *Collins* at 961 (where the S.D. Fla. was reversed by the 11th Circuit when questions by the jury suggested that "some members of the jury may have gone along with a finding of liability only if accompanied by an award of zero damages").

including whether a zero damage award is permissible; and (5) after an *Allen* charge was administered, the jury reached unanimity shortly thereafter; are clear indicators that the jury did not consider damages objectively and separately from liability, but rather, intertwined the two issues and used the damage award as a factor with which to compromise on the issue of liability. Appx0578-0876, Appx1136-1699, Appx5256-5267, discussed in greater detail, *infra*.

Under a long line of legal authority, these strong "indications that the jury may have rendered a compromise verdict" mandates a new trial on all issues. *Collins*, 749 F.3d at 960; *Mekdeci*, 711 F.2d at 1513; *Lucas v. Am. Mfg. Co.*, 630 F.2d 291, 292-94 (5th Cir. 1980); *Vidrine v. Kansas City Southern Ry. Co.*, 466 F.2d 1217, 1224-26 (5th Cir. 1972); *Hatfield*, 396 F.2d at 723; *Westminster*, 12 So. 3d at 839-42; *Frasher v. Whitehurst Family, Inc.*, 948 So. 2d 36, 37-39 (Fla. 3d DCA 2006); *Food Lion v. Jackson*, 712 So. 2d 800, 801-03 (Fla. 5th DCA 1998); *Ochlockonee Banks Rest., Inc. v. Colvin*, 700 So. 2d 1229, 1230-31 (Fla. 1st DCA 1997); *Een v. Rice*, 637 So. 2d 331, 332-33 (Fla. 2d DCA 1994); *Newalk v. Fla. Supermarkets, Inc.*, 610 So. 2d 528, 529-30 (Fla. 3d DCA 1992); *Broward Cnty. Sch. Bd. v. Dombrosky*, 579 So. 2d 748, 749-50 (Fla. 4th DCA 1991); *Watson v. Builders Square, Inc.*, 563 So. 2d 721, 722-23 (Fla. 4th DCA 1990); *Calloway v. Dania Alai Palace, Inc.*, 560 So. 2d 808, 809-10 (Fla. 4th DCA 1990); *Continuum Condo., Ass'n, Inc. v. Continuum VI, Inc.*, 549 So. 2d 1125, 1127-28 (Fla. 3d DCA 1989); *Rivera v. Aldrich*, 538 So.

2d 1390, 1391-92 (Fla. 3d DCA 1989); *Williams v. Ragsdale*, 500 So. 2d 314, 315-16 (Fla. 2d DCA 1986); *Borges v. Jacobs*, 483 So. 2d 773, 775 (Fla. 3d DCA 1986); *Timmy Woods*, 475 So. 2d at 257-58 (all cases requiring a new trial on all issues because of grossly inadequate damage award and likely compromise verdict).[3]

### C. The Jury's Zero Damage Awards Were Grossly Inadequate

The zero damage awards to BPI were against the great and manifest weight of the evidence and therefore shockingly inadequate. BPI presented damages evidence reflecting significant monetary losses in revenue and profit, including "but for" causation for all causes of action. Appx0677-0685 (citing Appx2206-2209 reflecting BPI's loss in sales for creatine products). At least some of these losses should have been awarded by virtue of the jury's verdict that the actions of Defendants caused harm to BPI. Significantly, Defendants offered no contrary

---

[3] See also *Pryer v. C.O. 3 Slavic*, 251 F.3d 448, 454-58 (3d Cir. 2001) (jury's liability finding and $1 nominal damage award likely represented a compromise verdict); *Skinner v. Total Petroleum, Inc.*, 859 F.2d 1439, 1445-46 (10th Cir. 1988) (liability finding and grossly inadequate damage awards was indicative of jury compromise); *Schuerholz v. Roach*, 58 F.2d 32, 34 (4th Cir. 1932) (grossly inadequate damage award indicated jury compromise); *Hammarskjold v. Fountain Powerboats*, 782 F. Supp. 1032, 1034 (E.D. Pa. 1992) ("Because there was conflicting evidence as to liability, I am persuaded that the low verdict was a compromise; that is, that the jury brought in a verdict for the plaintiff but in an amount less than what it would have brought in if liability had been free from doubt."); *Barton v. Griffith*, 253 F. Supp. 774, 775 (D.S.C. 1966) ("In view of the close question as to liability, the court can possibly surmise that in the jury deliberations some felt that defendant was liable, and others not; and that they thereby agreed upon a compromise verdict which was not adequate in amount.").

evidence, did not present a damages expert for rebuttal and did not mention damages at all in their closing argument.

The evidence that BPI was damaged by Defendants in some significant amount (at least more than zero dollars) was therefore uncontroverted. *Yarbrough*, 964 F.2d at 379 ("although [defendant] vigorously contested liability, it hardly challenged [plaintiff's] claims of damages"); *Mekdeci*, 711 F.2d at 1514 (where defendant never disputed damages, yet the jury denied any relief, the district court correctly held that the award was inadequate); *Hatfield*, 396 F.2d at 723 ("The verdict award of nominal damages in the teeth of an uncontroverted showing of substantial damages lacks any support in the record and cannot stand"); *Westminster*, 12 So. 3d at 842 ("the damage award of zero dollars was clearly inadequate in light of the substantial evidence at trial of economic and noneconomic damages"); *Watson*, 563 So. 2d at 722 ("when a damage award is clearly inadequate and the issue of liability is hotly contested, such circumstances give rise to a suggestion that the jury may have compromised its verdict"); *Timmy Woods*, 475 So. 2d at 258 (jury award was unquestionably inadequate, clearly contrary to the law on which the jury was instructed and the evidence before it).[4]

[4] *See also* generally *Johnson v. FFE Transp. Servs., Inc.*, 227 Fed. Appx. 780, 782 (11th Cir. 2007) ("A judge should grant a motion for a new trial when 'the verdict is against the clear weight of the evidence or will result in a miscarriage of justice.").

Case: 23-1068 Document: 35 Page: 26 Filed: 08/26/2023

Under the Lanham Act, "[a]ny person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which is likely to cause confusion…or in commercial advertising or promotion misrepresents the nature, characteristics or qualities,…of his or her or another person's goods…shall be liable in a civil action by any person who believes that he or she is likely to be damaged by such act." 15 U.S.C. §1125(a). BPI proved substantial economic damages resulting from Defendants' actions and the jury found that Defendants' false and misleading advertisements and promotions directly caused harm to BPI. Appx5263-5267. Nonetheless, the jury awarded zero damages which is not reconcilable with the jury's findings of harm. *Id.*

Under Florida common law, unfair competition involves a competitor engaging in fraudulent or deceptive conduct that creates a likelihood of consumer confusion. BPI proved and the jury found that Defendants engaged in fraudulent or deceptive conduct that was likely to cause consumer confusion. *Id*. Nonetheless, the jury awarded zero damages which is not reconcilable with the jury's finding of harm. *Id*. Likewise, with respect to false patent marking under 35 U.S.C. § 292, the jury found that Defendants falsely marked one or more products, with the intent to

deceive the public, but BPI allegedly did not suffer any competitive injury despite profound, uncontroverted evidence to the contrary. *Id*.

Under such circumstances, the Court could only conclude that the jury's woefully inadequate $0 damage awards for all three causes of action resulted from a compromise on liability and damages warranting a new trial on all issues. *Mekdeci*, 711 F.2d at 1515 ("When viewed in this context, any other explanation for the inadequate damage award is unpersuasive. On that basis, the district court certainly acted within its discretion when it ordered a new trial on all issues, rather than a partial retrial limited to a determination of damages."); *Collins*, 749 F.3d at 962 (Based on a "compromise verdict" we "REVERSE the district court's grant of judgment as a matter of law for defendants and, consistent with this opinion, REMAND for a new trial *on all issues*") (italics added).

**D. Liability Was "Hotly Contested"**

The fact that liability is vigorously contested is another key indicia suggesting a compromise verdict. *Pryer*, 251 F.3d at 455 ("[b]oth sides vigorously contested liability"); *Mekdeci*, 711 F.2d at 1515 ("the parties 'strongly contested' the issue of liability"); *Westminster*, 12 So. 3d at 842 ("the issue of liability was hotly contested throughout the trial proceedings"); *Calloway*, 560 So. 2d at 810 ("When the damage award is clearly inadequate and the issue of liability is hotly contested, such circumstances give rise to a suggestion that the jury may have compromised its

verdict."). Here, a very large portion of the trial (*i.e.*, time, witnesses and exhibits) was dedicated to liability. Indeed, all of the defense witnesses were directed to avoiding liability and none even testified, much less presented any evidence, regarding damages or the mitigation thereof. The deadlocking of the jury further confirms that liability was "hotly contested."

### E. The Jury Was Deadlocked Without Any Means of Reaching Unanimity Then Reached A Verdict Shortly After The *Allen* Charge

Another key indicia of a compromise verdict is that the jury was initially deadlocked during deliberations. *Yarbrough*, 964 F.2d at 380; *Skinner*, 859 F.2d at 1446; *Mekdeci*, 711 F.2d at 1515; *Westminster*, 12 So. 3d at 840 ("That the jury may have compromised its verdict in this case is further indicated by the course of the jury's deliberations. For example, after deliberating for several hours, the jury informed the court that it was deadlocked."). Here, after deliberating for approximately six hours (from 5:43 p.m. on October 20, 2021 to 1:54 p.m. on October 21, 2021)[5], the jury sent a note to the district court stating: "WE ARE NOT UNANIMOUS ON ANY OF THE CLAIMS ***AND DO NOT SEE ABILITY TO BECOME SO***". Appx5258 (emphasis added). The district court then read the *Allen* Charge to the jury and deliberations recommenced at 2:00 p.m. Appx1470-1472.

---

[5] Appx1407; Appx1470

In the *Allen* Charge, the district court instructed the jurors that it was their duty to consult with one another and deliberate with the view towards reaching an agreement. *Id*. The district court also advised the jury of the consequences of failing to reach a decision. *Id*. Less than two (2) hours later, the jury returned with a verdict (at 3:57 p.m. on October 21, 2021). Appx1473. *Westminster*, 12 So. 3d at 842 (the fact jury reached verdict less than one hour after being deadlocked supported jury compromise).

### F. The Jury's Questions During Deliberations Establish That It Was Considering A Trade-Off Between Liability And Damages

The jury's questions during deliberations present even more indicia that it compromised on liability and damages. The jury first asked the district court "IS THERE A MINIMUM AMOUNT OR CAN WE PUT $0.00." Appx5261. The district court responded NO to the question of minimum amount and YES to the question of putting $0.00. Appx5259. The jury next asked the district court, "CAN WE MARK "YES" TO CERTAIN PARTS AND "NO" TO OTHER PARTS OF THE SAME CLAIM?" The district court responded YES. Appx5260. Finally, after another hour of deliberations, there was an unknown but persistent issue during deliberations embodied in the question, "CAN THE FOREPERSON SPEAK TO THE JUDGE FOR A FEW MINUTES?" Appx5256. The district court responded NO. For the jury to pose this question, there was clearly some confusion with the decision marking or other problem presented.

Overall, these questions show that the jury was intertwining the two issues and contemplating making a compromise trade-off finding harm but no damages. *Cortez v. Falley*, 1994 WL 409576, at *3 (D. Kan. Aug. 2, 1994) (finding compromise verdict and granting new trial on all issues where the jury's questions during deliberations "indicate that the jury was not considering the damages issue objectively and separately from the issue of liability and may have been using the damage award as a factor with which to compromise on the issue of liability"); *Mekdeci*, 711 F.2d at 1515 & nn.4-5 (jury sent communications indicating uncertainty on damage causation issue); *Timmy Woods*, 475 So. 2d at 258 n.5 (jury question whether there was minimum amount that may awarded showed "confus[ion] on the law of damages, compromising on liability, or both").

Thus, because there are extraordinarily strong indications that the jury reached a compromise verdict, including the grossly inadequate $0 damage awards, a new trial is required on all causes of action, including both liability and damages. *Pryer*, 251 F.3d at 457 ("On this record, there is no reasonable basis for concluding with assurance that the questions of liability and damages were so separable that the jury's determination on one issue had no bearing on its determination on the other.").

### G. The District Court Abused Its Discretion By Denying A New Trial

The district court's Order Denying Motion for a New Trial ("Order") amounts to an abuse of discretion. It confirms that a motion for a new trial must be granted "when the issues of liability and damages were tried together and there are indications that the jury may have rendered a compromised verdict." Appx0006 (quoting *Collins v. Marriott Int'l, Inc.*, 749 F.3d 951, 960 (11th Cir. 2014) (quoting *Mekdeci v. Merrell Nat'l Labs., Div. of Richardson-Merrell, Inc.*, 711 F.2d 1510, 1513 (11th Cir. 1983)). However, the Order denies a new trial based on narrow justifications while failing to follow Eleventh Circuit precedent and consider an overwhelming amount of indicia reflecting a compromise verdict. Appx0007.

The Order notes that "an insufficient damages verdict, standing alone, does not necessarily indicate a compromise." *Id.* (quoting *Mekdeci*, 711 F.2d at 1513-14 (internal citations omitted). This is an accurate statement of the law but it does not reflect the circumstances. First, this was not an *insufficient* damages award (*i.e.,* $1,000), this was nonsensical zero-dollar verdict that cannot be reconciled with the jury's finding of *harm* to BPI. More importantly, the zero-dollar damages verdict does not "stand alone." The district court simply neglected to consider any of the other indicia provided. Specifically, the Order failed to consider or address: (i) liability being hotly contested; (ii) the jury indicating it was deadlocked; (iii) the jury's suspicious questions before reaching a verdict (including whether a zero

damage award is permissible); and (iv) the jury reaching unanimity shortly after an *Allen* charge was administered.

The facts of *Collins* bear shocking similarities to this case and hence control the result. Liability was hotly contested. *Id*. at 961. The jury asked if it could find the defendants negligent but award zero dollars to the plaintiff. *Id*. The jury, in a note to the district judge, stated that it was unable to come to an agreement. *Id*. at 961. After being told to keep deliberating, and just over an hour later, the jury rendered its verdict. *Id*. Notwithstanding significant evidence of damages, the jury awarded zero dollars. *Id*. at 960. On appeal, the Eleventh Circuit ruled that the Florida district court abused its discretion in not granting a new trial. *Id*. at 962. Since the facts of *Collins* are so similar, this Court should reach the same result.

According to the Order "the jury award suggests that [BPI] failed to prove with reasonable certainty any amount of lost profits that Plaintiff lost on account of Defendants' illegal behavior." Appx0007. The Order presents no support for this conclusion and the use of the word "suggests" amounts to speculation. It also ignores the fact that BPI presented damages evidence at trial reflecting significant monetary losses in revenue and profit, including "but for" causation for all causes of action. Appx0677-0685 (citing Appx2206-2209 reflecting BPI's loss in sales for creatine products). The jury must have favorably relied on this evidence to find that BPI *was harmed* by Defendants' behavior in connection with *two causes of action* (and even

appears to have compromised on a third)[6]. Appx5263-5267. The logical explanation in light of *all the indicia* is a compromise verdict.

The only other justification for the district court's ruling is "[w]here the damages have not been stipulated, the jury is entitled to believe that a claim does not merit an award." Appx0007-0008 (quoting *Mekdeci*, 711 F.2d at 1514). *Collins* addressed the same rationale advanced by the lower court but was not persuaded. There, the Eleventh Circuit addressed the district court's conclusion that "the jury's award of damages was not inadequate as a matter of law because the parties did not stipulate to a minimum amount of damages and the evidence at trial did not indisputably set a range of monetary recovery" by ruling that "there need not be an agreed-upon damages range for an award to be inadequate." *Collins*, 749 F.3d at 961 (quoting *Mekdeci*, 711 F.2d at 1514). Because the other required indicia of a compromise verdict were present, the Eleventh Circuit found that the district court had committed reversible error. *Collins* at 961-962 (citing *Westminster*, 12 So.3d at 842; *Newalk*, 610 So.2d at 529; and *Mekdeci*, 711 F.2d at 1514-15).

Significantly, the *Collins* Court gave special treatment to the *Mekdeci* case where, as here, the jury award was inadequate, liability was strongly contested and

[6] There is every reason to believe that the jury engaged in exactly the same approach of conflating liability with damages to reach a compromise verdict regarding BPI's false patent marking allegations. Appx5263. According to the Verdict Form, Defendants falsely marked one or more products, for the purpose of deceiving the public, but BPI—*a direct competitor*—did not suffer a *competitive injury*. *Id*.

Case: 23-1068 Document: 35 Page: 34 Filed: 08/28/2023

the jury could not reach an agreement on liability. *Id*. According to the Court, the most important indicia was that after the jury stated to the judge that it was "hopelessly deadlocked," it returned a verdict shortly after receiving an *Allen* charge. As in *Collins*, the district court abused its discretion by failing to (1) consider all of the indicia of a compromise verdict; (2) follow the controlling authority; and (3) grant BPI's Motion for New Trial.

## II. RESPONSE TO APPELLANT'S OPENING BRIEF

### A. The District Court's Sanction Was Not An Abuse of Discretion

On July 14, 2021, the district court affirmed the magistrate judge's R&R and sanctioned all three Defendants on the basis that they committed a fraud on the court when Kramer knowingly, in bad faith and on behalf of all parties, fabricated a license agreement to advance their case and attempted to obstruct discovery of the fraud. Appx00111; Appx0020. As a result, the district court ordered that Defendants were precluded from introducing into evidence or otherwise using the License Agreement in their case-in-chief; the jury would be advised of Kramer's attempt to manufacture favorable evidence and its effect on his overall credibility; and BPI was entitled to reasonable attorneys' fees and costs incurred in connection with the sanctions motion and two prior motions to compel discovery regarding the License Agreement. *Id*. The ruling was warranted in every respect and the remedy was far less severe than the district court could have been levied under the circumstances.

### 1. The Court's Inherent Powers To Sanction Parties

Federal courts possess the inherent power to sanction parties and attorneys who conduct litigation in bad faith who perpetrate a fraud on the court. *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43-51 (1991) ("It has long been understood that 'certain implied powers must necessarily result to our Courts of justice from the nature of their institution,' powers 'which cannot be dispensed with in a Court, because they are necessary to the exercise of all others.'") (quoting *United States v. Hudson*, 11 U.S. 32, 7 (1812)); *Vargas v. Peltz*, 901 F. Supp. 1572, 1581-82 (S.D. Fla. 1995). "These powers are 'governed not by rule or statute but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases.'" *Chambers,* 501 U.S. at 43 (quoting *Link v. Wabash R. Co.,* 370 U.S. 626, 630-31 (1962)).

The Court's inherent powers include the authority to impose "reasonable and appropriate" sanctions on the parties, as well as their counsel, for abusive practices. *Martin v. Automobile Lamborghini Exclusive, Inc.,* 307 F.3d 1332, 1335 (11th Cir. 2002). This authority includes the inherent power to sanction the parties for a fraud upon the Court. *Id.* (citing *Chambers,* 501 U.S. at 44); *In re E.I. DuPont De Nemours & Company-Benlate Litigation*, 99 F.3d 363, 367 (11th Cir. 1996) ("[e]very district court 'has the power to conduct an independent investigation in order to determine whether it has been the victim of fraud.'")).

In order to "exercise its inherent power a court must find that the party acted in bad faith." *Martin,* 307 F.3d at 1335; *JTR Enterprises, LLC v. Columbian Emeralds,* 697 F. App'x 976, 986 (11th Cir. 2017) ("[t]he key to invoking a court's inherent power to sanction is a finding of bad faith."); *see also*, *Barnes v. Dalton*, 158 F.3d 1212, 1214 (11th Cir. 1998). Bad faith may be found when a party commits a fraud on the court. *Barash v. Kates*, 585 F. Supp. 2d 1347, 1362 (S.D. Fla. 2006) (citing *Chambers*, 501 U.S. at 46); *Allapattah Servs., Inc. v. Exxon Corp.*, 372 F. Supp. 2d 1344, 1373 (S.D. Fla. 2005) ("Bad faith exists when the court finds that a fraud has been practiced upon it, "the very temple of justice has been defiled," or where a party or attorney knowingly or recklessly raises a frivolous argument, delays or disrupts the litigation or hampers the enforcement of a court order.) (citing *Chambers*, 501 U.S. at 46).

In the Eleventh Circuit, a fraud on the court must be established by clear and convincing evidence. *Booker v. Dugger*, 825 F.2d 281, 283 (11th Cir. 1987). Once fraud is established, however, district courts have discretion under the inherent powers doctrine "to fashion an appropriate sanction for conduct which abuses the judicial process." *Chambers*, 501 U.S. at 44-45.

Significantly, "the inherent powers doctrine is most often invoked where a party commits perjury or destroys or ***doctors evidence***." *Qantum Communs. Corp. v. Star Broad., Inc.*, 473 F. Supp. 2d 1249, 1269 (S.D. Fla. 2007) (emphasis added);

*Vargas*, 901 F. Supp. at 1574-82; *McDowell v. Seaboard Farms of Athens, Inc.*, 1996 WL 684140, at *8-10 (M.D. Fla. Nov. 4, 1996) (dismissing claims in part based on fabricated evidence). The need for sanctions is heightened where the scheme goes to the pivotal or "linchpin" issue in the case. *Vargas* at 1582.

### 2. Defendants Fabricated Evidence To Favor Their Case

The reason the district court sanctioned Defendants was simple. Defendant Kramer, knowingly, in bad faith, and on behalf of all Defendants, ***fabricated evidence***, obstructed discovery into it and attempted to use judicial proceedings to cover up his fraud. Appx0011; Appx0020. The facts are set forth in the R&R and are not disputed by the Appellants.

#### i. Defendants ThermoLife and Kramer Originally Alleged That Muscle Beach Nutrition Is A Licensee Of ThermoLife

The first Complaint contained allegations regarding "ThermoLife's dietary supplement product Muscle Beach CRTN-3." Appx0205-0206. The Complaint contained counts for false advertising and unfair competition. Appx0208-0215. The First Amended Complaint contained the same allegations about the "ThermoLife product" CRTN-3 and added false patent marking allegations. Appx0236-0237; Appx0256-0258.

ThermoLife and Kramer moved to dismiss the Amended Complaint arguing, *inter alia,* that the allegations in the Amended Complaint related to then non-party

Muscle Beach Nutrition—one of ThermoLife's "***licensees***"—and not to ThermoLife or Kramer (generally alleging that BPI was suing the wrong company). Appx3202; Appx0023. In sum, Defendants represented to the district court that there was no association between ThermoLife and the accused product CRTN-3; the product is solely advertised and sold by the separate entity Muscle Beach Nutrition; and the only relationship between the two entities is that Muscle Beach Nutrition is a patent and trademark "licensee" of ThermoLife. *Id.*

#### ii. Kramer Fabricates A License To Support The False Allegation That Muscle Beach Nutrition Is Merely A Licensee Of ThermoLife

In February 2020, BPI served its First Requests for Production ("RFP") on ThermoLife and Kramer. Appx0025. RFP No. 11 requested all licenses to the ThermoLife patents. *Id.* In response, on March 20, 2020, ThermoLife produced several licenses, including a document entitled "Purchase and License Agreement" between ThermoLife and Muscle Beach Nutrition ("License Agreement"). *Id.* This document recites an "Effective Date" of ***March 16, 2017***. *Id.* Nothing in the License Agreement itself or ThermoLife's written response notified BPI that the License Agreement was, in fact, created during this litigation on March 9, 2020 by Kramer, much less to purportedly to "memorialize" a pre-existing oral or implied license between ThermoLife and Muscle Beach. *Id.*

According to the terms of the License Agreement, ThermoLife licensed certain patents, the "NO3-T" trademark and the use of creatine nitrate to Muscle Beach Nutrition in exchange for the purchase of raw materials from ThermoLife. Appx4152, ¶¶1.0, 2.0. There are no price terms. *Id*. The other terms require Muscle Beach Nutrition to provide a purchase order for creatine nitrate "to ThermoLife (Attention: Ron Kramer)" *Id*., ¶2.4.1. ThermoLife was supposed to fill the order, ship it and invoice Muscle Beach Nutrition *Id*., ¶¶2.4.2, 2.4.3. Finally, Muscle Beach Nutrition must then remit payment to ThermoLife. *Id*., ¶2.5.3. None of these activities ever took place and none of the required documents were ever exchanged. Appx4193-4194.; Appx4182. The License Agreement purports to be executed by Kramer on behalf of both entities, despite the fact that (i) the two signatures on the document do not match each other; (ii) neither of the signatures match Kramer's signature on the other licenses; and (iii) Kramer's last name is misspelled beneath one of the signatures ("Kraer"). Appx4159.

On February 21, 2020, BPI served a subpoena on (then) non-party Muscle Beach Nutrition requesting production of any license agreements with ThermoLife. *Id*. On April 2, 2020, Muscle Beach Nutrition produced a copy of the fabricated License Agreement that had been previously produced by ThermoLife. *Id*.

### iii. Defendants Obstructed Discovery Into The Fabricated License Agreement

On April 3, 2020, BPI propounded a Second Set of Discovery Requests to ThermoLife and Kramer. *Id*. The purposes of the Second Request for Production was to obtain more information regarding the relationship between ThermoLife and non-party Muscle Beach and evaluate the legitimacy of the License Agreement by requesting discovery into the document itself, including (1) paperwork reflecting actual performance between the parties and (2) electronic discovery about its genesis, such as native files, drafts and metadata. Appx0026.

Meanwhile, a related interrogatory sought basic information about the License Agreement, such as author, date, signatory, place and witnesses. *Id*. Defendants refused to provide discovery and objected on the frivolous basis that any inquires into the License Agreement that *ThermoLife itself produced* "[was] not relevant to any claim or defense in this action" because BPI had not pled alter ego and "[Muscle Beach Nutrition] is not a party to this lawsuit." *Id*. BPI was forced to file two motions to compel and, with respect to the second set of discovery, specifically requested the documents, data and responses regarding the License Agreement. *Id*.

### iv. Defendants Attempt To Use The Judicial Proceedings To Cover Up Their Fraud

In part because ThermoLife and Kramer claimed BPI sued the wrong entity, and in part because of similar discovery issues relating to Muscle Beach Nutrition,

in June 2020, BPI added Muscle Beach Nutrition as a party in a Second Amended Complaint. Appx0023. Five days later, Defendants filed an Expedited Request for a Telephonic Status Conference with the district court. *Id*.

In the expedited request, ThermoLife and Kramer advised the district court that they had agreed to "indemnify, defend, and hold harmless" Muscle Beach Nutrition and agreed to be "held jointly and severally liable for any judgment against [Muscle Beach Nutrition] in order to 'streamline' the action including any remaining discovery and the issues for trial." Appx0024. Bizarrely, this stipulation was contingent on the district court maintaining the then-existing pretrial schedule. *Id*. The real purpose of this gambit was to remove the issue of the relationship between ThermoLife and Muscle Beach Nutrition from the case and moot BPI's outstanding discovery into the fraudulent License Agreement.

On June 16, 2020, the district court denied the expedited request, stating that "consistent with the Rules, Plaintiff is entitled to discovery; Defendants cannot unilaterally limit Plaintiff's discovery rights. In sum, regardless of any indemnification agreement between Defendants, Defendants must comply with rules and law governing this action." *Id*.

On June 18, 2020, two days after the district court's rejection of ThermoLife and Kramer's attempt to limit the scope of discovery by offering to indemnify and hold Muscle Beach harmless, ThermoLife and Kramer filed their Answer and

Affirmative Defenses to the Second Amended Complaint. *Id*. Muscle Beach Nutrition separately filed its Answer on July 7, 2020. *Id*. Significantly, after spending months arguing that Muscle Beach Nutrition was a separate entity from ThermoLife and that BPI had sued the wrong entities, both Answers admitted that "ThermoLife and Muscle Beach are alter egos of each other, with ThermoLife controlling Muscle Beach." *Id*.

On June 19, 2020, the magistrate judge held a hearing on BPI's two motions to compel. During this hearing, ThermoLife continued to argue that its admission that Muscle Beach Nutrition was its alter ego rendered the License Agreement and BPI's discovery regarding it irrelevant. Appx0026; Appx0015-0017. Unpersuaded, the magistrate judge ordered ThermoLife and Kramer to provide amended responses to BPI's RFPs and interrogatories regarding the creation of the License Agreement. Appx0026. Accordingly, despite ThermoLife and Kramer's judicial admission of alter ego liability in the Answer filed the day before the hearing, the License Agreement remained relevant to the issues in the case. Appx0031-0032.

Only after being ordered by the magistrate judge did ThermoLife and Kramer supplemented their discovery responses. Appx0027. The underlying metadata for the License Agreement showed that the License Agreement had been created on March 9, 2020 by Kramer. *Id*. This was a month *after* BPI requested it in discovery;

ten months *after* ThermoLife misrepresented to the Court that Muscle Beach Nutrition was a "licensee" of ThermoLife; and ***three years after it is dated***. *Id*.

In response to an interrogatory which asked ThermoLife to "[d]escribe the circumstances surrounding the creation and execution of the License Agreement]," ThermoLife admitted that on March 9, 2020, Kramer created the agreement by accessing one of ThermoLife's other licenses from early 2017, used it as a template and made the necessary edits, thereby back dating it to ***March 16, 2017***. Appx0027-0028. Kramer signed this manufactured document on behalf of ThermoLife and Muscle Beach Nutrition. The document was produced twice to BPI, once by counsel on behalf of ThermoLife and once by counsel on behalf of Muscle Beach Nutrition. *Id*.

### 3. The Standard For An Award Of Sanctions Has Been Met

The district court affirmed and adopted the R&R on BPI's motion for sanctions, ruling that the magistrate judge applied the clear and convincing evidence standard and correctly concluded that BPI had shown that: (1) Kramer knowingly created a document for use in this litigation to advance his case and impede the efficient presentation of BPI's case; (2) Kramer fabricated a written agreement that did not exist prior to this lawsuit and initially tried to pass it off as legitimate; and (3) the circumstances surrounding the creation of the License Agreement, coupled with its seemingly innocuous production during discovery and the subsequent

tactical attempts to stymie discovery on this issue, providing ***clear and conceiving evidence of Defendants' bad faith***. Appx0014-0015; Appx0019; Appx0022; Appx0030; Appx0034.

Appellants' argument that even accepting the Court's findings, the standard for sanctions was not met is incorrect and built on a faulty premise. Contrary to Appellants' contentions, the district court was ***not*** "required to determine that bad faith was the 'only' explanation for the alleged sanctionable conduct," because it identified *direct* evidence of subjective bad faith. *Roadway Express, Inc. v. Piper*, 447 U.S. 752, 767 (1980)). Even assuming, *arguendo*, that this was necessary, it is would still not be an abuse of discretion for the district court to determine that the only explanation for fabricating evidence, attempting to pass it off as legitimate, obstructing discovery into it and attempting to use judicial proceedings to cover up the fraud requires bad faith. Indeed, the district court affirmed the findings of the magistrate judge that Defendants committed a fraud upon on the court which is sufficient to find that a party has acted in bad faith, warranting the imposition of sanctions. *Barash*, 585 F. Supp. 2d at 1362 (citing *Chambers*, 501 U.S. at 46) ("bad faith may be found where the court finds that a '. . . fraud has been practiced upon it, or that the very temple of justice has been defiled.'").

In determining that the clear and convincing evidence standard was met, the district court and the magistrate judge both scrutinized and summarily rejected

Defendants' unsupported, inconsistent and *post-hoc* excuse that the License Agreement was a "memorialization of the earlier unwritten patent license." Appx0015-0016 ("Likewise, the Magistrate Judge considered, and subsequently dismissed, Defendants' argument that the License Agreement was simply a "memorialized" pre-existing oral or implied agreement."); Appx0032-0033.

The district court also correctly dispensed with Appellants' argument under *Purchasing Power, LLC v. Bluestem Brands, Inc.*, 851 F.3d 1218 (11th Cir. 2017). In *Purchasing Power*, the Eleventh Circuit reversed a district court's imposition of sanctions on plaintiff's *counsel*. *Id*. at 1228. There, the district court had expressly applied a recklessness standard and found that the plaintiff's counsel acted recklessly when he failed to adequately investigate the plaintiff's citizenship before representing to the court that diversity jurisdiction existed. *Id*. at 1223. The Eleventh Circuit reversed, finding that the district court applied the incorrect legal standard for unlocking the court's inherent power to sanction counsel because "recklessness ***alone*** does not constitute conduct tantamount to bad faith." *Id*. at 1223 (emphasis added). Here, the magistrate judge and the district court applied the correct legal standard. Appx0016. Significantly, the *Purchasing Power* Court also found that the district court's conclusion—that "there is no evidence [plaintiff's counsel] investigated [defendant's] citizenship—was not supported by the record evidence.

*Purchasing Power*, 851 F.3d at 1225. That is not the situation there. The magistrate judge's conclusions are fully supported by the record. Appx0016.[7]

According to Appellants, several factual determinations are clearly erroneous, however, these challenges lack adequate (any) basis. For example, although Appellants allege that the district court incorrectly concluded that Kramer obfuscated the license agreement's authenticity, this amounts to mere disagreement with the R&R, which supports the conclusions with evidence, whereas Appellants provide no countervailing evidence at all. Appx0032. At most, Appellants merely restate that "ThermoLife granted an oral license to MBN" based on their subjective conclusion, coupled with the Declaration of Jeremy DeLuca ("DeLuca Decl."), a former employee. Appx4560-4567. However, both the R&R, and the Sanctions Order, debunk this gratuitous position on multiple grounds. Appx0017; Appx0032.

As a threshold matter, Appellants' claim that the License Agreement was a "memoralization" stands in stark contrast to those accepted by courts as legitimate

[7] The facts here are not "far removed from the facts of the cases relied on by the court in granting sanctions" merely because the magistrate judge cited *TeleVideo Systems, Inc. v. Heidenthal*, 826 F.2d 915, 917 (9th Cir. 1987). Whether *TeleVideo* involved perjury is inconsequential since the magistrate judge was emphasizing the immutable point that "Defendants cannot escape sanctions because they eventually rectified their misconduct after being ordered by the Court." Appx0034 (citing *TeleVideo* at 917 which confirmed the district court's entry of default judgment against defendant who committed perjury during depositions even though defendant clarified the statements under questioning by the district judge before trial started).

in other intellectual property cases. Appx0032 (citing *Balsamo/Olson Grp., Inc. v. Bradley Place Ltd. P'ship*, 966 F. Supp. 757, 763 (C.D. Ill. 1996) (where arm's length agreement expressly stated that it was a "memorialization" of an earlier oral agreement). Appx0032. By constrast, nothing in the License Agreement or ThermoLife's discovery responses notified BPI that the License Agreement was to "memorialize" a pre-existing oral or implied license. Appx0025; Appx0017.

Indeed, this concept did not even surface until BPI suspected irregularities in the document. Appx0017. Even then, Appellants refused to participate in discovery surrounding it, instead forcing BPI to file two motions to compel. *Id*. Fearful that a loss on these motions would reveal the true nature of a fraudulent document, Appellants engaged in various forms of chichanery, including (i) filing an expedited request before the district court and offering to indemnify and hold Muscle Beach harmless if the judge maintained the existing pretrial deadlines; (ii) admitting alter ego liability for Muscle Beach Nutrition; (iii) arguing before the magistrate judge that admission of alter ego liability foreclosed BPI's right to discovery. Appx0017.

Other aspects of the License Agreement show that the document is a sham. It did not reflect the date on which it was memorialized, it was signed by Kramer for both parties under mysterious circumstances and the terms do not reflect the actual relationship between ThermoLife and Muscle Beach (and therefore does not reflect the course of conduct of the parties). Appx0032; Appx0017.

Appellants' reliance on the Deluca Declaration does not call into question the district court's findings, much less render them clearly erroneous. In fact, it adds nothing of value. Appx4566. At most, DeLuca testifies that ThermoLife paid for everything and was never paid back. *Id*. What is far more significant is what he fails to address. Nowhere does Mr. DeLuca even mention the existence of a "binding, pre-litigation, oral agreement," much less on the date to which Kramer chose to back date the written document (March 16, 2017). *Id*. The reason is simple: there was no oral agreement and he was no longer associated with Muscle Beach Nutrition when Kramer manufactured the License Agreement (March 9, 2020).

Appellants further rely on the *absence* of a price term to prove conformance between the alleged oral and written agreement. Appx45566, DeLuca Decl., ¶11. However, Muscle Beach Nutrition made no payments at all which is not consistent with a price to be determined. Even assuming, *arguendo*, that it is consistent, this is coincidence (at best) and proves nothing, except that the absence of a price term is common in supply agreements.[8] The fact that the parties never performed under *any* of the substantive terms of the agreement is the most compelling fact, but not surprising, since Kramer admitted he modified a previous document used to define ThermoLife's relationship with *other companies*. Naturally, such a document might

[8] U.C.C. § 2-305, "Open Price Term." https://www.law.cornell.edu/ucc/2/2-305.

not contain a price term, but otherwise would have nothing to do with the actual relationship with Muscle Beach Nutrition.

Thus, the License Agreement did not "memorialize" anything—it was created for the sole purpose of justifying the false representation to BPI and the distric court that ThermoLife and Muscle Beach Nutrition were licensees. Accordingly, the notion that the License Agreement memorialized an earlier, oral agreement is just another clumsy cover-up, contradicted by (i) the history prior to the creation of the document; (ii) the document itself; (iii) the manner in which it was produced; (iv) the fact that neither party ever operated under any its terms; and (v) the circumstances surrounding the inception of the document.

Given the fact that the district court determined that Kramer's fraudulent actions were not a "memorialization" of anything, the manner in which Kramer manufactured evidence hardly exonerates him. Not only did Kramer fail to include any language in the License Agreement itself to signify that it memorialized an earlier agreement, he failed to make any such indication when it was produced, avoided discovery into the document, used procedural devices to thrwart BPI's efforts to confirm its suspicions and declared Muscle Beach Nutrition an alter ego

for the sole purpose of avoiding discovery into the document.[9]

It is unclear whether Appellants are still arguing that the Sanctions Order should be vacated because the remedy was impermissible under the court's inherent powers. However, courts are given wide latitude in fashioning remedies to include the authority to regulate litigation and impose "reasonable and appropriate" sanctions on the parties for abusive practices. Appx0013-0014. Thus, to the extent Appellants are arguing that the sanctions imposed were unsupported or otherwise too harsh, these arguments were fully considered and rejected by the district court. Appx0018-0019; Appx0036-0037 (R&R imposing and justifying sanctions).

### B. The District Court Correctly Denied Defendants' Renewed JMOL

Having been found liable by a jury for false advertising and unfair competition, Appellants now erroneously claim that BPI failed to present sufficient evidence to support the verdict as to several elements of these causes of action. The question for the district court on a renewed Rule 50 motion was whether the evidence is legally sufficient to find for BPI on these issues. As described more fully below, the trial record establishes that BPI presented substantial evidence that is more than sufficient for a reasonable juror to find that BPI had met its burden of proof for each

[9] Appellants allege that the jury "may have been influenced" by the personal conduct of Kramer from over ten years ago (citing to Appx3563), but fails to cite any aspect of the trial where such conduct was even presented to the jury.

of the elements of false advertising and unfair competition.

### 1. Standard Of Review

When considering whether a ruling on a motion for judgment notwithstanding the verdict should be upheld, the standard of review to be applied by this Court is the same as that applied by the district court. *Carter v. City of Miami*, 870 F.2d 578, 581 (11th Cir. 1989). Under Federal Rule of Civil Procedure 50(b), a party's renewed motion for judgment as a matter of law brought after a jury has returned a verdict should only be granted if "there is no legally sufficient evidentiary basis" for a reasonable jury to find for the non-moving party. *Chaney v. City of Orlando*, 483 F.3d 1221, 1227 (11th Cir. 2007) (citing *Lipphardt v. Durango Steakhouse of Brandon, Inc.*, 267 F.3d 1183, 1186 (11th Cir. 2001) (citing Fed.R.Civ.P. 50)); *McGinnis v. American Home Mortgage Servicing, Inc.*, 817 F.3d 1241, 1254 (11th Cir. 2016) ("the question before a district court confronting a renewed Rule 50(b) motion is whether the evidence is "legally sufficient…to find for the party on that issue.") (citing Fed.R.Civ.P. 50(a)(1)); *Arthur Pew Constr. Co. v. Lipscomb*, 965 F.2d 1559, 1563 (11th Cir.1992) (stating that the "usual inquiry" under Rule 50 is "sufficiency, i.e. whether the evidence was sufficient to submit [the issue] to the jury"); *Cleveland v. Home Shopping Network, Inc.*, 369 F.3d 1189, 1192 (11th Cir. 2004) (stating that judgment as a matter of law should only be granted "when there is no legally sufficient evidentiary basis for a reasonable jury to find for the party on

that issue"); *see also* 9A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2537 (2d ed. 1995) ("[t]he standard for granting a renewed motion for judgment as a matter of law under Rule 50(b) is precisely the same as the standard for granting the pre-submission motion [under 50(a)]").

In considering whether the verdict is supported by sufficient evidence, "the court must evaluate all the evidence, together with any logical inferences, in the light most favorable to the non-moving party." *McGinnis* at 1254 (citing *Beckwith v. City of Daytona Beach Shores*, 58 F.3d 1554, 1560 (11th Cir. 1995); *Montgomery v. Noga*, 168 F.3d 1282, 1289 (11th Cir. 1999) ("In considering the sufficiency of the evidence that supports the jury's verdict, the evidence is viewed "in the light most favorable to, and with all reasonable inferences drawn in favor of, the nonmoving party.") (*quoting Walker v. NationsBank of Fla., N.A.*, 53 F.3d 1548, 1555 (11th Cir. 1995)). "If reasonable and fair-minded persons in the exercise of impartial judgment might reach different conclusions based on the evidence presented, the motion should be denied." *Montgomery* at 1289 (*citing Walls v. Button Gwinnett Bancorp, Inc.*, 1 F.3d 1198, 1200 (11th Cir. 1993)).

As the Eleventh Circuit has stressed, "[i]t is the jury's task—not [the court's]—to weigh conflicting evidence and inferences and determine the credibility of witnesses." *Chaney* at 1254 (citing *Shannon v. Bellsouth Telecomms., Inc.*, 292 F.3d 712, 715 (11th Cir. 2002)) (quoting *Lipphardt v. Durango Steakhouse of*

*Brandon, Inc.*, 267 F.3d 1183, 1186 (11th Cir. 2001)). Accordingly, once the jury rendered its verdict, the Court's sole consideration is whether the verdict is supported by sufficient evidence. *Lipphardt* at 1186; *Arthur Pew* at 1563.

### 2. BPI Does Not Have To Prove Specific Monetary Damage Or Losses Coextensive With CRTN-3 Sales To Support The Damages Verdict

Appellants direct a large portion of their argument in support of the reversal of the district court's denial of the JMOL to the connection between BPI's lost sales and the specific amount of sales of the Muscle Beach Nutrition CRTN-3 product. However, BPI need not establish that the two are directly related for several reasons. First, since the jury verdict was for $0 for both false advertising and unfair competition, the district court need only have determined that there was sufficient evidence to support *harm*, not harm in any specific amount. With similar reasoning, BPI need not defend any specific amount it requested at trial because the jury did not find in favor of BPI on such an amount. Thus, whether BPI offered expert testimony to link the *amount* of its declining sales to the *amount* of sales of CRTN-3 is of no consequence under the jury's verdict. The notion that in order to defeat a renewed Rule 50 motion for judgment as a matter of law, BPI must now identify sufficient evidence that Defendants' false advertising caused millions in lost sales and millions in lost profits when the jury did not return such a verdict would be an error of law. *Cleveland v. Home Shopping Network, Inc.*, 369 F.3d 1189, 1192 (11th

Cir.2004) (stating that judgment as a matter of law should only be granted "when there is no legally sufficient evidentiary basis for a reasonable jury to find for the party on that issue").

Second, the comparative between the sales BPI lost and the sales of CRTN-3 is a false comparative because BPI's request for damages was the result of three causes of action. Specifically, BPI's position at trial was that the amount it lost in sales was not just due to false advertising and unfair competition, but also false marking, all of which worked in concert. For example, ThermoLife was supplying larger companies with creatine nitrate, including Cellucor (one of the largest sellers of the ingredient creatine nitrate) against which BPI was competing. Cellucor, in turn, was false marking its product with "NO3-T" which also adorned CRTN-3.

### 3. BPI Presented Sufficient Evidence That BPI Was Harmed

Appellants' allegation that BPI's theory of harm rested entirely on speculation is incorrect and contrary to the evidence. BPI presented substantial evidence that in the third quarter of 2017—in the same timeframe the accused product CRTN-3 was introduced into the marketplace and falsely advertised as increasing vasodilation[10]—BPI's sales of its competitive (but non-nitrate containing) creatine products dropped dramatically. Appx0679-0680; Appx2206 (BPI's sales); Appx1987.

[10] This is the false claim that also supported the jury's finding of unfair competion.

BPI's Chief Executive Officer, Chris MacKenzie, did not speculate about these financial losses or the cause of them, but rather, provided uncontroverted testimony that Defendants' false advertising claim that CRTN-3 increases vasodilation caused harm to BPI, including contributing, at least in part, to the drop in BPI's sales. Appx0650-0685 (citing Appx.2206).[11]

Q. Was BPI competitively injured by the actions of defendants regarding the promotion of CRTN-3 as a vasodilator?

A. Absolutely.

Q. How so?

A. Again it's a – it's a benefit from the product that we were not able to lay claim to.

Q. But for defendants' actions regarding CRTN-3, would BPI have experienced the competitive injury in the form of lost sales regarding its creatine products?

A. No, not at all.

MacKenzie maintained this position on cross examination. Appx0727; Appx0739.

Alone, or in the aggregate, the uncontroverted testimony provides sufficient support for the jury's finding that Defendants' false vasodilation claims in the

---

[11] MacKenzie provided similar testimony that ThermoLife's false patent marking (also committed by Cellucor) also contributed to this drop of sales. *Id.*

advertising for CRTN-3 harmed BPI and caused at least some of the drop in sales of BPI's creatine products. Indeed, Mr. MacKenzie provided a logical and causal connection between BPI's drop in sales and the false advertising (and false marking) by Defendants, including in particular retail outlets. Appx0650-0685. Namely, Defendants falsely claimed vasodilation as a new benefit to their product—a benefit that had not been claimed by any creatine nitrate prior to 2017—damaging BPI by creating a false market impression that Defendants' products (and all creatine nitrate products) provided that benefit.

Moreover, by publicly claiming that CRTN-3 (containing too low a dosage of creatine nitrate) was sufficient to increase vasodilation, Defendants implicitly claimed that all creatine nitrate products (certainly all such products with the same or more creatine nitrate per serving) increase vasodilation. This commercial misimpression helped the licensees, including Cellucor, sell products in GNC and displace BPI's products. *Id*. Thus MacKenzie's testimony that Cellucor's products, including its creatine nitrate products, contributed to BPI's drop in sales is consistent with (and does not refute) the jury's verdict. Specifically, this dynamic supports the conclusion that the harm to BPI was caused by false advertising statements that the quantity of creatine nitrate in CRTN-3 is sufficient to increase vasodilation.

Appellants' allegations that BPI's sales were either decreasing before CRTN-3 entered the market and/or experienced a spike after CRTN-3 introduced amount to

attorney argument that was either not presented to the jury at all and/or was simply rejected. Appellants' argument that the modest sales of CRTN-3 could not have caused the amount of damages claimed by BPI is similarly flawed. Due to the impermissible compromise verdict entered by the jury this issue is not presently before the Court because the jury did not award the amount sought by BPI.

Nevertheless, BPI provided sufficient evidence that a jury could have found that the full amount requested by BPI, or some subset thereof, as damages. As noted above, MacKenzie provided sufficient testimonial and documentary evidence to establish that BPI was harmed by false advertising. Appellants' argument ignores the market effects that these false statements had due to Defendants' vertically integrated nature–Defendants are both raw material providers and selling consumer products, which is known by consumers and the rest of the industry. It stands to reason that false advertising about vasodilation extends beyond the immediate sales of CRTN-3 and unfairly benefits all similarly dosed creatine nitrate products. This is reflected in Mr. MacKenzie's testimony that BPI was "unfairly disadvantaged" by "NO3-T creatine [nitrate.]" Appx0727.

Futhermore, the reason Cellucor factored so prominently in the case was because of BPI's false patent marking allegations which concerned both CRTN-3 and the Cellucor line of products. Appx0650-0685. The mere fact that there was an enormous amount of evidence and testimony in pursuit of this cause of action—

which contributed to BPI's lost sales—does not detract from evidence supporting the conclusion that the advertising of CRTN-3 damaged BPI (albeit in $0 damages).

### 4. BPI Proved That Advertising CRTN-3 As "Increasing Vasodilation" Was Literally False And Misleading

At trial, BPI presented evidence that in January of 2020, during the Reexamination of U.S. Patent No. 8,455,531 ("the '531 Patent") (assigned to ThermoLife), ThermoLife submitted the sworn Declaration of Jon Lundberg Under 37 C.F.R. § 1.132 to successfully overcome various pieces of prior art. Appx2257. This document is not hearsay because it was submitted by retained expert Lundberg on behalf of party ThermoLife. Fed.R.Evid. (d)(2)(C).

The Lundberg Declaration, attached and relied on a paper by Larsen, et al., "Effects of dietary nitrate on oxygen cost during exercise," *Acta Physiol (Oxf)*., 2007, 191(1):59-66 ("Larsen 2007") [Exhibit H to Lundberg Declaration; Appx2220] to conclude that "[i]n my lab's experiments to study if there are any physiological effects of ingested nitrate…we found that we must administer to our human subjects 0.1 mmol nitrate/kg body weight, which is about 6.2 mg/kg body weight to produce consistent results demonstrating administration of nitrates actually could produce ***any physiological effects***." Appx2257, ¶6 (emphasis added). The "physiological effects" referred to by Dr. Lundberg include vasodilation. *Id*.

Through BPI's expert, Dr. Steve Bannister, BPI established that 6.2 mg/kg body weight equates to a 500 mg dose for an average adult in the U.S. weighing 177

pounds. Appx0775-0776. BPI further established through the label and independent testing that CRTN-3 contains 1,000 mg of creatine nitrate which equates to only 319.4 mg of nitrate. Appx0798-0769. The amount of nitrate contained in CRTN-3 is therefore substantially below the required minimum nitrate dose (500 mg) to cause any physiological effects, including vasodilation, in average American consumers. Appx0769. Thus, the representation on the CRTN-3 label that the product will "increase vasodilation" is literally false and constitutes false advertising. *Id*.

Significantly, the declaration of Dr. Lundberg and the trial testimony of Dr. Steve Bannister regarding the dosage amount necessary to increase vasodilation were corroborated by several other sources, all of which were sponsored by and/or relied on by ThermoLife and/or its trial expert, Dr. Thomas Bannister. For example, the Larsen 2007 study (cited and relied on in the Lundberg Declaration) is incorporated by reference into ThermoLife's '531 Patent itself establishing what constitutes a "pharmaceutically effective amount" to increase vasodilation. Appx2228, '531 Patent, col. 8, lines 24-27; col. 22, lns. 15-26; claim 3.

Moreover, ThermoLife's trial expert, Dr. Thomas Bannister, relied on a paper by Galvan, et al., Effects of 28 days of two creatine nitrate based dietary supplements on beach press power in recreationally active males, *J Int Soc Sports Nutr* 2015; 12 (Suppl 1) ("Galvan Paper") wherein the lowest dosage reported was 500 mg of nitrate. Appx2321; Appx1349.

Case: 23-1068 Document: 35 Page: 60 Filed: 08/28/2023

Significantly, none of Defendants' witnesses, including their only testifying expert, Dr. Thomas Bannister, ***addressed the Lundberg Declaration*** at trial. As such, Dr. Lundberg's substantive conclusions and Dr. Steve Bannister's testimony in support thereof were unchallenged, unrebutted and undisputed. Appx0771-0776. Moreover, Dr. Thomas Bannister was forced to admit ThermoLife's additional reliance on and acceptance of the 2007 Larsen Reference through its incorporation into '531 Patent and his own reliance on the corroborating Galvan Paper. Appx0791.

Appellants respond to this mountain of evidence by either not responding, attempting to undercut their *own expert's sworn opinions* and/or offering incredible testimony through lay witness Alexander Nikolaidis, the Director of Research of Muscle Beach Nutrition. Nikolaidis testimony amounted to a hodgepodge of unsupported scientific opinions masquerading as lay testimony (for which there was no prior notice to BPI) and purported "testing" and anecdotal "results" about his own personal experiences and those of non-witnesses that were objectively baseless. For example, Nikolaidis' testimony focused on his own self-administration of CRTN-3 followed by his subjective observations that he felt vasodilated. Appx0944-0952. Apparently to Nikolaidis, personally consuming unproven compounds—even in excess—qualifies as a viable method of testing their effects. *Id*. Nikolaidis also testified about the alleged effects of other individuals who were affiliated with Muscle Beach Nutrition. *Id*. Specifically, Nikolaidis tested his "inventions" on

Kramer, their secretary, Kramer's girlfriend, members of the local Y.M.C.A., and someone named "Ike Catcher." *Id*. Nikolaidis initially presented Catcher as an independent bodybuilder who "felt more pump" from CRTN-3, however, it was later revealed that he is a biased participant in Muscle Beach Nutrition's advertisements. *Id*.; Appx1234. The jury rightfully discarded Nikolaidis' subjective belief in his own physiological response and the unverified views of non-testifying individuals.

Appellants further allege that their position that CRTN-3 increases vasodilation is not literally false because the product might be capable of causing vasodilation in persons who weigh under 113 pounds. However, Appellants presented no evidence whatsoever that CRTN-3 actually increases vasodilation in such persons or that they would even qualify as consumers, which are primarily bodybuilders who tend to be heavier than average human beings.[12] The only alleged support for this contention is BPI's expert's testimony that to even cause any vasodilation, the user would *have to be 113 pounds*. Appx0776. The expert did not testify that there were any such users, much less that they experienced vasodilation upon ingesting CRTN-3. Indeed, there is no evidence of record that CRTN-3 increases vasodilation in such persons or that there are any such consumers of the

[12] Adults weighing under 113 pounds constitutes less than 1% of the adult male population and less than 7% of the adult female population. https://dqydj.com/weight-percentile-calculator-men-women/, analyzing data provided by Data comes from adults in the CDC's 2015-16 NHANES survey.

product. Thus, the percentage of the consumer market for CRTN-3 and creatine products that weigh under 113 pounds is either non-existent or *de minimis*, but neither is in evidence. Equally unpersuasive is Appellants' argument that CRTN-3 might cause vasodilation if a user administered more than the recommended amount. Again, there is no evidence that any users did so.[13]

#### 5. BPI Presented Sufficient Evidence That The False Advertising OF CRTN-3 Was Material to Consumers' Purchasing Decisions

Another aspect of Appellants' argument is that no reasonable jury could conclude that the promotion of CRTN-3 as ***increasing vasodilation*** had any material effect on purchasing decisions because BPI failed to offer any evidence. However, there was more than sufficient evidence to establish that Defendants' deception was likely to influence the purchasing decision.

It should be noted that "increase vasodilation" is prominently featured on the CRTN-3 label as a therapeutic benefit of use the product, along with what is considered a synonomous promotion: "pump." Appx2949; Appx0666. Thus, CRTN-3 promotes vasodilation as an inherent quality or characteristic of the product. It is difficult to imagine a consumer purchasing CRTN-3 for any reason other than the therapeutic effects promoted on the label. Appellants' position is similar to

---

[13] Appellants' reliance on *In re GNC Corp.*, 789 F.3d 505 (4th Cir. 2015) is misplaced because there are no experts who agree that CRTN-3 causing vasodilation is a reasonable and duly qualified scientific proposition.

Case: 23-1068 Document: 35 Page: 63 Filed: 09/06/2023

promoting aspirin as alleviating headaches, then taking the position that claiming what the product does regarding headaches is irrelevant to purchasing decisions.

According to Appellants, BPI offered no evidence about the impact of the false statement on purchasing decisions. However, BPI's CEO, MacKenzie, testified that he is familiar with marketing, sales, customers and competitors of nutrition products. Appx0623. He stated that while none of BPI's creatine products contain creatine nitrate (Appx0635), CRTN-3 does contain creatine nitrate (Appx0665) and the associated claim of vasodilation is material to consumers. Appx0684.

Specifically, MacKenzie testified that consumers generally want what is new and exciting. *Id*. When creatine nitrate (the key ingredient in CRTN-3) is accompanied with the promise of vasodilation (*i.e.*, an increase of blood to the muscle resulting in a "pump"), BPI was not able to compete and fell behind. *Id*. This testimony is sufficient evidence that customers were purchasing products like CRTN-3 because of the promotion of vasodilation. Indeed, as a result, BPI lost its leadership role in the creatine market because it could not make such claims. *Id.*

On cross examination, Appellants' counsel even posited that consumers were actually buying Muscle Beach Nutrition's CRTN-3 product because they wanted to experience vasodilation and McKenzie agreed (if it actually caused vasodilation).

Appx0727[14]; Appx0739. McKenzie further testified that once the vasodilation claim hit the market, a company would be disadvantaged if it is not incorporating that claim. Appx0739.

Significantly, Appellants themselves presented evidence that vasodilation and the correlated "pump" experience is an important characteristic to consumers of CRTN-3. According to Kramer, all of the representations made in connections with Muscle Beach Nutrition products are important for consumers when they are deciding which dietary supplement to take. Appx1185. Various customer feedback offered by Kramer during his direct testimony reflected the fact that consumers were seeking "pump." Appx1191-1193[15]. Kramer further testified that when customers say "I feel more pump," CRTN-3 is "***working as advertised, the effects of nitrates and vasodilation***." Appx1193. Nothing could more reflective of Appellants' advertising have a material effect on any purchasing decisions.

---

[14] Q: If it's in there enough, right? Your products don't have that benefit and so maybe thats why ***consumers are actually buying ThermoLife's products or Muscle Beach products*** or Cellucor products, ***because they want that vasodilation***. They want that pump that's produced by the creatine nitrate that is not produced by normal creatine, is that right? A. ***If it was produced by the NO3-T creatine, it would be right*** but our contention is that it's not, and thus, we're unfairly disadvantaged. The marketing works against us, etcetera.

[15] Q. When you see a customer saying "I feel more pump," again what does that tell you in you terms of whether your product is working as advertised? A. Yes, absolutely. Working as advertised, the effects of nitrates and vasodilation.

Furthermore, consistent with the jury instructions at trial, BPI may establish the materiality requirement by proving that "the defendants misrepresented an inherent quality or characteristic of the product." *Johnson & Johnson Vision Care, Inc. v. 1-800 Contacts, Inc.*, 299 F.3d 1242, 1250 (11th Cir. 2002); *see also Osmose Inc. v. Viance, LLC*, 612 F.3d 1298, 1319 (11th Cir. 2010). In this case, Appellants' misrepresentations on the CRTN-3 labels and elsewhere that the product will "increase vasodilation" relate to the inherent qualities and characteristics of the product and thus BPI has established the materiality requirement. *Id.*

The false advertising that CRTN-3 will increase vasodilation turned on the question of whether the product contained a sufficient quantity of the active ingredient (creatine nitrate) to provide consumers with the stated physiological effect (vasodilation). This relates to an inherent quality and characteristic of the CRTN-3 product because, if nothing else, customers expect a product to have sufficient active ingredient to bring about the claimed effects. The false advertising was therefore material under governing precedent.

Appellants mistakenly rely on *J-B Weld Company, LLC v. the Gorilla Glue Company*, 978 F.3d 778 (11th Cir. 2020) for the proposition that the "inherent quality or characteristic" formulation adopted by the Elevanth Circuit does not replace the consumer-oriented nature of the materiality inquiry with a scientific one." However, *J-B Weld* is distinguishable and its scope is not as broad as suggested

by Defendants. *J-B Weld* did not overrule or abrogate *Johnson & Johnson* or *Osmose*, or the premise that a plaintiff may show materiality by showing that the false advertising statement relates to an "inherent quality or characteristic."

*J-B Weld* merely held that when the falsity relating to an alleged "inherent characteristic or quality" of a product *turns on a hyper-technical scientific definition*, a plaintiff must show that consumers care about the distinction presented by the hyper-technical definition. Specifically, *J-B Weld* dealt with whether an adhesive product advertised as having "steel bond epoxy" properly met the chemical formula for the scientific definition of an "epoxy" and of having a "steel bond[.]" The Eleventh Circuit found that to base a false advertising claim on highly specialized scientific definitions, (such as what constitutes an "epoxy" and what constitutes a "steel bond") it must first be shown that consumers care about the distinction of what is scientifically an "epoxy" and what is scientifically a "steel bond." Put another way, the Court found that to consumers the phrase "steel bond epoxy" did not constitute an "inherent quality and characteristic" of the product because "not every component or ingredient of a product need be material to consumers." *Id.*, at n. 11.

By contrast, the false advertising in the present case relates to whether the CRTN-3 product caused a physiological effect (vasodilation) that Defendants expressly represented. It is axiomatic that consumers assume that a product will function as claimed and contains sufficient active ingredient to do so. *J-B Weld* does

Case: 23-1068 Document: 35 Page: 67 Filed: 08/28/2023

not stand for the proposition that BPI must provide independent evidence that a claim about a physiological benefit allegedly imparted by the primary active ingredient must be shown to be material. Nevertheless, several witnesses, including both party representatives, testified that the representation that CRTN-3 increases vasodilation was material to a consumer's purchasing decisions.[16]

Appellants' reliance on the Second Circuit case of *Apotex Inc. v. Accorda Therapeutics, Inc.*, 823 F.3d 51 (2d Cir. 2016) is equally misplaced. *Apotex* is not analogous and is distinguishable. The case involved a complex chart which appeared in a brochure about the pharmaceutical tizanidine. *Id.* at 57. Under these facts, the *Apotex* Court agreed with the district court that the juxtaposition of the text and image communicates a literally false message. *Id*. at 67. The Court further noted that "the plaintiff must also demonstrate that the false or misleading representation involved an inherent or material quality of the product.'" *Id.* However, the plaintiff failed to show that the complex chart related to an "inherent or material quality of the product" or that the product was otherwise material to consumers' purchasing decisions. *Id*. at 67-68.

[16] Reliance on the full context of the advertisement does not change the result since, as noted above, elsewhere on the label, CRNT-3 promotes "pump," "strength," "intensity," "growth," "performance" and other expressions of a vasodilative effect.

The false advertising in this case does not turn on hyper-technical "pharmacokinetic differences" or anything remotely analogous. It turns on the simple issue of whether there is sufficient active ingredient to increase vasodilation as expressly advertised. Thus, BPI did not rely on just any quality or characteristic of CRTN-3 as Appellants suggest. Rather, BPI relied on an important quality and characteristic which all parties agreed *consumers care about*—vasodilation.

Finally, the district court's jury instruction on materiality was not an abuse of discretion. The jury was instructed that BPI may prove that the deception had a material effect on consumer purchasing decisions by showing that the deception was likely to influence consumers' purchasing decisions. Appx5246. This is precisely the instruction ThermoLife proposed and now concedes captures the Eleventh Circuit's holding in *J-B Weld*.

The district court further instructed the jury that BPI may show materiality by showing that the false advertising is related to an inherent quality or characteristic of the product. This is consistent with certain language in the Lanham Act:

> "[a]ny person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which is likely to cause confusion…***or in commercial advertising or promotion misrepresents the nature, characteristics or qualities,…of his or her or another person's goods***…shall be liable in a civil action by any person who believes that he or she is likely to be damaged by such act.

15 U.S.C. §1125(a) (emphasis added). The district court's instruction is therefore in accord with the Lanham Act and governing authority. *Johnson & Johnson Vision Care, Inc. v. 1-800 Contacts, Inc.*, 299 F.3d 1242, 1250 (11th Cir. 2002) ("A plaintiff may establish this materiality requirement by proving that "the defendants misrepresented an inherent quality or characteristic of the product."); *see also Osmose Inc. v. Viance, LLC*, 612 F.3d 1298, 1319 (11th Cir. 2010). The instruction is not at odds with *J-B Weld*.

Regardless, BPI proved at trial that the false advertising had a material effect on consumer purchasing decisions by showing that the deception influenced consumers' purchasing decisions ***and*** related to an inherent quality or characteristic ***and*** the quality or characteristic was one consumers cared about. Even assuming, *arguendo*, that the district court's jury instruction should have not included language relating to an "inherent quality or characteristic," or if it did, should have qualified the instruction by requiring that the quality or characteristic be one consumers care about, it would not have changed the outcome and was therefore harmless error.

**6. The District Court Correctly Denied The JMOL As It Relates To Unfair Competition**

Appellants represent that the legal analysis is the same for violations of the Lanham Act and Florida's state law unfair competition claims. Appellants therefore rely on the same arguments regarding the district court's decision to deny their Rule 50 Motion with respect to the unfair competion claim as the false advertising claim.

Accordingly, BPI relies on the same arguments advanced above to support its position that the district court correctly denied the JMOL regarding the jury's verdict in favor of BPI on unfair competition.

**C. The District Court Did Not Err In Denying Relief Under Rule 60**

The district court correctly ruled that Defendants' Rule 60 Motion was untimely under Rule 60(c). Appx0009. The Rule 60 Motion purports to be based on subsections 60(b)(1) ("mistake") and 60(b)(3) ("fraud," "misrepresenation" or "misconduct"). *Id.* Significantly, Appellants failed to identify any mistake, fraud, misrepresentation, or misconduct whatsoever. Regardless, pursuant to subsection 60(c), "a motion under Rule 60(b) must be made within a reasonable time"—and for subsections (1) and (3)—"no more than a year after the entry of the judgment or order or the date of the proceeding." Fed.R.Civ.P. 60(c)(1).

With respect to the portion of the Rule 60 Motion that seeks relief from the Sanctions Order, the Court entered its ruling on July 14, 2021. Appx0011. This was over a year and three months before Defendants' Rule 60 Motion was filed on October 25, 2022. Appx0085. Thus, this aspect of the Rule 60 Motion was *per se* untimely under Rule 60(c)(1). Defendants' argument that a portion of the Rule 60 Motion sought relief from the sanction that was "applied during trial" and therefore somehow only became final as of the final judgment is nothing more than an attempt to extend the concrete deadline of the district court's earlier ruling.

The result is no different with respect to the aspect of the Rule 60 Motion seeking relief from the adverse jury verdict (and subsequent judgment) on BPI's false advertising claims. Although the Motion was filed exactly one year from the date of the judgment—*see* Appx0001—this was not within a reasonable period of time. "A determination of what constitutes a reasonable time depends on the circumstances in an individual case, and in making the determination, courts should consider whether the parties have been prejudiced by the delay and whether a good reason has been presented for failing to take action sooner." *Rease v. AT&T Corp.*, 358 F. App'x 73, 75 (11th Cir. 2009). The Rule 60 Motion presented no reason for the delay which, in and of itself, is sufficent grounds for denying the Motion. The Eleventh Circuit has frequently held that a party's failure to seek Rule 60(b) relief within a reasonable time, where the party knew of the grounds for such relief, is a basis for denying a Rule 60(b) motion. *Stansell v. Revolutionary Armed Forces of Colombia*, 771 F. 3d 713, 738 (11th Cir. 2014). Here, there was no good reason for the substantial delay and Defendants were not prejudiced by anything other than their own inaction and lack of diligence.

## CONCLUSION AND PRAYER FOR RELIEF

For the foregoing BPI requests that the Court reverse the district court's denial of the Motion for a New Trial and its judgments based thereon, should be reversed, and this matter should be remanded for a new trial.

BPI further requests that the Court affirm the district court's judgments (i) denying Appellants' Rule 50(b) motion; (ii) sactioning Appellants; and (iii) denying Appellants' Rule 60 motion.

Date: September 6, 2023

/s/ Gregory L. Hillyer
Gregory L. Hillyer
Nicholas J. Sullivan
HILLYER LEGAL, PLLC
5335 Wisconsin Avenue, NW
Suite 440
Washington, DC 20015-2052
Telephone: (202) 686-2884
ghillyer@hillyerlegal.com
nsullivan@hillyerlegal.com

*Counsel for Plaintiff- for Appellee/Cross-Appellant BPI Sports, LLC*

# ADDENDUM

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 19-CV-60505-RS**

BPI SPORTS, LLC,

Plaintiff,

THERMOLIFE INTERNATIONAL, LLC,
MUSCLE BEACH NUTRITION LLC, and
RONALD L. KRAMER,

Defendants.
________________________________________/

**ORDER DENYING MOTION FOR NEW TRIAL**

This matter is before the Court on Plaintiff's Motion for a New Trial [DE 360], Defendants' Response in Opposition [DE 369], and Plaintiff's Reply [DE 378]. For the reasons that follow, Plaintiff's Motion for a New Trial is denied.

## I. BACKGROUND

This is a post-trial motion brought by Plaintiff following a five-day jury trial during October 2021. Plaintiff tried three counts against Defendants for (1) false advertising under the Lanham Act, 15 U.S.C. § 1125(a); (2) unfair competition under Florida common law; and (3) false patent marking under 35 U.S.C. § 292. On the first count, the jury returned a verdict for Plaintiff, finding that all Defendants engaged in false advertising and awarded Plaintiff $0. On the second count, the jury returned a verdict for Plaintiff, finding that all Defendants engaged in unfair competition, and again awarded Plaintiff $0. On the third count, the jury returned a verdict for Defendants and found that Plaintiff did not meet its burden to prove false patent marking on the part of Defendants. On October 25, 2021, in accordance with the verdict, the Court entered final judgment in favor of Plaintiff for false advertising and unfair competition, and in favor of

Defendants for false patent marking. *See* Final Judgment [DE 333]. Plaintiff now brings the present Motion, arguing that a new trial is warranted because the verdict and surrounding circumstances suggest that the jury impermissibly compromised on the issues of liability and damages.

## II. LEGAL STANDARD

Federal Rule of Civil Procedure 59 provides that a court may grant a motion for a new trial "for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a)(1)(A). The decision on a motion for a new trial is in the sound discretion of the district court. *Hewitt v. B.F. Goodrich Co.*, 732 F.2d 1554, 1556 (11th Cir. 1984); *see Allied Chem Corp. v. Daiflon, Inc.*, 449 U.S. 33, 36 (1980) ("The authority to grant a new trial, moreover, is confided almost entirely to the exercise of discretion on the part of the trial court.").

"A motion for a new trial under Federal Rule of Civil Procedure 59 must be granted 'when the issues of liability and damages were tried together and there are indications that the jury may have rendered a compromised verdict.'" *Collins v. Marriott Int'l, Inc.*, 749 F.3d 951, 960 (11th Cir. 2014) (quoting *Mekdeci v. Merrell Nat'l Labs., Div. of Richardson-Merrell, Inc.*, 711 F.2d 1510, 1513 (11th Cir. 1983)). "A compromised verdict results when jurors resolve their inability to make a determination with any certainly or unanimity on the issue of liability by finding inadequate damages. However, an insufficient damages verdict, standing alone, does not necessarily indicate a compromise." *Mekdeci*, 711 F.2d at 1513-14 (internal citations omitted).

## III. DISCUSSION

Plaintiff argues that a new trial is warranted under Rule 59 because the jury's verdict represents an impermissible compromise verdict between the issues of liability and damages. According to Plaintiff, the jury award of $0 in damages was grossly inadequate following a finding

that Defendants were liable for both false advertising and unfair competition. Plaintiff cites to a long line of legal authority to emphasize that a new trial is warranted where there are "strong indications that the jury may have rendered a compromise verdict." *Collins*, 749 F.3d at 960; *Mekdeci*, 711 F.2d at 1513. In opposition, Defendants argue that an "insufficient damages verdict, standing alone, does not necessarily indicate a compromise." *Mekdeci*, 711 F.2d at 1513. Further, Defendants argue that the jury award confirms Plaintiff's failure to meet the requirement that damages be proven with "reasonable certainty," as set out in the agreed-upon jury instructions, and that Plaintiff may have invited error as relates to the jury award because it consented to an instruction allowing for nominal to no damages.

Given the circumstances of the case and the jury's verdict, the Court is not convinced that a compromise verdict exists and that a new trial is therefore warranted. In the case at bar, the jury found for Plaintiff and against Defendants for false advertising and unfair competition but awarded Plaintiff $0 in damages on both counts. This is because Plaintiff did not prove with reasonable certainty the amount of damages that flowed from the proven violations of law. The Court's agreed-upon jury instruction on each claim was followed by a separate instruction requiring that: (1) Plaintiff prove that Defendants' actions caused Plaintiff to lose profits; and (2) Plaintiff establish the amount of its lost profits with "reasonable certainty." *See* Court's Instructions to the Jury, No. 9-12, 15 [DE 330]. The jury award suggests that Plaintiff failed to prove with reasonable certainty any amount of lost profits that Plaintiff lost on account of Defendants' illegal behavior. Rather than an impermissible compromise verdict, viewing the award in this light renders it an appropriate exercise of fact-finding, balancing and weighing of conflicting evidence, and credibility determinations that are the rightful domain of the jury. *See Shugart v. Central Rural Elec. Co-op.*, 110 F.3d 1501, 1506 (10th Cir. 1997) ("Where the damages have not been stipulated,

the jury is entitled to believe that a claim does not merit an award.") (*citing Mekdeci*, 711 F.2d at 1513).

The Court notes in closing that courts are generally reluctant to disturb a jury award in response to a potential compromise verdict. *See, e.g., Shugart*, 110 F.3d at 1506 ("Where there is evidence to support the jury's damage award…we are unwilling to conclude that the trial court abused its discretion by failing to grant a new trail based on impermissible compromise verdict."). This Court is unwilling to disturb the jury's verdict in this case, where the jury carefully deliberated and considered the issue of liability and damages following a five-day trial. Because an insufficient damages award, standing alone, does not necessarily indicate a compromise verdict, *Mekdeci,* 711 F.2d at 1513-14, and because the decision on a motion for a new trial is left to the sound discretion of the district court, *Hewitt*, 732 F.2d at 1556, the Court will deny Plaintiff's motion for a new trial.

For the foregoing reasons, it is hereby,

**ORDERED** that Plaintiff BPI Sports, LLC's Motion for New Trial [DE 360] is **DENIED**.

**DONE and ORDERED** in Fort Lauderdale, Florida this 30th day of September, 2022.



**RODNEY SMITH**
**UNITED STATES DISTRICT JUDGE**

cc: All Counsel of Record

**FORM 19. Certificate of Compliance with Type-Volume Limitations** **Form 19**
**July 2020**

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS

**Case Number:** 2023-1068, -1112, -1625

**Short Case Caption:** BPI Sports, LLC v. ThermoLife International LLC

**Instructions:** When computing a word, line, or page count, you may exclude any items listed as exempted under Fed. R. App. P. 5(c), Fed. R. App. P. 21(d), Fed. R. App. P. 27(d)(2), Fed. R. App. P. 32(f), or Fed. Cir. R. 32(b)(2).

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

☑ the filing has been prepared using a proportionally-spaced typeface and includes 13,022 words.

☐ the filing has been prepared using a monospaced typeface and includes ________ lines of text.

☐ the filing contains ________ pages / ________ words / ________ lines of text, which does not exceed the maximum authorized by this court's order (ECF No. ________).

Date: 09/06/2023

Signature: /s/ Gregory L. Hillyer

Name: Gregory L. Hillyer

Save for Filing