**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**

| | |
|---|---|
| BPI SPORTS, LLC,<br><br>*Plaintiff*,<br><br>v.<br><br>THERMOLIFE INTERNATIONAL, LLC,<br>MUSCLE BEACH NUTRITION, LLC,<br>and<br>RONALD L. KRAMER.<br><br>*Defendants*. | **CASE NO. 0:19-cv-60505-SMITH** |

**DECLARATION OF MATTHEW J. DOWD IN SUPPORT OF DEFENDANTS' OPPOSITION TO BPI'S SANCTIONS MOTION**

I, Matthew J. Dowd, hereby declare, under penalty of perjury, as follows:

1. I am a member and managing partner of the firm Dowd Scheffel PLLC ("Dowd Scheffel"), located in Washington, DC. Along with local counsel Reed Smith, Dowd Scheffel represents Defendants ThermoLife International, LLC, Muscle Beach Nutrition, LLC, and Ronald L. Kramer (hereinafter, collectively referred to as "Defendants") in the above-referenced action.

2. I was lead counsel at the trial in October 2021, and I argued the appeal on behalf of Defendants at the U.S. Court of Appeals for the Federal Circuit, successfully arguing that BPI's false-advertising claims were meritless.

3. I make and submit this declaration in connection with Defendants' Opposition to BPI's Sanctions Motion, D.E. 473.

**BPI's Sanctions Motion Contains Several Material Errors and Omissions**

4. Having reviewed BPI's sanctions motion in detail, the motion appears to contain

several material errors and omissions, including when it quotes sentences or portions of sentences of Defendants' *Munsingwear* motion.

5. For example, BPI quotes this Court as writing: "Litigants have an obligation to reconsider and revise their positions when they are no longer viable" in *MSPA Claims 1, LLC v. Liberty Mutual Fire Insurance Co.*, No. 17-22539-CV, 2025 WL 643208, at *4 (S.D. Fla. Feb. 25, 2025), *aff'd in part*, 2025 WL 2800463 (S.D. Fla. Sept. 26, 2025). Our review of the two opinions in that case indicate that the court did not write the sentence BPI quotes.

6. In reviewing the cases, my colleagues and I read both decisions, which are attached as Exhibits 6 and 7. Neither decision contains the quoted sentence. Additionally, searching the term "litigants" across both opinions results in a total of three results, none of which are a part of the quote presented in BPI's sanctions motion.

7. My associate also searched Westlaw to determine whether the quotation comes from a different case, and I reviewed the results of his searches. Across all federal and state jurisdictions on Westlaw, he searched for the full phrase "litigants have an obligation to reconsider and revise their positions when they are no longer viable." He also searched various portions and minor variations of that phrase, such as "litigants have an obligation to reconsider," "obligation to reconsider and revise their position," "obligation to reconsider and revise their positions," and "revise their positions when they are no longer viable." These searches are shown in Exhibit 8. Each search resulted in zero results for cases containing the above phrase or the searched portions of it.

8. My associate also searched via Google for the entire phrase "litigants have an obligation to reconsider and revise their positions when they are no longer viable." He also searched the following portions of that phrase: "litigants have an obligation to reconsider" and

"obligation to reconsider and revise their position." These searches again resulted in no hits. *See* Ex. 9.

9. BPI's motion (including its Exhibit 1) also incorrectly quotes from Defendant's *Munsingwear* motion multiple times. From our review, the source or reason for the incorrect quotations is not clear, but the incorrect quotations meaningfully change the meaning and connotation of the quoted material.

10. For instance, BPI incorrectly quotes a sentence from Defendant's *Munsingwear* motion by inserting a "not" into the quoted sentence.

| **Quotation from *Munsingwear* Motion** | **BPI's Incorrect Quotation** |
|---|---|
| "Thus, ThermoLife was obligated only to produce the requested documents." D.E. 462 at 13. | "Thus, ThermoLife was **not** obligated only to produce the requested documents." D.E. 473-1 at 4. |

11. The addition of "not" entirely changes the meaning of the Defendants' sentence. By adding "not" to the sentence, BPI misrepresents that Defendants had an obligation to produce more than the requested documents. The opposite is true, as explained in the *Munsingwear* motion. BPI's erroneous addition creates the incorrect impression that Defendants somehow failed to comply with their discovery obligations, when no such thing occurred.

12. BPI included another incorrect quotation from Defendants' *Munsingwear* motion, as shown below. In this second incorrect quotation, BPI incorrectly deleted the word "all" from the sentence quoted from Defendants' motion.

| **Quotation from *Munsingwear* Motion** | **BPI's Incorrect Quotation** |
|---|---|
| "Defendants fully complied and produced | "Defendants fully complied and produced |

| | |
|---|---|
| **all** responsive discovery." D.E. 462 at 13. | responsive discovery." D.E. 473-1 at 3. |

13. To me, it is unclear why BPI would alter this quotation from Defendants' *Munsingwear* motion. As Defendants have explained elsewhere, Defendants did produce all responsive discovery, and BPI has not alleged otherwise. D.E. 462 at 13, D.E. 469 at 4–8.

14. The omission misrepresents Defendants' actions as potentially not fully complying with its obligation. Again, the opposite is true, as Defendants completely fulfilled their discovery obligations in producing all responsive discovery, not just some portion of it.

15. BPI included another incorrect quotation from Defendants' *Munsingwear* motion, as shown below. In this incorrect quotation, BPI incorrectly omits the phrase "the finding."

| Quotation from *Munsingwear* Motion | BPI's Incorrect Quotation |
|---|---|
| "In doing so, the Federal Circuit did not affirm **the finding** that the License Agreement was fabricated." D.E. 462 at 15. | "In so doing, the Federal Circuit did not affirm that the License Agreement was fabricated." D.E. 473 at 10. |

16. It is unclear to me why BPI decided to exclude "the finding" from the quoted sentence, though the omission is meaningful in my view. After all, the objective of Defendants' *Munsingwear* motion is narrowly focused on specific findings. In my view, BPI's misquoted sentence misrepresents the thrust of Defendants' motion.

17. BPI included another incorrect quotation from Defendants' *Munsingwear* motion, as shown below. In this incorrect quotation, BPI deleted the phrase "from arguments presented" from the sentence quoted from Defendants' motion, as shown below.

| Quotation from *Munsingwear* Motion | BPI's Incorrect Quotation |
|---|---|

| | |
|---|---|
| "presumably **from arguments presented** in Defendants' appeal, that Defendants 'did not fabricate the License Agreement.'" D.E. 462 at 15. | "presumably in Defendants' appeal, that Defendants 'did not fabricate the License Agreement.'" D.E. 473 at 10. |

18. The omission of the phrase "from arguments presented" is a misrepresentation of Defendants' statement in my view. Defendants were making the argument that they did not fabricate the license agreement, rather than trying to present the lack of fabrication as a fact.

19. BPI included another incorrect quotation from Defendants' *Munsingwear* motion, as shown below. In this incorrect quotation, BPI deleted the word "civil" from the sentence quoted from Defendants' motion.

| Quotation from *Munsingwear* Motion | BPI's Incorrect Quotation |
|---|---|
| "the standard disposition in federal **civil** cases." D.E. 462 at 16. | "the standard disposition in federal cases". D.E. 473 at 12. |

20. BPI's incorrect quotation expands the meaning to include both civil and criminal cases, but Defendants' *Munsingwear* motion did not purport to provide a characterization of vacatur law in criminal cases. Nonetheless, this omission represents a trend of continued omissions and errors when BPI has quoted Defendants' submission.

21. On page 16 of BPI's sanctions motion, BPI misattributes a quotation by the Federal Circuit to the Ninth Circuit. BPI writes: "In affirming an award of attorneys' fees, the Ninth Circuit noted the findings as follows," followed by a block quotation. D.E. 473 at 16. That passage appears in *ThermoLife International LLC v. GNC Corp.*, 922 F.3d 1347, 1355 (Fed. Cir. 2019), a Federal Circuit decision, not a Ninth Circuit decision.

22. BPI's motion reproduces the Federal Circuit's quotation with bolded and italicized

text that does not appear in the original opinion, and BPI does not identify the added emphases. This modification of the original text without identification of the added emphases contravenes standard citation practice, including § 5.2(d)(1) of the Bluebook. It is also notable because, for other quotations in its motion, BPI does correctly note when it added an emphasis.

23. As noted in its Certificate of Compliance, BPI did make "[t]wo minor revisions" to correct counting errors on page fourteen, changing "six (6) to five (5) and five to four." D.E. 473 at 21. Notably, BPI failed to correct the misstatement on page fifteen that Defendants waited "five months" after the denial of certiorari to file the motion, despite correcting that same miscalculation to "four months" on the previous page. D.E. 473 at 14–15.

**The Pending Ninth Circuit Case**

24. BPI's motion cites the pending case *ThermoLife International, LLC v. BPI Sports, LLC*, 186 F.4th 1176 (9th Cir. 2026). BPI fails to note the vigorous dissent of Judge Miller in that case concerning whether attorney's fees can be awarded pursuant to Federal Rule of Civil Procedure 41(d). See *id.* at 1187 ("Because no statute or rule authorizes a district court hearing one case to award fees for a different case, I would vacate the district court's order.").

25. Indeed, the majority opinion has recognized that "a circuit split has emerged as to whether attorney's fees may be awarded as costs under Rule 41(d)(2)." *Id.* at 1182.

26. For that reason, ThermoLife and Muscle Beach Nutrition have strong grounds for seeking Supreme Court review on that issue.

**BPI's Sanctions Motion Continues Its Unreasonable Litigation Tactics**

27. BPI's current motion for sanctions is consistent with the litigation tactics of BPI and its counsel throughout the entirety of its fundamentally flawed case. Because BPI invokes the Court's inherent authority when seeking sanctions and because I understand inherent authority to

be rooted, at least in part, in equitable principles, I provide some examples of BPI's conduct during this case that may be relevant to assessing whether sanctions under the Court's inherent authority are appropriate.

28. For instance, one significant example of BPI's obstructionist conduct was when BPI, through its counsel, worked to prevent Defendants' ability to call BPI's key Rule 30(b)(6) witness Derek Ettinger at trial. *See* D.E. 321; D.E. 321-1 to D.E. 321-12. Mr. Ettinger was BPI's sole 30(b)(6) witness. In discovery responses, BPI instructed that Mr. Ettinger "may only be contacted through the undersigned counsel of record." D.E. 321 at 4. Mr. Hillyer represented Mr. Ettinger at the 30(b)(6) deposition (prior to Dowd Scheffel's involvement in the case). *Id.* at 5. Nevertheless, when Defendants sought to arrange Mr. Ettinger's appearance and serve a trial subpoena, BPI counsel stated that he lacked authority to accept service of the trial subpoena. D.E. 321 at 2. BPI asserted that it "has no control over Mr. Ettinger, and has no further information to provide to Defendants on this issue." *Id.* at 5.

29. In view of BPI's tactic, we were forced to retain a process server in order to effect service on Mr. Ettinger. This occurred starting around October 8, 2021, shortly before and during the October 2021 jury trial. Defendants were forced to pursue multiple attempts to effect service of the subpoena on Mr. Ettinger, but Mr. Ettinger appeared to be avoiding acceptance of service. We attempted to have process served on Mr. Ettinger personally multiple times at various addresses provided by BPI in its Rule 26 disclosures, such as his residence, the residence of his wife, and BPI's business address. Despite multiple attempts to serve Mr. Ettinger at multiple locations, our process server was unable to personally serve Mr. Ettinger. D.E. 321 at 6.

30. Defendants ultimately filed another motion seeking assistance in securing Mr. Ettinger's testimony. *Id.* at 3. The resulting expenditure of resources arose from attempts to obtain

testimony from the very witness BPI had designated to speak for the company.

31. On the first day of trial, BPI notified the Court, for the first time, that Mr. Ettinger "was no longer living" at the residence where service was being attempted. Ex. 3 (Tr. 1:59:2–3). BPI also informed the Court, for the first time, that "Mr. Ettinger is no longer an officer of the company." *Id.* (Tr. 1:58:22).

32. BPI did not produce Mr. Ettinger as a witness until BPI was warned that if Mr. Ettinger did not testify, the Court would "limit Mr. Mackenzie's testimony consistent to what Mr. Ettinger would testify to." *Id.* (Tr. 1:62:18–21). Notably, BPI had just told the Court that "BPI doesn't have the authority to accept service on behalf of Mr. Ettinger." *Id.* (Tr. 1:58:23–24).

33. Even when Mr. Ettinger appeared at trial, this did not resolve the concerns surrounding his testimony, which materially conflicted with his earlier deposition testimony about the same period. At his deposition on April 24, 2020, Mr. Ettinger testified: "If it has to do with financials, yes, very into the financials." Ex. 2 (Ettinger Dep. Tr. 47:4–5). At trial, however, when asked whether he had been knowledgeable about BPI's financial statements through April 2020, he answered, "Absolutely not," and later stated that, "as chairman, I have very little knowledge about BPI financials." Ex. 4 (Tr. 4:16:25–17:2); *id.* (Tr. 4:17:22–23). When confronted with his deposition testimony, Ettinger acknowledged that he had previously testified that he was "very into the financials," answering, "I did say that, yes." *Id.* (Tr. 4:25:10–13).

34. Later, Mr. Ettinger was intimately involved with BPI's bankruptcy proceeding. Only twenty-three months after the trial, based on public documents, Mr. Ettinger swore under oath in BPI's bankruptcy proceeding that, without qualification, "[a]s a Manager on the Board of Managers of the Parent Company, I have personal knowledge of the Debtor's books and records, and the Debtor's financial and operational affairs." D.E. 448-6 at 42.

35. To date, the record in this case has not explained the inconsistencies in Mr. Ettinger's statements that he had knowledge into BPI's financials at the time of his deposition, did not have that knowledge at the time of the trial in October 2021, and then subsequently regained that knowledge for the bankruptcy proceeding.

36. Another example of BPI's obstructionist conduct occurred prior to trial when BPI failed to acknowledge an emergency request to meet and confer after a member of my firm tested positive for COVID-19. On August 7, 2021, I learned of the positive test by a member of my firm. Hours later, I notified Mr. Hillyer and requested a conference about a short continuance. I explained: "We have recently had a firm employee test positive for COVID-19. This recent development further supports Defendants' request for a short continuance of the trial." Although BPI's trial counsel sent multiple emails concerning other case-related matters, they had not yet acknowledged or responded to the continuance request when Defendants filed their expedited motion for continuance on August 8. The Court granted the continuance and directed the parties to confer about outstanding issues. D.E. 272.

37. Throughout trial, BPI advanced a wholly untenable damages theory. Defendants' CRTN-3 product only ever generated limited total pre-revenue sales. D.E. 448 at 11–13. In closing, however, BPI's counsel described the requested false-marking recovery as a percentage "of [ThermoLife's total] profit that they realized which is identical to our lost revenue." Ex. 4 (Tr. 4:241:18–20); D.E. 448 at 11–13. Counsel then requested this percentage of ThermoLife's total profits under each of BPI's three causes of action, albeit as alternative rather than cumulative awards. Ex. 4 (Tr. 4:263:8–265:11); D.E. 448 at 11–13. Thus, BPI was seeking lost-profit damages equivalent to many multiples of the total sales of MBN's CRTN-3 product. That theory did not make sense, as BPI never reasonably explained why BPI's own lost profits were attributable to such

minimal sales of the only product accused of false advertising.

38. As a more recent example of BPI's pattern of refusing to meet and confer, on September 23, 2025, Defendants noted BPI's failure to respond to a meet and confer requested to discuss Defendants' second renewed motion for attorney's fees. D.E. 452-10, Ex. 86 at 1. Shortly thereafter, on September 26, 2025, Defendants proposed withdrawing and refiling their renewed attorney's fees motion after conferral or, alternatively, extending BPI's response deadline so the parties could "work towards resolution of the issues raised." D.E. 452-10, Ex. 87 at 6. Defendants also offered to consider negotiated reductions in the requested fees and expenses. *Id.* at 7. As Defendants subsequently explained in their reply, BPI did not respond to any of those proposals. D.E. 454 at 8. BPI instead sought denial of the motion alleging a failure to meet and confer. D.E. 452 at 1–4.

39. Many of the threats and allegations that BPI levies in its motion have been recycled throughout the litigation. For example, BPI previously threatened Dowd Scheffel by stating: "if this behavior continues, we will move to have your pro hac vice admission revoked." D.E. 448-2 at 23. This unreasonable threat is seen again in the present motion, where BPI is seeking Dowd Scheffel's pro hac revocation as a sanction. Similarly, BPI's labeling of disputed arguments as "frivolous" without further support is not a new behavior. For example, on August 19, 2021, BPI filed an unnecessary motion to compel updated financial information which it used as a vehicle to disparage Defendants' new counsel regarding unrelated matters. *See, e.g.*, D.E. 277. This motion referred to Defendants' reasonable efforts to resolve ambiguities in the parties' joint stipulations as advancing "frivolous arguments and ultimatums." *Id.* at. 6 n.7 (recounting Defendant's ultimately validated identification of BPI's "entire false marking case" as "atextual," "unsupported by precedent," "objectively unreasonable" and "lack[ing] any good-faith basis").

40. To date, BPI has not denied that Mr. Hillyer is being compensated on a contingency basis. Defendants identified that Mr. Hillyer appears to be compensated on a contingency basis after BPI's own bankruptcy filing listed Hillyer Legal PLLC as holding a $189,862.88 claim for "legal" services and designated that claim "Contingent." D.E. 448-6, Ex. 103 at 1; D.E. 448 at 15.

**Eight Lawsuits Filed in 2018-2019**

41. BPI's motion identifies eight lawsuits filed in the United States District Court for the District of Arizona in 2018 and 2019, none of which were filed by Defendants' present counsel. *See* Mot. 16–18. These lawsuits were filed by ThermoLife's prior counsel Gregory Collins, who was lead trial counsel in the present action during the relevant time concerning the imposed sanctions and prior to Dowd Scheffel's engagement. Dowd Scheffel entered an appearance in one of the eight lawsuits after ThermoLife's claims had already been voluntarily dismissed. At that time, the remaining litigation concerned the opposing party's counterclaims.

42. BPI's sanctions motion appears to cite these separate eight cases as supposed evidence of sanctionable conduct in the present case. To ensure that the record is clear, undersigned counsel was not involved with the filing of those separate cases.

**ThermoLife is Not a Patent Troll**

43. BPI's sanctions motion accuses ThermoLife of being a "patent troll." Even under the broadest and most aggressive definition of that term, ThermoLife is not a "patent troll."

44. To begin with, "patent troll" is a pejorative term that is generally intended to impugn the reputation of innovative entities that assert their patent rights against egregious infringers. *See, e.g.*, Ryan Davis, *Iancu Calls Patent Troll Concerns "Orwellian Doublespeak",* Law360 (Oct. 19, 2018), https://www.law360.com/articles/1093935; Prof. Adam Mossoff, *Thomas Edison was a "Patent Troll",* Slate (May 19, 2014),

https://slate.com/technology/2014/05/thomas-edison-charles-goodyear-and-elias-howe-jr-were-patent-trolls.html; Michael Risch, *Patent Troll Myths*, 42 Seton Hall L. Rev. 457 (2012).

45. Because it is a pejorative term, trial courts frequently order that parties not use the term. *E.g.*, *Utherverse Gaming LLC v. Epic Games Inc.*, No. C21-799-RSM, 2024 WL 4253194, at *1 (W.D. Wash. Sept. 20, 2024) (agreeing to not "us[e] pejorative or derogatory terms for non-practicing entities such as 'patent troll'"); *see also Taction Tech., Inc. v. Apple Inc.*, No. 21-CV-812 TWR (JLB), 2026 WL 2325187, at *17 (S.D. Cal. Aug. 11, 2026) ("The Parties agree not to present any evidence, testimony, or argument characterizing any party, witness, or entity in pejorative terms, including as a 'patent troll . . . .").

46. A different, non-inflammatory, and non-pejorative term that is used to convey some of the characteristics of a so-called "patent troll" is a "non-practicing entity," or "NPE." John R. Allison, Mark A. Lemley & David L. Schwartz, *How Often Do Non-Practicing Entities Win Patent Suits?* 32 Berkeley Tech. L. J. 235, 236 (2017). An NPE is an entity that has or acquires patents but does not "practice," or commercialize, the inventions protected by the patents. An NPE can include innovative entities such as universities and research entities that develop inventions, obtain IP protection (including patent protection) for their inventions, and then license the IP to entities that are better suited to commercialize the inventions.

47. A different term (typically considered less inflammatory and less pejorative) that is used to convey some of the characteristics of a so-called "patent troll" is a "patent assertion entity," or a "PAE." *Id***.**

48. According to one advocacy group that aggressively lobbies against strong patent rights, a patent troll is an entity that "uses patents as legal weapons, instead of actually creating any new products or coming up with new ideas." *See* Ex. 10. Patent trolls typically do not apply

for their own patents, instead often purchasing them from other entities. *Id*. Often these patents are broad and claim technologies that are basic or obvious, making them easier to assert in litigation.

49. ThermoLife is not a patent troll for numerous reasons. First, it largely develops its own innovation through its research and development efforts, as is evidenced by the named inventors on most of its patents.

50. For instance, I understand, based on the declaration of Ronald L. Kramer dated July 30, 2026, filed with the *Munsingwear* motion, that ThermoLife's patent portfolio consists of "112 issued patents and 123 pending patent applications spanning approximately 19 jurisdictions." D.E. 462-1 at 2. BPI has not refuted this evidence in its opposition to the *Munsingwear* motion or in its sanctions motion. *See* D.E. 469 at 3–14, D.E. 473 at 7–20. Additionally, I understand that the vast majority of ThermoLife patents were procured through applications filed by ThermoLife, and many of those patents list Ronald Kramer as an inventor.

51. ThermoLife's patents are generally directed to amino acid nitrates and their various uses. D.E. 462-1 at 2. ThermoLife's patents are widely licensed by leading companies in the supplement industry, confirming the innovation and novelty of its patents. ThermoLife's licensees include leaders in the industry such as "Force Factor, LLC, Cellucor, Inc., Ghost Lifestyle LLC, Glanbia plc., HumanN, Inc., Qunol® by Quten Research Institute, LLC, Sanofi S.A., and dozens of other companies." *Id*.

52. ThermoLife's website states that it is a "supplier of patented ingredients, botanicals, and new technologies for the supplement industry." *See* Ex. 11. Because ThermoLife practices one or more of its patents, ThermoLife is, by definition, not a patent troll.

**The Motion was Not Filed for an Improper Purpose**

53. BPI's sanctions motion contends that the *Munsingwear* motion was filed for an improper purpose. I disagree for several reasons.

54. First, the reasons set forth in Defendants' *Munsingwear* motion are supported by substantial case law. Furthermore, BPI has not substantively addressed the case law cited in Defendants' *Munsingwear* motion or in its reply. For instance, in the *Munsingwear* motion, Defendants cited numerous cases supporting its requested relief, and BPI responded with a long footnote offering misplaced characterizations of those cases. D.E. 469 at 10–11. As Defendants' reply explained, BPI's characterization of the cases describes "circumstances in which mootness resulted from settlement, graduation, cancellation of a contract, or other external events." D.E. 472 at 10. However, Defendants' reply also noted that "providing examples of circumstances warranting vacatur does not establish that those circumstances constitute the exclusive universe in which equitable relief is available." *Id*.

55. Second, on June 16, 2026, I explained by email to Mr. Hillyer the bases for Defendants' intended *Munsingwear* motion. *See* Ex. 18. In that email, I wrote: "We also note that the requested limited vacatur will have no impact on BPI or any of its rights. Accordingly, we are cautiously optimistic that BPI would not oppose the motion." *Id.*

56. Through that email, I made it clear that Defendants' understanding and my understanding were that the *Munsingwear* motion would have no impact on BPI or BPI's rights. Neither BPI nor its counsel have disputed that understanding. Despite my effort to explain Defendants' position, Mr. Hillyer declined to provide any explanation for why BPI opposed the motion. *See* Ex. 18. Mr. Hillyer did not respond to my June 16, 2026 email, other than stating "BPI will oppose the motion." *Id.*

57. Third, the *Munsingwear* motion was not filed with the intent of harassing, causing unnecessary delay, or needlessly increasing the cost of litigation. Again, as explained in Defendants' *Munsingwear* motion (D.E. 462), in the reply in support thereof (D.E. 472), in Defendants' letter responding to BPI's draft Rule 11 motion (Ex. 1), and in the present opposition, there is no basis to claim harassment, unnecessary delay, or increasing the cost of litigation when BPI did not have to oppose or even respond to Defendants' *Munsingwear* motion.

**BPI's Motion for Sanctions Copies Much of BPI's Opposition to the Rule 60 Motion Verbatim**

58. Exhibit 17 is a comparison report of BPI's Opposition to Defendants' Motion Under Rule 60(b)(6) (D.E. 469) and BPI's Motion for Sanctions (D.E. 473). The comparison report was prepared by my associate on October 20, 2026, by downloading D.E. 469 and D.E. 473 from the Court's docket on PACER. The compare files tool was opened in Adobe Acrobat, with the Rule 11 motion being selected as the new file and the Opposition selected as the old file. The settings for the compare files tool were set such that only comparisons between text were made. The output from the compare files tool is the comparison report. The comparison report highlights all text that has been added, deleted, or modified when comparing the Motion for Sanctions to BPI's Opposition to Defendants' Motion Under Rule 60(b)(6). All text that is not highlighted is repeated verbatim in both documents. The text that is highlighted in yellow is indicated as being modified or moved to a different location between the documents. For example, the section "The Motion Is Untimely Under Fed.R.Civ.P. 60(c)" from the Rule 11 motion, D.E. 473 at 14, is nearly identical to the section "The Motion Is Untimely Under Fed.R.Civ.P. 60(c)" in BPI's Opposition. D.E. 469 at 13–14.

**Defendants' Current Counsel are Experienced, Ethical Attorneys**

59. I am currently lead counsel, admitted pro hac vice, in this action and have extensive experience in litigation and appellate work. *See* Ex. 14. I clerked for the Honorable Paul R. Michel, Chief Judge (ret.) for the U.S. Court of Appeals for the Federal Circuit. I have argued dozens of appeals before the U.S. Court of Appeals for the Federal Circuit, the Ninth Circuit, and the D.C. Circuit, involving issues such as patent law, Hatch-Waxman, administrative law, Fifth Amendment takings, contract claims, government employment issues, and criminal law. I have over twenty-five years of experience in representing clients before the United States Patent and Trademark Office. My work has been reported in the *Wall Street Journal* and the *Washington Post*. In 2013, I represented Nobel Laureate James Watson as *amicus curiae* in the case *Association for Molecular Pathology v. Myriad Genetics, Inc.*, 569 U.S. 576 (2013). I am also a professorial lecturer at the George Washington University, where I teach appellate advocacy.

60. My colleague Robert J. Scheffel, who is also counsel in this action, has over twenty-five years of trial and appellate experience in complex litigation. *See* Ex. 15. He clerked for the Honorable Arthur J. Gajarsa (ret.) of the U.S. Court of Appeals for the Federal Circuit. He has been involved in over ten cases that have gone to trial, extensive litigation, and appellate work over the last fifteen years. He has had experience in representing agricultural, pharmaceutical, and technological companies during his career, including representing companies such as Verizon, Mylan, and Credo. He also lectured at the University of New Hampshire Franklin Pierce School of Law, where he taught patent litigation.

61. Our lead local counsel Edward Mullins serves as Defendants' local counsel in this action and is a distinguished, highly respected commercial litigator and appellate lawyer with an exceptional professional record. *See* Ex. 16. As reflected in his firm biography, Mr. Mullins is

board-certified by the Florida Bar in International Litigation and Arbitration and has handled more than 125 appeals in state and federal courts, including cases before the United States Supreme Court. He currently serves as chair-elect of the Section of International Law of the American Bar Association, where he previously held multiple leadership positions, including Secretary, Budget, Membership, and Membership Officer and division director for disputes and co-chair of the International Litigation and Alternative Dispute Resolution Committees of the Section of Litigation. He is also a former chair of both the Florida Bar International Law Section and the Appellate Courts Rules Committee of Florida Bar. He also served as the inaugural chair of the Florida Bar Board Certification Committee for International Litigation and Arbitration. Chambers USA has ranked him for general commercial litigation in Florida since 2016, and he holds an AV Preeminent rating from Martindale-Hubbell. In addition to representing clients, Ed serves as an arbitrator and is a member of the commercial panel of arbitrators for the American Arbitration Association and the International Center for Dispute Resolution and is a fellow of the Chartered Institute of Arbitrators.

**Exhibits**

62. Attached as **Exhibit 1** is a true and correct copy of a letter from Matthew J. Dowd to Gregory Hillyer dated October 2, 2026.

63. Attached as **Exhibit 2** is a true and correct copy of excerpts of the deposition transcript of Derek Ettinger, dated April 24, 2020.

64. Attached as **Exhibit 3** is a true and correct copy of excerpts of the Trial Transcript dated October 15, 2021, available as Docket Entry No. 355.

65. Attached as **Exhibit 4** is a true and correct copy of excerpts of the Redacted Trial Transcript dated October 20, 2021, available as Docket Entry No. 358.

66. Attached as **Exhibit 5** is a true and correct copy of excerpts of the Transcript of Jury Trial (Nov. 13, 2025) in *United States v. Wheat*, Criminal Action No. 1:17-cr-229-AT-CMS (N.D. Ga. filed Mar. 17, 2026), as available from the court's docket as Docket Entry No. 867.

67. Attached as **Exhibit 6** is a true and correct copy of *MSPA Claims 1, LLC v. Liberty Mut. Fire Ins. Co.*, No. 17-22539-CV, 2025 WL 643208 (S.D. Fla. Feb. 25, 2025), as downloaded from Westlaw.com.

68. Attached as **Exhibit 7** is a true and correct copy of *MSPA Claims 1, LLC v. Liberty Mut. Fire Ins. Co*., No. 17-22539-CV, 2025 WL 2800463 (S.D. Fla. Sept. 26, 2025), as downloaded from Westlaw.com.

69. Attached as **Exhibit 8** is a true and correct copy of a screenshot of search history from Westlaw.com (accessed Oct. 19, 2026).

70. Attached as **Exhibit 9** is a true and correct copy of screenshots of search results from Google.com (accessed October 20, 2026).

71. Attached as **Exhibit 10** is a true and correct copy of *Patent Trolls*, Electronic Frontier Foundation (accessed Oct. 20, 2026), accessible at https://www.eff.org/issues/resources-patent-troll-victims.

72. Attached as **Exhibit 11** is a true and correct copy of the home page of the ThermoLife International, LLC website (accessed Oct. 20, 2026), accessible at https://www.thermolife.com/.

73. Attached as **Exhibit 12** is a true and correct copy of Official Form 204 in *In re BPI Sports, LLC*, No. 23-17463-SMG (Bankr. S.D. Fla. filed Sept. 18, 2023), as accessible from the court's docket as Docket Entry No. 3.

74. Attached as **Exhibit 13** is a true and correct copy of a document titled

"Inconsistencies in Ettinger's Testimony," available as Docket Entry No. 454-4 in this case.

75. Attached as **Exhibit 14** is a true and correct copy of the Firm Biography of Matthew J. Dowd (accessed Oct. 21, 2026), accessible at https://www.dowdscheffel.com/matthew-j-dowd. I note that my firm biography may not be completely up to date in terms of relevant experience.

76. Attached as **Exhibit 15** is a true and correct copy of the Firm Biography of Robert J. Scheffel (accessed Oct. 21, 2026), accessible at https://www.dowdscheffel.com/robert-j-scheffel. I note that Mr. Scheffel's firm biography may not be completely up to date in terms of relevant experience.

77. Attached as **Exhibit 16** is a true and correct copy of the Firm Biography of Ed Mullins (accessed Oct. 21, 2026), accessible at https://www.reedsmith.com/our-people/ed-mullins/.

78. Attached as **Exhibit 17** is a true and correct copy of a comparison chart of Docket Entry No. 469 and Docket Entry No. 473 generated using Adobe Acrobat's compare files tool.

79. Attached as **Exhibit 18** is a true and correct copy of an email conversation between Matthew J. Dowd and Greg Hillyer dated June 24, 2026.

I declare under the penalty of perjury that the foregoing is true and correct.

Executed on October 21, 2026.

By: /s/ Matthew J. Dowd
Matthew J. Dowd